Elizabeth J. Cabraser (State Bar No. 083151)
Kevin Budner (State Bar No. 287271)
Phong-Chau Nguyen (State Bar No. 286789)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
kbudner@lchb.com
pgnguyen@lchb.com

David Stellings (*pro hac vice* to be filed)
Katherine McBride (*pro hac vice* to be filed)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com

*[additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BROADMOOR LUMBER & PLYWOOD CO., MARDERS, and FERRARO FOODS, <br><br> Plaintiffs, <br><br> v. <br><br> TOYOTA INDUSTRIES CORPORATION, TOYOTA MATERIAL HANDLING N.A., TOYOTA MATERIAL HANDLING, INC., and TOYOTA MOTOR CORPORATION <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   NATURE OF THE ACTION.......................................................................... 1

III.  PARTIES ....................................................................................................... 8

    A.    Plaintiffs ............................................................................................ 8

    B.    Defendants ...................................................................................... 10

IV.  JURISDICTION AND VENUE .................................................................. 14

V.   DIVISIONAL ASSIGNMENT ................................................................... 16

VI.  FACTS COMMON TO ALL COUNTS...................................................... 17

    A.    The U.S. regulators began investigating Toyota's forklift-related
       misconduct by at least 2020. ......................................................... 18

    B.    Toyota's investigation revealed rampant fraud.............................. 19

        1.    Toyota fabricated and manipulated the emissions test results of the
            Class Engines. ..................................................................... 20

        2.    Toyota also cheated on "output tests" relating to performance
            metrics such as horsepower and torque....................................... 25

    C.    The misconduct detailed in the SIC Reports also affected the Class Engines
       and Class Vehicles sold in the U.S., rendering them illegal to sell or
       import. ............................................................................................. 25

    D.    Defendants' marketing featured false promises of environmental
       friendliness and misrepresentations of high engine performance and
       emissions compliance—all of which omitted material information about
       Toyota's fraud. ................................................................................ 27

    E.    Toyota Motor Corporation fostered a culture of noncompliance and fraud
       at its many subsidiaries and affiliates, and bears responsibility for their
       failures. ........................................................................................... 32

VII. CLASS ACTION ALLEGATIONS ............................................................ 34

    A.    Numerosity: Federal Rule of Civil Procedure 23(a)(1)........................ 35

    B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2)
       and 23(b)(3)..................................................................................... 35

    C.    Typicality: Federal Rule of Civil Procedure 23(a)(3) ......................... 36

    D.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) ......................... 36

    E.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)...... 37

    F.    Superiority: Federal Rule of Civil Procedure 23(b)(3) ........................ 37

VIII. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED............................ 37

    A.    Discovery Rule Tolling ................................................................... 37

**TABLE OF CONTENTS**
(continued)

Page

B.   Tolling Due to Fraudulent Concealment ................................................................. 38

C.   Estoppel ................................................................................................................... 38

IX.   CAUSES OF ACTION ........................................................................................................ 39

A.   Claims Asserted on Behalf of the Nationwide Class ............................................. 39

NATIONWIDE COUNT I: Fraud By Concealment (Common Law) ...... 39

NATIONWIDE COUNT II: Unjust Enrichment ..................................... 41

B.   Claims Asserted on Behalf of the State-Specific Classes ...................................... 42

1.   California ................................................................................................. 42

CALIFORNIA COUNT I: Violations of the California Unfair
Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.* ...................... 42

CALIFORNIA COUNT II: Violations of the California False
Advertising Law Cal. Civ. Code § 17500 *et seq.* .................................... 44

CALIFORNIA COUNT III: Breach of Express Warranty Cal. Com.
Code §§ 2313 and 10210 ......................................................................... 45

CALIFORNIA COUNT IV: Breach of Implied Warranty of
Merchantability Cal. Com. Code §§ 2314 and 10212 .............................. 48

CALIFORNIA COUNT V: Violation of Song-Beverly Consumer
Warranty Act, Breach of Implied Warranty Cal Civ. Code § 1790,
*et seq.* ...................................................................................................... 49

CALIFORNIA COUNT VI: Violation of the Song-Beverly
Consumer Protection Act, Breach of Express Warranty Cal Civ.
Code § 1790, *et seq.* ................................................................................ 51

CALIFORNIA COUNT VII: Breach of Express California
Emissions Warranties Cal. Code Regs. 13 § 2425, 2435. ........................ 52

CALIFORNIA COUNT VIII: Failure to Recall/Retrofit ......................... 54

2.   New Jersey .............................................................................................. 55

NEW JERSEY COUNT I: Violations of the New Jersey Consumer
Fraud Act N.J. Stat. Ann. § 56:8-1 *et seq.* .............................................. 55

NEW JERSEY COUNT II: Breach of Express Warranty N.J.S.
12A:2-313 and 2A-210 ............................................................................. 57

NEW JERSEY COUNT III: Breach of Implied Warranty of
Merchantability N.J.S. 12A:2-314 and 2A-212 ....................................... 60

3.   New York ................................................................................................ 61

NEW YORK COUNT I: Violations of the New York General
Business Law § 349 N.Y. Gen. Bus. Law § 349 ...................................... 61

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

NEW YORK COUNT II: Violations of the New York General
Business Law § 350 N.Y. Gen. Bus. Law § 350........................................ 64

4

NEW YORK COUNT III: Breach of Express Warranty N.Y.
U.C.C. Law §§ 2-313 and 2A-210 ............................................................ 66

5

NEW YORK COUNT IV: Breach of Implied Warranty of
Merchantability N.Y. U.C.C. Law §§ 2-314 and 2A-212........................ 69

6

7       X.        REQUEST FOR RELIEF ................................................................................ 70

8       XI.       DEMAND FOR JURY TRIAL........................................................................ 71

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiffs Broadmoor Lumber & Plywood Co., Marders, and Ferraro Foods, individually and on behalf of all others similarly situated (the "Classes"), allege the following against Toyota Material Handling N.A., Toyota Material Handling, Inc., Toyota Industries Corporation ("TICO"), and Toyota Motor Corporation ("TMC") (collectively, "Defendants" or "Toyota"), based, where applicable, on personal knowledge, information and belief, public corporate admissions, and the pre-filing investigation of counsel.

## II.   NATURE OF THE ACTION

1.     Something is rotten at Toyota. In recent years alone, no fewer than five separate cheating scandals have surfaced, together implicating millions of vehicles produced within the Toyota corporate family over twenty years.

2.     In 2021, for example, Toyota paid a $180 million civil penalty and entered a consent decree admitting to systematically violating Clean Air Act ("CAA") reporting requirements from 2005 to at least 2015.[1] Then, in 2022, Toyota subsidiary Hino Motors admitted to "misconduct in relation to its applications for certification concerning the emissions and the fuel economy performance of its engines" in commercial diesel trucks dating back to 2010.[2] In 2023, yet another Toyota subsidiary, Daihatsu, admitted to falsifying certification data and other misconduct in a wide range of vehicles.[3] And then earlier this year, news broke of Toyota's admission to yet another massive cheating scandal, this time in certification tests for seven vehicle models that required a stop sale for all three of the models still in production.[4] Together,

---

[1] Department of Justice Press Release,, *Toyota Motor Company to Pay $180 Million in Settlement for Decade-Long Noncompliance with Clean Air Act Reporting Requirements* (Jan. 14, 2021), available at: https://www.justice.gov/opa/pr/toyota-motor-company-pay-180-million-settlement-decade-long-noncompliance-clean-air-act#:~:text=Along%20with%20the%20civil%20complaint,the%20imposition%20of%20injunctive%20relief.

[2] Hino Press Release, *Misconduct concerning Engine Certification* (March 4, 2022), available at: https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[3] Daihatsu Investigation Report (Executive Summary) (December 20, 2023), available at: https://www.daihatsu.com/news/2023/report_1_E.pdf.

[4] *See* Yuri Kageyama, *Toyota apologizes for cheating on vehicle testing and halts production of three models*, Associated Press (June 3, 2024), available at: https://apnews.com/article/toyota-certification-cheating-japan-automakers-scandal-26585a96df2a32f7d67a4011a0a98772.

these scandals depict a company-wide culture of deception and noncompliance. Even Toyota Motor Corporation—the Japanese automaker and affiliate of TICO—has been forced to acknowledge the link between these many scandals within the Toyota family, stating after the most recent public revelation: "[w]e take it seriously that the problem was discovered at Toyota following the recent discovery of certification issues at Hino Motors, Ltd., and Daihatsu Motor Co., Ltd. and Toyota Industries Corporation [TICO]."[5] The last scandal in this long list, involving TICO and its U.S. subsidiaries, is the subject of this Complaint.

3.      In March 2023, TICO announced a "[s]uspension of domestic shipment in Japan due to potential violation of regulations related to certification of engines for forklifts."[6] An example of one of the forklifts at issue is depicted below.[7]



---

[5] *See* Toyota Motor Corporation News Release, *Results of Investigation Regarding Model Certification Applications* (June 3, 2024), available at: https://global.toyota/en/newsroom/corporate/40920588.html.

[6] Toyota Industries Corporation News Release, *Suspension of Domestic Shipment in Japan Due to Potential Violation of Regulations Related to Certification of Engines for Forklifts* (March 17, 2023), (hereinafter "TICO 03/23 Press Release") available at: https://www.toyota-industries.com/news/2023/03/17/005490. A PDF copy of the TICO 03/23 Press Release downloaded from TICO's website is also available at the following permalink: https://www.lieffcabraser.com/pdf/TICO03-2023Release.pdf.

[7] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

4.      In the 2023 announcement, TICO conceded that the affected engines—two diesel models (certification model year 2014 1ZS & 1KD) and one gasoline model (certification model year 2009 4Y)—exceed "the domestic (Japanese) emissions regulation values due to aging degradation" and admitted to a "potential violation of regulations related to Japanese certification for emissions." *See* TICO 03/23 Press Release.[8] As in prior cheating scandals, Toyota then convened a "Special Investigation Committee [("SIC")] made up of outside experts [to] conduct[] an independent investigation." *See* Results of the Investigation Regarding Domestic Certification for Engines, (January 29, 2024) (hereinafter "SIC Release") at 1.[9]

5.      The results of the SIC investigation, released January 29, 2024, revealed that the cheating was even more widespread than Toyota previously disclosed. *Id.* In addition to the three forklift engines already implicated, the SIC investigation identified many more: one more current forklift engine (certification model year 2014 1FS), three formerly used forklift engines (certification model year 2007 1DZ, 4Y, and 1FZ), and a current and former engine used in construction machinery like excavators (certification model years 2016 and 2020 Construction 1KD). The engines, collectively the "Class Engines," are organized in the chart below, which also includes a summary from the SIC of the identified misconduct for each engine. The vehicles equipped with those engines and sold in the United States are referred to herein as the "Class Vehicles." *Id.*[10]

---

[8] As explained further below, this same cheating applied to certification in the U.S. market as well.

[9] A PDF copy of the SIC Release downloaded from TICO's website (https://www.toyota-industries.com/news/item/20240129_release_e.pdf), is available at the following permalink: https://www.lieffcabraser.com/pdf/SICRelease.pdf.

[10] The Class Vehicles include at a minimum the Core IC Diesel Pneumatic (1ZS); the Mid and Large IC Diesel Pneumatics (IKD); the Core IC Cushion and Core IC Pneumatic (4Y); and the Large IC Cushion; Box Car Special; Paper Roll Special; Mid IC Pneumatic; Large IC Pneumatic (1FS).

| Use (Engine type) | | Type | Domestic certification acquisition timing | Key details of improper conduct | | | |
|---|---|---|---|---|---|---|---|
| | | | | Used values different from measured values | Modified ECU Software | Replaced parts etc. during testing | Used different engines for the test |
| Current models | Forklift (diesel) | 1KD | 2014 | ● | ● | | |
| | | 1ZS | 2014 | | ● | | |
| | Forklift (gasoline, LPG) | 2009 4Y | 2009 | ● | ● | ● | ● |
| | | 1FS | 2014 | ● | ● | ● | |
| | Construction machinery (diesel) | 2020 1KD for Construction Machinery | 2020 | | ● | | |
| Past models | Forklift (diesel) | 2007 1DZ | 2007 | ● | | | |
| | Forklift (gasoline, LPG) | 2007 4Y | 2007 | ● | ● | ● | ● |
| | | 1FZ | 2007 | | | | ● |
| | Construction machinery (diesel) | 2016 1KD for Construction Machinery | 2016 | ● | ● | ● | |

6. The minutiae of the scheme are detailed in the SIC reports, incorporated herein.[11] At a high level, the scheme had the intent and effect of misrepresenting the vehicles' true emissions levels as well as their "output" (e.g., torque and power). As outlined in the preceding chart, at a high level, the elements of the emissions scheme included:

a. using "values different from measured values"—i.e., fabricating important emissions numbers for certification testing;

b. modifying the engine control unit ("ECU") software in the test engines so that they performed differently in certification tests than they would in real-world use;

c. replacing parts during emissions testing, again with the intention and effect of generating incorrect emissions values inconsistent with real-world use; and

[11] The SIC reports were issued in versions of various lengths—defined elsewhere herein as the SIC Published Report, the SIC Summary Report, and the SIC Release. Permalinks to each are available at: https://www.lieffcabraser.com/pdf/SICRelease.pdf; https://www.lieffcabraser.com/pdf/SICSummaryReport.pdf; and https://www.lieffcabraser.com/pdf/SICPublishedReport.pdf.

1          d.      using different engines for the tests than were equipped in production-

2   model vehicles.

3          7.      The net effect of this deceptive scheme is that the Class Vehicles emitted more

4   pollutants than represented, allowed by law, or reasonably expected. This rendered the Class

5   Engines and/or Vehicles illegal to import or sell. It also undermined Toyota's many

6   representations to the Class that the Class Engines were "the cleanest engine[s] in the industry,"[12]

7   "good for the environment,"[13] "Attain[ed] the Industry's Top-Level Environmental

8   Performance,"[14] and "Emissions Compliant."[15]

9          8.      Unfortunately, the fraud did not stop there. Toyota also cheated on "output tests"

10  designed to measure torque, horsepower, and other important performance metrics. *See, e.g.*,

11  Toyota Industries Corporation Investigation Report (Published Version) (January 29, 2024)

12  (hereinafter "SIC Published Rep.")[16] at 169-72; Toyota Industries Corporation Investigation

13  Report (Summary Version) (January 29, 2024) (hereinafter "SIC Summary Rep.")[17] at 48.[18]

---

[12] Toyota Forklifts Blog, *An Inside Look At The Toyota Internal Combustion Forklift Engine* (March 30, 2023) (hereinafter "Toyota Forklifts Blog"), formerly available at: https://www.toyotaforklift.com/resource-library/blog/toyota-products/an-inside-look-at-the-toyota-internal-combustion-forklift-engine (now available at: https://web.archive.org/web/20230608112243/https://www.toyotaforklift.com/resource-library/blog/toyota-products/an-inside-look-at-the-toyota-internal-combustion-forklift-engine; and https://www.dillontoyotalift.com/about/blog/?Search=4Y&SearchType=tag); a PDF copy of the Toyota Forklifts Blog downloaded from the web archive is available at the following permalink: https://www.lieffcabraser.com/pdf/ToyotaForkliftsBlog.pdf.

[13] Toyota Material Handling, Parts & Services: Forklift 4Y Engine, formerly available at: https://www.toyotaforklift.com/resource-library/video-library/toyota-forklift-4y-engine (now available at: https://www.facebook.com/watch/?v=667545237085000).

[14] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

[15] *See* Toyota Forklifts Blog; *see also* Toyota Material Handling Northern California, TMHNC, *Product Review: Toyota Diesel Forklift*, available at: https://www.tmhnc.com/blog/toyota-diesel-forklifts-product-review (touting 1ZS "Tier IV Final Emissions Compliant").

[16] A PDF copy of the SIC Published Report downloaded from TICO's website (https://www.toyota-industries.com/news/item/reference_full_e.pdf) is available at the following permalink: https://www.lieffcabraser.com/pdf/SICPublishedReport.pdf.

[17] A PDF copy of the SIC Summary Report downloaded from TICO's website (https://www.toyota-industries.com/news/item/reference_summary_e.pdf) is available at the following permalink: https://www.lieffcabraser.com/pdf/SICSummaryReport.pdf.

[18] *See also, e.g.*, Toyota Motor Corporation News Release, *Certification Irregularities at Toyota Industries* (Jan. 29, 2024), available at: https://global.toyota/en/newsroom/corporate/40376368.html?utm_source=miragenews&utm_med

Specifically, engineers "modified the fuel injection amounts" by modifying the ECU software Control Parameter values—or, in other words, employees engaged in intentional misconduct designed to misrepresent the engines' "torque curve," among other things. SIC Summary Rep. at 48. These performance characteristics matter. Toyota's misconduct directly undercut its public-facing representations and violated reasonable expectations in the purchase and lease of the Class Vehicles.

9. Recognizing the severity of the misconduct, Toyota Motor and TICO have "deeply"[19] and "sincerely apologize[d] for a great deal of inconvenience to our customers, dealers, suppliers, and many other stakeholders." *See* TICO 03/23 Press Release. But, at the same time, Toyota has tried to limit the damage to Japan. After the initial revelations, Toyota claimed that the scandal and resulting "stop sale . . . only applies to the Japanese market," and "[t]here is no impact on the current inventory or product offering in the US."[20]

10. The facts on the ground demonstrate otherwise. These facts include, among others, that the investigations leading to Toyota's admissions of misconduct in Japan *originated in the United States*; that Toyota was forced to stop selling the affected forklifts in the United States; that the relevant Japanese and U.S. emissions regulations are similar; and that the pervasive culture of fraud and deceit infected the divisions responsible for the development and certification of all the relevant engines, including the Class Engines sold in the United States.

11. To be clear, the misconduct first surfaced in the United States, not Japan, based on U.S. regulators' investigations into misconduct that affected vehicles sold in the U.S. market. SIC

---

ium=miragenews&utm_campaign=news ("The investigation found that irregularities occurred during the horsepower output testing for the certification of three diesel engine models for automobiles that Toyota had commissioned to TICO.").

[19] *Id.*

[20] Forklift Action, *Toyota suspends diesel, petrol models* (April 20, 2023), available at: https://www.forkliftaction.com/news/toyota-suspends-diesel-petrol-models.aspx?n=26871.

Published Rep. at 5. The U.S. investigation is still underway several years later, and soon after it began, Toyota was forced to issue two different forklift stop sales in U.S.[21,22]

12.      This is not particularly surprising given the similarities between the U.S. and Japanese regulatory regimes. The bulk of the relevant Japanese emissions regulations are largely identical to the U.S. standards—meaning that any cheating uncovered there would very likely apply to the engines certified here.

13.      The SIC reports confirm as much, explaining that the Japanese certification process for at least the 1KD, 1ZS, 4Y, and 1FS engines relied on prior testing and results undertaken to certify those engines for the U.S. market first. *See* SIC Summary Rep. at 22-23 ("The 1KD Engine first obtained U.S. certification, and then obtained domestic certification as of June 17, 2014 *using the data used for U.S. certification*.") (emphasis added); *id.* at 27 (explaining that the 1ZS obtained Japanese certification using the "correction values calculated based on the results of the 1KD Engine deterioration durability testing"—which, again, were generated during the certification testing for the U.S. market); *Id.* at 30 ("[T]he 2007 4Y Engine first applied for U.S. certification," and "the deterioration durability testing for the 2009 4Y Engine adhered fundamentally to the deterioration durability testing method for the 2007 4Y Engine[.]"); *id.* ("After obtaining U.S. certification, the 1FS Engine applied for domestic certification using the deterioration correction values calculated on the basis of the deterioration factors used for U.S. certification and obtained domestic certification as of June 17, 2014."). In this context, the direct link between the admitted fraud and the U.S. Class Vehicles is clear.

14.      To top it all off, the SIC reports describe a toxic culture of fraud, negligence, and noncompliance that—like other recent scandals within the Toyota corporate family—pervaded the TICO departments responsible for engine certifications for all markets, including the United States. To cite just a few examples, at TICO and its subsidiaries:

---

[21] Toyota Motor Corporation News Release, *Suspension of Production of Certain Forklift Models in North America* (May 21, 2021), available at: https://www.toyota-industries.com/news/2021/05/21/005055/.

[22] Forklift Action, *Toyota halts certain diesel models* (Dec. 9, 2021), available at: https://www.forkliftaction.com/news/toyota-halts-certain-diesel-models.aspx?n=25571.

a.      "[t]here was no department dedicated to regulation certification" (SIC Release at 4), nor any "training on the "implementation of deterioration durability testing" or the "tightening of emissions regulations" (SIC Summary Rep. at 13), leading to "an organization-wide deficit of understanding about regulations" (*id.* at 53);

b.      dysfunctional managers imposed "[u]nreasonable development schedules" that pressured engineers to cheat and cut corners (*id.* at 54-55); and

c.      "basic awareness of respecting data accuracy was weak" (SIC Release at 4)—a serious problem that "is not only a violation of the fundamental ethics of engineering, but also improper conduct that disguises the true capabilities of the engine" (SIC Summary Rep. at 57).[23]

15.     Again, something is truly rotten at Toyota, and that rot has affected the U.S. market every bit as much as the Japanese. Plaintiffs and the proposed Classes—the ultimate and intended targets of Toyota's deception—seek to enjoin the Defendants' misconduct and to recover the economic damages they suffered from it.

## III.   PARTIES

### A.   Plaintiffs

16.     Plaintiff **Broadmoor Lumber & Plywood Co.** (for purpose of this paragraph, "Plaintiff") is a family-owned landscaping supply business operating in South San Francisco and the neighboring communities. Plaintiff is a California corporation with its principal place of business in South San Francisco, California. Plaintiff owns eight Class Vehicles: five of model 8FGU25 (serial numbers 38696, 38530, 83351, 75075, 69169) and three of model 8FGU30 (serial numbers 61639, 73786, 76798). Plaintiff purchased the Class Vehicles new from an authorized Toyota forklift dealer. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations that they were clean-burning, low-emissions, high-performance, and sustainable. Plaintiff also purchased the Class Vehicles under the assumption—and based on Toyota's

---

[23] Notably, the SIC reports in the investigation of Toyota subsidiary Hino described a similarly toxic culture of noncompliance. *See, e.g.*, Special Investigation Committee, Hino Motors, Ltd. (Aug. 1, 2022), *Investigation Report (Summary)* at 31-42, available at: https://www.hino-global.com/corp/news/20220812_Investigation%20Report%20%28Summary%29.pdf.

representations—that they met or exceeded all regulatory emissions standards. At the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had it known that they emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

17.     Plaintiff **Marders** (for purpose of this paragraph, "Plaintiff") is a family-owned plant nursery, landscaping, and tree moving business. Plaintiff is a New York corporation with its principal place of business located in Bridgehampton, New York. Plaintiff owns the following Class Vehicle: 50-8FGU25 (serial number 10517). Plaintiff purchased the Class Vehicle new from an authorized Toyota forklift dealer. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations that it was clean-burning, low-emissions, high-performance, and sustainable. Plaintiff also purchased the Class Vehicle under the assumption—and based on Toyota's representations—that it met or exceeded all regulatory emissions standards. At the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had it known that it emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

18.     Plaintiff **Ferraro Foods** (for purpose of this paragraph, "Plaintiff") is a specialty Italian food distributor that services restaurants in Eastern U.S., with facilities in New Jersey, New York, Connecticut, Maryland, Indiana, North Carolina, and Florida. Plaintiff is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. Plaintiff owns the

following Class Vehicle: 8FGCU25 (serial number 23143). Plaintiff purchased the Class Vehicle through its acquisition of Napoli Foods in 2019, through which Ferraro acquired all of Napoli Foods' assets and claims arising therefrom. Napoli Foods, as a reasonable consumer, would not have purchased the Class Vehicle, or would have paid less for it, had it known that it emitted more than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than advertised. Similarly, Plaintiff would not have purchased the Class Vehicle from Napoli Foods at all, had it known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than advertised.

## B.  **Defendants**

19.  **Toyota Industries Corporation** ("TICO" or "Toyota Industries") is a Japanese corporation with its principal place of business located in Kariya, Aichi, Japan. TICO designs, develops, manufactures, and sells materials handling equipment, textile machinery, automobiles, and automobile parts and engines, including Toyota-branded forklifts and forklift engines. TICO is an affiliate of Toyota Motor Corporation (TMC). TICO performed diesel engine development, design, and testing work in its close relationship with its corporate affiliate, TMC, in what it publicly describes as a "family effort."[24]

20.  On information and belief, TICO engineered, designed, developed, manufactured, and tested the Class Engines and Class Forklifts. TICO exported many of these engines (and potentially certain complete forklifts) through regular shipments from Japan directed to ports in California and elsewhere in the United States, with the knowledge and understanding that they would be sold throughout the United States, including in California. Data compiled from bills of lading from the website Import Yeti show regular shipments of containers of "component Toyota forklift trucks" and "Forklift trucks," from TICO in Nagoya Ko, Japan to Los Angeles and Long Beach, California, and Seattle and Tacoma, Washington, ultimately directed to TICO's subsidiary

---

[24] *See* Toyota Material Handling, *Toyota Industries Corporation Makes Forklifts, And So Much More* (March 28, 2023), available at: https://www.toyotaforklift.com/resource-library/blog/toyota-culture/toyota-industries-corporation-makes-forklifts-and-so-much-more.

TMH USA. TICO sent eleven such shipments of engines and/or forklifts into the United States within just the month of May 2024 alone, with a total of more than 1,500 shipments sent from TICO in Japan to Los Angeles, California from January 2015 to May 2024.[25] On information and belief, TICO also reviewed and approved the marketing, and advertising campaigns designed to sell the Toyota forklifts in California and throughout the United States.

21.    TICO also performed the required U.S. and state regulatory emissions and performance tests for the Class Engines to be sold in the United States, including California. On information and belief, TICO performed the testing at its facilities in Kariya, Aichi, Japan, and then sent the results to the EPA and California's regulatory authority, CARB.[26] Following initial regulatory certification, TICO also engaged directly with these emissions regulators in their (still open) investigation of the emissions issues described herein. As TICO itself has explained, it was in the second half of 2020 when TICO was making its "yearly application for certification for 2021 for forklift gasoline engines for the North American market" that it first "became concerned about data used for past applications in the U.S." and it was TICO that then "handled data confirmation and information requests from the U.S. environmental authorities." *See* TICO 03/23 Press Release. Then, in the wake of the U.S. production pause in 2022, TICO announced that "the Company" (i.e., TICO) later "obtained engine certification for its main models of small liquefied petroleum gas (LPG) lift trucks and resumed shipments" and that TICO itself was "working to obtain certification and resume production for the remaining models" in the United States.[27]

22.    **Toyota Material Handling N.A.** ("TMHNA") is an Indiana corporation with its principal place of business located in Columbus, IN. TMHNA is a wholly-owned U.S. subsidiary of TICO, and it engages in business including manufacturing, parts distribution, and sales and

---

[25] *See* www.importyeti.com/supplier/toyota-industries.

[26] TICO's laboratory is listed as the "Test Lab Name" in the annual certification data submitted to the EPA from 2011-present for Toyota's large non-road spark ignition engines (including forklifts), *See* EPA, *Compliance and Fuel Economy Data, Annual Certification Data for Vehicles, Engines, and Equipment*, available at:https://www.epa.gov/compliance-and-fuel-economy-data/annual-certification-data-vehicles-engines-and-equipment.

[27] *See* TICO Annual Financial Report 2023 at 86, available at: https://www.toyota-industries.com/investors/item/2023_annual_financial_report_E.pdf.

1  marketing through dealerships throughout the United States,[28] including the dealership Toyota

2  Material Handling of Northern California, located in Livermore, CA (now operating as Total

3  Industries). TMHNA shares leadership and key decision makers with its parent company, TICO

4  (as well as with its subsidiary, Toyota Material Handling, Inc.). For example, Brett Wood is the

5  President & CEO of TMHNA, a member of the board of Toyota Material Handling, Inc., and also

6  a Senior Executive Officer on the board of TICO.[29]

7       23.    **Toyota Material Handling, Inc.** ("TMH USA") is a California corporation with

8  its principal place of business located in Columbus, Indiana. TMH USA is a wholly-owned U.S.

9  subsidiary of Toyota Material Handling N.A., a subsidiary of TICO. TMH USA engages in

10  business—including manufacturing, research and development, sales, and parts distribution—in

11  all 50 states. TMH USA manufactured many of the complete Class Vehicles in the United States

12  with engines shipped from TICO in Japan. TMH USA was formed after the integration of two

13  former arms of Toyota's U.S. material handling business, Toyota Material Handling U.S.A. Inc.

14  and Toyota Industrial Equipment Manufacturing, into one new entity: TMH USA. Prior to the

15  integration, Toyota Material Handling U.S.A. Inc. was headquartered in Irvine, California from

16  2002 into 2014. At some point in 2014, after many Class Vehicles were already designed, made,

17  and sold, Toyota Material Handling U.S.A. Inc. moved its headquarters from Irvine, California, to

18  Indiana and continued the integration with the Indiana business into 2019.[30] TMH USA remains

19  incorporated under California law.

20       24.    TMH USA regularly submits applications to the EPA and to CARB in California

21  obtain the certification necessary for the sale of Toyota forklifts in the United States and

22  California. TICO knew and approved of TMH USA's submissions, which were necessary for

23  TICO to export its products for sale in the United States and California, and which list TICO as

24  _____

25  [28] *See* Toyota Material Handling N.A., available at: https://www.tmhna.com/.

   [29] See Toyota Material Handling, Management Team, available at:
26  https://www.toyotaforklift.com/about-toyota/team/brett-wood.

   [30] *See* Modern Materials Handling, *Toyota Material Handling completes North American*
27  *Integration process (*January 16, 2020), available at:
   https://www.mmh.com/article/toyota_material_handling_completes_north_american_integration_
28  process.

the entity responsible for the testing laboratory for the certification tests. TMH USA also shares leadership and decision makers with its parent company, TICO. For example, Brett Wood, the President & CEO of TMHNA, is on the board for both TMH USA and TICO.[31] Similarly, Mitch Shibagaki is the Executive Vice President and Treasurer of TMH USA, the Executive Coordinator for TMHNA, and the recent Financial Planning & Analysis (FP&A) Group Manager for TICO.[32]

25.     **Toyota Motor Corporation** ("TMC" or "Toyota Motor") is a Japanese corporation with its principal place of business in Toyota City, Aichi, Japan. Toyota is one of the largest vehicle manufacturers in the world and is in the business of designing, developing, manufacturing, and selling automobiles and component parts. TMC is an affiliate corporation of TICO and owns approximately 25% of TICO's voting shares.[33]

26.     Historically, Toyota and TICO have worked closely together to design and develop engines. In November 2014, the companies announced that they would consolidate their shared diesel engine development functions under TICO, with TICO to then be responsible for production of new diesel engines for both companies in a "more efficient" joint business structure. Under this structure, TMC takes charge of developing "base technologies" common to both diesel and gasoline engines, and TICO takes on the diesel engine development and production from there.[34] TMC also uses TICO to conduct testing for emissions certification purposes, including for certain diesel engines.[35]

27.     There has been substantial cross-pollination among the leadership from TMC with its affiliate, TICO. For example, Takue Sasaki, TICO's Executive Vice President during the time

---

[31] *See* Toyota Material Handling, Management Team, available at: https://www.toyotaforklift.com/about-toyota/team/brett-wood.

[32] *See* Toyota Material Handling, Management Team, available at: https://www.toyotaforklift.com/about-toyota/team/mitch-shibagaki.

[33] Toyota Annual Financial Report (March 31, 2023) at 8, available at: https://www.toyota-industries.com/investors/item/2023_annual_financial_report_E.pdf.

[34] *See* Toyota Motor Corporation and Toyota Industries Corporation News Release, *Toyota Industries Corp. and Toyota Motor Corp. to Consolidate Diesel Engine Development and Production* (November 28, 2014), available at: https://www.toyota-industries.com/news/2014/11/28/004920/index.html.

[35] *See* Toyota Motor Corporation News Release, *supra* n.18.

1  period that many of the Class Vehicles were in production and development, was also a former

2  managing officer at TMC. Similarly, Mitsuhisa Kato, a member of TICO's board of directors,

3  served as a Senior Advisor to TMC at the same time. So too with Takahiko Ijichi, who was both

4  an Audit & Supervisory Board Member for TICO and a Senior Advisor to TMC. Another

5  example, Shigeki Terashi, was, for much of the relevant time period, Chief Officer of TMC's

6  North America Operations Group, President & COO of Toyota Motor North America, Inc., and

7  the Chairman of the Board at TICO.[36]

8  **IV.    JURISDICTION AND VENUE**

9       28.    Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C.

10  § 1332(d), because at least one member of the proposed Class is of diverse citizenship from one

11  Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest

12  and costs.

13      29.    This Court has general personal jurisdiction over TMH USA because it is a

14  California corporation formed in 2002 according to its latest filings with the California and

15  Indiana secretaries of state.

16      30.    This Court also has specific personal jurisdiction over Defendants pursuant to

17  California Code of Civil Procedure § 410.10. Defendants conduct substantial business in this

18  District; some of the conduct giving rise to the Complaint took place in this District; and some of

19  Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on

20  business in this state or having an office or agency in this state, and causing injury to property in

21  this state arising out of Defendants' acts and omissions outside this state.

22      31.    As explained below, each of the Defendants purposefully directed their activities

23  toward California and availed themselves of the privilege of conducting activities in this

24  jurisdiction. Although TMC and TICO are based in Japan, they are subject to the Court's specific

25  personal jurisdiction because they have pervasive contacts with the United States and California,

26

27  [36] *See, e.g.*, Toyota Industries Corporation, Leadership, available at: https://www.toyota-industries.com/company/data/index.html; Global Executive Pages, Toyota, Shigeki Terashi (June

28  16, 2015), available at: https://global.toyota/pages/executives/2016/pdf/en/08_TERASHI_Shigeki.pdf.

purposefully directed their activities to the United States and California, and exert substantial control over their domestic affiliates and subsidiaries, TMH USA and TMHNA.

32. The Defendants' contacts with California are substantial. To begin, many of the misrepresentations and omissions at issue in this case were directed not only at Toyota customers, but also to both federal and state regulators. As explained in the SIC's Investigation Report (Published Version), "[i]n order to sell engines across the United States including California, an application must be made to CARB as well as the EPA." SIC Published Rep. at 105 n.214. For each of the engines in the Class Vehicles, Toyota targeted California and CARB to obtain the permission to sell the vehicles. *See, e.g.*, *id.* at 105-07, 127-29.

33. The communications between Toyota and CARB in California regarding the engines in the Class Vehicles were extensive and, as documented herein, included many of the misrepresentations and omissions underlying this case. Toyota's efforts targeted at the U.S. and California are further reflected in the significant engine certification data submitted to both the EPA[37] and CARB.[38] Moreover, and as typical with foreign manufacturers (and as the SIC's Investigative Report confirms), these critical interactions with the federal and California regulators involved the Japanese Toyota entities in addition to their U.S. subsidiaries.

34. After the regulatory certifications necessary to sell the Class Engines and Class Vehicles in the U.S. were obtained, TICO then physically entered California through its routine and voluminous shipments of Toyota Forklifts and component engines and parts from Japan into the United States, through ports in Los Angeles and Long Beach, California, over the course of many years.

---

[37] EPA, *Annual Certification Data for Vehicles, Engines, and Equipment*, available at: https://www.epa.gov/compliance-and-fuel-economy-data/annual-certification-data-vehicles-engines-and-equipment. The available data lists Toyota Material Handling, Inc. as the "manufacturer" of several of the engines in the Class Vehicles and TICO as the entity conducting the relevant laboratory testing (MFR Test Lab Name).

[38] CARB, *Off-Road Compression-Ignition Certification Program: Off-Road Compression-Ignition Certification Checklist*, available at: https://ww2.arb.ca.gov/resources/documents/road-compression-ignition-certification-program-road-compression-ignition and CARB, *Large Spark-Ignition Engine - Regulatory and Certification Documents*, available at: https://ww2.arb.ca.gov/large-spark-ignition-engine-regulatory-and-certification-documents.

35.     Finally, TMH USA was based in Irvine, California into 2014, a time period that includes the development and manufacture of many of the Class Vehicle models at issue in this Complaint.

36.     The Defendants also targeted Class members in each of the fifty states, including California, with advertising for the Class Vehicles; purposefully directed their activities to the fifty states, including California; and controlled the design, distribution, and sale of the Class Vehicles themselves. California is a significant market for Toyota forklifts. There are at least twelve authorized dealerships within the TMHNA and TMH USA dealership network in California that sell and lease Toyota forklifts, including two in this District alone (in Livermore and Salinas, CA).[39]

37.     These contacts with the United States and California establish personal jurisdiction over each of the Defendants. In addition, and to the extent necessary, this Court also has pendent personal jurisdiction over the claims of non-California Plaintiffs.

38.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class members residing in this District, including Plaintiff Broadmoor. Defendants have marketed, advertised, sold, and leased the Class Vehicles from authorized dealers located in this District, including Toyota Material Handling of Northern California located in Livermore, CA.

## V.     DIVISIONAL ASSIGNMENT

39.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division. Defendants conduct substantial business in the counties served by this Division, have marketed, advertised, sold, and leased the Class Vehicles in those counties, and have caused harm to Class members residing in those counties, including Plaintiff Broadmoor, which has its principal place of business in San Mateo County.

---

[39] *See* Toyota Forklift Dealer Search Tool, available at: https://toyotaforklift.com/dealers.

1    **VI.    FACTS COMMON TO ALL COUNTS**

2           40.     For almost a decade, the automotive industry has been plagued by a series of

3    emissions and fuel economy cheating scandals. Cases like Volkswagen "Clean Diesel,"[40] FCA

4    "EcoDiesel,"[41] Mercedes-Benz BlueTEC,[42] Audi $CO_2$,[43] Porsche MPG,[44] Cummins Diesel,[45] and

5    others have taught us that automakers can and frequently do illegally manipulate emissions, fuel

6    economy, and other performance-related test results, and then sell those vehicles to customers on

7    false premises and with deceptive representations.

8           41.     Toyota and its subsidiaries are no exception. As described above, a number of

9    emissions and certification misconduct scandals have recently surfaced across the corporate

10   family. This includes a 2021 admission that Toyota had been systematically violating CAA

11   reporting requirements from 2002 to at least 2015—conduct for which Toyota agreed to a $180

12   million fine.[46] And in 2023, Toyota subsidiary Daihatsu revealed significant misconduct and

13   manipulation in test data submitted to regulators.[47] In June 2024, Toyota publicly apologized for

14   yet another scandal, this time implicating certification tests for seven vehicle models.

15   _____

16   [40] Department of Justice Press Release, *Volkswagen to Spend Up to $14.7 Billion to Settle
     Allegations of Cheating Emissions Tests and Deceiving Customers on 2.0 Liter Diesel Vehicles*
17   (June 28,2016), available at: https://www.justice.gov/opa/pr/volkswagen-spend-147-billion-settle-
     allegations-cheating-emissions-tests-and-deceiving.
18   [41] Department of Justice Press Release, *In Civil Settlements with the United States and California,
     Fiat Chrysler will Resolve Allegations of Cheating on Federal and State Vehicle Emission Tests*
19   (Jan. 10, 2019), available at: https://www.justice.gov/opa/pr/civil-settlements-united-states-and-
     california-fiat-chrysler-will-resolve-allegations.
20   [42] Department of Justice Press Release, *The U.S. Reaches $1.5 Billion Settlement with Daimler
     AG Over Emissions Cheating in Mercedes-Benz Diesel Vehicles (*Sep. 14, 2020*),* available at:
21   https://www.justice.gov/opa/pr/us-reaches-15-billion-settlement-daimler-ag-over-emissions-
     cheating-mercedes-benz-diesel.
22   [43] Settlement website available at: https://vwmpgsettlement.com/.
23   [44] Settlement website available at: https://www.porschegasolinesettlementusa.com/.
24   [45] Department of Justice Press Release, *United States and California Announce Diesel Engine
     Manufacturer Cummins Inc. Agrees to Pay a Record $1.675 Billion Civil Penalty in Vehicle Test
25   Cheating Settlement* (Jan. 10, 2024*),* available at: https://www.justice.gov/opa/pr/united-states-
     and-california-announce-diesel-engine-manufacturer-cummins-inc-agrees-
26   pay#:~:text=Beyond%20agreeing%20to%20pay%20a,emissions%20testing%20and%20certificati
     on%20requirements.
27   [46] Department of Justice Press Release, *supra* n.1.
     [47] Daihatsu Investigation Report (Executive Summary) (Dec. 20, 2023), available at:
28   https://www.daihatsu.com/news/2023/report_1_E.pdf.

42.     Of particular note, in 2022, Toyota subsidiary Hino Motors admitted that it had engaged in "misconduct in relation to its applications for certification concerning the emissions and the fuel economy performance of its engines for the Japanese market."[48] Critically, that conduct in Japan was predicated on and precipitated by investigations into conduct in the U.S., led to a class settlement with private plaintiffs worth hundreds of millions of dollars, and remains the subject of ongoing enforcement actions by the Department of Justice and California Attorney General. *See, e.g.*, *Express Freight In'l v. Hino Motors, Ltd.*, No. 1:22-cv-22483, Dkt. 146 (S.D. Fla.).

43.     The misconduct underlying this case follows a strikingly similar pattern and sequence: (1) regulators in the United States began investigating potential fraud into Toyota's data submissions; (2) the Toyota company issued a series of stop sales on some affected vehicles in U.S. but did not own up to the scale of the problem; (3) Toyota's internal investigation (led by outside counsel) expanded to conduct ostensibly affecting the Japanese market; (4) the investigation revealed widespread misconduct, and Toyota convened a Special Investigation Committee; (5) the SIC reports identified even more misconduct and uncovered a corporate culture of deceit and noncompliance. And, of course, as in the Hino litigation, (6) the misconduct rendered Toyota's customer-facing representations false, misleading, and deceptive in ways material to Plaintiffs and the Classes.

**A.     The U.S. regulators began investigating Toyota's forklift-related misconduct by at least 2020.**

44.     This case begins and ends with vehicles sold in the United States. As noted above, TICO admits that the misconduct surfaced no later than the "second half of 2020," when TICO was "compl[ying] with an inquiry from the ***United States*** Environmental Protection Agency ("EPA") for the deterioration durability data submitted in the past, and found some questions about the appropriateness of the deterioration durability testing." SIC Summary Rep. at 4 (emphasis added). In other words, at about the same time that the U.S. regulators began

---

[48] Hino Press Release, *Misconduct concerning Engine Certification* (March 4, 2022), available at: https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

investigating Toyota subsidiary Hino's data irregularities, they became suspicious of, and started probing, TICO's data too.

45.     In responding to the EPA's investigations, and before there was any inquiry into the effect on the Japanese market, TICO "found some questions about the appropriateness of the deterioration durability testing," SIC Summary Rep. at 4—a critical factor in emissions testing designed to assess the performance of emission control systems over time. The "questions about the appropriateness" were serious, and TICO "engaged outside attorneys to investigate" them. *Id.* at 4.

46.     Shortly thereafter, in April 2021, TICO quietly announced a "suspension of production of certain [gasoline and LPG] forklift models in North America" due to "delays in obtaining U.S. engine emissions certification."[49] Then, in December 2021, TICO's U.S. subsidiary, Toyota Material Handling (TMH), announced it was "voluntarily suspending production and sales" of certain diesel forklift models "out of a proactive abundance of caution as TMH continues to confirm the compliance of these products within EPA standards."[50] With the regulators now looking over their shoulders, Toyota could not get its engines certified in the United States.

47.     As it turns out, Toyota's misconduct affected not just vehicles designed for the U.S. market but also those sold in Japan. This became clear early in the outside counsel investigation. SIC Summary Rep. at 4. And while the U.S. regulatory investigation is ongoing, the results of the Japanese investigation illuminate the nature and scope of the misconduct in both countries.

**B.     Toyota's investigation revealed rampant fraud.**

48.     TICO's fraud came to light in successive public releases, starting in March 2023. In that initial release, TICO "confirmed the excess over the domestic (Japanese) emissions

---

[49] Toyota Industries Corporation News Release, *Suspension of Production of Certain Forklift Models in North America* (May 21, 2021), available at: https://www.toyota-industries.com/news/2021/05/21/005055/.

[50] Forklift Action, *Toyota halts certain diesel models* (Dec. 9, 2021), available at: https://www.forkliftaction.com/news/toyota-halts-certain-diesel-models.aspx?n=25571.

1  regulation values due to aging degradation" and imposed a stop sale on three engines (the 1ZS,

2  1KD, and 4Y). *See* TICO 03/23 Press Release. At the time, however, the full scope of the fraud

3  had not been revealed, and Toyota claimed that the misconduct "only applie[d] to the Japanese

4  market" and had no "impact on . . . the US."[51]

5       49.    To further "clarify the details of the case," Toyota convened an ostensibly neutral

6  Special Investigation Committee, as it had done previously in both the Hino and Daihatsu

7  scandals. The extent of the SIC's neutrality is not without question,[52] but for this purpose it is

8  worth noting that the committee had access to extensive information, including materials

9  collected by outside counsel, interviews of 72 employees, and additional data. Their investigation

10  lasted approximately ten months and culminated in reports that elucidated the connection to the

11  U.S. market and certification process, expanded the scope of the fraud, and significantly increased

12  the number of affected engines and vehicles.

13       50.    In brief, the reports outlined emissions fraud, output performance fraud, and a

14  pervasive culture of cheating and non-compliance—all of which implicate the Class Vehicles sold

15  in the United States.

16       **1.    Toyota fabricated and manipulated the emissions test results of the
            Class Engines.**

17

18       51.    With minor potential exceptions noted herein, the full scope of the emissions fraud

19  (as it is currently understood) is outlined in the SIC reports, which Plaintiffs again incorporate by

20  reference.

21       52.    To recap, much of the misconduct related to deterioration durability testing—a

22  process used to determine how the emissions control systems perform over time. The

23  deterioration correction value (also known as the deterioration factor) that results from this testing

24  informs the threshold emissions performance levels required of the engine. Take, for example, a

25  hypothetical pollutant that cannot exceed a limit of 12 units under relevant regulations. If

26

27  [51] Forklift Action, *Toyota suspends diesel, petrol models* (April 20, 2023), available at:
    https://www.forkliftaction.com/news/toyota-suspends-diesel-petrol-models.aspx?n=26871.

28  [52] Notably, one of the three committee members (Makoto Shimamoto) is a repeat player who was
    also a member of the Hino SIC and works for Yamaha—a company in which Toyota has a
    minority ownership stake and with which it has a close relationship.

deterioration durability testing shows a deterioration correction value (degradation) of, say, 20% over the time period set in the regulation, then, at the time of the certification test, the engine must not emit more than 10 units of that pollutant (10 * 1.2 = 12). The deterioration factor is therefore a critical component of compliant and accurate emissions measures.

53. In the process of conducting the deterioration tests (and other emissions tests), however, Toyota engaged in a wide range of cheating strategies, grouped into four categories in the "key details of improper conduct" columns in the chart below. They include: (1) using values different from measured values, (2) modifying ECU software, (3) replacing parts etc. during testing, and (4) using different engines for the test.

| | Use (Engine type) | Type | Domestic certification acquisition timing | Key details of improper conduct | | | |
|---|---|---|---|---|---|---|---|
| | | | | Used values different from measured values | Modified ECU Software | Replaced parts etc. during testing | Used different engines for the test |
| Current models | Forklift (diesel) | 1KD | 2014 | ● | ● | | |
| | | 1ZS | 2014 | | ● | | |
| | Forklift (gasoline, LPG) | 2009 4Y | 2009 | ● | ● | ● | ● |
| | | 1FS | 2014 | ● | ● | ● | |
| | Construction machinery (diesel) | 2020 1KD for Construction Machinery | 2020 | | ● | | |
| Past models | Forklift (diesel) | 2007 1DZ | 2007 | ● | | | |
| | Forklift (gasoline, LPG) | 2007 4Y | 2007 | ● | ● | ● | ● |
| | | 1FZ | 2007 | | | | ● |
| | Construction machinery (diesel) | 2016 1KD for Construction Machinery | 2016 | ● | ● | ● | |

54. The SIC reports collectively dedicate dozens of pages to describing the details of these strategies as applied to each of the relevant engines. As one example, Toyota engineers "rewr[ote] [unfavorable] test results" for both NOx and particulate matter values "in order to obtain certification and otherwise knowingly violat[ed] domestic laws and regulations and intentionally disguise[d] facts," among other "intentional improper" tactics to falsify test data. SIC Release at 7.

55.   As additional illustrative examples, Toyota: swapped out parts during testing processes, or even tested the wrong engine, which heavily skewed the results; used different ECU software for testing than was used in mass production vehicles; and simply threw out test results they did not like. *See, e.g.*, *id.* at 7-8; SIC Summary Rep. at 37.

56.   The basic takeaway for all facets of the fraud is that Toyota routinely cut corners and subverted regulatory testing processes with the express intent of falsely representing that their engines could perform in ways they simply could not.

57.   According to the SIC, the so-called "root causes" underlying all of this fraud included, among others:

a.   a "[c]ontractor's mentality"—meaning that TICO, and certain groups within it, often considered themselves mere contractors to other groups or companies (e.g., TMC) and did not take ownership over their projects;

b.   "Trivializing engines for industrial vehicles"; and

c.   "Low risk sensitivity among executives at the Engine Division"—e.g., lack of commitment and education regarding deterioration durability testing. SIC Release at 8-9.

58.   As further evidence of Toyota's culture of cheating, TICO lacked "a department dedicated to regulation certification" (SIC Release at 4), and decided against any meaningful training on the "implementation of deterioration durability testing" or the "tightening of emissions regulations" (SIC Summary Rep. at 13). The result was an "organization-wide deficit of understanding about regulations" (*Id.* at 53) and a "weak" record on "respecting data accuracy" (SIC Release at 4). As the SIC makes clear, this culture—and the cheating that emerged from it— led to "violation[s] of the fundamental ethics of engineering" that "disguise[d] the true capabilities of the engine[s]" in question. SIC Summary Rep. at 57.

59.   Whatever the reasons, the fraud was rampant and persisted for nearly two decades. And, to be clear, it was highly illegal. Under both Japanese and U.S. regulations, engines that do not meet specified emissions values cannot be certified and are not legal to sell. Moreover, in both markets:

The engine used for deterioration durability testing must have "the

same structure, equipment, and performance" as the vehicle engine and emission reduction equipment of the motor vehicle for which the device type designation is being applied for, that is, the same specifications as the engine to be mass produced after obtaining the device type designation.

For the duration of deterioration durability testing, parts relating to emissions performance shall not be replaced, except for parts that are to be replaced periodically. Therefore, in principle, deterioration durability testing is expected to be performed on the same engine with the same parts.

SIC Published Rep. at 58; *accord* SIC Summary Rep. at 15. Put simply, manufacturers are not allowed to monkey with their certification test engines or vehicles or, obviously, to lie about the test results. Toyota did both.

60.     It is worth noting, however, that according to the SIC reports some but not all of the affected engines exceeded regulatory limits during the in-house retesting for the investigation. Specifically, as reflected in the chart below, the current diesel engines (2014 1KD, 2020 1KD for construction, and the 1ZS) all "had NOx (nitrous oxide) values that exceeded the domestic regulation values." SIC Release at 2 n.2. The current gasoline models (2009 4Y and 2014 1FS), in contrast, reportedly did not exceed regulatory limits.[53]

---

[53] The results for the "old type" models have yet to be confirmed.

| Use | Engine Model | | | Year Certified | Reported on March 17 | | Results of this Investigation | | No. of Domestic Sales | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Violations | Regulations Values Exceeded | Violations | Whether Regulation Values Exceeded or not (Note 1*) | FY2022 Sales | Total Sales | |
| Forklift | Current type | Diesel | 1KD | 2014 | • | • | • | Same as Reported on March 17 | 2,000 units | 11,000 units | 163,000 units |
| | | | 1ZS | | | | | | 8,000 units | 61,000 units | |
| | | Gasoline | 4Y | 2009 | | Confirmed no excess | | Confirmed no excess | 6,000 units | 89,000 units | |
| | | | 1FS | 2014 | | — | • | Confirmed no excess | 200 units | 2,000 units | |
| | Old type | Diesel | Former 1DZ | 2007 | | — | • | To be confirmed | — | 26,000 units | 67,000 units |
| | | | 3Z | | | | | | | 20,000 units | |
| | | | 15Z | 2010 | | | | | | 4,000 units | |
| | | Gasoline | Former 4Y | 2007 | | | | | | 16,000 units | |
| | | | 1FZ | | | | | | | 1,000 units | |
| Construction Machinery | Current type | Diesel | 1KD | 2020 | • | — | • | • | 2,000 units | 2,000 units | 2,000 units |
| | Old type | Diesel | Former 1KD | 2016 | | — | • | To be confirmed | — | 1,000 units | 1,000 units |

61.     There are many reasons to be skeptical of the "no-excess" findings, including the fact that testing was done in-house, without any witnesses or regulatory oversight. They are also belied by common sense: if Toyota did not need to cheat, why would it do so? Furthermore, roughly a month after the SIC reports were issued, Japan's Ministry of Land, Infrastructure, Transport and Tourism (MLIT) revoked Toyota's approval to sell three engines, including two (4Y and 1FS) that the SIC reported had no excess emissions.[54]

62.     Plaintiffs thus allege on information and belief that (a) all the of the Class Engines were fraudulently certified and illegal to sell and/or import and that (b) all the Class Vehicles' emitted pollutants in excess of the regulatory limits and beyond what Plaintiffs and the Class reasonably expected.

---

[54] TICO News Release, *Administrative Sanction on Domestic Industrial Engine Certification by the Ministry of Land, Infrastructure, Transport and Tourism (MLIT)* (Feb. 22, 2024), available at: https://www.toyota-industries.com/news/2024/02/22/008589/index.html.

1

2

**2.** **Toyota also cheated on "output tests" relating to performance metrics such as horsepower and torque.**

3

63.     As noted above, in addition to the emission-related misconduct, Toyota also

4

cheated on "output tests" designed to measure torque, horsepower, and other important

5

performance metrics. *See, e.g.*, SIC Published Rep. at 169-72; SIC Summary Rep. at 48.[55]

6

64.     In short, TICO engineers "modified the fuel injection amounts" by altering the

7

ECU software Control Parameter values. SIC Summary Rep. at 48. This resulted in a falsified

8

"engine performance curve" designed to (falsely) "ensure that the output values were above the

9

specification values (development target values)." SIC Published Rep. at 197. Put differently,

10

TICO engaged in intentional misconduct designed to misrepresent critical performance metrics—

11

conduct they knew was "deemed improper." SIC Summary Rep. at 48-49.

12

65.     Thus far, the SIC's output test findings are limited to engines designed for

13

automobiles (not forklifts or construction equipment). However, TICO employees close to the

14

issue admitted the fraudulent tactics "had been widely practiced in [TICO's] Engine Calibration

15

Group"—which was also responsible for the Class Engines—"for some time." SIC Summary

16

Rep. at 48; *see also id.* at 57 ("Such improper conduct trivializing data accuracy is found to have

17

been spread over a long period of time and to a considerable extent . . . .")

18

66.     Plaintiffs therefore allege upon information and belief that the output fraud also

19

affected the Class Engines.

20

**C.** **The misconduct detailed in the SIC Reports also affected the Class Engines and Class Vehicles sold in the U.S., rendering them illegal to sell or import.**

21

22

67.     The investigation conducted by the SIC was, according to Toyota, "limited to

23

improper conduct relating to emissions certification in Japan." SIC Summary Rep. at 4-5. But, as

24

noted above, that is highly implausible given the U.S. origins of the (still ongoing) regulatory

25

investigation.

26

27

28

---

[55] *See also, e.g.*, Toyota Motor Corporation News Release, *supra* n.18 ("The investigation found that irregularities occurred during the horsepower output testing for the certification of three diesel engine models for automobiles that Toyota had commissioned to TICO.").

68.    Importantly, and as the SIC recognized, many of the certifications in Japan were "obtained on the premise of U.S. and EU emissions certification," making the Japanese conduct inextricably intertwined with the engines sold in the U.S. *Id.* at 5 n.1; *see also* SIC Summary Rep. at 15 ("It should be noted that if a carbon monoxide, etc. emissions control device has already been certified in the U.S. or Europe prior to domestic certification, the deterioration factor calculated at the time of U.S. or European certification can be used in the application for domestic certification, and there is no need to redo deterioration durability testing in accordance with domestic laws and regulations."); SIC Published Rep. at 58 (similar).

69.    In fact, the Japanese certification process for most of the engines at issue—at least the 1KD, 1ZS, 4Y, and 1FS engine—relied on prior testing done to certify those engines for the U.S. market first. *See, e.g.*, SIC Summary Rep. at 22-23 ("The 1KD Engine first obtained U.S. certification, and then obtained domestic certification as of June 17, 2014 using the data used for U.S. certification."); SIC Summary Rep. at 27 (explaining that the 1ZS obtained Japanese certification using the "correction values calculated based on the results of the 1KD Engine deterioration durability testing"—which, again, were generated during the certification testing for the U.S. market); SIC Summary Rep. at 30 ("[T]he 2007 4Y Engine first applied for U.S. certification," and "the deterioration durability testing for the 2009 4Y Engine adhered fundamentally to the deterioration durability testing method for the 2007 4Y Engine."); SIC Summary Rep. at 30 ("After obtaining U.S. certification, the 1FS Engine applied for domestic certification using the deterioration correction values calculated on the basis of the deterioration factors used for U.S. certification and obtained domestic certification as of June 17, 2014.").

70.    This is made possible by the very significant overlap—at points nearly identical—between the Japanese and U.S. emissions regulations. As exemplified in the chart below, the off-highway diesel emissions standards in Japan and the U.S. (Tier 4 or Tier IV standards) are functionally "equivalent." SIC Published Rep. at 74 (chart showing the regulations applicable to the Class Engines over time).[56]

---

[56] *See also* Veethree Group, *Off-Highway Diesel Emissions Standards* (July 26, 2022), available at: https://www.veethree.com/group/veethree-group-news/off-highway-diesel-emissions/; *see*

71.     The point is that, notwithstanding Toyota's contrary disclaimers, the fraud exposed in the SIC reports was clearly directed at Japanese *and* U.S. customers. The two markets are governed by overlapping regulatory regimes, and TICO regularly used the exact same fraudulent tests and test results for both of them.

**D.      Defendants' marketing featured false promises of environmental friendliness and misrepresentations of high engine performance and emissions compliance—all of which omitted material information about Toyota's fraud.**

72.     To many businesses and other customers, including Plaintiffs, engine performance, emissions compliance, and environmental friendliness are important factors in their decision to purchase or lease a forklift. Toyota understood this and capitalized on it.

73.     As one example, in a forklift-related post, Toyota acknowledged "[s]ustainability of the environment is an important consideration for professionals in any industry. That's why Toyota has set out to meet that need with top-of-the-line, environmentally friendly products."[57]

---

*also, e.g.*, Dieselnet, *Japan: Nonroad Engines*, available at: https://dieselnet.com/standards/jp/nonroad.php (detailing regulatory scheme and comparisons to U.S. regime);

[57] Liftow Ltd. and Toyota Material Handling Blog Post, *Toyota Forklifts: What Make Them Industry Leaders* (March 6, 2019), available at: https://liftow.com/blogs/news/toyota-forklifts-what-make-them-industry-leaders.

74.     A relevant trade association publication reinforces the message: "Demand for lower vehicle emissions and higher fuel efficiency in the automotive industry has drifted over to vehicles in other motive industries. Industrial lift trucks are no exception. Like the automotive industry, some of the drivers for emissions reductions are more stringent regulatory emissions standards. But much of the demand comes from industry itself."[58]

75.     Defendants targeted these preferences in their misleading advertising and other representations and omissions about the Class Engines and Class Vehicles.

76.     For starters, both TMH[59] and TICO[60] dedicate entire sections of their websites to their environmental and sustainability initiatives. Their eco-branding is clearly an important part of their marketing strategies.

77.     But more importantly, over the last decade and half, Toyota has made repeated false and misleading statements about the specific Class Engines and Class Vehicles. Below are some illustrative examples, generally grouped by engine and fuel type.

78.     **Gasoline engines—4Y, 1FS, and 1FZ**:

    a.     "The 4Y Engine is unique in that it is the cleanest engine in the industry, and its emission standards rival the emission standards of any competitive internal combustion engine."[61]

    b.     "4Y: Low emission, High power, Low fuel consumption."[62]

    c.     In addition to its performance and durability, the 4Y is "emissions compliant."[63]

---

[58] Fabricators and Manufacturers Association, *No, Low-emissions Lift Trucks Clear the Air* (March 27, 2013), available at: https://www.fmamfg.org/blog/low-emissions-lift-trucks-clear-the-air.

[59] Toyota Material Handling, *Toyota Sustainability and ESG*, available at: https://www.toyotaforklift.com/about-toyota/sustainability.

[60] Toyota Industries Corporation, *Environmental Initiatives*, available at: https://www.toyota-industries.com/sustainability/environment/; *see also* Toyota Industries Corporation, *Corporate Profile 2024*, available at: https://www.toyota-industries.com/company/item/Corporate_Profile_2024_E_view.pdf.

[61] *See* Toyota Forklifts Blog.

[62] Toyota Industries Corporation, *Gasoline Engines Y series*, available at: https://key-components.toyota-industries.com/products/engine/gasoline/4y/.

[63] *See* Toyota Forklifts Blog.

d.      The 4Y was "engineered with sustainability in mind. The 4Y engine's emissions system filters carbon monoxide, hydrocarbon, and nitrogen oxide gases, allowing it to surpass federal EPA emission standards."[64]

e.      "But durability isn't the only thing the 4Y has going for it. It's just as good for the environment as it is for your business, whether you run LPG or gasoline."[65]

f.      The 4Y is "EPA and CARB compliant for emissions."[66]

g.      In addition to general "high performance" (torque, horsepower, etc.), the 4Y and 1FS engines have "environmental performance" benefits and "clean exhaust."[67]

79.     **Diesel engines—1ZS, 1KD, and 1DZ:**

a.      "Toyota's environmentally-friendly 8-Series lift trucks"—powered by the 1ZS—"are recognized as the world's cleanest internal combustion forklifts available."[68]

b.      The 1ZS engine is "Tier IV Final Emissions Compliant." It is "ideal for the agricultural industry because it meets Tier IV final emissions standards."[69]

c.      The 1ZS "meet[s] the federal EPA Tier 4 Final regulations."[70]

d.      The IZS engine provides "less displacement than the previous model for lower emissions and fuel costs."[71]

e.      "The newest forklifts expand Toyota's comprehensive diesel pneumatic line, which now provides 3,000 to 17,500 lb. capacity models that meet the federal EPA Tier 4

---

[64] Toyota Blog Post, *The History of Toyota's 4Y Engine* (March 8, 2019), previously available at: https://www.dillontoyotalift.com/about/blog/e_358/News---Events/2019/3/The-History-of-Toyota-s-4Y-Engine (also previously available on TMH website).
[65] Toyota Forklifts Blog.
[66] *Id.* ("deeper dive" into 4Y engine video starting at 1:25).
[67] TICO Product Information, *Gasoline Engines*, available at: https://key-components.toyota-industries.com/products/engine/gasoline/.
[68] Toyota Forklifts YouTube Channel, Toyota Forklift Commercial 1 https://www.youtube.com/watch?v=S5WSezyZqQM.
[69] Toyota Material Handling Northern California, TMHNC, *Product Review: Toyota Diesel Forklift,* available at: https://www.tmhnc.com/blog/toyota-diesel-forklifts-product-review.
[70] Summit Toyota Lifts, *Toyota's New 1ZS Diesel Engine* (Jan. 15, 2015), available at: https://www.summithandling.com/news/toyotas-1zs-diesel-engine/.
[71] *See* Toyota Forklifts Blog.

Final regulations. The 1ZS engine maintains the horsepower and increases the torque while achieving greater fuel savings."[72]

f.      "Small Capacity Lift Trucks Offer Significant Advancements in Fuel Efficiency, while Meeting Stringent Federal EPA Tier 4-Final Diesel Engine Standards." The "diesel series [is] powered by a clean-burning Toyota engine" that "offer[s] significant advancements in durability, ergonomics, productivity and fuel efficiency, while meeting stringent federal EPA Tier 4 Final diesel engine standards." The 1ZS engine also "minimiz[es] emissions and particulate matter."[73]

g.      The 8-Series lift truck is "the world's cleanest internal combustion lift truck and the first and only lift truck to surpass 2007 Federal EPA emissions standards and meet California's stringent 2010 emission standards."[74]

h.      The "recently unveiled [] new 8-Series lift truck . . . produces 70 percent less smog-forming emissions than the 2007 standard. In developing the 8-Series, TMHU also took a global leadership role by exceeding both state and federal emissions regulations and by integrating elements of sustainable design such as increasing the amount of recyclable parts used in the manufacturing process." [75]

i.      "The 1FS is built with special electronics that all lead to better fuel efficiency and low emissions."[76]

j.      The 1KD engine "helps decrease fuel consumption and emissions."[77]

---

[72] Summit Toyota Lifts, *Toyota's* New 1ZS Diesel Engine (Jan. 15, 2015), *supra* n.70.

[73] Vesco Toyota Lift (publishing Toyota Press Release), *Toyota Expands 8-Series Small Capacity Diesel Lift Truck Line with New Clean-Burning 1ZS Engine* (Dec. 19, 2013), available at: http://www.vescoforklifts.com/news/136.php; https://www.fmforklift.com/news/136.php.

[74] Toyota Material Handling / National Arbor Day Foundation Joint Press Release, *Toyota Material Handling Teams With Arbor Day Foundation To Plant A Tree For Each 8-Series Lift Truck Delivered In 2007* (Nov. 20, 2006), available at: https://www.arborday.org/media/pressreleases/pressreleasetxt.cfm?id=119.

[75] *Id.*

[76] Toyota Forklifts Blog.

[77] *Id.*

80.     **Additional, broadly applicable misrepresentations and omissions**:

a.      From Shankar Basu, then-President and CEO of TMH: "Toyota is committed to environmental responsibility, and it's a role we take very seriously"—"one of Toyota's goals is to support environmentally appropriate and socially beneficial initiatives contributing to a cleaner environment."[78]

b.      Toyota's "New Lift Trucks [Are] Fitted with Engines Having Significantly Greater Environmental Performance" and were developed under the key concept of "Attain the Industry's Top-Level Environmental Performance.'"[79]

c.      "In 2013, [Toyota] successively developed three industrial engine models. Leveraging our years of experience and combined strengths of our diverse businesses, these engines have attained significantly higher environmental performance."[80]

d.      Toyota is "pushing forward environmentally friendly technologies and manufacturing processes: Toyota remains the first and only manufacturer to offer UL-listed, EPA and CARB-certified Compressed Natural Gas (CNG) powered lift trucks."[81]

81.     In addition to this steady stream of false and misleading statements about emissions and sustainability, Toyota's representations about other performance features like torque and horsepower were—as one would expect—ubiquitous.[82]

---

[78] Toyota Material Handling / National Arbor Day Foundation Joint Press Release (Nov. 20, 2006), *supra* n.74.

[79] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

[80] *Id.*

[81] Vesco ToyotaLift, *Toyota Ranked Number One Lift Tuck Supplier for Tenth Consecutive Year* (Oct. 24, 2012), available at: http://www.vescoforklifts.com/news/50.php.

[82] *See, e.g.*, Diesel 1ZS (https://key-components.toyota-industries.com/products/engine/diesel/1zs/); Diesel 1DZ (https://key-components.toyota-industries.com/products/engine/diesel/1dz/); Gas 4Y (https://key-components.toyota-industries.com/products/engine/gasoline/4y/); Gas 1FS (https://key-components.toyota-industries.com/products/engine/gasoline/1fs/); *see also* Toyota Industries Report, *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

82.     As described throughout this Complaint, these statements about the Class Engines and Class Vehicles were material and misleading. Put simply, Toyota cheated on its tests and then lied about it both to the regulators and consumers.

**E.     Toyota Motor Corporation fostered a culture of noncompliance and fraud at its many subsidiaries and affiliates, and bears responsibility for their failures.**

83.     As described above, TMC is at the center of a constellation of scandals (CAA reporting for TMC vehicles, certification test reporting for TMC vehicles, Hino, Daihatsu, TICO), including this one. The thread tying them all together is the culture of fraud, regulatory noncompliance, and deception emanating from TMC. Indeed, Akio Toyoda, the Chairman and (for much of the relevant time period) President and CEO of TMC, "took full responsibility" for the TICO forklifts scandal and apologized to Toyota's "customers and stakeholders for the inconvenience and concern caused by the successive irregularities at Hino Motors, Daihatsu and Toyota Industries."[83]

84.     As noted in a prominent Japanese newspaper, the series of scandals "invit[e] doubts about the carmarker group's governance," and the "situation should be taken as a problem with the whole group," including TMC. As the hub of the wheel on which all of these scandals turn, "it is unacceptable for Toyota [Motor Company] to merely pass the buck to its subsidiaries."[84] Plaintiffs agree.

85.     Further evidence of TMC's strong nexus to the facts of this Complaint is found in the significant corporate overlap between TMC and TICO. As of March 2023, TMC owned

---

[83] Chris Pandolfo, FOXBusiness, *Toyota chairman issues apology for subsidiary safety scandal, brand remains world's top-seller* (Jan. 30, 2024), available at: https://www.foxbusiness.com/fox-news-auto/toyota-chairman-issues-apology-subsidiary-safety-scandal-brand-remains-worlds-top-seller; Reuters, *Toyota remains world's top-selling automaker; chairman apologizes over scandals* (Jan. 30, 2024), available at: https://www.cnbc.com/2024/01/30/toyota-remains-top-selling-automaker-chair-apologizes-over-scandals.html; Financial times, *Toyota chair apologises for faulty data scandals and promises action*, available at: https://www.ft.com/content/8eff37e4-433c-4ab8-85e3-5be70a165588.

[84] The Mainichi, *Editorial: Toyota group must seek and destroy roots of rampant fraud, poor oversight* (Feb. 3, 2024), available at: https://mainichi.jp/english/articles/20240203/p2a/00m/0op/017000c.

1  24.7% of TICO's voting rights and was the "primary" purchaser of TICO's automobile and

2  engine products. TICO, in turn, owns some 8% of TMC's shares.[85]

3      86.    In addition to their reciprocal ownership stakes and further cementing the blurred

4  lines between them, the companies also closely collaborate in their work for engine design,

5  development, and testing. In 2014, the companies moved to officially consolidate their "joint

6  diesel engine development and production" under TICO. This delegation structure meant that

7  TMC could then focus on "the development of cutting-edge base technologies" that would be

8  used in TICO's engine development work.[86] By its nature, this complementary structure means

9  the companies worked closely together to reciprocally design and build the final engine product

10  from the ground up.

11      87.    Prior to this reorganization for diesel engine work in 2014, TMC previously

12  conducted some of its own diesel engine development and design work, which on information

13  and belief situates the design and development work for earlier model year compression ignition

14  (diesel) Class Vehicles directly under TMC during that time period.

15      88.    All of this points to one conclusion: TMC was not a distant and innocent corporate

16  affiliate, but rather very much involved in creating the culture and directing the policies

17  responsible for the fraud underlying this Complaint. Throughout numerous similar testing

18  scandals within the Toyota corporate family, TMC remains the common denominator. Discovery

19  will further reveal the nature and extent of TMC's role in this latest scandal, including in

20  developing the Class Vehicles and their engines and relevant components (both before and after

21  the 2014 reorganization). This could include for example TMC personnel involved in the design

22  and development work for the Class Engines or their components, in monitoring TICO in its

23  engine development and testing work delegated by TMC, or in sharing policies, resources, or

24  testing facilities that enabled the misconduct described herein.

---

25

26  [85] Toyota Industries Corporation, Annual Financial Report (For the Year Ended March 31, 2023), available at: https://www.toyota-

27  industries.com/investors/item/2023_annual_financial_report_E.pdf.

28  [86] *See* Toyota Industries Corporation, News Release, *Toyota Industries Corp. and Toyota Motor Corp. to Consolidate Diesel Engine Development and Production* (Nov. 28, 2014), available at: https://www.toyota-industries.com/news/2014/11/28/004920/index.html.

* * *

89.     Defendants' deceptive actions harmed Plaintiffs and the Classes. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Vehicles were designed to mislead consumers and businesses about their true emissions levels and performance, owners and lessees of the Class Vehicles have suffered losses in money and/or property. Plaintiffs did not receive the vehicles they paid for and reasonably expected to receive and, as a result, have suffered damages.

## VII.    CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"). The Class Vehicles implicated by this Complaint include all of those equipped with one of the following Class Engines (listed by certification year): 2014 1KD, 2014 1ZS, 2014 1FS, 2009 4Y, 2007 4Y, 2007 1DZ, 2007 1FZ, 2020 1KD for construction machinery, and 2016 1KD for construction machinery.

91.     The proposed Nationwide Class includes all persons and entities that purchased or leased a Class Vehicle in the United States, including its territories.

92.     Plaintiffs also propose separate State Classes for the states listed in the claims below, each of which includes all persons and entities that purchased or leased a Class Vehicle in that state.

93.     Excluded from the Classes are:

a.     Defendants' officers, directors and employees; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; and

b.     Judicial officers and their immediate family members and associated court staff assigned to this case.

94.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses or State classes under Rule 23(c)(5), or modified in any other way.

95.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims. This action may also, in the Court's discretion, be maintained as a class action with respect to particular common issues.

96.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**A.     Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

97.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class, and multiple hundreds or thousands of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**B.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

98.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.     Whether Defendants engaged in the conduct alleged herein;

b.     Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States and California;

c.     Whether Defendants owed a duty to disclose accurate emissions and output performance of the Class Vehicles;

d.     Whether Defendants misrepresented the Class Vehicles' emissions and output performance;

e.     Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

f.     Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

g.     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

**C.**     **Typicality: Federal Rule of Civil Procedure 23(a)(3)**

99.     Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class member purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

**D.**     **Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

100.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle emissions litigation and other complex class action proceedings. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

**E.      Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

101.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**F.      Superiority: Federal Rule of Civil Procedure 23(b)(3)**

102.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants such that it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

103.     Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

**A.      Discovery Rule Tolling**

104.     For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

105.     Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the Class Vehicles' emissions and performance levels, including but not limited to their practice of secretly manipulating and fabricating test results.

106.     Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities,

1    dealerships, businesses, or consumers until—at the earliest—January 29, 2024, when Defendants

2    released the Special Investigation Committee report that first disclosed the scope of the emissions

3    and performance frauds and their relationship to the Class Vehicles in the U.S.

4           107.    Likewise, a reasonable and diligent investigation could not have disclosed that

5    Defendants had information in their possession about the existence of its sophisticated emissions

6    and performance deceptions and that they concealed that information, which Plaintiffs only

7    discovered shortly before this action was filed.

8           **B.**      **Tolling Due to Fraudulent Concealment**

9           108.    Throughout the relevant time period, all applicable statutes of limitation have been

10    tolled by Defendants' knowing and active fraudulent concealment of the facts alleged in this

11    Complaint.

12           109.    Upon information and belief, prior to the date of this Complaint, and at least as

13    early as 2020—when U.S. authorities began their investigation—Defendants knew of the

14    emissions and performance defects in certain Class Vehicles, but continued to allow Plaintiffs and

15    Class members to purchase and operate their Class Vehicles. In so doing, Defendants concealed

16    and/or failed to notify Plaintiffs and Class members about the true nature of the Class Vehicles.

17           110.    Instead of disclosing their deception, Defendants falsely represented the Class

18    Vehicles' emissions and performance.

19           111.    Any otherwise-applicable statutes of limitation have therefore been tolled by

20    Defendants' exclusive knowledge and active concealment of the facts alleged herein.

21           **C.**      **Estoppel**

22           112.    Defendants were and are under a continuous duty to disclose to Plaintiffs and

23    Class members the true character, quality, and nature of the Class Vehicles, including their output

24    performance, emissions systems, and their compliance with applicable federal and state law.

25           113.    Although Defendants had the duty throughout the relevant period to disclose to

26    Plaintiffs and Class members that they had engaged in the deception described in this Complaint,

27    Defendants did not disclose accurate output performance and emissions statistics and did not

28    correct their misleading disclosures with respect to the Class Vehicles. Defendants actively

1 concealed the true character, quality, and nature of the emission and engine output defects in the

2 Class Vehicles, and made misrepresentations about the quality, reliability, characteristics, and/or

3 performance of the Class Vehicles. Plaintiffs and Class members reasonably relied upon

4 Defendants' knowing and active concealment of these facts.

5    114. Based on the foregoing, Defendants are estopped from relying on any statutes of

6 limitations in defense of this action.

7 **IX. CAUSES OF ACTION**

8   **A.** <u>**Claims Asserted on Behalf of the Nationwide Class**</u>

9
           **NATIONWIDE COUNT I:**
            **Fraud By Concealment**
10             **(Common Law)**

11    115. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

12 forth herein.

13    116. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in

14 the alternative, on behalf of the State Classes, against all Defendants.

15    117. Defendants are liable for both fraudulent concealment and nondisclosure. *See, e.g.*,

16 Restatement (Second) of Torts §§ 550-51 (1977).

17    118. Specifically, Defendants committed fraud by manipulating and falsifying their

18 engine tests and test data for emissions and output testing, misrepresenting the Class Vehicles'

19 true output and emissions performance, concealing the true nature of the Class Vehicles'

20 emissions and performance from Plaintiffs and the Classes, and attesting that the Class Vehicles

21 complied with applicable emissions laws.

22    119. A reasonable customer would not have expected that their Class Vehicles did not

23 offer the represented and reasonably expected emissions or output performance.

24    120. Defendants knew that these facts about the Class Vehicles would be important to

25 customers deciding to purchase or lease them. Defendants ensured that Plaintiffs and the Classes

26 did not discover this information through actively concealing it. Defendants intended for

27 Plaintiffs and the Classes to rely on their misrepresentations and omissions—which they did by

28 paying for the Class Vehicles.

121.    Defendants had a duty to disclose the emissions and performance defects. These important facts were known and/or accessible only to the Defendants, including due to their involvement in the design, installment, and testing of engines in the Class Vehicles. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Classes.

122.    Defendants also had a duty to disclose the true nature of the Class Vehicles in light of their affirmative statements about the Class Vehicles with respect to emissions performance and performance. In uniform advertising and marketing materials provided with the Class Engines and Class Vehicles, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the Classes the emissions and performance defects.

123.    Defendants knew these statements were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the existence of the emissions and performance test manipulation. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiffs and the Classes, Defendants had the duty to disclose the whole truth. They did not.

124.    Defendants' deceptive actions harmed Plaintiffs and the Classes. Because Defendants fraudulently concealed the truth about the Class Vehicles, customers who paid for the Class Vehicles suffered economic losses. Plaintiffs suffered damages including but not limited to overpaying for vehicles that did not perform as represented and reasonably expected. Accordingly, Defendants are liable to Plaintiffs and the Classes for damages in an amount to be proven at trial.

125.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Classes; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**NATIONWIDE COUNT II:**
**Unjust Enrichment**

126.     Plaintiffs incorporate by reference paragraphs 1-114 above as though fully set forth herein.

127.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

128.     By reason of their conduct, Defendants caused damages to Plaintiffs and the Classes. Plaintiff and the Classes conferred a benefit on Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' misrepresentations, concealment, and omissions alleged above regarding the true nature and output of the Class Vehicles' emissions and performance.

129.     As a result of Defendants' fraud and deception, Plaintiffs and members of the Classes were not aware of the true facts concerning the Class Vehicles.

130.     Plaintiffs and members of the Classes did not benefit from the Defendants' misconduct.

131.     Defendants knowingly benefitted from their unjust conduct. They sold and leased the Class Vehicles for more than what the vehicles were worth, and/or accepted the inflated benefits from the sale and lease of the Class Vehicles, at the expense of Plaintiffs and the Classes.

132.     Plaintiffs and the Classes conferred tangible and material economic benefits upon Defendants when they purchased or leased the Class Vehicles. Defendants profit from sales and leases of Class Vehicles, including through Toyota's authorized dealership network.

133.     Defendants readily accepted and retained these benefits from Plaintiffs and the Classes. Plaintiffs and the Classes would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the truth about these vehicles at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Classes.

134.     It is inequitable and unconscionable for Defendants to retain these benefits because they intentionally manipulated and falsified the Class Vehicles' engine tests and test data for

emissions and output testing, misrepresented the Class Vehicles' true output and emissions

performance, concealed the true nature of the Class Vehicles' emissions and performance from

Plaintiffs and the Classes, and attested that the Class Vehicles complied with applicable emissions

laws. Plaintiffs and members of the Classes would not have purchased or leased the Class

Vehicles or would have paid less for them, had Defendants not engaged in these

misrepresentations, concealment, and omissions.

135. Plaintiffs and the Classes do not have an adequate remedy at law.

136. Equity cannot in good conscience permit Defendants to retain the benefits that

they derived from Plaintiffs and the Classes through unjust and unlawful acts, and therefore

restitution or disgorgement of the amount of Defendants' unjust enrichment is necessary.

137. Plaintiffs plead this claim separately as well as in the alternative to their claims for

damages under Fed. R. Civ. P. 8(a)(3).

**B.** **Claims Asserted on Behalf of the State-Specific Classes**

**1.** **California**

**CALIFORNIA COUNT I:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

138. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

139. Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim

on behalf of itself and the California State Class against all Defendants.

140. California Business and Professions Code § 17200 prohibits any "unlawful, unfair,

or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and

unfair business acts and practices in violation of the Unfair Competition Law ("UCL").

141. Defendants' knowing and intentional conduct, as described herein, constitutes

unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Defendants

violated the UCL in at least the following ways:

1     A.     by knowingly and intentionally failing to disclose to Plaintiff and

2     California State Class members material information about the Class Vehicles' true

3     emissions and output performance while obtaining money from the California State Class

4     members;

5     B.     by misrepresenting the Class Vehicles as possessing functional and defect-

6     free, EPA-compliant engine systems; and

7     C.     by knowingly designing and manufacturing the Class Vehicles in a manner

8     that they emit more pollution and achieve worse output performance on the road than

9     what was disclosed to regulators and represented to individual and entities who purchased

10    or leased them, and failing to fix the defects free of charge;

11    D.     by violating the other California laws alleged herein, including the False

12    Advertising Law, California Commercial Code, and Song-Beverly Consumer Warranty

13    Act.

14    142.    Defendants' misrepresentations and omissions alleged herein caused Plaintiff and

15    the California State Class members to make their purchases or leases of their Class Vehicles.

16    Absent those misrepresentations and omissions, Plaintiff and California State Class members

17    would not have purchased or leased these Class Vehicles, would not have purchased or leased

18    these Class Vehicles at the prices they paid, and/or would have purchased or leased less

19    expensive alternative vehicles that did not have inflated performance values or issues with

20    exhaust emissions.

21    143.    Accordingly, Plaintiff and California State Class members have suffered

22    ascertainable loss and actual damages as a direct and proximate result of Defendants'

23    misrepresentations and their concealment of and failure to disclose material information.

24    144.    Defendants' violations present a continuing risk to Plaintiffs and California State

25    Class members, as well as to the general public. Defendants' unlawful acts and practices

26    complained of herein affect the public interest.

27    145.    Plaintiffs plead this claim separately as well as in the alternative to their claims for

28    damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiffs have no adequate remedy at law,

including for the future unlawful acts, methods, or practices as set forth above absent an

injunction. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not

certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are

designed to prevent.

146.    Plaintiff requests that this Court enter such orders or judgments as may be

necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices

and to restore to members of the California State Class any money it acquired by unfair

competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. &

Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

147.    Plaintiffs, on behalf of themselves and the California State Class, further seek an

award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**CALIFORNIA COUNT II:**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

148.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

149.    Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim

on behalf of itself and the California State Class against all Defendants.

150.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . .

corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to

induce the public to enter into any obligation relating thereto, to make or disseminate or cause

to  be made or disseminated . . . from this state before the public in any state, in any newspaper

or  other publication, or any advertising device, . . . or in any other manner or means whatever,

including over the Internet, any statement . . . which is untrue or misleading, and which is known,

or which by the exercise of reasonable care should be known, to be untrue or misleading."

151.    Defendants caused to be made or disseminated through California and the United

States, through advertising, marketing and other publications, statements that were untrue or

misleading, and which were known, or which by the exercise of reasonable care should have been

1    known to Defendants, to be untrue and misleading to consumers, including California State Class

2    members.

3         152.    Defendants have violated Section 17500 because the misrepresentations and

4    omissions  regarding the reliability and functionality of Class Vehicles as set forth in this

5    Complaint were material and likely to deceive a reasonable consumer.

6         153.    Plaintiff and the other California State Class members have suffered an injury in

7    fact, including  the loss of money or property, as a result of Defendants' unfair, unlawful, and/or

8    deceptive practices. In purchasing or leasing their Class Vehicles, the California State Class relied

9    on the misrepresentations and/or omissions of Defendants with respect to the performance and

10   reliability of the Class Vehicles. Defendants' representations turned out not to be true because the

11   Class Vehicles are distributed with faulty and defective systems, rendering certain performance

12   and emissions functions unreliable.

13        154.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants'

14   business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that

15   was perpetuated, both in the State of California and nationwide.

16        155.    The California State Class requests that this Court enter such orders or judgments

17   as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or

18   deceptive practices and to restore to the California State Class any money Defendants acquired by

19   unfair competition, including restitution and/or restitutionary disgorgement, and for such other

20   relief set forth below.

**CALIFORNIA COUNT III:**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

24        156.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

25   forth herein.

26        157.    Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim

27   on behalf of itself and the California State Class against all Defendants.

158.   Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

159.   With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

160.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

161.   In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

162.   In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

163.   For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

164.   The warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-

related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

165.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

166.    As manufacturers of large spark- and compression-ignition-powered vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

167.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

168.    Despite the existence of warranties, Defendants failed to inform Plaintiff and California State Class members that the Class Vehicles were defectively designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to individual and entities who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

169.    Defendants breached the express warranty promising to repair and correct Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

170.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

171.    Furthermore, the limited warranty promising to repair and correct Defendants' defects in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make California State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

172.    Accordingly, recovery by Plaintiff and California State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defects in materials and workmanship, and they seek all remedies as allowed by law.

173.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. California State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

174.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defects in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and California State Class members' remedies would be insufficient to make them whole.

175.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and California State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

176.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

177.    As a direct and proximate result of Defendants' breach of express warranties, California State Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

178.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

179.    Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

180.   Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

181.   With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

182.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

183.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

184.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable and not fit for the ordinary purpose for which vehicles are used.

185.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

186.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and California State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT V:**
**Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty**
**Cal Civ. Code § 1790,** *et seq.*
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

187.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

188.   Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

189.    Plaintiff and members of the California State Class who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

190.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

191.    Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

192.    Defendants impliedly warranted to Plaintiff and the other members of the California State Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

193.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.    Pass without objection in the trade under the contract description.

B.    Are fit for the ordinary purposes for which such goods are used.

C.    Are adequately contained, packaged, and labeled.

D.    Conform to the promises or affirmations of fact made on the container or label.

194.    The Class Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, which conceals the vehicles' true emissions.

195.    Class Vehicles are not adequately labeled because the labeling fails to disclose the fact that they are defective.

196.    In the various channels of information through which Defendants sold and marketed Class Vehicles, Defendants failed to disclose material information concerning the Class Vehicles, which they had a duty to disclose. Defendants had a duty to disclose the defect because,

as detailed above: (a) Defendants knew about the defect; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California State Class members; (c) Defendants actively concealed material facts from the general public and California State Class members concerning the Class Vehicles' true emissions and performance; and (d) Defendants made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth. As detailed above, Defendants knew the information concerning the defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

197.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, this defect has caused members of the California State Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

198.    Plaintiff and members of the California State Class have been damaged as a result of the diminished value of Defendants' products.

199.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

200.    Under Cal. Civ. Code § 1794, Plaintiff and the other members of the California State Class are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VI:**
**Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
**Cal Civ. Code § 1790, *et seq.***
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

201.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

202.    Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

203. Plaintiff and Members of the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

204. The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

205. Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

206. Defendants made express warranties to members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

207. As set forth above in detail, the Class Vehicles are inherently defective in that they were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output and emissions ratings, and/or did not comply with emissions regulations when being driven. This defect substantially impairs the use and value of the Class Vehicles to reasonable consumers.

208. As a result of Defendants' breach of their express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiff and the other members of the California State Class. Plaintiff and members of the California State Class have been damaged as a result of, *inter alia*, the lesser value of Defendants' products.

209. Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiff and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

210. Pursuant to California Civil Code § 1794, Plaintiff and the other members of the California State Class are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VII:**
**Breach of Express California Emissions Warranties**
**Cal. Code Regs. 13 § 2425, 2435.**
**(By Plaintiff Broadmoor on Behalf of the California State Class)**

211. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

212.    Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the California State Class against all Defendants.

213.    Each Class Vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Code Regs. tit. 13, §§ 2425, 2435.

214.    The express California Emissions Warranties generally warrant "that the engine is designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board" and "[f]ree from defects in materials and workmanship which cause the failure of a warranted part to be identical in all material respects to the part as described in the engine manufacturer's application for certification for a period of five years or 3,000 hours of operation, whichever occurs first." Cal. Code Regs. tit. 13, § 2425 (regulation applicable to compression ignition engines, typically diesel).

215.    For spark ignition vehicles (typically gasoline-powered), the warranty applies for "3 years or 2,500 hours, whichever occurs first" and additionally provides the engine must be "[f]ree from defects in materials and workmanship which cause the failure of a high-cost warranted part to be identical in all material respects to the part as described in the engine manufacturer's application for certification . . . for a period of five years or 3,500 hours of operation, whichever occurs first." Cal. Code Regs. tit. 13, § 2435 (spark ignition). High-cost warranted parts are determined pursuant to a statutory formula. *Id.*

216.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2. Among those duties, "if the manufacturer or its representative in this state does not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." *See* Cal. Civ. Code § 1793.2(d)(1).

217.    Plaintiffs and California Subclass members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state"

1  because it is unnecessary and futile, including due to the nature of the nonconformity. Cal. Civ.

2  Code § 1793.2(c).

3  218.  This Complaint, as well as a letter sent by Plaintiffs to Defendants in advance of

4  filing, are written notice of nonconformity to Defendants and "shall constitute return of the

5  goods." *Id*.

6  219.  In addition to all other damages and remedies, California State Class members are

7  entitled to "recover a civil penalty of up to two times the amount of damages" for the

8  aforementioned violation. *See* Cal. Civ. Code § 1794(e).

9  **CALIFORNIA COUNT VIII:**
**Failure to Recall/Retrofit**

10  **(By Plaintiff Broadmoor on Behalf of the California State Class)**

11  220.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

12  forth herein.

13  221.  Plaintiff Broadmoor (for the purposes of this count, "Plaintiff") brings this claim

14  on behalf of itself and the California State Class against all Defendants.

15  222.  Defendants manufactured, marketed, distributed, sold, or otherwise placed into the

16  stream of U.S. commerce the Class Vehicles, as set forth above.

17  223.  Defendants knew or reasonably should have known that the Class Vehicles emit a

18  substantially increased amount of pollution and reasonably should have known that the Class

19  Vehicles were likely to be dangerous when used in a reasonably foreseeable manner.

20  224.  Defendants failed to recall the Class Vehicles in a timely manner or warn of the

21  Class Vehicles' heightened emissions.

22  225.  A reasonable manufacturer in same or similar circumstances would have timely

23  and properly recalled the Class Vehicles.

24  226.  Plaintiff and California State Class members were harmed by Defendants' failure

25  to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered

26  damages, caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the

27  Class Vehicles. Defendants' failure to timely recall the Class Vehicles was a substantial factor in

28  causing harm to Plaintiff and California State Class members as alleged herein.

1

2.      **New Jersey**

2

**NEW JERSEY COUNT I:**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**(By Plaintiff Ferraro Foods on Behalf of the New Jersey State Class)**

3

4

5       208.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

6       forth herein.

7       209.    Plaintiff Ferraro Foods (for the purposes of this count, "Plaintiff") brings this

8       claim on behalf of itself and the New Jersey State Class against all Defendants.

9       210.    Plaintiff and New Jersey State Class members and Defendants are "persons" under

10      the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

11      211.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat.

12      §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or

13      commerce.

14      212.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person

15      of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

16      misrepresentation, or the knowing concealment, suppression, or omission of any material fact

17      with the intent that others rely upon such concealment, suppression or omission, in connection

18      with the sale or advertisement of any merchandise or real estate, or with the subsequent

19      performance of such person as aforesaid, whether or not any person has in fact been misled,

20      deceived or damaged thereby." N.J. Stat. § 56:8-2.

21      213.    In the course of their business, Defendants concealed and suppressed material facts

22      concerning the Class Vehicles. Defendants accomplished this by (a) manipulating the data in the

23      emissions certification and output testing for the Class Engines such that they falsely represented

24      emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

25      emissions tests when they in fact did not.

26      214.    Plaintiff and New Jersey State Class members had no way of discerning that

27      Defendants' representations were false and misleading because Plaintiff and New Jersey State

28

Class members did not have access to Defendants' emissions certification and output test engines and data.

215.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

216.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Jersey State Class.

217.    Defendants knew or should have known that their conduct violated the New Jersey CFA.

218.    Defendants owed Plaintiff and the New Jersey State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B.    intentionally concealed the foregoing from regulators, Plaintiff, and New Jersey State Class members; and/or

    C.    made incomplete representations about the Class Vehicles' output performance and emissions, while purposefully withholding material facts from Plaintiffs and the Florida State Class that contradicted these representations.

219.    Defendants' concealment of the Class Vehicles' true emissions and performance was material to Plaintiff and the New Jersey State Class.

220.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New Jersey State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

221.    Defendants' violations present a continuing risk to Plaintiff and the New Jersey

State Class as well as to the general public. Defendants' unlawful acts and practices complained

of herein affect the public interest.

222.    Plaintiff and New Jersey State Class members suffered ascertainable loss and

actual damages as a direct and proximate result of Defendants' misrepresentations and

concealment of and failure to disclose material information. Absent those misrepresentations and

omissions, Plaintiff and New Jersey State Class members would not have purchased or leased the

Class Vehicles, would not have purchased or leased them at the prices they paid, and/or would

have purchased or leased less expensive alternative vehicles that did not have inflated

performance values or issues with exhaust emissions. Defendants had an ongoing duty to all their

customers to refrain from unfair and deceptive practices under the New Jersey CFA.

223.    As a direct and proximate result of Defendants' violations of the New Jersey CFA,

Plaintiff and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an

amount to be proven at trial, and seek all just and proper remedies, including, but not limited to,

actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and

unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just

and appropriate relief.

**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
**N.J.S. 12A:2-313 and 2A-210**
**(By Plaintiff Ferraro Foods on Behalf of the New Jersey State Class)**

224.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

225.    Plaintiff Ferraro Foods (for the purposes of this count, "Plaintiff") brings this

claim on behalf of itself and the New Jersey State Class against all Defendants.

226.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

227.    With respect to leases, Defendants are and were at all relevant times "lessors" of

motor vehicles under N.J.S. 12A:2A-103(1)(p).

228.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

229.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

230.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

231.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120.Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

232.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

233.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

234.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

235.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

236.    Despite the existence of warranties, Defendants failed to inform Plaintiff and New Jersey State Class members that the Class Vehicles were defective and were defectively designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to individuals and entities who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

237.    Defendants breached the express warranty promising to repair and correct Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

238.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

239.    Furthermore, the limited warranty promising to repair and correct Defendants' defects in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and New Jersey State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

240.    Despite the existence of warranties, Defendants failed to inform Plaintiff and New Jersey State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

241.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

242. Accordingly, recovery by Plaintiff and New Jersey State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

243. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and New Jersey State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

244. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship because of Defendants' failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and New Jersey State Class members' remedies would be insufficient to make them whole.

245. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and New Jersey State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

246. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

247. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and New Jersey State Class members have been damaged in an amount to be determined at trial.

**NEW JERSEY COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.J.S. 12A:2-314 and 2A-212**
**(By Plaintiff Ferraro Foods on Behalf of the New Jersey State Class)**

248. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

249.    Plaintiff Ferraro Foods (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the New Jersey State Class against all Defendants.

250.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

251.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

252.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

253.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

254.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable and not fit for the ordinary purpose for which vehicles are used.

255.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

256.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and New Jersey State Class members have been damaged in an amount to be proven at trial.

### 3.    New York

**NEW YORK COUNT I:**
**Violations of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(By Plaintiff Marders on Behalf of the New York State Class)**

257.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

258.   Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

259.   Plaintiff and the New York State Class members and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

260.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

261.   The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

262.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

263.   Plaintiff and New York State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and New York State Class members did not have access to Defendants' emissions certification and output test engines and data.

264.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

265.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New York State Class.

266.   Defendants knew or should have known that their conduct violated the NY DAPA.

- 62 -

267.    Defendants owed Plaintiff and the New York State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators and New York State Class members; and/or

C.    made incomplete representations about the Class Vehicles' emissions and performance while purposefully withholding material facts that contradicted these representations.

268.    Defendants' concealment of the true characteristics of the Class Vehicles' true emissions and performance was material to Plaintiff and the New York State Class.

269.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles

270.    Defendants' violations present a continuing risk to Plaintiff and the New York State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

271.    Plaintiff and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Absent those misrepresentations and omissions, Plaintiff and New York State Class members would not have purchased or leased the Class Vehicles, would not have purchased or leased them at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have inflated performance values or issues with exhaust emissions. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

272. As a direct and proximate result of Defendants' violations of the NY DAPA, Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damage.

273. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff and New York State Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT II:**
**Violations of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(By Plaintiff Marders on Behalf of the New York State Class)**

274. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

275. Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

276. Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

277. The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

278. Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiff and the New York State Class.

279.    Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Class Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Class Vehicles to intentionally and grossly defraud and mislead the New York State Class concerning the true emissions produced by the Class Vehicles and their performance.

280.    The misrepresentations and omissions regarding emissions and performance set forth above were material and likely to deceive a reasonable consumer.

281.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New York State Class.

282.    Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the illegality and true characteristics of the Class Vehicles, the quality of Defendants' brand and the true value of the Class Vehicles.

283.    Defendants' violations of the NY FAA present a continuing risk to Plaintiff and New York State Class members and to the general public. Defendants' deceptive acts and practices affect the public interest.

284.    The Class Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

285.    Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's false advertising in violation of the NY FAA.

286.    Plaintiff and the New York State Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class members. Because Defendants' conduct was committed willingly and knowingly, New York State Class members are entitled to recover three times actual damages, up to $10,000.

287.     The New York State Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**NEW YORK COUNT III:**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(By Plaintiff Marders on Behalf of the New York State Class)**

288.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

289.     Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

290.     Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

291.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

292.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

293.     In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

294.     In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

295.     For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well.

1    *See* 40 C.F.R. § 1039.120.Thus, Defendants also provide an express warranty for their Class

2    Vehicles through a Federal Emissions Warranty.

3        296.    The Warranty required by the EPA for spark-ignition vehicles applies for three

4    years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes

5    first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than

6    $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent

7    of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-

8    related warranty for the engine may not be shorter than the standard warranty terms. *See* 40

9    C.F.R. § 1048.120.

10       297.    The Warranty required by the EPA for compression-ignition vehicles applies for

11   3,000 hours or five years, whichever comes first, and likewise may not be shorter than the

12   standard warranty terms. *See* 40 C.F.R. § 1039.120.

13       298.    Defendants were required to provide these warranties to purchasers or lessees of

14   Class Vehicles.

15       299.    Defendants' warranties formed a basis of the bargain that was reached when

16   consumers purchased or leased Class Vehicles.

17       300.    Despite the existence of warranties, Defendants failed to inform Plaintiff and New

18   York State Class members that the Class Vehicles were defectively designed and manufactured to

19   emit more pollution and achieve inferior output performance than what was disclosed to

20   regulators and represented to the individuals and entities who purchased or leased them, and

21   Defendants failed to fix the defective emission components free of charge.

22       301.    Defendants breached the express warranty promising to repair and correct

23   Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and

24   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25       302.    Affording Defendants a reasonable opportunity to cure their breach of written

26   warranties would be unnecessary and futile here.

27       303.    Furthermore, the limited warranty promising to repair and correct Defendants'

28   defects in materials and workmanship fails in its essential purpose because the contractual remedy

1   is insufficient to make Plaintiff and New York State Class members whole and because

2   Defendants have failed and/or have refused to adequately provide the promised remedies within a

3   reasonable time.

4        304.   Accordingly, recovery by Plaintiff and New York State Class members is not

5   restricted to the limited warranty promising to repair and correct Defendants' defects in materials

6   and workmanship, and they seek all remedies as allowed by law.

7        305.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

8   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

9   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

10  material facts regarding the Class Vehicles. Plaintiff and New York State Class members were

11  therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

12       306.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

13  resolved through the limited remedy of repairing and correcting Defendants' defects in materials

14  and workmanship because of Defendants' failure and/or continued failure to provide such limited

15  remedy within a reasonable time, and any limitation on Plaintiff and New York State Class

16  members' remedies would be insufficient to make them whole.

17       307.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff

18  and New York State Class members assert, as additional and/or alternative remedies, the

19  revocation of acceptance of the goods and the return to them the purchase or lease price of all

20  Class Vehicles currently owned or leased, and for such other incidental and consequential

21  damages as allowed.

22       308.   Defendants were provided reasonable notice of these issues by way of a letter sent

23  by Plaintiff as well as the regulators' investigations.

24       309.   As a direct and proximate result of Defendants' breach of express warranties,

25  Plaintiff and New York State Class members have been damaged in an amount to be determined

26  at trial.

27

28

**NEW YORK COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(By Plaintiff Marders on Behalf of the New York State Class)**

310.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

311.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this count on behalf of itself and the New York State Class against all Defendants.

312.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

313.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under N.Y. UCC Law § 2A-103(1)(p).

314.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

315.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

316.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading emissions ratings and/or performance representations, and/or did not comply with emissions regulations when being used in the real world, and were therefore not merchantable and not fit for the ordinary purpose for which vehicles are used.

317.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

318.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and New York State Class members have been damaged in an amount to be proven at trial.

1   **X.       REQUEST FOR RELIEF**

2            WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class

3   and all State Classes, respectfully request that the Court enter judgment in their favor and against

4   Defendants, as follows:

5            A.      An order certifying the Nationwide and State Classes under the applicable

6   provisions of Rule 23; appointing and designating the Plaintiffs to serves as

7   representatives of the Class and applicable State Classes; and appointing the undersigned

8   attorneys to serve as Class Counsel;

9            B.      An order temporarily and permanently enjoining Defendants from

10  continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and

11  practices alleged in this Complaint;

12           C.      Relief in the form of a comprehensive program to fully reimburse and

13  make whole all Class members for all costs and economic losses that resulted from the

14  inaccurate emissions and performance disclosures, as well as any other consequential

15  damages suffered as a result;

16           D.      A declaration that Defendants are financially responsible for all Class

17  notices and the administration of Class relief;

18           E.      Costs, restitution, compensatory damages for economic loss and out-of-

19  pocket costs, multiple damages under applicable states' laws, punitive and exemplary

20  damages under applicable law; and disgorgement, in an amount to be determined at trial;

21           F.      Rescission of all Class Vehicle purchases or leases, including

22  reimbursement and/or compensation of the full purchase price of all Class Vehicles,

23  including taxes, licenses, and other fees;

24           G.      Any and all applicable statutory and civil penalties;

25           H.      An order requiring Defendants to pay both pre- and post-judgment interest

26  on any amounts awarded;

27           I.      An award of costs and attorneys' fees, as allowed by law;

28

1        J.        Leave to amend this Complaint to conform to the evidence produced at

2    trial; and

3        K.        Such other or further relief as the Court may deem appropriate, just, and

4    equitable.

5    **XI.    DEMAND FOR JURY TRIAL**

6        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

7    and all issues in this action so triable of right.

8    Dated: September 22, 2024            Respectfully submitted,

9

10                            By: */s/ Elizabeth J. Cabraser*

11                            Elizabeth J. Cabraser (State Bar No. 083151)
                             Kevin Budner (State Bar No. 287271)
12                            Phong-Chau G. Nguyen (State Bar No. 286789)
                             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                             275 Battery Street, 29th Floor
13                            San Francisco, CA 94111
                             Telephone: 415.956.1000
14                            Facsimile: 415.956.1008
                             E-mail: ecabraser@lchb.com
15                            E-mail: kbudner@lchb.com
                             E-mail: pgnguyen@lchb.com
16
                             David Stellings (*pro hac vice* to be filed)
17                            Katherine McBride (*pro hac vice* to be filed)
                             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
18                            250 Hudson Street, 8th Floor
                             New York, NY 10013
19                            Telephone: 212.355.9500
                             Facsimile: 212.355.9592
20                            E-mail: dstellings@lchb.com
                             E-mail: kmcbride@lchb.com
21
                             Roland Tellis (State Bar No. 186269)
22                            BARON & BUDD, P.C.
                             15910 Ventura Boulevard, Suite 1600
23                            Encino, CA 91436
                             Telephone: 818.839.2333
24                            Facsimile: 818.986.9698
                             E-mail: rtellis@baronbudd.com
25

26

27

28