1
2
3
4
5
6
7
8
9
10
11
12
13

Elizabeth J. Cabraser (State Bar No. 083151)
Kevin Budner (State Bar No. 287271)
Phong-Chau Nguyen (State Bar No. 286789)
Celena H. Nelson (State Bar No. 356840)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
kbudner@lchb.com
pgnguyen@lchb.com
chnelson@lchb.com

David Stellings (*pro hac vice*)
Katherine McBride (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com

14

*[additional counsel listed on signature page]*

15
16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

17
18
19
20
21
22
23
24
25
26
27
28

BROADMOOR LUMBER & PLYWOOD
CO., AIR GROUP LLC, ALEXANDER
MOVING CO., et al.,

                                Plaintiffs,

        v.

TOYOTA INDUSTRIES CORPORATION,
TOYOTA MATERIAL HANDLING N.A.,
TOYOTA MATERIAL HANDLING, INC.,
and TOYOTA MOTOR CORPORATION

                                Defendants.

Case No. 3:24-cv-06640-JSC

**AMENDED CLASS ACTION
COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   NATURE OF THE ACTION .............................................................................. 1

III.  PARTIES ............................................................................................................ 9

      A.    Plaintiffs .................................................................................................. 9

      B.    Defendants ............................................................................................. 24

IV.   JURISDICTION AND VENUE ........................................................................ 30

V.    DIVISIONAL ASSIGNMENT ......................................................................... 32

VI.   FACTS COMMON TO ALL COUNTS ............................................................ 33

      A.    The U.S. regulators began investigating Toyota's forklift-related
            misconduct by at least 2020. ................................................................ 34

      B.    Toyota's investigation revealed rampant fraud. ................................... 36

            1.    Toyota fabricated and manipulated the emissions test results of the
                  Class Engines. ............................................................................. 36

            2.    Toyota also cheated on "output tests" relating to performance
                  metrics such as horsepower and torque. ...................................... 41

      C.    The misconduct detailed in the SIC Reports also affected the Class Engines
            and Class Vehicles sold in the U.S., rendering them illegal to sell or
            import. ................................................................................................... 41

      D.    Defendants' marketing featured false promises of environmental
            friendliness and misrepresentations of high engine performance and
            emissions compliance—all of which omitted material information about
            Toyota's fraud. ..................................................................................... 44

      E.    Toyota Motor Corporation fostered a culture of noncompliance and fraud
            at its many subsidiaries and affiliates, and bears responsibility for their
            failures. ................................................................................................. 48

VII.  CLASS ACTION ALLEGATIONS ................................................................... 51

      A.    Numerosity: Federal Rule of Civil Procedure 23(a)(1) ........................ 52

      B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2)
            and 23(b)(3) .......................................................................................... 52

      C.    Typicality: Federal Rule of Civil Procedure 23(a)(3) .......................... 53

      D.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) .......................... 53

      E.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) ...... 53

      F.    Superiority: Federal Rule of Civil Procedure 23(b)(3) ........................ 53

VIII. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ........................... 54

      A.    Discovery Rule Tolling ......................................................................... 54

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      B.    Tolling Due to Fraudulent Concealment.................................................. 54

4      C.    Estoppel................................................................................................... 55

5    IX.    CAUSES OF ACTION ....................................................................................... 56

       A.    Claims Asserted on Behalf of the Nationwide Class .............................. 56
6
                     NATIONWIDE COUNT I: Fraud By Concealment (Common law) ....... 56
7
                     NATIONWIDE COUNT II: Unjust Enrichment (Common law)............. 57

8                    NATIONWIDE COUNT III: Breach of Implied Warranty of
                     Merchantability (Uniform Commercial Code)....................................... 59
9
       B.    Claims Asserted on Behalf of the State-Specific Classes ...................... 61
10
             1.    Alabama .......................................................................................... 61
11
                     ALABAMA COUNT I: Violations of the Alabama Deceptive
                     Trade Practices Act Ala. Code § 8-19-1, *et seq.* ........................................ 61
12
                     ALABAMA COUNT II: Breach of Express Warranty Ala. Code
13                   §§ 7-2-313 and 7-2A-210................................................................... 63

14                   ALABAMA COUNT III: Breach of Implied Warranty of
                     Merchantability Ala. Code §§ 7-2-314 and 7-2A-212.............................. 66
15
             2.    Arizona............................................................................................ 67
16
                     ARIZONA COUNT I: Violations of the Arizona Consumer Fraud
                     Act Ariz. Rev. Stat. § 44-1521, *et seq.*....................................................... 67
17
                     ARIZONA COUNT II: Breach of Express Warranty Ariz. Rev.
18                   Stat. §§ 47-2313 and 47-2A210 .................................................................. 69

19                   ARIZONA COUNT III: Breach of Implied Warranty of
                     Merchantability Ariz. Rev. Stat. §§ 47-2314 and 47-2A212 ................... 72
20
             3.    California ......................................................................................... 73
21
                     CALIFORNIA COUNT I: Violations of the California Unfair
                     Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.* ..................... 73
22
                     CALIFORNIA COUNT II: Violations of the California False
23                   Advertising Law Cal. Civ. Code § 17500 *et seq.*.................................... 76

24                   CALIFORNIA COUNT III: Breach of Express Warranty Cal. Com.
                     Code §§ 2313 and 10210 ............................................................................ 77
25
                     CALIFORNIA COUNT IV: Breach of Implied Warranty of
                     Merchantability Cal. Com. Code §§ 2314 and 10212............................... 80
26
                     CALIFORNIA COUNT V: Violation of Song-Beverly Consumer
27                   Warranty Act, Breach of Implied Warranty Cal Civ. Code § 1790,
                     *et seq.* ........................................................................................................... 81
28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3    CALIFORNIA COUNT VI: Violation of the Song-Beverly
     Consumer Protection Act, Breach of Express Warranty Cal Civ.
4    Code § 1790, *et seq.* ................................................................. 83

5    CALIFORNIA COUNT VII: Breach of Express California
     Emissions Warranties Cal. Code Regs. 13 § 2425, 2435. ........................ 85

6    CALIFORNIA COUNT VIII: Failure to Recall/Retrofit......................... 86

7    4.    Colorado ............................................................................ 87

8    COLORADO COUNT I: Violations of the Colorado Consumer
     Protection Act Colo. Rev. Stat. § 6-1-101 *et seq.* ............................... 87

9    COLORADO COUNT II: Breach of Express Warranty Colo. Rev.
10   Stat. §§ 4-2-313 and 4-2.5-210 ..................................................... 89

11   COLORADO COUNT III: Breach of Implied Warranty of
     Merchantability Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.................... 92

12   5.    Georgia ............................................................................. 93

13   GEORGIA COUNT I: Violations of Georgia's Fair Business
     Practices Act Ga. Code Ann. § 10-1-390 *et seq.*................................. 93

14   GEORGIA COUNT IV: Violations of Georgia's Uniform
15   Deceptive Trade Practices Act Ga. Code Ann. § 10-1-370 *et seq.* ........... 96

16   GEORGIA COUNT V: Breach of Express Warranty Ga. Code Ann.
     §§ 11-2-313 and 11-2A-210.......................................................... 98

17   GEORGIA COUNT VI: Breach of Implied Warranty of
     Merchantability Ga. Code Ann. §§ 11-2-314 and 11-2A-212 ................ 101

18   6.    Indiana.............................................................................. 102

19   INDIANA COUNT I: Violations of the Indiana Deceptive
20   Consumer Sales Act Ind. Code § 24-5-0.5-3 ................................... 102

21   INDIANA COUNT II: Breach of Express Warranty Ind. Code
     §§ 26-1-3-313 and 26-1-2.1-210.................................................. 104

22   INDIANA COUNT III: Breach of Implied Warranty of
     Merchantability Ind. Code §§ 26-1-3-314 and 26-1-2.1-212................. 107

23   7.    Kansas .............................................................................. 108

24   KANSAS COUNT I: Violations of the Kansas Consumer
25   Protection Act Kan. Stat. Ann. § 50-623 *et seq.* .............................. 108

26   KANSAS COUNT II: Breach of Express Warranty Kan. Stat.
     §§ 84-2-313 and 84-2A-210......................................................... 111

27   KANSAS COUNT III: Breach of Implied Warranty of
     Merchantability Kan. Stat. §§ 84-2-314 and 84-2A-212 ..................... 114

28   8.    Kentucky ........................................................................... 115

**TABLE OF CONTENTS**
**(continued)**

Page

KENTUCKY COUNT I: Violations of the Kentucky Consumer
Protection Act Ky. Rev. Stat. Ann. § 367.110 *et seq.* ............................. 115

KENTUCKY COUNT II: Breach of Express Warranty Ky. Rev.
Stat. §§ 335.2-313 and 355.2A-210 ........................................................ 118

KENTUCKY COUNT III: Breach of Implied Warranty of
Merchantability Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212 .............. 121

9.  Massachusetts............................................................................................. 122

MASSACHUSETTS COUNT I: Deceptive Acts or Practices
Prohibited by Massachusetts Law Mass. Gen. Laws Ch. 93a, § 1, *et
seq.* ....................................................................................................... 122

MASSACHUSETTS COUNT II: Breach of Express Warranty
Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210........................................ 125

MASSACHUSETTS COUNT III: Breach of Implied Warranty of
Merchantability Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212 ............ 127

10. Minnesota.................................................................................................... 128

MINNESOTA COUNT I: Violations of the Minnesota Prevention
of Consumer Fraud Act Minn. Stat. § 325F.68 *et seq.* ........................... 128

MINNESOTA COUNT II: Violations of the Minnesota Uniform
Deceptive Trade Practices Act Minn. Stat. § 325D.43-48 *et seq.*........... 131

MINNESOTA COUNT III: Breach of Express Warranty Minn.
Stat. §§ 336.2-313 and 336.2A-210 ........................................................ 133

MINNESOTA COUNT IV: Breach of Implied Warranty of
Merchantability Minn. Stat. §§ 336.2-314 and 336.2A-212................... 136

11. Missouri ...................................................................................................... 137

MISSOURI COUNT I: Violations of the Missouri Merchandising
Practices Act Mo. Rev. Stat. § 407.010 *et seq.* ...................................... 137

MISSOURI COUNT II: Breach of Express Warranty Mo. Stat.
§§ 400.2-313 and 400.2A-210 ................................................................ 140

MISSOURI COUNT III: Breach of Implied Warranty of
Merchantability Mo. Stat. §§ 400.2-314 and 400.2A-212 ...................... 143

12. Nebraska...................................................................................................... 144

NEBRASKA COUNT I: Violations of the Nebraska Consumer
Protection Act Neb. Rev. Stat. § 59-1601 *et seq.*.................................... 144

NEBRASKA COUNT IV: Breach of Express Warranty Neb. Rev.
St. U.C.C. §§ 2-313 and 2A-210............................................................. 146

NEBRASKA COUNT V: Breach of Implied Warranty of
Merchantability Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212 ................. 149

**TABLE OF CONTENTS**
(continued)

Page

13.  New Jersey ................................................................ 150

NEW JERSEY COUNT I: Violations of the New Jersey Consumer
Fraud Act N.J. Stat. Ann. § 56:8-1 *et seq.* ............................... 150

NEW JERSEY COUNT II: Breach of Express Warranty N.J.S.
12A:2-313 and 2A-210 ........................................................ 153

NEW JERSEY COUNT III: Breach of Implied Warranty of
Merchantability N.J.S. 12A:2-314 and 2A-212 .............................. 156

14.  New York ................................................................. 157

NEW YORK COUNT I: Violations of the New York General
Business Law § 349 N.Y. Gen. Bus. Law § 349 ............................... 157

NEW YORK COUNT II: Violations of the New York General
Business Law § 350 N.Y. Gen. Bus. Law § 350 ............................... 159

NEW YORK COUNT III: Breach of Express Warranty N.Y.
U.C.C. Law §§ 2-313 and 2A-210 ............................................. 161

NEW YORK COUNT IV: Breach of Implied Warranty of
Merchantability N.Y. U.C.C. Law §§ 2-314 and 2A-212 ...................... 164

15.  Ohio ..................................................................... 165

OHIO COUNT I: Violations of the Ohio Consumer Sales Practices
Act Ohio Rev. Code § 1345.01 *et seq.* .................................... 165

OHIO COUNT II: Violations of the Ohio Deceptive Trade
Practices Act Ohio Rev. Code § 4165.01 *et seq.* .......................... 168

OHIO COUNT III: Breach of Express Warranty Ohio. Rev. Code
§ 1302.26, *et seq.* / U.C.C. § 2-313 ...................................... 171

OHIO COUNT IV: Breach of Implied Warranty of Merchantability
Ohio Rev. Code Ann. §§ 1302.27 and 1310.19 ............................... 174

16.  Tennessee ................................................................ 175

TENNESSEE COUNT I: Violations of the Tennessee Consumer
Protection Act Tenn. Code Ann. § 47-18-101 *et seq.* ...................... 175

TENNESSEE COUNT II: Breach of Express Warranty Tenn. Code
Ann. §§ 47-2-313 and 47-2A-210 ............................................. 177

TENNESSEE COUNT III: Breach of Implied Warranty of
Merchantability Tenn. Code Ann. §§ 47-2-314 and 47-2A-212 ............. 180

17.  Texas .................................................................... 181

TEXAS COUNT I: Violations of the Deceptive Trade Practices Act
Tex. Bus. & Com. Code § 17.41 *et seq.* ................................... 181

TEXAS COUNT II: Breach of Express Warranty Tex. Bus. & Com.
Code §§ 2.313 and 2A.210 ................................................... 184

1

**TABLE OF CONTENTS**
**(continued)**

2

**Page**

3

TEXAS COUNT III: Breach of Implied Warranty of
Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212............. 187

4

X.       REQUEST FOR RELIEF ........................................................................... 188

5

XI.      DEMAND FOR JURY TRIAL...................................................................... 189

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

Plaintiffs Broadmoor Lumber & Plywood Co.; Air Group, LLC; Alexander Moving Company; Andrews Hardware Company, Inc.; Arn Distributors, Inc.; Catalina Beverage Co.; C.T.D Distributing, Inc. d/b/a Long Produce, Inc.; D.I.J. Construction, Inc.; Doan's Nursery Number One, Inc.; Empire Lumber & Millwork Co.; Ferraro Fine Foods Corp.; Goodwill Industries of the Redwood Empire; H & S Transport Co.; JOSCO Products; Krieser Drywall & Insulation; Lanham Hardwood Flooring Co., Inc.; Marders; Perry Supply, LLC; Phoenix Paver Manufacturing, LLC; PMC, Inc. d/b/a KC Scaffold; United Farm and Home Cooperative; and US Strong Power Inc., individually and on behalf of all others similarly situated (the "Classes"), allege the following against Toyota Material Handling N.A. ("TMHNA"), Toyota Material Handling, Inc. ("TMH USA"), Toyota Industries Corporation ("TICO")[1] and Toyota Motor Corporation ("TMC") (collectively, "Defendants" or "Toyota"), based, where applicable, on personal knowledge, information and belief, public corporate admissions, and the pre-filing investigation of counsel.

## II.     NATURE OF THE ACTION

1.     Something is rotten at Toyota. In recent years alone, no fewer than five separate cheating scandals have surfaced, together implicating millions of vehicles produced within the Toyota corporate family over twenty years.

2.     In 2021, for example, Toyota paid a $180 million civil penalty and entered a consent decree admitting to systematically violating Clean Air Act ("CAA") reporting requirements from 2005 to at least 2015.[2] Then, in 2022, Toyota subsidiary Hino Motors admitted to "misconduct in relation to its applications for certification concerning the emissions and the

---

[1] Toyota Material Handling N.A., Toyota Material Handling, Inc., and TICO are referred to herein collectively as "Toyota Industries."

[2] Department of Justice Press Release, *Toyota Motor Company to Pay $180 Million in Settlement for Decade-Long Noncompliance with Clean Air Act Reporting Requirements* (Jan. 14, 2021), available at: https://www.justice.gov/opa/pr/toyota-motor-company-pay-180-million-settlement-decade-long-noncompliance-clean-air-act#:~:text=Along%20with%20the%20civil%20complaint,the%20imposition%20of%20injunctive%20relief.

fuel economy performance of its engines" in commercial diesel trucks dating back to 2010.[3] In 2023, yet another Toyota subsidiary, Daihatsu, admitted to falsifying certification data and other misconduct in a wide range of vehicles.[4] And then in early 2024, news broke of Toyota's admission to yet another massive cheating scandal, this time in certification tests for seven vehicle models that required a stop sale for all three of the models still in production.[5] Together, these scandals depict a company-wide culture of deception and noncompliance. Even Toyota Motor Corporation—the Japanese automaker and affiliate of TICO—has been forced to acknowledge the link between these many scandals within the Toyota family, stating after the most recent public revelation: "[w]e take it seriously that the problem was discovered at Toyota following the recent discovery of certification issues at Hino Motors, Ltd., and Daihatsu Motor Co., Ltd. and Toyota Industries Corporation [TICO]."[6] The last scandal in this long list, involving TICO and its U.S. subsidiaries (together, "Toyota Industries"), is the subject of this Complaint.

3.    In March 2023, TICO announced a "[s]uspension of domestic shipment in Japan due to potential violation of regulations related to certification of engines for forklifts."[7] An example of one of the forklifts at issue is depicted below.[8]

---

[3] Hino Press Release, *Misconduct concerning Engine Certification* (March 4, 2022), available at: https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

[4] Daihatsu Investigation Report (Executive Summary) (December 20, 2023), available at: https://www.daihatsu.com/news/2023/report_1_E.pdf.

[5] *See* Yuri Kageyama, *Toyota apologizes for cheating on vehicle testing and halts production of three models*, Associated Press (June 3, 2024), available at: https://apnews.com/article/toyota-certification-cheating-japan-automakers-scandal-26585a96df2a32f7d67a4011a0a98772.

[6] *See* Toyota Motor Corporation News Release, *Results of Investigation Regarding Model Certification Applications* (June 3, 2024), available at: https://global.toyota/en/newsroom/corporate/40920588.html.

[7] Toyota Industries Corporation News Release, *Suspension of Domestic Shipment in Japan Due to Potential Violation of Regulations Related to Certification of Engines for Forklifts* (March 17, 2023), (hereinafter "TICO 03/23 Press Release") available at: https://www.toyota-industries.com/news/2023/03/17/005490. A PDF copy of the TICO 03/23 Press Release downloaded from TICO's website is also available at the following permalink: https://www.lieffcabraser.com/pdf/TICO03-2023Release.pdf.

[8] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:24-CV-06640-JSC

1
2
3
4
5
6
7
8
9
10
11
12



13    4.    In the 2023 announcement, TICO conceded that the affected engines—two diesel

14  models (certification model year 2014 1ZS & 1KD) and one gasoline model (certification model

15  year 2009 4Y)—exceed "the domestic (Japanese) emissions regulation values due to aging

16  degradation" and admitted to a "potential violation of regulations related to Japanese certification

17  for emissions." *See* TICO 03/23 Press Release.[9] As in prior cheating scandals, Toyota then

18  convened a "Special Investigation Committee [("SIC")] made up of outside experts [to] conduct[]

19  an independent investigation." *See* Results of the Investigation Regarding Domestic Certification

20  for Engines, (January 29, 2024) (hereinafter "SIC Release") at 1.[10]

21    5.    The results of the SIC investigation, released January 29, 2024, revealed that the

22  cheating was even more widespread than Toyota previously disclosed. *Id.* In addition to the three

23  forklift engines already implicated, the SIC investigation identified many more: one more current

24  forklift engine (certification model year[11] 2014 1FS), three formerly used forklift engines

25  ―――――――――――――――
[9] As explained further below, this same cheating applied to certification in the U.S. market as
26  well.

[10] A PDF copy of the SIC Release downloaded from TICO's website (https://www.toyota-
27  industries.com/news/item/20240129_release_e.pdf), is available at the following permalink:
https://www.lieffcabraser.com/pdf/SICRelease.pdf.

28  [11] Certification model year refers to the year in which the engine was originally certified, but the

(certification model year 2007 1DZ, 4Y, and 1FZ), and a current and former engine used in construction machinery like excavators (certification model years 2016 and 2020 Construction 1KD). The engines, collectively, and with certain exceptions, the "Class Engines,"[12] are organized in the chart below, which also includes a summary from the SIC of the identified misconduct for each engine. The vehicles equipped with those engines and sold in the United States are referred to herein as the "Class Vehicles." *Id.*[13]

| | Use (Engine type) | Type | Domestic certification acquisition timing | Key details of improper conduct | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Used values different from measured values | Modified ECU Software | Replaced parts etc. during testing | Used different engines for the test |
| Current models | Forklift (diesel) | 1KD | 2014 | ● | ● | | |
| | | 1ZS | 2014 | | ● | | |
| | Forklift (gasoline, LPG) | 2009 4Y | 2009 | ● | ● | ● | ● |
| | | 1FS | 2014 | ● | ● | ● | |
| | Construction machinery (diesel) | 2020 1KD for Construction Machinery | 2020 | | ● | | |
| Past models | Forklift (diesel) | 2007 1DZ | 2007 | ● | | | |
| | Forklift (gasoline, LPG) | 2007 4Y | 2007 | ● | ● | ● | ● |
| | | 1FZ | 2007 | | | | ● |
| | Construction machinery (diesel) | 2016 1KD for Construction Machinery | 2016 | ● | ● | ● | |

sales for the engines continued on thereafter. For example, certification model year 2014 would be sold onward into 2015, up through at least the U.S. stop sale in 2021.

[12] Counsel for TICO represented to Plaintiffs that the following engines were never sold in the U.S. or equipped in vehicles sold in the U.S.: 2007 1FZ, 2016 and 2020 1KD for construction machinery. Based on those representations, Plaintiffs have removed those engines, and vehicles equipped with them, from the proposed definitions of the Classes. Plaintiffs reserve all rights to re-add them should discovery warrant.

[13] The Class Vehicles include at a minimum the Core IC Diesel Pneumatic (1ZS); the Mid and Large IC Diesel Pneumatics (IKD); the Core IC Cushion and Core IC Pneumatic (4Y); and the Large IC Cushion; Box Car Special; Paper Roll Special; Mid IC Pneumatic; Large IC Pneumatic (1FS).

6.     The minutiae of the scheme are detailed in the SIC reports, incorporated herein.[14] At a high level, the scheme had the intent and effect of misrepresenting the vehicles' true emissions levels as well as their "output" (e.g., torque and power). As outlined in the preceding chart, at a high level, the elements of the emissions scheme included:

a.     using "values different from measured values"—i.e., fabricating important emissions numbers for certification testing;

b.     modifying the engine control unit ("ECU") software in the test engines so that they performed differently in certification tests than they would in real-world use;

c.     replacing parts during emissions testing, again with the intention and effect of generating incorrect emissions values inconsistent with real-world use; and

d.     using different engines for the tests than were equipped in production-model vehicles.

7.     The net effect of this deceptive scheme is that the Class Vehicles emitted more pollutants than represented, allowed by law, or reasonably expected. This rendered the Class Engines and/or Vehicles illegal to import or sell. It also undermined Toyota Industries' many representations to the Class that the Class Engines were "the cleanest engine[s] in the industry,"[15] "good for the environment,"[16] "Attain[ed] the Industry's Top-Level Environmental

---

[14] The SIC reports were issued in versions of various lengths—defined elsewhere herein as the SIC Published Report, the SIC Summary Report, and the SIC Release. Permalinks to each are available at: https://www.lieffcabraser.com/pdf/SICRelease.pdf; https://www.lieffcabraser.com/pdf/SICSummaryReport.pdf; and https://www.lieffcabraser.com/pdf/SICPublishedReport.pdf.

[15] Toyota Forklifts Blog, *An Inside Look At The Toyota Internal Combustion Forklift Engine* (March 30, 2023) (hereinafter "Toyota Forklifts Blog"), formerly available at: https://www.toyotaforklift.com/resource-library/blog/toyota-products/an-inside-look-at-the-toyota-internal-combustion-forklift-engine (now available at: https://web.archive.org/web/20230608112243/https://www.toyotaforklift.com/resource-library/blog/toyota-products/an-inside-look-at-the-toyota-internal-combustion-forklift-engine; and https://www.dillontoyotalift.com/about/blog/?Search=4Y&SearchType=tag); a PDF copy of the Toyota Forklifts Blog downloaded from the web archive is available at the following permalink: https://www.lieffcabraser.com/pdf/ToyotaForkliftsBlog.pdf.

[16] Toyota Material Handling, Parts & Services: Forklift 4Y Engine, formerly available at: https://www.toyotaforklift.com/resource-library/video-library/toyota-forklift-4y-engine (now available at: https://www.facebook.com/watch/?v=667545237085000).

Performance,"[17] and "Emissions Compliant."[18]

8.    Unfortunately, the fraud did not stop there. Toyota also cheated on "output tests" designed to measure torque, horsepower, and other important performance metrics. *See, e.g.*, Toyota Industries Corporation Investigation Report (Published Version) (January 29, 2024) (hereinafter "SIC Published Rep.")[19] at 169-72; Toyota Industries Corporation Investigation Report (Summary Version) (January 29, 2024) (hereinafter "SIC Summary Rep.")[20] at 48.[21] Specifically, engineers "modified the fuel injection amounts" by modifying the ECU software Control Parameter values—or, in other words, employees engaged in intentional misconduct designed to misrepresent the engines' "torque curve," among other things. SIC Summary Rep. at 48. These performance characteristics matter. Toyota's misconduct directly undercut its public-facing representations and violated reasonable expectations in the purchase and lease of the Class Vehicles.

9.    Recognizing the severity of their misconduct, Toyota Motor and TICO have "deeply"[22] and "sincerely apologize[d] for a great deal of inconvenience to our customers, dealers, suppliers, and many other stakeholders." *See* TICO 03/23 Press Release. But, at the same time, Toyota has tried to limit the damage to Japan. After the initial revelations, Toyota claimed

---

[17] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

[18] *See* Toyota Forklifts Blog; *see also* Toyota Material Handling Northern California, TMHNC, *Product Review: Toyota Diesel Forklift*, available at: https://www.tmhnc.com/blog/toyota-diesel-forklifts-product-review (touting 1ZS "Tier IV Final Emissions Compliant").

[19] A PDF copy of the SIC Published Report downloaded from TICO's website (https://www.toyota-industries.com/news/item/reference_full_e.pdf) is available at the following permalink: https://www.lieffcabraser.com/pdf/SICPublishedReport.pdf.

[20] A PDF copy of the SIC Summary Report downloaded from TICO's website (https://www.toyota-industries.com/news/item/reference_summary_e.pdf) is available at the following permalink: https://www.lieffcabraser.com/pdf/SICSummaryReport.pdf.

[21] *See also, e.g.*, Toyota Motor Corporation News Release, *Certification Irregularities at Toyota Industries* (Jan. 29, 2024), available at: https://global.toyota/en/newsroom/corporate/40376368.html?utm_source=miragenews&utm_medium=miragenews&utm_campaign=news ("The investigation found that irregularities occurred during the horsepower output testing for the certification of three diesel engine models for automobiles that Toyota had commissioned to TICO.").

[22] *Id.*

that the scandal and resulting "stop sale . . . only applies to the Japanese market," and "[t]here is no impact on the current inventory or product offering in the US."[23]

10.    The facts on the ground demonstrate otherwise. These facts include, among others, that the investigations leading to Toyota's admissions of misconduct in Japan *originated in the United States*; that Toyota was forced to stop selling the affected forklifts in the United States; that the relevant Japanese and U.S. emissions regulations are similar; and that the pervasive culture of fraud and deceit infected the divisions responsible for the development and certification of all the relevant engines, including the Class Engines sold in the United States.

11.    To be clear, the misconduct first surfaced in the United States, not Japan, based on U.S. regulators' investigations into misconduct that affected vehicles sold in the U.S. market. SIC Published Rep. at 5. The U.S. investigation is still underway several years later, and soon after it began, Toyota was forced to issue two different forklift stop sales in U.S.[24,25]

12.    This is not particularly surprising given the similarities between the U.S. and Japanese regulatory regimes. The bulk of the relevant Japanese emissions regulations are largely identical to the U.S. standards—meaning that any cheating uncovered there would very likely apply to the engines certified here.

13.    The SIC reports confirm as much, explaining that the Japanese certification process for at least the 1KD, 1ZS, 4Y, and 1FS engines relied on prior testing and results undertaken to certify those engines for the U.S. market first. *See* SIC Summary Rep. at 22-23 ("The 1KD Engine first obtained U.S. certification, and then obtained domestic certification as of June 17, 2014 *using the data used for U.S. certification*.") (emphasis added); *id.* at 27 (explaining that the 1ZS obtained Japanese certification using the "correction values calculated based on the results of the 1KD Engine deterioration durability testing"—which, again, were generated during the certification testing for the U.S. market); *Id.* at 30 ("[T]he 2007 4Y Engine first applied for

---

[23] Forklift Action, *Toyota suspends diesel, petrol models* (April 20, 2023), available at: https://www.forkliftaction.com/news/toyota-suspends-diesel-petrol-models.aspx?n=26871.

[24] Toyota Motor Corporation News Release, *Suspension of Production of Certain Forklift Models in North America* (May 21, 2021), available at: https://www.toyota-industries.com/news/2021/05/21/005055/.

[25] Forklift Action, *Toyota halts certain diesel models* (Dec. 9, 2021), available at: https://www.forkliftaction.com/news/toyota-halts-certain-diesel-models.aspx?n=25571.

1   U.S. certification," and "the deterioration durability testing for the 2009 4Y Engine adhered

2   fundamentally to the deterioration durability testing method for the 2007 4Y Engine[.]"); *id.*

3   ("After obtaining U.S. certification, the 1FS Engine applied for domestic certification using the

4   deterioration correction values calculated on the basis of the deterioration factors used for U.S.

5   certification and obtained domestic certification as of June 17, 2014."). In this context, the direct

6   link between the admitted fraud and the U.S. Class Vehicles is clear.

7          14.    Equally as damning is the fact that **Toyota is now *requiring* prospective**

8   **customers to sign a document acknowledging** that the "EPA is reviewing prior emissions

9   certifications . . . including the testing, reporting, and recordkeeping practices of Toyota Material

10  Handling, Inc. (TMH) and its parent company. This review may result in the EPA voiding the

11  certificate that originally authorized TMH to sell the engines in the engines listed below in the

12  U.S."—namely, "8-Series LSI forklift engine models produced from 2007 through 2020." "As a

13  result," the document warns, prospective customers ***should not rely* on the emissions label**

14  **affixed to such engines** or the existence of a previously issued emissions certificate for such

15  engines." This kind of admission is virtually unheard of and yet, in the context of this case, not at

16  all surprising.

17         15.    To top it all off, the SIC reports describe a toxic culture of fraud, negligence, and

18  noncompliance that—like other recent scandals within the Toyota corporate family—pervaded

19  the TICO departments responsible for engine certifications for all markets, including the United

20  States. To cite just a few examples, at TICO and its subsidiaries:

21         a.     "[t]here was no department dedicated to regulation certification" (SIC

22  Release at 4), nor any "training on the "implementation of deterioration durability testing" or the

23  "tightening of emissions regulations" (SIC Summary Rep. at 13), leading to "an organization-

24  wide deficit of understanding about regulations" (*id.* at 53);

25         b.     dysfunctional managers imposed "[u]nreasonable development schedules"

26  that pressured engineers to cheat and cut corners (*id.* at 54-55); and

27         c.     "basic awareness of respecting data accuracy was weak" (SIC Release at

28  4)—a serious problem that "is not only a violation of the fundamental ethics of engineering, but

also improper conduct that disguises the true capabilities of the engine" (SIC Summary Rep. at 57).[26]

16.     Again, something is truly rotten at Toyota, and that rot has affected the U.S. market every bit as much as the Japanese. Plaintiffs and the proposed Classes—the ultimate and intended targets of Toyota's deception—seek to enjoin the Defendants' misconduct and to recover the economic damages they suffered from it.

**III.    PARTIES**

**A.    <u>Plaintiffs</u>**

17.     Plaintiff **Broadmoor Lumber & Plywood Co.** (for the purpose of this paragraph, "Plaintiff") is a family-owned landscaping supply business operating in South San Francisco and the neighboring communities. Plaintiff is a California corporation with its principal place of business in South San Francisco, California. Plaintiff owns eight Class Vehicles: five model 8FGU25s (serial numbers 38696, 38530, 83351, 75075, 69169) and three model 8FGU30s (serial numbers 61639, 73786, 76798). Plaintiff purchased the Class Vehicles both new (serial numbers 38696, 38530, 83351, 61639, 73786, 76798, 75075, and 69169) and used (serial numbers 75075 and 69169) from RJMS Corporation in Hayward, CA and Toyota Material Handling in Livermore, CA. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had

---

[26] Notably, the SIC reports in the investigation of Toyota subsidiary Hino described a similarly toxic culture of noncompliance. *See, e.g.*, Special Investigation Committee, Hino Motors, Ltd. (Aug. 1, 2022), *Investigation Report (Summary)* at 31-42, available at: https://www.hino-global.com/corp/news/20220812_Investigation%20Report%20%28Summary%29.pdf.

Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

18.     Plaintiff **Air Group, LLC** (for the purpose of this paragraph, "Plaintiff") is a family-owned residential and commercial heating, cooling, and plumbing business. Plaintiff is a New Jersey corporation with its principal place of business located in Whippany, New Jersey. Plaintiff owns the following Class Vehicle: 8FGC7OU (serial number 11048). Plaintiff purchased the Class Vehicle new from an authorized Toyota dealer in South Hackensack, New Jersey. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

19.     Plaintiff **Alexander Moving Company** (for the purpose of this paragraph, "Plaintiff") is a moving and storage company. Plaintiff is an Ohio corporation with its principal place of business located in Mentor, Ohio. Plaintiff owns the following Class Vehicle: 8FGU25 (serial number 37878). Plaintiff leased and then purchased the Class Vehicle used from Toyota

1  Material Handling Ohio in Cleveland, Ohio. Plaintiff decided to acquire the Class Vehicle based

2  in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output,

3  performance, and sustainability. Plaintiff also acquired the Class Vehicle under the reasonable

4  expectation—and based on Toyota's representations and/or omissions—that it met or exceeded

5  all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at

6  the time of acquisition, Plaintiff did not know that the Class Vehicle operated with worse

7  emissions and engine output performance than reasonably expected based on Defendants'

8  advertising and omitted information. Toyota's omissions and/or misrepresentations were material

9  to Plaintiff. Plaintiff would not have acquired the Class Vehicle, or would have paid less for it,

10  had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that

11  it did not comply with emission standards; and its real-world output performance was worse than

12  represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and

13  proximate result of Defendants' misconduct, including but not limited to overpaying for the Class

14  Vehicle at the point of acquisition.

15       20.     Plaintiff **Andrews Hardware Company, Inc**. (for the purpose of this paragraph,

16  "Plaintiff") is a family-owned hardware store business. Plaintiff is an Alabama corporation with

17  its principal place of business located in Citronelle, Alabama. Plaintiff owns the following Class

18  Vehicles: 8FGU30 (serial number 14109) and 7FGU35 (serial number 62932). Plaintiff

19  purchased the Class Vehicles used from an authorized Toyota forklift dealer in Alabama. Plaintiff

20  decided to purchase the Class Vehicles based in part on Toyota's representations and/or

21  omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff

22  also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's

23  representations and/or omissions—that they met or exceeded all regulatory emissions standards.

24  Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did

25  not know that the Class Vehicles operated with worse emissions and engine output performance

26  than reasonably expected based on Defendants' advertising and omitted information. Toyota's

27  omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have

28  purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the

Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

21.    Plaintiff **Arn Distributors, Inc. d/b/a Packaging & More** (for the purpose of this paragraph, "Plaintiff") is a distributor of packaging supplies. Plaintiff is a California corporation with its principal place of business located in Vernon, California. Plaintiff owns the following Class Vehicles: 8FGCU15 (serial number 15762) and 8FGCU18 (serial number 16480). Plaintiff purchased the Class Vehicles used from an authorized Toyota dealer in California. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

22.    Plaintiff **Catalina Beverage Co.** (for the purpose of this paragraph, "Plaintiff") is a wholesale distributor of beer, wine, spirits, and a variety of food and grocery items. Plaintiff is a California corporation with its principal place of business located in Avalon, California. Plaintiff owns the following Class Vehicles: model 8FGU25 (serial number 64067) and two model

8FGU20s (serial numbers 31604, 17303). Plaintiff purchased each of the Class Vehicles new from three separate dealerships: Toyotalift, Inc., in Santee, California; Toyota Forklifts of St. Louis, Inc., in St. Louis, Missouri; and a third dealership located in California. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

23.     Plaintiff **C.T.D Distributing, Inc., d/b/a Long Produce, Inc.** (for the purpose of this paragraph, "Plaintiff") is a wholesale produce distributor. Plaintiff is a California corporation with its principal place of business located in Pico Rivera, California. Plaintiff owns the following Class Vehicle: 8FGCU20 (serial number 42280). Plaintiff leased and then purchased the Class Vehicle new from Rebas, Inc., d/b/a Toyota-Lift of Los Angeles, a Toyota forklift dealer in Santa Fe Springs, California. Plaintiff decided to acquire the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also acquired the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of acquisition, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and

omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have acquired the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

24.     Plaintiff **D.I.J. Construction, Inc.** (for the purpose of this paragraph, "Plaintiff") is a construction company that focuses on striping and chip sealing roads and also manufactures thermoplastic striping material. Plaintiff is a Texas corporation with its principal place of business located in Bertram, Texas. Plaintiff owns the following seven Class Vehicles: four model 8FDU25s (serial numbers 30601, 11365, 32602, and 62959) and three model 8FGU25s (serial numbers 73471, 73504, and 76824). Plaintiff purchased the Class Vehicles both used (serial numbers 11365, 32602, and 76824) and new (the remaining four forklifts) from an authorized Toyota dealer in Troy, Texas. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

25.     Plaintiff **Doan's Nursery Number One, Inc.** (for the purpose of this paragraph, "Plaintiff") is a nursery that propagates, grows, and sells high-quality plants to the public and landscapers, with a specialty in Asian exotic flowers, fruits, and vegetable plants. Plaintiff is a Texas corporation with its principal place of business located in Irving, Texas. Plaintiff owns the following Class Vehicle: 8FGCSU20 (serial number 17542). Plaintiff purchased the Class Vehicle used from a dealer in Irving, Texas. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

26.     Plaintiff **Empire Lumber & Millwork Co.** (for the purpose of this paragraph, "Plaintiff") is a building materials dealer that specializes in doors, frames, and hardware. Plaintiff is a New Jersey corporation with its principal place of business located in Newark, New Jersey. Plaintiff owns the following Class Vehicle: 8FGU30 (serial number 61939). Plaintiff purchased the Class Vehicle used from a third party in New Jersey. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the

1   Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated

2   with worse emissions and engine output performance than reasonably expected based on

3   Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations

4   were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have

5   paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than

6   reasonably expected; that it did not comply with emission standards; and that its real-world output

7   performance was worse than represented and/or reasonably expected. Plaintiff has suffered a

8   concrete injury as a direct and proximate result of Defendants' misconduct, including but not

9   limited to overpaying for the Class Vehicle at the point of sale.

10          27.    Plaintiff **Ferraro Fine Foods Corp.** (for the purpose of this paragraph, "Plaintiff")

11  is a specialty Italian food distributor that services restaurants in the Eastern U.S., with facilities in

12  New Jersey, New York, Connecticut, Maryland, Indiana, North Carolina, and Florida. Plaintiff is

13  a Delaware corporation with its principal place of business in Piscataway, New Jersey. Plaintiff

14  owns the following Class Vehicle: 8FGCU25 (serial number 23143). Plaintiff purchased the Class

15  Vehicle through its acquisition of Napoli Foods in 2019, through which Ferraro acquired all of

16  Napoli Foods' assets and claims arising therefrom. Toyota concealed the true nature of the Class

17  Vehicle, and at the time of purchase, Plaintiff (as Napoli Foods) could not have known that the

18  Class Vehicle operated with worse emissions and engine output performance than reasonably

19  expected based on Defendants' advertising and omitted information. Toyota's omissions and/or

20  misrepresentations were material. Plaintiff, as a reasonable consumer, would not have purchased

21  the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle

22  emitted more pollutants than reasonably expected; that it did not comply with emission standards;

23  and that its real-world output performance was worse than represented and/or reasonably

24  expected. Similarly, Plaintiff would not have purchased the Class Vehicle from Napoli Foods at

25  all, had it known that the Class Vehicle emitted more pollutants than reasonably expected; that it

26  did not comply with emission standards; and that its real-world output performance was worse

27  than advertised. Plaintiff has suffered a concrete injury as a direct and proximate result of

28

Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

28.     Plaintiff **Goodwill Industries of the Redwood Empire** (for the purpose of this paragraph, "Plaintiff") is a nonprofit organization that serves Sonoma, Napa, Mendocino, Lake, Humboldt, and Trinity Counties in Northern California. Plaintiff is a California Non-Governmental Organization with its principal place of business located in Santa Rosa, California. Plaintiff owns the following Class Vehicle: 8FGCU25 (serial number 16430). Plaintiff purchased the Class Vehicle used from an authorized Toyota dealer in California. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

29.     Plaintiff **H & S Transfer Co.** (for the purpose of this paragraph, "Plaintiff") is a moving and storage company. Plaintiff is a Georgia corporation with its principal place of business located in Augusta, Georgia. Plaintiff owns the following Class Vehicle: 8FGU25 (serial number 89647). Plaintiff leased and then purchased the Class Vehicle from Toyota Fork Lifts of Atlanta located in Augusta, Georgia. Plaintiff decided to acquire the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also acquired the Class Vehicle under the reasonable

expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of acquisition, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have acquired the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of acquisition.

30.     Plaintiff **JOSCO Products** (for the purpose of this paragraph, "Plaintiff") is a family-owned company that sells a variety of cleaning products and other materials, ranging from trademarked EcoRags, to gloves and facemasks, to fiberglass and chemicals. Plaintiff is a Texas corporation with its principal place of business located in Austin, Texas. Plaintiff owns the following Class Vehicle: model 8FGU25 (serial number 13676). Plaintiff purchased the Class Vehicle used from Doggett Equipment Services, Ltd. in San Antonio, Texas. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff

has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

31.     Plaintiff **Krieser Drywall & Insulation** (for the purpose of this paragraph, "Plaintiff") is a family-owned insulation business. Plaintiff is a Nebraska corporation with its principal place of business located in Seward, Nebraska. Plaintiff owns the following Class Vehicle: 8FGU30 (serial number 35902). Plaintiff purchased the Class Vehicle used from a third party. Plaintiff decided to purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or omissions—that it met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class Vehicle operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more pollutants than reasonably expected; that it did not comply with emission standards; and that its real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicle at the point of sale.

32.     Plaintiff **Lanham Hardwood Flooring Co., Inc.** (for the purpose of this paragraph, "Plaintiff") is a hardwood flooring distributor. Plaintiff is a Kentucky corporation with its principal place of business located in Louisville, Kentucky. Plaintiff owns the following four Class Vehicles: model 8FGCU30 (serial number 10728); model 8FGCU30 (serial number 19444); model 8FGCU30 (serial number 15220); and model 8FGCU25 (serial number 43982). Plaintiff purchased the Class Vehicles from dealerships located in Ohio and Indiana. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding its cleanliness, emissions output, performance, and sustainability. Plaintiff

1    also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's

2    representations and/or omissions—that it met or exceeded all regulatory emissions standards.

3    Toyota concealed the true nature of the Class Vehicle, and at the time of purchase, Plaintiff did

4    not know that the Class Vehicles operated with worse emissions and engine output performance

5    than reasonably expected based on Defendants' advertising and omitted information. Toyota's

6    omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have

7    purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the

8    Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with

9    emission standards; and that their real-world output performance was worse than represented

10   and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate

11   result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles

12   at the point of sale.

13       33.    Plaintiff **Marders** (for the purpose of this paragraph, "Plaintiff") is a family-

14   owned plant nursery, landscaping, and tree moving business. Plaintiff is a New York corporation

15   with its principal place of business located in Bridgehampton, New York. Plaintiff owns the

16   following Class Vehicle: 50-8FGU25 (serial number 10517). Plaintiff purchased the Class

17   Vehicle new from Mid Country Machinery in Brewerton, New York. Plaintiff decided to

18   purchase the Class Vehicle based in part on Toyota's representations and/or omissions regarding

19   their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the

20   Class Vehicle under the reasonable expectation—and based on Toyota's representations and/or

21   omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the

22   true nature of the Class Vehicle, and at the time of purchase, Plaintiff did not know that the Class

23   Vehicle operated with worse emissions and engine output performance than reasonably expected

24   based on Defendants' advertising and omitted information. Toyota's omissions and/or

25   misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class

26   Vehicle, or would have paid less for it, had Plaintiff known that the Class Vehicle emitted more

27   pollutants than reasonably expected; that it did not comply with emission standards; and that its

28   real-world output performance was worse than represented and/or reasonably expected. Plaintiff

1  has suffered a concrete injury as a direct and proximate result of Defendants' misconduct,

2  including but not limited to overpaying for the Class Vehicle at the point of sale.

3      34.    Plaintiff **Perry Supply, LLC** (for the purpose of this paragraph, "Plaintiff") is a

4  specialty concrete business. Plaintiff is a Massachusetts corporation with its principal place of

5  business located in Pembroke, Massachusetts. Plaintiff owns the following Class Vehicles:

6  8FGU15 (serial number 32968) and 8FGU30 (serial number 65367). Plaintiff purchased the Class

7  Vehicles used from authorized dealers in Colorado and Massachusetts. Plaintiff decided to

8  purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding

9  their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the

10  Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or

11  omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the

12  true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class

13  Vehicles operated with worse emissions and engine output performance than reasonably expected

14  based on Defendants' advertising and omitted information. Toyota's omissions and/or

15  misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class

16  Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted

17  more pollutants than reasonably expected; that they did not comply with emission standards; and

18  that their real-world output performance was worse than represented and/or reasonably expected.

19  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

20  misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

21      35.    Plaintiff **Phoenix Paver Manufacturing, LLC** (for the purpose of this paragraph,

22  "Plaintiff") is manufacturer of concrete pavers. Plaintiff is an Arizona corporation with its

23  principal place of business located in Phoenix, Arizona. Plaintiff owns the following Class

24  Vehicles: three model 8FDU25s (serial numbers 62853, 60325, 60328), nine model 8FD45Us

25  (serial numbers 10371, 10375, 10377, 10887, 10889, 11397, 11402, 11832, 20206) and one

26  model 8FD70U (serial number 20269). Plaintiff purchased the Class Vehicles new from an

27  authorized Toyota dealer in Arizona. Plaintiff decided to purchase the Class Vehicles based in

28  part on Toyota's representations and/or omissions regarding their cleanliness, emissions output,

performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable

expectation—and based on Toyota's representations and/or omissions—that they met or exceeded

all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at

the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse

emissions and engine output performance than reasonably expected based on Defendants'

advertising and omitted information. Toyota's omissions and/or misrepresentations were material

to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for

them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably

expected; that they did not comply with emission standards; and that their real-world output

performance was worse than represented and/or reasonably expected. Plaintiff has suffered a

concrete injury as a direct and proximate result of Defendants' misconduct, including but not

limited to overpaying for the Class Vehicles at the point of sale

   36. Plaintiff **PMC, Inc. d/b/a KC Scaffold** (for the purpose of this paragraph,

"Plaintiff") is a scaffolding rental and installation company. Plaintiff is a Kansas corporation with

its principal place of business located in Kansas City, Kansas. Plaintiff owns the following three

Class Vehicles: two model 8FGU25s (serial numbers C3215 and C2094) and one model 8FDU25

(serial number C1669). Plaintiff purchased the Class Vehicles new from an authorized Toyota

dealer in Kansas City, Missouri. Plaintiff decided to purchase the Class Vehicles based in part on

Toyota's representations and/or omissions regarding their cleanliness, emissions output,

performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable

expectation—and based on Toyota's representations and/or omissions—that they met or exceeded

all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at

the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse

emissions and engine output performance than reasonably expected based on Defendants'

advertising and omitted information. Toyota's omissions and/or misrepresentations were material

to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for

them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably

expected; that they did not comply with emission standards; and that their real-world output

performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

37.    Plaintiff **United Farm and Home Cooperative** (for the purpose of this paragraph, "Plaintiff") is a farm supply and home goods business with multiple locations in Tennessee. Plaintiff is a Tennessee corporation with its principal place of business in Columbia, Tennessee. Plaintiff owns 12 Class Vehicles: four model 8FGU15s (serial numbers 31059, 33990, 60841, 62062), three model 8FGU25s (serial numbers 12818, 19936, 12796), two model 8FGCU25s (serial numbers 72317, 68970), one model 7FGU15 (serial number 66231), one model 8FDU30 (serial number 31913), and one model 8FGU30 (serial number 76580). Plaintiff purchased most of its Class Vehicles new from AG Equipment USA in La Vergne, Tennessee. Class Vehicle model 8FDU30 (serial number 31913) was purchased used in Indiana. Class Vehicle model 8FGU30 (serial number 76580) was also purchased used. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

38.    Plaintiff **US Strong Power, Inc.** (for the purpose of this paragraph, "Plaintiff") is a cleaning products supplier. Plaintiff is a Texas corporation with its principal place of business

located in South Houston, Texas. Plaintiff owns the following Class Vehicles: three model 8FGU25 (serial numbers 17447, 48275, 35434). Plaintiff purchased the Class Vehicles used in Houston, Texas. Plaintiff decided to purchase the Class Vehicles based in part on Toyota's representations and/or omissions regarding their cleanliness, emissions output, performance, and sustainability. Plaintiff also purchased the Class Vehicles under the reasonable expectation—and based on Toyota's representations and/or omissions—that they met or exceeded all regulatory emissions standards. Toyota concealed the true nature of the Class Vehicles, and at the time of purchase, Plaintiff did not know that the Class Vehicles operated with worse emissions and engine output performance than reasonably expected based on Defendants' advertising and omitted information. Toyota's omissions and/or misrepresentations were material to Plaintiff. Plaintiff would not have purchased the Class Vehicles, or would have paid less for them, had Plaintiff known that the Class Vehicles emitted more pollutants than reasonably expected; that they did not comply with emission standards; and that their real-world output performance was worse than represented and/or reasonably expected. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, including but not limited to overpaying for the Class Vehicles at the point of sale.

**B.**    **Defendants**

39.    **Toyota Industries Corporation** ("TICO" or "Toyota Industries") is a Japanese corporation with its principal place of business located in Kariya, Aichi, Japan. TICO designs, develops, manufactures, and sells materials handling equipment, textile machinery, automobiles, and automobile parts and engines, including Toyota-branded forklifts and forklift engines. TICO is an affiliate of Toyota Motor Corporation (TMC). TICO performed diesel engine development, design, and testing work in its close relationship with its corporate affiliate, TMC, in what it publicly describes as a "family effort."[27]

40.    On information and belief, TICO engineered, designed, developed, manufactured, and tested the Class Engines and Class Forklifts. TICO exported many of the Class Engines (and

---

[27] *See* Toyota Material Handling, *Toyota Industries Corporation Makes Forklifts, And So Much More* (March 28, 2023), available at: https://www.toyotaforklift.com/resource-library/blog/toyota-culture/toyota-industries-corporation-makes-forklifts-and-so-much-more.

potentially certain complete Class Forklifts and other vehicle components) through regular

shipments from Japan directed to ports in California and elsewhere in the United States, with the

knowledge and understanding that they would be sold throughout the United States, including in

California. Data compiled from bills of lading from the website Import Yeti show regular

shipments of containers of "component Toyota forklift trucks" and "Forklift trucks," from TICO

in Nagoya Ko, Japan to Los Angeles and Long Beach, California, and Seattle and Tacoma,

Washington, ultimately directed to TICO's subsidiary TMH USA. TICO sent eleven such

shipments of engines and/or forklifts into the United States within just the month of May 2024

alone, with a total of more than 1,600 shipments sent from TICO in Japan to Los Angeles,

California from January 2015 to November 2024.[28] In fact, the top port TICO ships to in the

United States is Los Angeles, California and the state TICO ships to most is California.[29]

41.    On information and belief, TICO also reviewed and approved the marketing, and

advertising campaigns designed to sell the Toyota forklifts in California and throughout the

United States.  After the marketing and sales are complete, TICO continues to monitor customer

data and track service, through a central structure it has developed to "digitally manag[e]

information on lift trucks owned by customers and their history of repairs while assigning

experienced and highly skilled personnel and utilizing leading-edge information technology."[30]

42.    TICO also performed the required U.S. federal and state regulatory emissions and

performance tests for the Class Engines to be sold in the United States, including in California.

On information and belief, TICO performed the testing at its facilities in Kariya, Aichi, Japan,

and then sent the results to the EPA and California's regulatory authority, CARB.[31]

---

[28] *See* www.importyeti.com/supplier/toyota-industries.

[29] *Id.* TICO ships to California ports (directed to Toyota Material Handling) a significant amount more than it ships to Indiana (the now headquarters of Toyota Material Handling. *See generally id.*

[30] *Business Activities*, Toyota Industries Corporation (2023), available at https://www.toyota-industries.com/investors/item/TICOReport2023_E_P18-32_business_initiatives.pdf.

[31] TICO's laboratory is listed as the "Test Lab Name" in the annual certification data submitted to the EPA from 2011-present for Toyota's large non-road spark ignition engines (including forklifts), *See* EPA, *Compliance and Fuel Economy Data, Annual Certification Data for Vehicles, Engines, and Equipment*, available at:https://www.epa.gov/compliance-and-fuel-economy-data/annual-certification-data-vehicles-engines-and-equipment.

43.    Following initial regulatory certification, TICO also engaged directly with these emissions regulators in their (still open) investigation of the emissions issues described herein. As TICO itself has explained, it was in the second half of 2020 when TICO was making its "yearly application for certification for 2021 for forklift gasoline engines for the North American market" that it first "became concerned about data used for past applications in the U.S." and it was TICO that then engaged with regulators and "handled data confirmation and information requests from the U.S. environmental authorities." *See* TICO 03/23 Press Release. Due to the certification issues, TICO decided to pause production and shipment of certain forklift models in the U.S. in 2021.[32]

44.    Then, in the wake of the U.S. production pause in 2022, TICO announced that "the Company" (i.e., TICO) later "obtained engine certification for its main models of small liquefied petroleum gas (LPG) lift trucks and resumed shipments" and that TICO itself was "working to obtain certification and resume production for the remaining models" in the United States.[33]

45.    **Toyota Material Handling N.A.** ("TMHNA") is an Indiana corporation with its principal place of business located in Columbus, IN. TMHNA is a wholly-owned U.S. subsidiary of TICO. TMHNA is the North American headquarters for TICO's materials handling equipment business, and it engages in business including manufacturing, parts distribution, and sales and marketing through dealerships throughout the United States,[34] including the dealership Toyota Material Handling of Northern California, located in Livermore, CA (now operating as Total Industries).

46.    On information and belief, TMHNA also reviewed and approved the marketing, and advertising campaigns designed to sell the Class Vehicles (with the Class Engines) in California and throughout the United States.

---

[32] *Suspension of Production*, Toyota Industries Corporation, https://www.toyota-industries.com/news/2021/05/21/005055/index.html#:~:text=TICO%20expects%20that%20the%20certification%20process%20will%20take,at%20Toyota%20Material%20Handling%20starting%20on%20June%201.

[33] *See* TICO Annual Financial Report 2023 at 86, available at: https://www.toyota-industries.com/investors/item/2023_annual_financial_report_E.pdf.

[34] *See* Toyota Material Handling N.A., available at: https://www.tmhna.com/.

47.    TMHNA shares leadership and key decision makers with its parent company, TICO (as well as with its subsidiary, Toyota Material Handling, Inc.). For example, Brett Wood is the President, CEO and a director of TMHNA, a member of the board of Toyota Material Handling, Inc., and also a Senior Executive Officer on the board of TICO.[35]  Likewise, Lea Ann King was the secretary of THMNA in 2018 (and prior), was the secretary for TMH USA in 2019, is currently an officer of TMH USA and is currently the VP of Legal for THMNA.[36]

48.    **Toyota Material Handling, Inc.** ("TMH USA") is a California corporation with its principal place of business located in Columbus, Indiana. TMH USA is a wholly-owned U.S. subsidiary of TMHNA, which is itself a subsidiary of TICO. TMH USA engages in business— including manufacturing, research and development, sales, and parts distribution—in all 50 states, including in California. TMH USA manufactured many of the complete Class Vehicles in the United States with engines and components shipped from TICO in Japan. TMH USA was formed after the integration of two former arms of Toyota's U.S. material handling business, Toyota Material Handling U.S.A. Inc. and Toyota Industrial Equipment Manufacturing, into one new entity: TMH USA. This was done to integrate the two businesses and "increase overall synergy."[37] Prior to the integration, Toyota Material Handling U.S.A. Inc. was headquartered in Irvine, California from 2002 into 2014. At some point in 2014, after many Class Vehicles were already designed, made, and sold, Toyota Material Handling U.S.A. Inc. moved its headquarters from Irvine, California, to Indiana and continued the integration with the Indiana business into 2019.[38] TMH USA remains incorporated under California law.

---

[35] See Toyota Material Handling, Management Team, available at: https://www.toyotaforklift.com/about-toyota/team/brett-wood.

[36] *See Lea Ann King*, Toyota Material Handling, https://www.toyotaforklift.com/about-toyota/team/lea-ann-king (last visited Dec. 12, 2024).

[37] *Toyota Material Handling Completes North American Integration Process*, Toyota Material Handling (Jan. 6, 2020), https://www.toyotaforklift.com/news/toyota-material-handling-completes-north-american-integration-process.

[38] *See* Modern Materials Handling, *Toyota Material Handling completes North American Integration process (*January 16, 2020), available at: https://www.mmh.com/article/toyota_material_handling_completes_north_american_integration_process.

49.     TMH USA regularly submits applications to the EPA and to CARB in California obtain the certification necessary for the sale of Toyota forklifts in the United States and California. TICO knew and approved of TMH USA's submissions, which were necessary for TICO to export its products for sale in the United States and California, and which list TICO as the entity responsible for the testing laboratory for the certification tests, and TMH USA as the manufacturer of the tested forklifts.

50.     Like TMHNA, TMH USA also shares leadership and decision makers with its parent company, TICO. For example, Brett Wood, the President, CEO, and a director of TMHNA, is on the board for both TMH USA and TICO.[39] Similarly, Mitch Shibagaki is the Executive Vice President and Treasurer of TMH USA, the Executive Coordinator for TMHNA, and the recent Financial Planning & Analysis (FP&A) Group Manager for TICO.[40]

51.     Plaintiffs refer to TICO, TMH USA, and TMHNA collectively as "Toyota Industries."

52.     **Toyota Motor Corporation** ("TMC" or "Toyota Motor") is a Japanese corporation with its principal place of business in Toyota City, Aichi, Japan. Toyota is one of the largest vehicle manufacturers in the world and is in the business of designing, developing, manufacturing, and selling automobiles and component parts. TMC is an affiliate corporation of TICO and owns approximately 25% of TICO's voting shares and is TICO's largest shareholder by a substantial margin.[41]  And at the same time TICO is TMC's second largest shareholder.[42]

53.     Historically, TMC and TICO have worked closely together to design and develop engines. In fact, Toyota's first forklift was invented and developed in 1955 by TMC (then Toyota Motor Sales Co.). As the lift truck market grew in subsequent decades, Toyota established a

---

[39] *See* Toyota Material Handling, Management Team, available at: https://www.toyotaforklift.com/about-toyota/team/brett-wood.

[40] *See* Toyota Material Handling, Management Team, available at: https://www.toyotaforklift.com/about-toyota/team/mitch-shibagaki; TICO Stock Information and Ratings, available at: https://www.toyota-industries.com/investors/stock/index.html.

[41] Toyota Annual Financial Report (March 31, 2023) at 8, available at: https://www.toyota-industries.com/investors/item/2023_annual_financial_report_E.pdf.

[42] *Stock Overview*, Toyota, https://global.toyota/en/ir/stock/outline/?padid=ag478 (last visited Dec. 12, 2024).

dedicated factory for the production of industrial products in Japan, and then ultimately moved its production and sale of material handling equipment to TICO. [43] And in November 2014, TMC and TICO announced that they would consolidate their shared diesel engine development functions under TICO, with TICO to then be responsible for production of new diesel engines for both companies in a "more efficient" joint business structure. Under this structure, TMC takes charge of developing "base technologies" common to both diesel and gasoline engines, and TICO takes on the diesel engine development and production from there.[44] TMC also uses TICO to conduct testing for emissions certification purposes, including for certain diesel engines.[45] Unsurprisingly then, TMC and TICO executives worked together to understand the "certification issues" of their products, with an aim to review and create better systems for their certification work.[46]

54.     There has been substantial cross-pollination among the leadership at TMC and TICO. For example, Takuo Sasaki, TICO's Executive Vice President during the time period that many of the Class Vehicles were in production and development, was also a former managing officer at TMC. Similarly, Mitsuhisa Kato, a member of TICO's board of directors, served as a Senior Advisor to TMC at the same time. And Takahiko Ijichi was both an Audit & Supervisory Board Member for TICO and a Senior Advisor to TMC. Another example, Shigeki Terashi, was, for much of the relevant time period, Chief Officer of TMC's North America Operations Group, President & COO of Toyota Motor North America, Inc., and the Chairman of the Board at TICO.[47]

---

[43] *A History of Toyota Forklifts*, Toyota Material Handling (Apr. 2, 2018), https://www.toyotaforklift.com/resource-library/blog/toyota-culture/a-history-of-toyota-forklifts.

[44] *See* Toyota Motor Corporation and Toyota Industries Corporation News Release, *Toyota Industries Corp. and Toyota Motor Corp. to Consolidate Diesel Engine Development and Production* (November 28, 2014), available at: https://www.toyota-industries.com/news/2014/11/28/004920/index.html.

[45] *See* Toyota Motor Corporation News Release, *supra* n.21.

[46] *Ongoing Certification Issues: What Happened in the Toyota Group and What is Being Done Now?*, Toyota Times (Nov. 13, 2024), https://toyotatimes.jp/en/newscast/100.html ("Top management and the employees met onsite and put their heads together to hold a TPS (Toyota Production System) Jishuken (Joint Kaizen Activities) for certification work.").

[47] *See, e.g.*, Toyota Industries Corporation, Leadership, available at: https://www.toyota-industries.com/company/data/index.html; Global Executive Pages, Toyota, Shigeki Terashi (June

1

**IV.    JURISDICTION AND VENUE**

2          55.    Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C.

3    § 1332(d), because at least one member of the proposed Class is of diverse citizenship from one

4    Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest

5    and costs.

6          56.    This Court has general personal jurisdiction over TMH USA because it is a

7    California corporation formed in 2001 according to its filings with the California and Indiana

8    secretaries of state.

9          57.    This Court also has specific personal jurisdiction over Defendants pursuant to

10   California Code of Civil Procedure § 410.10. Defendants conduct substantial business in this

11   District; some of the conduct giving rise to the Complaint took place in this District; and some of

12   Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on

13   business in this state or having an office or agency in this state, and causing injury to property in

14   this state arising out of Defendants' acts and omissions outside this state.

15         58.    As explained below, each Defendant purposefully directed its activities toward

16   California and availed themselves of the privilege of conducting activities in this jurisdiction.

17   Although TMC and TICO are based in Japan, they are subject to the Court's specific personal

18   jurisdiction because they have pervasive contacts with the United States and California,

19   purposefully directed their activities to the United States and California. TICO with TMC

20   established Toyota Material Handling with a North American branch to streamline the production

21   and sale of the Class Vehicles in the United States.[48]  And TICO and TMC and exert substantial

22   control over their domestic affiliates and subsidiaries, TMH USA and TMHNA.

23         59.    The Defendants' contacts with California are substantial. To begin, the

24   Defendants, together, designed, developed, manufactured, and sold the Class Vehicles (and Class

25   Engines) directed to customers in the United States, including in California. Defendants'

26   interactions in California go beyond just a sale of a Class Vehicle to a customer. Defendants, as

27   ───────────────────
     16, 2015), available at:

28   https://global.toyota/pages/executives/2016/pdf/en/08_TERASHI_Shigeki.pdf.
     [48] *See Business Activities*, *supra* note 30.

TICO has explained, have developed a post-sale experience for customers in an attempt to increase customer satisfaction by providing a unique and individualized customer experience targeted to the customer's logistic site (for example, the Plaintiffs' logistical sites located in California). Additionally, many of the misrepresentations and omissions at issue in this case were directed not only at Toyota forklift customers, but also to both federal and state regulators. As explained in the SIC's Investigation Report, "[i]n order to sell engines across the United States including California, an application must be made to CARB as well as the EPA." SIC Published Rep. at 105 n.214. For each of the engines in the Class Vehicles, Toyota Industries targeted California and CARB to obtain permission to sell the vehicles through regulatory certification *See, e.g.*, *id.* at 105-07, 127-29.

60.     The communications between Toyota Industries and CARB in California regarding the engines in the Class Vehicles were extensive and, as documented herein, included many of the misrepresentations and omissions underlying this case. Toyota Industries' efforts targeted at the U.S. and California are further reflected in the significant engine certification data submitted to both the EPA[49] and CARB.[50] Moreover, and as typical with foreign manufacturers (and as the SIC's Investigative Report confirms), these critical interactions with the federal and California regulators involved the Japanese Toyota entities in addition to their U.S. subsidiaries.

61.     After the regulatory certifications necessary to sell the Class Engines and Class Vehicles in the U.S. were obtained, TICO then targeted and physically entered California through its routine and voluminous shipments of Toyota Forklifts and component engines and parts from Japan into the United States, through ports in Los Angeles and Long Beach, California, over the

---

[49] EPA, *Annual Certification Data for Vehicles, Engines, and Equipment*, available at: https://www.epa.gov/compliance-and-fuel-economy-data/annual-certification-data-vehicles-engines-and-equipment. The available data lists Toyota Material Handling, Inc. as the "manufacturer" of several of the engines in the Class Vehicles and TICO as the entity conducting the relevant laboratory testing (MFR Test Lab Name).

[50] CARB, *Off-Road Compression-Ignition Certification Program: Off-Road Compression-Ignition Certification Checklist*, available at: https://ww2.arb.ca.gov/resources/documents/road-compression-ignition-certification-program-road-compression-ignition and CARB, *Large Spark-Ignition Engine - Regulatory and Certification Documents*, available at: https://ww2.arb.ca.gov/large-spark-ignition-engine-regulatory-and-certification-documents.

course of many years. In fact, the port in Los Angeles, California, is the port most frequently used by TICO for its shipments into the United States.

62.    Finally, TMH USA was based in Irvine, California into 2014, a time period that includes the development and manufacture of many of the Class Vehicle models at issue in this Complaint.

63.    The Defendants also targeted Class members in each of the fifty states, including California, with advertising for the Class Vehicles; purposefully directed their activities to the fifty states, including California; and controlled the design, distribution, and sale of the Class Vehicles themselves. California is a significant market for Toyota forklifts and for the Class members who paid for them. There are at least twelve authorized dealerships within the TMHNA and TMH USA dealership network in California that sell and lease Toyota forklifts, including two in this District alone (in Livermore and Salinas, CA).[51]

64.    These contacts with the United States and California establish personal jurisdiction over each of the Defendants. In addition, and to the extent necessary, this Court also has pendent personal jurisdiction over the claims of non-California Plaintiffs.

65.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class members residing in this District, including Plaintiff Broadmoor. Defendants have marketed, advertised, sold, and leased the Class Vehicles from authorized dealers located in this District, including Toyota Material Handling of Northern California located in Livermore, CA.

## V.    DIVISIONAL ASSIGNMENT

66.    This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division. Defendants conduct substantial business in the counties served by this Division, have marketed, advertised, sold, and leased the Class Vehicles in those counties, and have caused harm to Class members residing in

---

[51] *See* Toyota Forklift Dealer Search Tool, available at: https://toyotaforklift.com/dealers.

- 32 -

those counties, including Plaintiff Broadmoor, which has its principal place of business in San

Mateo County.

**VI.     FACTS COMMON TO ALL COUNTS**

67.     For almost a decade, the automotive industry has been plagued by a series of

emissions and fuel economy cheating scandals. Cases like Volkswagen "Clean Diesel,"[52] FCA

"EcoDiesel,"[53] Mercedes-Benz BlueTEC,[54] Audi $CO_2$,[55] Porsche MPG,[56] Cummins Diesel,[57] and

others have taught us that automakers can and frequently do illegally manipulate emissions, fuel

economy, and other performance-related test results, and then sell those vehicles to customers on

false premises and with deceptive representations.

68.     Toyota and its subsidiaries are no exception. As described above, a number of

emissions and certification misconduct scandals have recently surfaced across the corporate

family. This includes a 2021 admission that Toyota had been systematically violating CAA

reporting requirements from 2002 to at least 2015—conduct for which Toyota agreed to a $180

million fine.[58] And in 2023, Toyota subsidiary Daihatsu revealed significant misconduct and

---

[52] Department of Justice Press Release, *Volkswagen to Spend Up to $14.7 Billion to Settle Allegations of Cheating Emissions Tests and Deceiving Customers on 2.0 Liter Diesel Vehicles* (June 28,2016), available at: https://www.justice.gov/opa/pr/volkswagen-spend-147-billion-settle-allegations-cheating-emissions-tests-and-deceiving.

[53] Department of Justice Press Release, *In Civil Settlements with the United States and California, Fiat Chrysler will Resolve Allegations of Cheating on Federal and State Vehicle Emission Tests* (Jan. 10, 2019), available at: https://www.justice.gov/opa/pr/civil-settlements-united-states-and-california-fiat-chrysler-will-resolve-allegations.

[54] Department of Justice Press Release, *The U.S. Reaches $1.5 Billion Settlement with Daimler AG Over Emissions Cheating in Mercedes-Benz Diesel Vehicles (*Sep. 14, 2020*)*, available at: https://www.justice.gov/opa/pr/us-reaches-15-billion-settlement-daimler-ag-over-emissions-cheating-mercedes-benz-diesel.

[55] Settlement website available at: https://vwmpgsettlement.com/.

[56] Settlement website available at: https://www.porschegasolinesettlementusa.com/.

[57] Department of Justice Press Release, *United States and California Announce Diesel Engine Manufacturer Cummins Inc. Agrees to Pay a Record $1.675 Billion Civil Penalty in Vehicle Test Cheating Settlement* (Jan. 10, 2024), available at: https://www.justice.gov/opa/pr/united-states-and-california-announce-diesel-engine-manufacturer-cummins-inc-agrees-pay#:~:text=Beyond%20agreeing%20to%20pay%20a,emissions%20testing%20and%20certification%20requirements.

[58] Department of Justice Press Release, *supra* n.2.

manipulation in test data submitted to regulators.[59] In June 2024, Toyota publicly apologized for yet another scandal, this time implicating certification tests for seven vehicle models.

69.    Of particular note, in 2022, Toyota subsidiary Hino Motors admitted that it had engaged in "misconduct in relation to its applications for certification concerning the emissions and the fuel economy performance of its engines for the Japanese market."[60] Critically, that conduct in Japan was predicated on and precipitated by investigations into conduct in the U.S., led to a class settlement with private plaintiffs worth hundreds of millions of dollars, and remains the subject of ongoing enforcement actions by the Department of Justice and California Attorney General. *See, e.g.*, *Express Freight In'l v. Hino Motors, Ltd.*, No. 1:22-cv-22483, Dkt. 146 (S.D. Fla.).

70.    The misconduct underlying this case follows a strikingly similar pattern and sequence: (1) regulators in the United States began investigating potential fraud into Toyota's data submissions; (2) the Toyota company (Toyota Industries) issued a series of stop sales on some affected vehicles in U.S. but did not own up to the scale of the problem; (3) Toyota's internal investigation (led by outside counsel) expanded to conduct ostensibly affecting the Japanese market; (4) the investigation revealed widespread misconduct, and Toyota convened a Special Investigation Committee; (5) the SIC reports identified even more misconduct and uncovered a corporate culture of deceit and noncompliance. And, of course, as in the Hino litigation, (6) the misconduct rendered Toyota Industries' customer-facing representations false, misleading, and deceptive in ways material to Plaintiffs and the Classes.

**A.    The U.S. regulators began investigating Toyota's forklift-related misconduct by at least 2020.**

71.    This case begins and ends with vehicles sold in the United States. As noted above, TICO admits that the misconduct surfaced no later than the "second half of 2020," when TICO was "compl[ying] with an inquiry from the ***United States*** Environmental Protection Agency

---

[59] Daihatsu Investigation Report (Executive Summary) (Dec. 20, 2023), available at: https://www.daihatsu.com/news/2023/report_1_E.pdf.

[60] Hino Press Release, *Misconduct concerning Engine Certification* (March 4, 2022), available at: https://www.hino-global.com/corp/news/assets/1f350e73535af44c2a8c90c2f916eae2.pdf.

("EPA") for the deterioration durability data submitted in the past, and found some questions about the appropriateness of the deterioration durability testing." SIC Summary Rep. at 4 (emphasis added). In other words, at about the same time that the U.S. regulators began investigating Toyota subsidiary Hino's data irregularities, they became suspicious of, and started probing, TICO's data too.

72.     In responding to the EPA's investigations, and before there was any inquiry into the effect on the Japanese market, TICO "found some questions about the appropriateness of the deterioration durability testing," SIC Summary Rep. at 4—a critical factor in emissions testing designed to assess the performance of emission control systems over time. The "questions about the appropriateness" were serious, and TICO "engaged outside attorneys to investigate" them. *Id.* at 4.

73.     Shortly thereafter, in April 2021, TICO quietly announced a "suspension of production of certain [gasoline and LPG] forklift models in North America" due to "delays in obtaining U.S. engine emissions certification."[61] Then, in December 2021, TICO's U.S. subsidiary, Toyota Material Handling (TMH), announced it was "voluntarily suspending production and sales" of certain diesel forklift models "out of a proactive abundance of caution as TMH continues to confirm the compliance of these products within EPA standards."[62] With the regulators now looking over its shoulders, Toyota could not get its engines certified in the United States.

74.     As it turns out, Toyota's misconduct affected not just vehicles designed for the U.S. market but also those sold in Japan. This became clear early in the outside counsel investigation. SIC Summary Rep. at 4. And while the U.S. regulatory investigation is ongoing, the results of the Japanese investigation illuminate the nature and scope of the misconduct in both countries.

---

[61] Toyota Industries Corporation News Release, *Suspension of Production of Certain Forklift Models in North America* (May 21, 2021), available at: https://www.toyota-industries.com/news/2021/05/21/005055/.

[62] Forklift Action, *Toyota halts certain diesel models* (Dec. 9, 2021), available at: https://www.forkliftaction.com/news/toyota-halts-certain-diesel-models.aspx?n=25571.

1      **B.      Toyota's investigation revealed rampant fraud.**

2      75.      TICO's fraud came to light in successive public releases, starting in March 2023.

3  In that initial release, TICO "confirmed the excess over the domestic (Japanese) emissions

4  regulation values due to aging degradation" and imposed a stop sale on three engines (the 1ZS,

5  1KD, and 4Y). *See* TICO 03/23 Press Release. At the time, however, the full scope of the fraud

6  had not been revealed, and Toyota claimed that the misconduct "only applie[d] to the Japanese

7  market" and had no "impact on . . . the US."[63]

8      76.      To further "clarify the details of the case," Toyota convened an ostensibly neutral

9  Special Investigation Committee, as it had done previously in both the Hino and Daihatsu

10  scandals. The extent of the SIC's neutrality is not without question,[64] but for this purpose it is

11  worth noting that the committee had access to extensive information, including materials

12  collected by outside counsel, interviews of 72 employees, and additional data. Their investigation

13  lasted approximately ten months and culminated in reports that elucidated the connection to the

14  U.S. market and certification process, expanded the scope of the fraud, and significantly increased

15  the number of affected engines and vehicles.

16      77.      In brief, the reports outlined emissions fraud, output performance fraud, and a

17  pervasive culture of cheating and non-compliance—all of which implicate the Class Vehicles sold

18  in the United States.

19      **1.      Toyota fabricated and manipulated the emissions test results of
               the Class Engines.**

20

21      78.      With minor potential exceptions noted herein, the full scope of the emissions fraud

22  (as it is currently understood) is outlined in the SIC reports, which Plaintiffs again incorporate by

23  reference.

24      79.      To recap, much of the misconduct related to deterioration durability testing—a

25  process used to determine how the emissions control systems perform over time. The

26  ───────────────

27  [63] Forklift Action, *Toyota suspends diesel, petrol models* (April 20, 2023), available at:
  https://www.forkliftaction.com/news/toyota-suspends-diesel-petrol-models.aspx?n=26871.

28  [64] Notably, one of the three committee members (Makoto Shimamoto) is a repeat player who was
  also a member of the Hino SIC and works for Yamaha—a company in which Toyota has a
  minority ownership stake and with which it has a close relationship.

1  deterioration correction value (also known as the deterioration factor) that results from this testing

2  informs the threshold emissions performance levels required of the engine. Take, for example, a

3  hypothetical pollutant that cannot exceed a limit of 12 units under relevant regulations. If

4  deterioration durability testing shows a deterioration correction value (degradation) of, say, 20%

5  over the time period set in the regulation, then, at the time of the certification test, the engine must

6  not emit more than 10 units of that pollutant (10 * 1.2 = 12). The deterioration factor is therefore

7  a critical component of compliant and accurate emissions measures.

8      80.    In the process of conducting the deterioration tests (and other emissions tests),

9  however, Toyota engaged in a wide range of cheating strategies, grouped into four categories in

10  the "key details of improper conduct" columns in the chart below. They include: (1) using values

11  different from measured values, (2) modifying ECU software, (3) replacing parts etc. during

12  testing, and (4) using different engines for the test.

| | Use (Engine type) | Type | Domestic certification acquisition timing | Key details of improper conduct | | | |
|---|---|---|---|---|---|---|---|
| | | | | Used values different from measured values | Modified ECU Software | Replaced parts etc. during testing | Used different engines for the test |
| Current models | Forklift (diesel) | 1KD | 2014 | ● | ● | | |
| | | 1ZS | 2014 | | ● | | |
| | Forklift (gasoline, LPG) | 2009 4Y | 2009 | ● | ● | ● | ● |
| | | 1FS | 2014 | ● | ● | ● | |
| | Construction machinery (diesel) | 2020 1KD for Construction Machinery | 2020 | | ● | | |
| Past models | Forklift (diesel) | 2007 1DZ | 2007 | ● | | | |
| | Forklift (gasoline, LPG) | 2007 4Y | 2007 | ● | ● | ● | ● |
| | | 1FZ | 2007 | | | | ● |
| | Construction machinery (diesel) | 2016 1KD for Construction Machinery | 2016 | ● | ● | ● | |

26      81.    The SIC reports collectively dedicate dozens of pages to describing the details of

27  these strategies as applied to each of the relevant engines. As one example, Toyota engineers

28  "rewr[ote] [unfavorable] test results" for both NOx and particulate matter values "in order to

obtain certification and otherwise knowingly violat[ed] domestic laws and regulations and intentionally disguise[d] facts," among other "intentional improper" tactics to falsify test data. SIC Release at 7.

82.     As additional illustrative examples, Toyota: swapped out parts during testing processes, or even tested the wrong engine, which heavily skewed the results; used different ECU software for testing than was used in mass production vehicles; and simply threw out test results they did not like. *See, e.g.*, *id.* at 7-8; SIC Summary Rep. at 37.

83.     The basic takeaway for all facets of the fraud is that Toyota routinely cut corners and subverted regulatory testing processes with the express intent of falsely representing that their engines could perform in ways they simply could not.

84.     According to the SIC, the so-called "root causes" underlying all of this fraud included, among others:

a.     a "[c]ontractor's mentality"—meaning that TICO, and certain groups within it, often considered themselves mere contractors to other groups or companies (e.g., TMC) and did not take ownership over their projects;

b.     "Trivializing engines for industrial vehicles"; and

c.     "Low risk sensitivity among executives at the Engine Division"—e.g., lack of commitment and education regarding deterioration durability testing. SIC Release at 8-9.

85.     As further evidence of Toyota's culture of cheating, TICO lacked "a department dedicated to regulation certification" (SIC Release at 4), and decided against any meaningful training on the "implementation of deterioration durability testing" or the "tightening of emissions regulations" (SIC Summary Rep. at 13). The result was an "organization-wide deficit of understanding about regulations" (*Id.* at 53) and a "weak" record on "respecting data accuracy" (SIC Release at 4). As the SIC makes clear, this culture—and the cheating that emerged from it— led to "violation[s] of the fundamental ethics of engineering" that "disguise[d] the true capabilities of the engine[s]" in question. SIC Summary Rep. at 57.

86.     Whatever the reasons, the fraud was rampant and persisted for nearly two decades. And, to be clear, it was highly illegal. Under both Japanese and U.S. regulations, engines that do

not meet specified emissions values cannot be certified and are not legal to sell. Moreover, in both markets:

> The engine used for deterioration durability testing must have "the same structure, equipment, and performance" as the vehicle engine and emission reduction equipment of the motor vehicle for which the device type designation is being applied for, that is, the same specifications as the engine to be mass produced after obtaining the device type designation.

> For the duration of deterioration durability testing, parts relating to emissions performance shall not be replaced, except for parts that are to be replaced periodically. Therefore, in principle, deterioration durability testing is expected to be performed on the same engine with the same parts.

SIC Published Rep. at 58; *accord* SIC Summary Rep. at 15. Put simply, manufacturers are not allowed to monkey with their certification test engines or vehicles or, obviously, to lie about the test results. Toyota did both.

87.    It is worth noting, however, that according to the SIC reports some but not all of the affected engines exceeded regulatory limits during the in-house retesting for the investigation. Specifically, as reflected in the chart below, the current diesel engines (2014 1KD, 2020 1KD for construction, and the 1ZS) all "had NOx (nitrous oxide) values that exceeded the domestic regulation values." SIC Release at 2 n.2. The current gasoline models (2009 4Y and 2014 1FS), in contrast, reportedly did not exceed regulatory limits.[65]

---

[65] The results for the "old type" models have yet to be confirmed.

| Use | Engine Model | | | Year Certified | Reported on March 17 | | Results of this Investigation | | No. of Domestic Sales | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Violations | Regulations Values Exceeded | Violations | Whether Regulation Values Exceeded or not (Note 1*) | FY2022 Sales | Total Sales | |
| Forklift | Current type | Diesel | 1KD | 2014 | • | • | • | Same as Reported on March 17 | 2,000 units | 11,000 units | 163,000 units |
| | | | 1ZS | | | | | | 8,000 units | 61,000 units | |
| | | Gasoline | 4Y | 2009 | | Confirmed no excess | | Confirmed no excess | 6,000 units | 89,000 units | |
| | | | 1FS | 2014 | | — | • | Confirmed no excess | 200 units | 2,000 units | |
| | Old type | Diesel | Former 1DZ | 2007 | | | | | | 26,000 units | 67,000 units |
| | | | 3Z | | | — | • | To be confirmed | — | 20,000 units | |
| | | | 15Z | 2010 | | | | | | 4,000 units | |
| | | Gasoline | Former 4Y | 2007 | | | | | | 16,000 units | |
| | | | 1FZ | | | | | | | 1,000 units | |
| Construction Machinery | Current type | Diesel | 1KD | 2020 | • | — | • | • (Note 1*) | 2,000 units | 2,000 units | 2,000 units |
| | Old type | Diesel | Former 1KD | 2016 | | — | • | To be confirmed | — | 1,000 units | 1,000 units |

88.    There are many reasons to be skeptical of the "no-excess" findings, including the fact that testing was done in-house, without any witnesses or regulatory oversight. They are also belied by common sense: if Toyota did not need to cheat, why would it do so? Furthermore, roughly a month after the SIC reports were issued, Japan's Ministry of Land, Infrastructure, Transport and Tourism (MLIT) revoked Toyota's approval to sell three engines, including two (4Y and 1FS) that the SIC reported had no excess emissions.[66]

89.    Plaintiffs thus allege on information and belief that (a) all the of the Class Engines were fraudulently certified and illegal to sell and/or import and that (b) all the Class Vehicles' emitted pollutants in excess of the regulatory limits and beyond what Plaintiffs and the Class reasonably expected.

---

[66] TICO News Release, *Administrative Sanction on Domestic Industrial Engine Certification by the Ministry of Land, Infrastructure, Transport and Tourism (MLIT)* (Feb. 22, 2024), available at: https://www.toyota-industries.com/news/2024/02/22/008589/index.html.

**2.    Toyota also cheated on "output tests" relating to performance metrics such as horsepower and torque.**

90.    As noted above, in addition to the emission-related misconduct, Toyota also cheated on "output tests" designed to measure torque, horsepower, and other important performance metrics. *See, e.g.*, SIC Published Rep. at 169-72; SIC Summary Rep. at 48.[67]

91.    In short, TICO engineers "modified the fuel injection amounts" by altering the ECU software Control Parameter values. SIC Summary Rep. at 48. This resulted in a falsified "engine performance curve" designed to (falsely) "ensure that the output values were above the specification values (development target values)." SIC Published Rep. at 197. Put differently, TICO engaged in intentional misconduct designed to misrepresent critical performance metrics— conduct they knew was "deemed improper." SIC Summary Rep. at 48-49.

92.    Thus far, the SIC's output test findings are limited to engines designed for automobiles (not forklifts or construction equipment). However, TICO employees close to the issue admitted the fraudulent tactics "had been widely practiced in [TICO's] Engine Calibration Group"—which was also responsible for the Class Engines—"for some time." SIC Summary Rep. at 48; *see also id.* at 57 ("Such improper conduct trivializing data accuracy is found to have been spread over a long period of time and to a considerable extent . . . .")

93.    Plaintiffs therefore allege upon information and belief that the output fraud also affected the Class Engines.

**C.    The misconduct detailed in the SIC Reports also affected the Class Engines and Class Vehicles sold in the U.S., rendering them illegal to sell or import.**

94.    The investigation conducted by the SIC was, according to Toyota, "limited to improper conduct relating to emissions certification in Japan." SIC Summary Rep. at 4-5. But, as noted above, that is highly implausible given the U.S. origins of the (still ongoing) regulatory investigation.

_____

[67] *See also, e.g.*, Toyota Motor Corporation News Release, *supra* n.21 ("The investigation found that irregularities occurred during the horsepower output testing for the certification of three diesel engine models for automobiles that Toyota had commissioned to TICO.").

95.    Importantly, and as the SIC recognized, many of the certifications in Japan were "obtained on the premise of U.S. and EU emissions certification," making the Japanese conduct inextricably intertwined with the engines sold in the U.S. *Id.* at 5 n.1; *see also* SIC Summary Rep. at 15 ("It should be noted that if a carbon monoxide, etc. emissions control device has already been certified in the U.S. or Europe prior to domestic certification, the deterioration factor calculated at the time of U.S. or European certification can be used in the application for domestic certification, and there is no need to redo deterioration durability testing in accordance with domestic laws and regulations."); SIC Published Rep. at 58 (similar).

96.    In fact, the Japanese certification process for most of the engines at issue—at least the 1KD, 1ZS, 4Y, and 1FS engine—relied on prior testing done to certify those engines for the U.S. market first. *See, e.g.*, SIC Summary Rep. at 22-23 ("The 1KD Engine first obtained U.S. certification, and then obtained domestic certification as of June 17, 2014 using the data used for U.S. certification."); SIC Summary Rep. at 27 (explaining that the 1ZS obtained Japanese certification using the "correction values calculated based on the results of the 1KD Engine deterioration durability testing"—which, again, were generated during the certification testing for the U.S. market); SIC Summary Rep. at 30 ("[T]he 2007 4Y Engine first applied for U.S. certification," and "the deterioration durability testing for the 2009 4Y Engine adhered fundamentally to the deterioration durability testing method for the 2007 4Y Engine."); SIC Summary Rep. at 30 ("After obtaining U.S. certification, the 1FS Engine applied for domestic certification using the deterioration correction values calculated on the basis of the deterioration factors used for U.S. certification and obtained domestic certification as of June 17, 2014.").

97.    This is made possible by the very significant overlap—at points nearly identical—between the Japanese and U.S. emissions regulations. As exemplified in the chart below, the off-highway diesel emissions standards in Japan and the U.S. (Tier 4 or Tier IV standards) are functionally "equivalent." SIC Published Rep. at 74 (chart showing the regulations applicable to the Class Engines over time).[68]

---

[68] *See also* Veethree Group, *Off-Highway Diesel Emissions Standards* (July 26, 2022), available at: https://www.veethree.com/group/veethree-group-news/off-highway-diesel-emissions/; *see*

1
2
3
4
5
6
7
8
9
10
11



12
13      98.     To the extent there were any doubts that Toyota's misconduct affects the U.S.

14  markets, they were dispelled when Toyota Industries notified its dealers that the EPA may "void[]

15  the certificate that originally authorized the TMH to sell the engines" in "forklift models

16  produced from 2007 through 2020." Dealers, in turn, most now present this same information to

17  prospective customers in the form a "Master Transaction Disclosure." The document similarly

18  advises that the EPA is "reviewing prior emissions certifications . . . including the . . . practices

19  of [TMH USA] and its parent company," and requires consumers to sign a document disclaiming

20  any "rel[iance] on the emissions label affixed" to certain Class Engines "or the existence of a

21  previously issued emissions certificate for such engines."

22      99.     Although the legal effect of this purported waiver is questionable, it is truly

23  remarkable that Toyota Industries feels compelled to acknowledge so publicly the fact that the

24  EPA certificates for its forklifts—certificates required for Toyota Industries to legally sell the

25  vehicles—will likely be rendered null and void.

26
27  _____

*also, e.g.*, Dieselnet, *Japan: Nonroad Engines*, available at:
28  https://dieselnet.com/standards/jp/nonroad.php (detailing regulatory scheme and comparisons to
U.S. regime);

100.    The point is that, notwithstanding Toyota's contrary disclaimers, the fraud exposed in the SIC reports was clearly directed at Japanese *and* U.S. customers. The two markets are governed by overlapping regulatory regimes, and TICO regularly used the exact same fraudulent tests and test results for both of them.

**D.    Defendants' marketing featured false promises of environmental friendliness and misrepresentations of high engine performance and emissions compliance—all of which omitted material information about Toyota's fraud.**

101.    To many businesses and other customers, including Plaintiffs, engine performance, emissions compliance, and environmental friendliness are important factors in their decision to purchase or lease a forklift. Toyota understood this and capitalized on it.

102.    As one example, in a forklift-related post, TMH USA acknowledged "[s]ustainability of the environment is an important consideration for professionals in any industry. That's why Toyota has set out to meet that need with top-of-the-line, environmentally friendly products."[69]

103.    A relevant trade association publication reinforces the message: "Demand for lower vehicle emissions and higher fuel efficiency in the automotive industry has drifted over to vehicles in other motive industries. Industrial lift trucks are no exception. Like the automotive industry, some of the drivers for emissions reductions are more stringent regulatory emissions standards. But much of the demand comes from industry itself."[70]

104.    Defendants targeted these preferences in their misleading advertising and other representations and omissions about the Class Engines and Class Vehicles.

---

[69] Liftow Ltd. and Toyota Material Handling Blog Post, *Toyota Forklifts: What Make Them Industry Leaders* (March 6, 2019), available at: https://liftow.com/blogs/news/toyota-forklifts-what-make-them-industry-leaders.

[70] Fabricators and Manufacturers Association, *No, Low-emissions Lift Trucks Clear the Air* (March 27, 2013), available at: https://www.fmamfg.org/blog/low-emissions-lift-trucks-clear-air.

1    105.    For starters, both TMH[71] and TICO[72] dedicate entire sections of their websites to

2    their environmental and sustainability initiatives. Their eco-branding is clearly an important part

3    of their marketing strategies.

4    106.    But more importantly, over the last decade and half, Toyota Industries has made

5    repeated false and misleading statements about the specific Class Engines and Class Vehicles.

6    Below are some illustrative examples, generally grouped by engine and fuel type.

7    107.    Gasoline engines—4Y and 1FS:

8        a.    "The 4Y Engine is unique in that it is the cleanest engine in the industry,

9    and its emission standards rival the emission standards of any competitive internal combustion

10   engine."[73]

11       b.    "4Y: Low emission, High power, Low fuel consumption."[74]

12       c.    In addition to its performance and durability, the 4Y is "emissions

13   compliant."[75]

14       d.    The 4Y was "engineered with sustainability in mind. The 4Y engine's

15   emissions system filters carbon monoxide, hydrocarbon, and nitrogen oxide gases, allowing it to

16   surpass federal EPA emission standards."[76]

17       e.    "But durability isn't the only thing the 4Y has going for it. It's just as good

18   for the environment as it is for your business, whether you run LPG or gasoline."[77]

19

20

21   [71] Toyota Material Handling, *Toyota Sustainability and ESG*, available at:
     https://www.toyotaforklift.com/about-toyota/sustainability.

22   [72] Toyota Industries Corporation, *Environmental Initiatives*, available at: https://www.toyota-
     industries.com/sustainability/environment/; *see also* Toyota Industries Corporation, *Corporate*

23   *Profile 2024*, available at: https://www.toyota-
     industries.com/company/item/Corporate_Profile_2024_E_view.pdf.

24   [73] *See* Toyota Forklifts Blog.

25   [74] Toyota Industries Corporation, *Gasoline Engines Y series*, available at: https://key-
     components.toyota-industries.com/products/engine/gasoline/4y/.

26   [75] *See* Toyota Forklifts Blog.

27   [76] Toyota Blog Post, *The History of Toyota's 4Y Engine* (March 8, 2019), previously available at:
     https://www.dillontoyotalift.com/about/blog/e_358/News---Events/2019/3/The-History-of-
     Toyota-s-4Y-Engine (also previously available on TMH website).

28   [77] Toyota Forklifts Blog.

1          f.       The 4Y is "EPA and CARB compliant for emissions."[78]

2          g.      In addition to general "high performance" (torque, horsepower, etc.), the

3 4Y and 1FS engines have "environmental performance" benefits and "clean exhaust."[79]

4     108.    Diesel engines—1ZS, 1KD, and 1DZ:

5          a.       "Toyota's environmentally-friendly 8-Series lift trucks"—powered by the

6 1ZS—"are recognized as the world's cleanest internal combustion forklifts available."[80]

7          b.      The 1ZS engine is "Tier IV Final Emissions Compliant." It is "ideal for the

8 agricultural industry because it meets Tier IV final emissions standards."[81]

9          c.       The 1ZS "meet[s] the federal EPA Tier 4 Final regulations."[82]

10          d.      The 1ZS engine provides "less displacement than the previous model for

11 lower emissions and fuel costs."[83]

12          e.       "The newest forklifts expand Toyota's comprehensive diesel pneumatic

13 line, which now provides 3,000 to 17,500 lb. capacity models that meet the federal EPA Tier 4

14 Final regulations. The 1ZS engine maintains the horsepower and increases the torque while

15 achieving greater fuel savings."[84]

16          f.       "Small Capacity Lift Trucks Offer Significant Advancements in Fuel

17 Efficiency, while Meeting Stringent Federal EPA Tier 4-Final Diesel Engine Standards." The

18 "diesel series [is] powered by a clean-burning Toyota engine" that "offer[s] significant

19 advancements in durability, ergonomics, productivity and fuel efficiency, while meeting stringent

20

21

---

22 [78] *Id.* ("deeper dive" into 4Y engine video starting at 1:25).

23 [79] TICO Product Information, *Gasoline Engines*, available at: https://key-components.toyota-industries.com/products/engine/gasoline/.

24 [80] Toyota Forklifts YouTube Channel, Toyota Forklift Commercial 1 https://www.youtube.com/watch?v=S5WSezyZqQM.

25 [81] Toyota Material Handling Northern California, TMHNC, *Product Review: Toyota Diesel Forklift,* available at: https://www.tmhnc.com/blog/toyota-diesel-forklifts-product-review.

26 [82] Summit Toyota Lifts, *Toyota's New 1ZS Diesel Engine* (Jan. 15, 2015), available at: https://www.summithandling.com/news/toyotas-1zs-diesel-engine/.

27 [83] *See* Toyota Forklifts Blog.

28 [84] Summit Toyota Lifts, *Toyota's* New 1ZS Diesel Engine (Jan. 15, 2015), *supra* n.82.

federal EPA Tier 4 Final diesel engine standards." The 1ZS engine also "minimiz[es] emissions and particulate matter."[85]

g.     The 8-Series lift truck is "the world's cleanest internal combustion lift truck and the first and only lift truck to surpass 2007 Federal EPA emissions standards and meet California's stringent 2010 emission standards."[86]

h.     The "recently unveiled [] new 8-Series lift truck . . . produces 70 percent less smog-forming emissions than the 2007 standard. In developing the 8-Series, TMHU also took a global leadership role by exceeding both state and federal emissions regulations and by integrating elements of sustainable design such as increasing the amount of recyclable parts used in the manufacturing process."[87]

i.     "The 1FS is built with special electronics that all lead to better fuel efficiency and low emissions."[88]

j.     The 1KD engine "helps decrease fuel consumption and emissions."[89]

109.     Additional, broadly applicable misrepresentations and omissions:

a.     From Shankar Basu, then-President and CEO of TMH: "Toyota is committed to environmental responsibility, and it's a role we take very seriously"—"one of Toyota's goals is to support environmentally appropriate and socially beneficial initiatives contributing to a cleaner environment."[90]

---

[85] Vesco Toyota Lift (publishing Toyota Press Release), *Toyota Expands 8-Series Small Capacity Diesel Lift Truck Line with New Clean-Burning 1ZS Engine* (Dec. 19, 2013), available at: http://www.vescoforklifts.com/news/136.php; https://www.fmforklift.com/news/136.php.

[86] Toyota Material Handling / National Arbor Day Foundation Joint Press Release, *Toyota Material Handling Teams With Arbor Day Foundation To Plant A Tree For Each 8-Series Lift Truck Delivered In 2007* (Nov. 20, 2006), available at: https://www.arborday.org/media/pressreleases/pressreleasetxt.cfm?id=119.

[87] *Id.*

[88] Toyota Forklifts Blog.

[89] *Id.*

[90] Toyota Material Handling / National Arbor Day Foundation Joint Press Release (Nov. 20, 2006), *supra* n.86.

b.     Toyota's "New Lift Trucks [Are] Fitted with Engines Having Significantly Greater Environmental Performance" and were developed under the key concept of "Attain the Industry's Top-Level Environmental Performance.'"[91]

c.     "In 2013, [Toyota] successively developed three industrial engine models. Leveraging our years of experience and combined strengths of our diverse businesses, these engines have attained significantly higher environmental performance."[92]

d.     Toyota is "pushing forward environmentally friendly technologies and manufacturing processes: Toyota remains the first and only manufacturer to offer UL-listed, EPA and CARB-certified Compressed Natural Gas (CNG) powered lift trucks."[93]

110.     In addition to this steady stream of false and misleading statements about emissions and sustainability, Toyota Industries' representations about other performance features like torque and horsepower were—as one would expect—ubiquitous.[94]

111.     As described throughout this Complaint, these statements about the Class Engines and Class Vehicles were material and misleading. Put simply, Toyota cheated on its tests and then lied about it both to the regulators and consumers.

**E.**     **Toyota Motor Corporation fostered a culture of noncompliance and fraud at its many subsidiaries and affiliates, and bears responsibility for their failures.**

112.     As described above, TMC is at the center of a constellation of scandals (CAA reporting for TMC vehicles, certification test reporting for TMC vehicles, Hino, Daihatsu, TICO), including this one. The thread tying them all together is the culture of fraud, regulatory

---

[91] Toyota Industries Report 2014 "Special Feature," *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

[92] *Id.*

[93] Vesco ToyotaLift, *Toyota Ranked Number One Lift Tuck Supplier for Tenth Consecutive Year* (Oct. 24, 2012), available at: http://www.vescoforklifts.com/news/50.php.

[94] *See, e.g.*, Diesel 1ZS (https://key-components.toyota-industries.com/products/engine/diesel/1zs/); Diesel 1DZ (https://key-components.toyota-industries.com/products/engine/diesel/1dz/); Gas 4Y (https://key-components.toyota-industries.com/products/engine/gasoline/4y/); Gas 1FS (https://key-components.toyota-industries.com/products/engine/gasoline/1fs/); *see also* Toyota Industries Report, *Development of New Lift Trucks Fitted with Engines Having Significantly Greater Environmental Performance*, available at: https://www.toyota-industries.com/investors/items/p16e-p19e.pdf.

noncompliance, and deception emanating from TMC. Indeed, Akio Toyoda, the Chairman and (for much of the relevant time period) President and CEO of TMC, "took full responsibility" for the TICO forklifts scandal and apologized to Toyota's "customers and stakeholders for the inconvenience and concern caused by the successive irregularities at Hino Motors, Daihatsu and Toyota Industries."[95]

113.    As noted in a prominent Japanese newspaper, the series of scandals "invit[e] doubts about the carmarker group's governance," and the "situation should be taken as a problem with the whole group," including TMC. As the hub of the wheel on which all of these scandals turn, "it is unacceptable for Toyota [Motor Company] to merely pass the buck to its subsidiaries."[96] Plaintiffs agree.

114.    Further evidence of TMC's strong nexus to the facts of this Complaint is found in the significant corporate overlap between TMC and TICO. As of March 2023, TMC owned 24.7% of TICO's voting rights and was the "primary" purchaser of TICO's automobile and engine products. TICO, in turn, owns some 8% of TMC's shares.[97]

115.    In addition to their reciprocal ownership stakes and further cementing the blurred lines between them, the companies also closely collaborate in their work for engine design, development, and testing. In 2014, the companies moved to officially consolidate their "joint diesel engine development and production" under TICO. This delegation structure meant that TMC could then focus on "the development of cutting-edge base technologies" that would be

---

[95] Chris Pandolfo, FOXBusiness, *Toyota chairman issues apology for subsidiary safety scandal, brand remains world's top-seller* (Jan. 30, 2024), available at: https://www.foxbusiness.com/fox-news-auto/toyota-chairman-issues-apology-subsidiary-safety-scandal-brand-remains-worlds-top-seller; Reuters, *Toyota remains world's top-selling automaker; chairman apologizes over scandals* (Jan. 30, 2024), available at: https://www.cnbc.com/2024/01/30/toyota-remains-top-selling-automaker-chair-apologizes-over-scandals.html; Financial times, *Toyota chair apologises for faulty data scandals and promises action*, available at: https://www.ft.com/content/8eff37e4-433c-4ab8-85e3-5be70a165588.

[96] The Mainichi, *Editorial: Toyota group must seek and destroy roots of rampant fraud, poor oversight* (Feb. 3, 2024), available at: https://mainichi.jp/english/articles/20240203/p2a/00m/0op/017000c.

[97] Toyota Industries Corporation, Annual Financial Report (For the Year Ended March 31, 2023), available at: https://www.toyota-industries.com/investors/item/2023_annual_financial_report_E.pdf.

used in TICO's engine development work.[98] By its nature, this complementary structure means the companies worked closely together to reciprocally design and build the final engine product from the ground up.

116.    Prior to this reorganization for diesel engine work in 2014, TMC previously conducted some of its own diesel engine development and design work, which on information and belief situates the design and development work for earlier model year compression ignition (diesel) Class Vehicles directly under TMC during that time period.

117.    All of this points to one conclusion: TMC was not a distant and innocent corporate affiliate, but rather very much involved in creating the culture and directing the policies responsible for the fraud underlying this Complaint. Throughout numerous similar testing scandals within the Toyota corporate family, TMC remains the common denominator. Discovery will further reveal the nature and extent of TMC's role in this latest scandal, including in developing the Class Vehicles and their engines and relevant components (both before and after the 2014 reorganization), and responding to and managing the scandal. This could include for example TMC personnel involved in the design and development work for the Class Engines or their components, in monitoring TICO in its engine development and testing work delegated by TMC, or in sharing policies, resources, or testing facilities that enabled the misconduct described herein, and in consulting, advising, and overseeing engagement with the regulators and public in the wake of the scandal.

* * *

118.    Defendants' deceptive actions harmed Plaintiffs and the Classes. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Vehicles were designed to mislead consumers and businesses about their true emissions levels and performance, owners and lessees of the Class Vehicles have suffered losses in money and/or property. Plaintiffs did not receive the vehicles they paid for and reasonably expected to receive and, as a result, have suffered damages.

---

[98] *See* Toyota Industries Corporation, News Release, *Toyota Industries Corp. and Toyota Motor Corp. to Consolidate Diesel Engine Development and Production* (Nov. 28, 2014), available at: https://www.toyota-industries.com/news/2014/11/28/004920/index.html.

1

**VII.    CLASS ACTION ALLEGATIONS**

2        119.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil

3    Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of themselves and all others

4    similarly situated as members of the following Nationwide Class and State Classes (collectively,

5    the "Classes"). The Class Vehicles implicated by this Complaint include all of those equipped

6    with one of the following Class Engines (listed by certification year, with sales ongoing in the

7    years that follow): 2014 1KD, 2014 1ZS, 2014 1FS, 2009 4Y, 2007 4Y, 2007 1DZ.

8        120.    The proposed Nationwide Class includes all persons and entities that purchased or

9    leased a Class Vehicle in the United States, including its territories.

10        121.    Plaintiffs also propose separate State Classes for the states listed in the claims

11    below, each of which includes all persons and entities that purchased or leased a Class Vehicle in

12    that state.

13        122.    Excluded from the Classes are:

14            a.        Defendants' officers, directors and employees; Defendants' affiliates and

15    affiliates' officers, directors and employees; Defendants' distributors and distributors' officers,

16    directors and employees; and

17            b.        Judicial officers and their immediate family members and associated court

18    staff assigned to this case.

19        123.    Plaintiffs reserve the right to amend the Class definitions if discovery and further

20    investigation reveal that any Class should be expanded, reduced, divided into additional

21    subclasses or State classes under Rule 23(c)(5), or modified in any other way.

22        124.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

23    Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

24    would be used in individual actions alleging the same claims. This action may also, in the Court's

25    discretion, be maintained as a class action with respect to particular common issues.

26        125.    This action has been brought and may be properly maintained on behalf of each of

27    the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the

28

1  numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its

2  provisions.

3    **A.**  <u>**Numerosity: Federal Rule of Civil Procedure 23(a)(1)**</u>

4    126. The members of the Class are so numerous and geographically dispersed that

5  individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that

6  there are hundreds of thousands of members of the Class, and multiple hundreds or thousands of

7  members in each State Class. The precise number and identities of Nationwide Class and State

8  Class members may be ascertained from Defendants' records. Class members may be notified of

9  the pendency of this action by recognized, Court-approved notice dissemination methods, which

10  may include U.S. mail, electronic mail, internet postings, and/or published notice.

11    **B.**  <u>**Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2)**</u>

12      <u>**and 23(b)(3)**</u>

13    127. This action involves common questions of law and fact, which predominate over

14  any questions affecting individual Class members, including, without limitation:

15      a. Whether Defendants engaged in the conduct alleged herein;

16      b. Whether Defendants designed, advertised, marketed, distributed, leased,

17  sold, or otherwise placed Class Vehicles into the stream of commerce in the United States and

18  California;

19      c. Whether Defendants owed a duty to disclose accurate emissions and output

20  performance of the Class Vehicles;

21      d. Whether Defendants misrepresented the Class Vehicles' emissions and

22  output performance;

23      e. Whether Defendants' conduct violates consumer protection statutes,

24  warranty laws, and other laws as asserted herein;

25      f. Whether Plaintiffs and the other Class members are entitled to equitable

26  relief, including, but not limited to, restitution or injunctive relief; and

27      g. Whether Plaintiffs and the other Class members are entitled to damages

28  and other monetary relief and, if so, in what amount.

1      **C.      Typicality: Federal Rule of Civil Procedure 23(a)(3)**

2      128.    Plaintiffs' claims are typical of the claims of the Class members whom they seek

3   to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class member purchased

4   or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as

5   described above. Plaintiffs and the other Class members suffered damages as a direct proximate

6   result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same

7   practices and courses of conduct that give rise to the claims of the other Class members.

8   Plaintiffs' claims are based upon the same legal theories as the claims of the other Class

9   members.

10     **D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

11     129.    Plaintiffs will fairly and adequately represent and protect the interests of the Class

12  members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the

13  interests of the Class members. Plaintiffs have retained counsel competent and experienced in

14  complex class action litigation, including vehicle emissions litigation and other complex class

15  action proceedings. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor

16  their counsel have interests that conflict with the interests of the other Class members. Therefore,

17  the interests of the Class members will be fairly and adequately protected.

18     **E.      Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

19     130.    Defendants have acted or refused to act on grounds generally applicable to

20  Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief

21  and declaratory relief, as described below, with respect to the Class as a whole.

22     **F.      Superiority: Federal Rule of Civil Procedure 23(b)(3)**

23     131.    A class action is superior to any other available means for the fair and efficient

24  adjudication of this controversy, and no unusual difficulties are likely to be encountered in its

25  management. The damages or other financial detriment suffered by Plaintiffs and the other Class

26  members are relatively small compared to the burden and expense that would be required to

27  individually litigate their claims against Defendants such that it would be impracticable for

28  members of the Class to individually seek redress for Defendants' wrongful conduct.

132.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule Tolling

133.    For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

134.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the Class Vehicles' emissions and performance levels, including but not limited to their practice of secretly manipulating and fabricating test results.

135.    Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, businesses, or consumers until—at the earliest—January 29, 2024, when Defendants released the Special Investigation Committee report that first disclosed the scope of the emissions and performance frauds and their relationship to the Class Vehicles in the U.S.

136.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions and performance deceptions and that they concealed that information, which Plaintiffs only discovered shortly before this action was filed.

### B.    Tolling Due to Fraudulent Concealment

137.    Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment of the facts alleged in this Complaint.

138. Upon information and belief, prior to the date of this Complaint, and at least as early as 2020—when U.S. authorities began their investigation—Defendants knew of the emissions and performance defects in certain Class Vehicles, but continued to allow Plaintiffs and Class members to purchase and operate their Class Vehicles. In so doing, Defendants concealed and/or failed to notify Plaintiffs and Class members about the true nature of the Class Vehicles.

139. Instead of disclosing their deception, Defendants falsely represented the Class Vehicles' emissions and performance.

140. Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and active concealment of the facts alleged herein.

**C.      Estoppel**

141. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their output performance, emissions systems, and their compliance with applicable federal and state law.

142. Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants did not disclose accurate output performance and emissions statistics and did not correct their misleading disclosures with respect to the Class Vehicles. Defendants actively concealed the true character, quality, and nature of the emission and engine output defects in the Class Vehicles, and made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and active concealment of these facts.

143. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

1  **IX.    CAUSES OF ACTION**

2      **A.    Claims Asserted on Behalf of the Nationwide Class**

3                          **NATIONWIDE COUNT I:**
                          **Fraud By Concealment**
4                            **(Common law)**

5      144.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

6  forth herein.

7      145.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under

8  California law or, in the alternative, under the laws of all fifty states and Puerto Rico, against all

9  Defendants. In the alternative, Plaintiffs bring claims on behalf of the State Classes under the

10 respective State laws against all Defendants.

11     146.    Defendants are liable for both fraudulent concealment and nondisclosure. *See, e.g.*,

12 Restatement (Second) of Torts §§ 550-51 (1977).

13     147.    Specifically, Defendants committed fraud by manipulating and falsifying their

14 engine tests and test data for emissions and output testing, misrepresenting the Class Vehicles'

15 true output and emissions performance, concealing the true nature of the Class Vehicles'

16 emissions and performance from Plaintiffs and the Classes, and attesting that the Class Vehicles

17 complied with applicable emissions laws.

18     148.    A reasonable customer would not have expected that their Class Vehicles did not

19 offer the represented and reasonably expected emissions or output performance.

20     149.    Defendants knew that these facts about the Class Vehicles would be important to

21 customers deciding to purchase or lease them. Defendants ensured that Plaintiffs and the Classes

22 did not discover this information through actively concealing it. Defendants intended for

23 Plaintiffs and the Classes to rely on their misrepresentations and omissions—which they did by

24 paying for the Class Vehicles.

25     150.    Defendants had a duty to disclose the emissions and performance defects. These

26 important facts were known and/or accessible only to the Defendants, including due to their

27 involvement in the design, installment, and testing of engines in the Class Vehicles. Defendants

28

1    also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs

2    and the Classes.

3        151.    Defendants also had a duty to disclose the true nature of the Class Vehicles in light

4    of their affirmative statements about the Class Vehicles with respect to emissions performance

5    and performance. In uniform advertising and marketing materials provided with the Class

6    Engines and Class Vehicles, Defendants intentionally concealed, suppressed, and failed to

7    disclose to Plaintiffs and the Classes the emissions and performance defects.

8        152.    Defendants knew these statements were misleading, deceptive, and incomplete

9    without the disclosure of the additional facts set forth above regarding the existence of the

10    emissions and performance test manipulation. Because they volunteered to provide information

11    about the Class Vehicles that they offered for sale to Plaintiffs and the Classes, Defendants had

12    the duty to disclose the whole truth. They did not.

13        153.    Defendants' deceptive actions harmed Plaintiffs and the Classes. Because

14    Defendants fraudulently concealed the truth about the Class Vehicles, customers who paid for the

15    Class Vehicles suffered economic losses. Plaintiffs suffered damages including but not limited to

16    overpaying for vehicles that did not perform as represented and reasonably expected.

17    Accordingly, Defendants are liable to Plaintiffs and the Classes for damages in an amount to be

18    proven at trial.

19        154.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with

20    intent to defraud; in reckless disregard of the rights of Plaintiffs and the Classes; and to enrich

21    themselves. Their misconduct warrants an assessment of punitive damages in an amount

22    sufficient to deter such conduct in the future, which amount shall be determined according to

23    proof at trial.

24                            **NATIONWIDE COUNT II:**
                            **Unjust Enrichment**
25                              **(Common law)**

26        155.    Plaintiffs incorporate by reference paragraphs 1-142 above as though fully set

27    forth herein.

28

156. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under California law or, in the alternative, under the laws of all fifty states and Puerto Rico, against all Defendants. In the alternative, Plaintiffs bring claims on behalf of the State Classes under the respective State laws against all Defendants.

157. By reason of their conduct, Defendants caused damages to Plaintiffs and the Classes. Plaintiff and the Classes conferred a benefit on Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' misrepresentations, concealment, and omissions alleged above regarding the true nature and output of the Class Vehicles' emissions and performance.

158. As a result of Defendants' fraud and deception, Plaintiffs and members of the Classes were not aware of the true facts concerning the Class Vehicles.

159. Plaintiffs and members of the Classes did not benefit from the Defendants' misconduct.

160. Defendants knowingly benefitted from their unjust conduct. They sold and leased the Class Vehicles for more than what the vehicles were worth, and/or accepted the inflated benefits from the sale and lease of the Class Vehicles, at the expense of Plaintiffs and the Classes.

161. Plaintiffs and the Classes conferred tangible and material economic benefits upon Defendants when they purchased or leased the Class Vehicles. Defendants profit from sales and leases of Class Vehicles, including through Toyota's authorized dealership network.

162. Defendants readily accepted and retained these benefits from Plaintiffs and the Classes. Plaintiffs and the Classes would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the truth about these vehicles at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Classes.

163. It is inequitable and unconscionable for Defendants to retain these benefits because they intentionally manipulated and falsified the Class Vehicles' engine tests and test data for emissions and output testing, misrepresented the Class Vehicles' true output and emissions performance, concealed the true nature of the Class Vehicles' emissions and performance from

1    Plaintiffs and the Classes, and attested that the Class Vehicles complied with applicable emissions

2    laws. Plaintiffs and members of the Classes would not have purchased or leased the Class

3    Vehicles or would have paid less for them, had Defendants not engaged in these

4    misrepresentations, concealment, and omissions.

5         164.    Plaintiffs and the Classes do not have an adequate remedy at law.

6         165.    Equity cannot in good conscience permit Defendants to retain the benefits that

7    they derived from Plaintiffs and the Classes through unjust and unlawful acts, and therefore

8    restitution or disgorgement of the amount of Defendants' unjust enrichment is necessary.

9         166.    Plaintiffs plead this claim separately as well as in the alternative to their claims for

10    damages under Fed. R. Civ. P. 8(a)(3).

11    **NATIONWIDE COUNT III:**
**Breach of Implied Warranty of Merchantability**

12    **(Uniform Commercial Code)**

13         167.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

14    forth herein.

15         168.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under

16    California law or, in the alternative, under the laws of all fifty states and Puerto Rico, against all

17    Defendants. All states (except Louisiana which has its own analog) have adopted Uniform

18    Commercial Code § 2-314, which provides that every contract for sale includes an implied

19    warranty that the goods are merchantable. This common question of merchantability is the

20    essence of an implied warranty claim and predominates over any potential differences among the

21    states' individual implied warranty laws.

22         169.    In the alternative, as detailed in the State-specific counts below, Plaintiffs bring

23    claims on behalf of the State Classes under the respective State laws, against all Defendants.

24         170.    Defendants are liable for breach of the implied warranty of merchantability. *See,*

25    *e.g.*, U.C.C. §§ 2-314, 2A-212.

26         171.    Defendants are and were at all relevant times "merchant[s]" and "seller[s]" of

27    vehicles under U.C.C. § 2-314.

28

172.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under U.C.C. § 2A-212.

173.    The Class Vehicles are and were at all relevant times "goods" within the meaning of U.C.C. § 2-314 and § 2A-212.

174.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to U.C.C. § 2-314 and § 2A-212.

175.    A warranty that the Class Vehicles were in merchantable condition and conformed to affirmations of fact about emissions compliance made on emissions control information labels is implied by law pursuant to U.C.C. § 2-314 and § 2A-212. *See* 40 C.F.R. § 1039.135(c)(12) ("The label must . . . State: "THIS ENGINE COMPLIES WITH U.S. EPA REGULATIONS FOR [MODEL YEAR] NONROAD DIESEL ENGINES."); 40 C.F.R. § 1048.135 ("The label must . . . [i]dentify the emission standards to which you have certified the engine (in g/kW-hr) [and] [i]nclude one of the following compliance statements . . . "THIS ENGINE COMPLIES WITH U.S. EPA REGULATIONS FOR [MODEL YEAR] NONROAD ENGINES.").

176.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven. The Class Vehicles were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

177.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Nationwide Class members have been damaged in an amount to be proven at trial.

**B.**      **Claims Asserted on Behalf of the State-Specific Classes**

**1.**      **Alabama**

**ALABAMA COUNT I:**
**Violations of the Alabama Deceptive Trade Practices Act**
**Ala. Code § 8-19-1, *et seq.***
**(On Behalf of the Alabama State Class)**

178.     Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

179.     Plaintiff Andrews Hardware Company, Inc. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Alabama State Class against all Defendants.

180.     Plaintiff and Alabama State Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

181.     Plaintiff and Alabama State Class members and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

182.     The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

183.     Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

184.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

185.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented

emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

186.    Plaintiff and Alabama State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Alabama State Class members did not have access to Defendants' emissions certification and output test engines and data. Alabama State Class members did not and could not unravel Defendants' deception on their own.

187.    Defendants thus violated the Alabama DTPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

188.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Alabama State Class.

189.    Defendants knew or should have known that their conduct violated the Alabama DTPA.

190.    Defendants owed the Alabama State Class a duty to disclose the illegality and public health risks, and the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and Alabama State Class members; and/or

c.    made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

191.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Alabama State Class.

192.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Alabama Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

193.    Plaintiff and the Alabama State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

194.    Pursuant to Ala. Code § 8-19-10(e), Plaintiffs' counsel has sent notice letters to Defendants. Additionally, Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. The Alabama State Class seeks all damages and relief to which it is entitled.

**ALABAMA COUNT II:**
**Breach of Express Warranty**
**Ala. Code §§ 7-2-313 and 7-2A-210**
**(On Behalf of the Alabama State Class)**

195.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

196.    Plaintiff Andrews Hardware Company, Inc. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Alabama State Class against all Defendants.

197.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of vehicles under § 7-2-103(1)(d).

198.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ala. Code. § 7-2A-103(1)(p).

199.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

200.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all

factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

201.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

202.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

203.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

204.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

205.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

206.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased the Class Vehicles.

207.    Despite the existence of warranties, Defendants failed to inform Alabama State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

208.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

209.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

210.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Alabama State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

211.    Accordingly, recovery by Plaintiff and the Alabama State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

212.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the Alabama State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

213.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Alabama State Class members' remedies would be insufficient to make them whole.

214. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Alabama State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

215. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

216. As a direct and proximate result of Defendants' breach of express warranties, Alabama State Class members have been damaged in an amount to be determined at trial.

**ALABAMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ala. Code §§ 7-2-314 and 7-2A-212**
**(On Behalf of the Alabama State Class)**

217. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

218. Plaintiff Andrews Hardware Company, Inc. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Alabama State Class against all Defendants.

219. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of vehicles under § 7-2-103(1)(d).

220. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ala. Code. § 7-2A-103(1)(p).

221. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

222. Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

223. These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

224. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

225. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Alabama State Class members have been damaged in an amount to be proven at trial.

**2.**    **Arizona**

**ARIZONA COUNT I:**
**Violations of the Arizona Consumer Fraud Act**
**Ariz. Rev. Stat. § 44-1521, *et seq.***
**(On Behalf of the Arizona State Class)**

226. Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

227. Plaintiff Phoenix Paver Manufacturing, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

228. Defendants, Plaintiff, and Arizona State Class members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

229. The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

230. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any

1    person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful

2    practice." Ariz. Rev. Stat. § 44-1522(A).

3          231.    In the course of their business, Defendants concealed and suppressed material facts

4    concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

5    emissions certification and output testing for the Class Engines such that they falsely represented

6    emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

7    emissions tests when they in fact did not.

8          232.    Plaintiff and Arizona State Class members had no way of discerning that

9    Defendants' representations were false and misleading because Plaintiff and Arizona State Class

10   members did not have access to Defendants' emissions certification and output test engines and

11   data.

12         233.    Defendants thus violated the Arizona CFA by, at minimum: employing deception,

13   deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

14   any material fact with intent that others rely upon such concealment, suppression or omission, in

15   connection with the sale of Class Vehicles.

16         234.    Defendants intentionally and knowingly misrepresented material facts regarding

17   the Class Vehicles with intent to mislead Plaintiff and the Arizona State Class.

18         235.    Defendants knew or should have known that their conduct violated the Arizona

19   CFA.

20         236.    Defendants owed Plaintiff and the Arizona State Class a duty to disclose the

21   illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

22              a.      possessed exclusive knowledge that they were manufacturing, selling, and

23   distributing vehicles throughout the United States that did not perform as advertised;

24              b.      intentionally concealed the foregoing from regulators, Plaintiff, and

25   Arizona State Class members; and/or

26              c.      made incomplete representations about the Class Vehicles' output

27   performance and emissions while purposefully withholding material facts from Plaintiff and

28   Arizona State Class members that contradicted these representations.

237.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to Plaintiff and the Arizona State Class.

238.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Arizona State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

239.    Plaintiff and the Arizona State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

240.    Plaintiff and the Arizona State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Arizona State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

241.    Plaintiff and the Arizona State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**ARIZONA COUNT II:**
**Breach of Express Warranty**
**Ariz. Rev. Stat. §§ 47-2313 and 47-2A210**
**(On Behalf of the Arizona State Class)**

242.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

243.    Plaintiff Phoenix Paver Manufacturing, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

244.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

245.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

246.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

247.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

248.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

249.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

250.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

251.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

252.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

253.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

254.    Despite the existence of warranties, Defendants failed to inform Plaintiff and Arizona State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

255.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

256.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

257.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Arizona State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

258.    Accordingly, recovery by Plaintiff and Arizona State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

259.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Arizona State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

260.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' Arizona State Class members' remedies would be insufficient to make them whole.

261.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Arizona State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

262.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

263.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Arizona State Class members have been damaged in an amount to be determined at trial.

**ARIZONA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ariz. Rev. Stat. §§ 47-2314 and 47-2A212**
**(On Behalf of the Arizona State Class)**

264.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

265.    Plaintiff Phoenix Paver Manufacturing, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Arizona State Class against all Defendants.

266.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

267.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

268.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

269.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

270.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

271.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

272.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arizona State Class members have been damaged in an amount to be proven at trial.

### 3.    California

**CALIFORNIA COUNT I:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the California State Class)**

273.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

274.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the

1    Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

2    themselves and the California State Class against all Defendants.

3        275.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair,

4    or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and

5    unfair business acts and practices in violation of the Unfair Competition Law ("UCL").

6        276.    Defendants' knowing and intentional conduct, as described herein, constitutes

7    unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Defendants

8    violated the UCL in at least the following ways:

9            a.    by knowingly and intentionally failing to disclose to Plaintiffs and

10   California State Class members material information about the Class Vehicles' true emissions and

11   output performance while obtaining money from the California State Class members;

12           b.    by misrepresenting the Class Vehicles as possessing functional and defect-

13   free, EPA-compliant engine systems; and

14           c.    by knowingly designing and manufacturing the Class Vehicles in a manner

15   that they emit more pollution and achieve worse output performance than what was disclosed to

16   regulators and represented to individual and entities who purchased or leased them, and failing to

17   fix the defects free of charge;

18           d.    by violating the other California laws alleged herein, including the False

19   Advertising Law, California Commercial Code, and Song-Beverly Consumer Warranty Act.

20       277.    Defendants' acts and practices deceived Plaintiffs and are likely to deceive the

21   public. In failing to disclose the emissions defects and suppressing other material facts from

22   Plaintiff and Class members, Defendants breached their duty to disclose these facts, violated the

23   UCL, and caused injuries to Plaintiff and Class Members.

24       278.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and

25   the California State Class members to make their purchases or leases of their Class Vehicles.

26   Defendants' concealed facts, omissions, and false or misleading representations to Plaintiff and

27   the Class Members, as alleged herein, are material in that a reasonable consumer would have

28

1    considered them important in deciding whether to purchase or lease the Class Vehicles or to pay a

2    lesser price.

3        279.    Absent those misrepresentations and omissions, Plaintiffs and California State

4    Class members would not have purchased or leased these Class Vehicles, would not have

5    purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or

6    leased less expensive alternative vehicles that did not have inflated performance values or issues

7    with exhaust emissions.

8        280.    Accordingly, Plaintiffs and California State Class members have suffered

9    ascertainable loss and actual damages as a direct and proximate result of Defendants'

10   misrepresentations and their concealment of and failure to disclose material information.

11       281.    Defendants' violations present a continuing risk to Plaintiffs and California State

12   Class members, as well as to the general public. Defendants' unlawful acts and practices

13   complained of herein affect the public interest.

14       282.    The injuries suffered by Plaintiffs and Class members are not outweighed by any

15   potential countervailing benefit to consumers or to competition, nor are the injuries that Plaintiffs

16   and Class members suffered injuries that could have been reasonably avoided.

17       283.    Plaintiffs plead this claim separately as well as in the alternative to their claims for

18   damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiffs have no adequate remedy at law,

19   including for the future unlawful acts, methods, or practices as set forth above absent an

20   injunction, and Plaintiffs and the Class members lack an adequate remedy at law to recover or

21   fully recover amounts and benefits subject to restitution pursuant to this cause of action and to

22   obtain or fully obtain the requested injunctive relief pursuant to this cause of action.

23       284.    Moreover, Defendants' alleged misconduct is ongoing and therefore damages are

24   not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions

25   are designed to prevent.

26       285.    Plaintiffs request that this Court enter such orders or judgments as may be

27   necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices

28   and to restore to members of the California State Class any money it acquired by unfair

1    competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. &

2    Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

3        286.    Plaintiffs, on behalf of themselves and the California State Class, further seek an

4    award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**CALIFORNIA COUNT II:**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(On Behalf of the California State Class)**

8        287.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

9    forth herein.

10       288.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina

11   Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the

12   Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

13   themselves and the California State Class against all Defendants.

14       289.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . .

15   corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to

16   induce the public to enter into any obligation relating thereto, to make or disseminate or cause

17   to  be made or disseminated .  . . from this state before the public in any state, in any newspaper

18   or  other publication, or any advertising device, .  . . or in any other manner or means whatever,

19   including over the Internet, any statement .  . . which is untrue or misleading, and which is

20   known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

21       290.    Defendants caused to be made or disseminated through California and the United

22   States, through advertising, marketing and other publications, statements that were untrue or

23   misleading, and which were known, or which by the exercise of reasonable care should have been

24   known to Defendants, to be untrue and misleading to consumers, including California State Class

25   members.

26       291.    Defendants have violated Section 17500 because the misrepresentations and

27   omissions  regarding the reliability and functionality of Class Vehicles as set forth in this

28   Complaint were material and likely to deceive a reasonable consumer.

292.    Plaintiffs and the other California State Class members have suffered an injury in fact, including  the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, the California State Class relied on the misrepresentations and/or omissions of Defendants with respect to the performance and reliability of the Class Vehicles. Defendants' representations turned out not to be true because the Class Vehicles are distributed with faulty and defective systems, rendering certain performance and emissions functions unreliable.

293.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated, both in the State of California and nationwide.

294.    The California State Class requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT III:**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California State Class)**

295.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

296.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

297.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

298.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

299.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

300.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

301.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

302.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

303.    The warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. See 40 C.F.R. § 1048.120.

304.     The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. See 40 C.F.R. § 1039.120.

305.     As manufacturers of large spark- and compression-ignition-powered vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

306.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

307.     Despite the existence of warranties, Defendants failed to inform Plaintiffs and California State Class members that the Class Vehicles were defectively designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to individual and entities who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

308.     Defendants breached the express warranty promising to repair and correct Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

309.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

310.     Furthermore, the limited warranty promising to repair and correct Defendants' defects in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make California State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

311.     Accordingly, recovery by Plaintiffs and California State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defects in materials and workmanship, and they seek all remedies as allowed by law.

312.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. California State Class members were therefore

2    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3         313.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

4    resolved through the limited remedy of repairing and correcting Defendants' defects in materials

5    and workmanship as many incidental and consequential damages have already been suffered

6    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7    continued failure to provide such limited remedy within a reasonable time, and any limitation on

8    Plaintiffs and California State Class members' remedies would be insufficient to make them

9    whole.

10        314.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs

11   and California State Class members assert, as additional and/or alternative remedies, the

12   revocation of acceptance of the goods and the return to them of the purchase or lease price of all

13   Class Vehicles currently owned or leased, and for such other incidental and consequential

14   damages as allowed.

15        315.    Defendants were provided reasonable notice of these issues by way of a letter sent

16   by Plaintiffs' counsel as well as the regulators' investigations.

17        316.    As a direct and proximate result of Defendants' breach of express warranties,

18   California State Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On Behalf of the California State Class)**

22        317.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

23   forth herein.

24        318.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina

25   Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the

26   Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

27   themselves and the California State Class against all Defendants.

28

319.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

320.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

321.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

322.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

323.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

324.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

325.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT V:**
**Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty**
**Cal Civ. Code § 1790, *et seq.***
**(On Behalf of the California State Class)**

326.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

327.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the

1    Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

2    themselves and the California State Class against all Defendants.

3         328.    Plaintiffs and members of the California State Class who purchased Class Vehicles

4    in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

5         329.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code

6    § 1791(a).

7         330.    Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of

8    Cal. Civ. Code § 1791(j).

9         331.    Defendants impliedly warranted to Plaintiffs and the other members of the

10   California State Class that the Class Vehicles were "merchantable" within the meaning of Cal.

11   Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer

12   would reasonably expect.

13        332.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or

14   "implied warranty that goods are merchantable" means that the consumer goods meet each of the

15   following:

16              a.    Pass without objection in the trade under the contract description.

17              b.    Are fit for the ordinary purposes for which such goods are used.

18              c.    Are adequately contained, packaged, and labeled.

19              d.    Conform to the promises or affirmations of fact made on the container or

20   label.

21        333.    The Class Vehicles would not pass without objection in the trade because they

22   share a common design defect in that they were materially different from vehicles and component

23   engines Defendants used for emissions testing, included defects that led to inflated and

24   misleading output performance and emissions ratings, and/or did not comply with emissions

25   regulations when being driven, which conceals the vehicles' true emissions.

26        334.    The Class Vehicles are not adequately labeled because the labeling fails to disclose

27   the fact that they are defective.

28

335.    In the various channels of information through which Defendants sold and marketed Class Vehicles, Defendants failed to disclose material information concerning the Class Vehicles, which they had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed above: (a) Defendants knew about the defect; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California State Class members; (c) Defendants actively concealed material facts from the general public and California State Class members concerning the Class Vehicles' true emissions and performance; and (d) Defendants made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth. As detailed above, Defendants knew the information concerning the defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

336.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, this defect has caused members of the California State Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

337.    Plaintiffs and members of the California State Class have been damaged as a result of the diminished value of Defendants' products.

338.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

339.    Under Cal. Civ. Code § 1794, Plaintiffs and the other members of the California State Class are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VI:**
**Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
**Cal Civ. Code § 1790,** *et seq.*
**(On Behalf of the California State Class)**

340.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

341.     Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

342.     Plaintiffs and Members of the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

343.     The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

344.     Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

345.     Defendants made express warranties to members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

346.     As set forth above in detail, the Class Vehicles are inherently defective in that they were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output and emissions ratings, and/or did not comply with emissions regulations when being driven. This defect substantially impairs the use and value of the Class Vehicles to reasonable consumers.

347.     As a result of Defendants' breach of their express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiffs and the other members of the California State Class. Plaintiffs and members of the California State Class have been damaged as a result of, inter alia, the lesser value of Defendants' products.

348.     Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

349.     Pursuant to California Civil Code § 1794, Plaintiffs and the other members of the California State Class are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VII:**
**Breach of Express California Emissions Warranties**
**Cal. Code Regs. 13 § 2425, 2435.**
**(On Behalf of the California State Class)**

350.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

351.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

352.    Each Class Vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Code Regs. tit. 13, §§ 2425, 2435.

353.    The express California Emissions Warranties generally warrant "that the engine is designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board" and "[f]ree from defects in materials and workmanship which cause the failure of a warranted part to be identical in all material respects to the part as described in the engine manufacturer's application for certification for a period of five years or 3,000 hours of operation, whichever occurs first." Cal. Code Regs. tit. 13, § 2425 (regulation applicable to compression ignition engines, typically diesel).

354.    For spark ignition vehicles (typically gasoline-powered), the warranty applies for "3 years or 2,500 hours, whichever occurs first" and additionally provides the engine must be "[f]ree from defects in materials and workmanship which cause the failure of a high-cost warranted part to be identical in all material respects to the part as described in the engine manufacturer's application for certification . . . for a period of five years or 3,500 hours of operation, whichever occurs first." Cal. Code Regs. tit. 13, § 2435 (spark ignition). High-cost warranted parts are determined pursuant to a statutory formula. *Id.*

355.     California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2. Among those duties, "if the manufacturer or its representative in this state does not

1   service or repair the goods to conform to the applicable express warranties after a reasonable

2   number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an

3   amount equal to the purchase price paid by the buyer, less that amount directly attributable to use

4   by the buyer prior to the discovery of the nonconformity." *See* Cal. Civ. Code § 1793.2(d)(1).

5       356.    Plaintiffs and California Subclass members are excused from the requirement to

6   "deliver nonconforming goods to the manufacturer's service and repair facility within this state"

7   because it is unnecessary and futile, including due to the nature of the nonconformity. Cal. Civ.

8   Code § 1793.2(c).

9       357.    This Complaint, as well as a letter sent by Plaintiffs' counsel to Defendants in

10  advance of filing, are written notice of nonconformity to Defendants and "shall constitute return

11  of the goods." *Id*.

12      358.    In addition to all other damages and remedies, California State Class members are

13  entitled to "recover a civil penalty of up to two times the amount of damages" for the

14  aforementioned violation. *See* Cal. Civ. Code § 1794(e).

## CALIFORNIA COUNT VIII:
### Failure to Recall/Retrofit
### (On Behalf of the California State Class)

17      359.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

18  forth herein.

19      360.    Plaintiffs Broadmoor Lumber & Plywood Co., Arn Distributors, Inc., Catalina

20  Beverage Co., C.T.D Distributing, Inc. d/b/a Long Produce, Inc., and Goodwill Industries of the

21  Redwood Empire (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

22  themselves and the California State Class against all Defendants.

23      361.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the

24  stream of U.S. commerce the Class Vehicles, as set forth above.

25      362.    Defendants knew or reasonably should have known that the Class Vehicles emit a

26  substantially increased amount of pollution and reasonably should have known that the Class

27  Vehicles were likely to be dangerous when used in a reasonably foreseeable manner.

28

1     363.    Defendants failed to recall the Class Vehicles in a timely manner or warn of the

2    Class Vehicles' heightened emissions.

3     364.    A reasonable manufacturer in same or similar circumstances would have timely

4    and properly recalled the Class Vehicles.

5     365.    Plaintiffs and California State Class members were harmed by Defendants' failure

6    to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered

7    damages, caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the

8    Class Vehicles. Defendants' failure to timely recall the Class Vehicles was a substantial factor in

9    causing harm to Plaintiffs and California State Class members as alleged herein.

**4.    Colorado**

**COLORADO COUNT I:**
**Violations of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. § 6-1-101 *et seq.***
**(On Behalf of the Colorado State Class)**

14     366.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

15    forth herein.

16     367.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this

17    claim on behalf of itself and the Colorado State Class against all Defendants.

18     368.    Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer

19    Protection Act "Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

20     369.    Plaintiff and Colorado State Class members are "consumers" for purposes of Col.

21    Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.

22     370.    The Colorado CPA prohibits deceptive trade practices in the course of a person's

23    business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA,

24    including: (1) knowingly making a false representation as to the characteristics, uses, and benefits

25    of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class members;

26    (2) representing that the Class Vehicles are of a particular standard, quality, and grade even

27    though Defendants knew or should have known they are not; (3) advertising the Class Vehicles

28    with the intent not to sell them as advertised; and (4) failing to disclose material information

1  concerning the Class Vehicles that was known to Defendants at the time of advertisement or sale

2  with the intent to induce Colorado State Class members to purchase, lease or retain the Class

3  Vehicles.

4          371.    In the course of their business, Defendants concealed and suppressed material facts

5  concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

6  emissions certification and output testing for the Class Engines such that they falsely represented

7  emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

8  emissions tests when they in fact did not.

9          372.    Plaintiff and Colorado State Class members had no way of discerning that

10  Defendants' representations were false and misleading because Plaintiff and the Colorado State

11  Class members did not have access to Defendants' emissions certification and output test engines

12  and data.

13          373.    Defendants thus violated the Colorado CPA by, at minimum: representing that

14  Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

15  representing that Class Vehicles are of a particular standard, quality, and grade when they are not;

16  advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing

17  that the subject of a transaction involving Class Vehicles has been supplied in accordance with a

18  previous representation when it has not.

19          374.    Defendants intentionally and knowingly misrepresented material facts regarding

20  the Class Vehicles with intent to mislead the Colorado State Class.

21          375.    Defendants knew or should have known that their conduct violated the Colorado

22  CPA.

23          376.    Defendants owed the Colorado State Class a duty to disclose the illegality and

24  public health risks, the true nature of the Class Vehicles, because Defendants:

25                  a.      possessed exclusive knowledge that they were manufacturing, selling, and

26  distributing vehicles throughout the United States that did not perform as advertised;

27                  b.      intentionally concealed the foregoing from regulators and Colorado State

28  Class members; and/or

1          c.      made incomplete representations about the Class Vehicles' output

2   performance and emissions, while purposefully withholding material facts that contradicted these

3   representations.

4          377.    Defendants' concealment of the Class Vehicles' true performance and emissions

5   was material to Plaintiff and the Colorado State Class.

6          378.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

7   deceive regulators and reasonable consumers, including the Colorado State Class, about the true

8   environmental cleanliness and output performance of the Class Vehicles, the quality of the

9   Defendants' brands, the devaluing of environmental cleanliness and integrity at Defendant

10  companies, and the true value of the Class Vehicles.

11         379.    Defendants' violations present a continuing risk to the Colorado State Class as

12  well as to the general public. Defendants' unlawful acts and practices complained of herein affect

13  the public interest.

14         380.    Plaintiff and the Colorado State Class suffered ascertainable loss and actual

15  damages as a direct and proximate result of Defendants' misrepresentations and concealment of

16  and failure to disclose material information. Defendants had an ongoing duty to all their

17  customers to refrain from unfair and deceptive practices under the Colorado CPA. All owners and

18  lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

19  unfair acts and practices made in the course of Defendants' business.

**COLORADO COUNT II:**
**Breach of Express Warranty**
**Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
**(On Behalf of the Colorado State Class)**

23         381.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

24  fully set forth herein.

25         382.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this

26  claim on behalf of itself and the Colorado State Class against all Defendants.

27

28

383.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of vehicles under § 4-2-103(1)(d).

384.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

385.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

386.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

387.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

388.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

389.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-

1   related warranty for the engine may not be shorter than the standard warranty terms. *See* 40

2   C.F.R. § 1048.120.

3       390.    The Warranty required by the EPA for compression-ignition vehicles applies for

4   3,000 hours or five years, whichever comes first, and likewise may not be shorter than the

5   standard warranty terms. *See* 40 C.F.R. § 1039.120.

6       391.    As manufacturers of large spark and compression ignition powered Vehicles,

7   Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

8       392.    Defendants' warranties formed a basis of the bargain that was reached when

9   consumers purchased or leased Class Vehicles.

10      393.    Despite the existence of warranties, Defendants failed to inform Colorado State

11  Class members that the Class Vehicles were defective and were intentionally designed and

12  manufactured to emit more pollution and achieve inferior output performance than what was

13  disclosed to regulators and represented to consumers who purchased or leased them, and

14  Defendants failed to fix the defective emission components free of charge.

15      394.    Defendants breached the express warranty promising to repair and correct

16  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

17  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

18      395.    Affording Defendants a reasonable opportunity to cure their breach of written

19  warranties would be unnecessary and futile here.

20      396.    Furthermore, the limited warranty promising to repair and correct Defendants'

21  defect in materials and workmanship fails in its essential purpose because the contractual remedy

22  is insufficient to make Colorado State Class members whole and because Defendants have failed

23  and/or have refused to adequately provide the promised remedies within a reasonable time.

24      397.    Accordingly, recovery by Colorado State Class members is not restricted to the

25  limited warranty promising to repair and correct Defendants' defect in materials and

26  workmanship, and they seek all remedies as allowed by law.

27      398.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

28  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

1    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2    material facts regarding the Class Vehicles. Colorado State Class members were therefore

3    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4        399.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

6    and workmanship as many incidental and consequential damages have already been suffered

7    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

8    continued failure to provide such limited remedy within a reasonable time, and any limitation on

9    Colorado State Class members' remedies would be insufficient to make them whole.

10        400.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff

11    and Colorado State Class members assert, as additional and/or alternative remedies, the

12    revocation of acceptance of the goods and the return to them of the purchase or lease price of all

13    Class Vehicles currently owned or leased, and for such other incidental and consequential

14    damages as allowed.

15        401.    Defendants were provided reasonable notice of these issues by way of a letter sent

16    by Plaintiffs' counsel as well as the regulators' investigations.

17        402.    As a direct and proximate result of Defendants' breach of express warranties,

18    Colorado State Class members have been damaged in an amount to be determined at trial.

19
**COLORADO COUNT III:**
**Breach of Implied Warranty of Merchantability**
20
**Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212**
**(On Behalf of the Colorado State Class)**
21

22        403.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

23    forth herein.

24        404.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this

25    claim on behalf of itself and the Colorado State Class against all Defendants.

26        405.    Defendants are and were at all relevant times "merchant[s]" with respect to

27    vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of vehicles under

28    § 4-2-103(1)(d).

406.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

407.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

408.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

409.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

410.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

411.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Colorado State Class members have been damaged in an amount to be proven at trial.

### 5.    Georgia

**GEORGIA COUNT I:**
**Violations of Georgia's Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390 *et seq.***
**(On Behalf of the Georgia State Class)**

412.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

413.    Plaintiff H & S Transport Co. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Georgia State Class against all Defendants.

414.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

415.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

416.    Plaintiff and Georgia State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Georgia State Class members did not have access to Defendants' emissions certification and output test engines and data.

417.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Georgia State Class.

418.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

419.    Defendants owed Plaintiff and the Georgia State Class a duty to disclose the illegality and the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators, Plaintiff, and Georgia State Class members; and/or

1                 c.      made incomplete representations about the Class Vehicles' output

2 performance and emissions while purposefully withholding material facts from Plaintiff and

3 Georgia State Class members that contradicted these representations.

4         420.    Defendants' concealment of the true characteristics of the Class Vehicles'

5 performance and emissions was material to Plaintiff and the Georgia State Class.

6         421.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

7 deceive regulators and reasonable consumers, including Plaintiff and the Georgia State Class,

8 about the true emissions and performance of the Class Vehicles, the quality of the Defendants'

9 brands, and the true value of the Class Vehicles.

10        422.    Defendants' violations present a continuing risk to Plaintiff and the Georgia State

11 Class, as well as to the general public. Defendants' unlawful acts and practices complained of

12 herein affect the public interest.

13        423.    Plaintiff and the Georgia State Class suffered ascertainable loss and actual

14 damages as a direct and proximate result of Defendants' misrepresentations and concealment of

15 and failure to disclose material information. Defendants had an ongoing duty to all their

16 customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of

17 Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

18 practices made in the course of Defendants' business.

19        424.    As a direct and proximate result of Defendants' violations of the Georgia FBPA,

20 Plaintiff and the Georgia State Class has suffered injury-in-fact and/or actual damage.

21        425.    Plaintiff and the Georgia State Class are entitled to recover damages and

22 exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

23        426.    Plaintiff and the Georgia State Class also seek an order enjoining Defendants'

24 unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief

25 available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

26        427.    Pursuant to Ga. Code Ann. § 10-1-399, Plaintiffs' counsel sent notice letters to

27 Defendants. Additionally, all Defendants were provided notice of the issues raised in this count

28

1    and this Complaint by way of the investigations conducted by governmental regulators. Plaintiff

2    and the Georgia State Class seek all damages and relief to which they are entitled.

3                                    **GEORGIA COUNT IV:**
                   **Violations of Georgia's Uniform Deceptive Trade Practices Act**
4                              **Ga. Code Ann. § 10-1-370 *et seq.***
                              **(On Behalf of the Georgia State Class)**
5

6          428.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

7    forth herein.

8          429.    Plaintiff H & S Transport Co. (for the purposes of this count, "Plaintiff") brings

9    this claim on behalf of itself and the Georgia State Class against all Defendants.

10         430.    Defendants, Plaintiff, and members of the Georgia State Class are "persons"

11   within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga.

12   Code. Ann. § 10-1-371(5).

13         431.    The Georgia UDTPA prohibits "deceptive trade practices," which include the

14   "misrepresentation of standard or quality of goods or services," and "engaging in any other

15   conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code.

16   Ann. § 10-1-372(a).

17         432.    In the course of their business, Defendants concealed and suppressed material facts

18   concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

19   emissions certification and output testing for the Class Engines such that they falsely represented

20   emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

21   emissions tests when they in fact did not.

22         433.    Plaintiff and Georgia State Class members had no way of discerning that

23   Defendants' representations were false and misleading because Plaintiff and Georgia State Class

24   members did not have access to Defendants' emissions certification and output test engines and

25   data.

26         434.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles

27   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

28   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

435.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Georgia State Class.

436.    Defendants knew or should have known that their conduct violated the Georgia UDTPA.

437.    Defendants owed Plaintiff and the Georgia State Class a duty to disclose the illegality and the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators, Plaintiff, and Georgia State Class members; and/or

c.    made incomplete representations about the Class Vehicles' performance and emissions while purposefully withholding material facts that contradicted these representations.

438.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to Plaintiff and the Georgia State Class.

439.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Georgia State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

440.    Defendants' violations present a continuing risk to Plaintiff and the Georgia State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

441.    Plaintiff and the Georgia State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their

1  customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All owners

2  and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

3  unfair acts and practices made in the course of Defendants' business.

4      442.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA,

5  Plaintiff and the Georgia State Class have suffered injury-in-fact and/or actual damage.

6      443.    Plaintiff and the Georgia State Class seek an order enjoining Defendants' unfair,

7  unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available

8  under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

9  
                          **GEORGIA COUNT V:**
10                        **Breach of Express Warranty**
                   **Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
11                   **(On Behalf of the Georgia State Class)**

12     444.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

13  fully set forth herein.

14     445.    Plaintiff H & S Transport Co. (for the purposes of this count, "Plaintiff") brings

15  this claim on behalf of itself and the Georgia State Class against all Defendants.

16     446.    Defendants are and were at all relevant times "merchant[s]" with respect to

17  vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of vehicles under

18  § 11-2-103(1)(d).

19     447.    With respect to leases, Defendants are and were at all relevant times "lessors" of

20  vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

21     448.    The Class Vehicles are and were at all relevant times "goods" within the meaning

22  of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

23     449.    In connection with the purchase or lease of each one of its new vehicles,

24  Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to

25  cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a

26  period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle.

27  This warranty exists to repair the vehicle in case of "defects in material and workmanship."

28

450.     In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

451.     For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

452.     The warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. See 40 C.F.R. § 1048.120.

453.     The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. See 40 C.F.R. § 1039.120.

454.     As manufacturers of large spark- and compression-ignition-powered vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

455.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

456.     Defendants also made numerous representations, descriptions, and promises to Plaintiff and Georgia State Class members regarding the performance and emission controls of their vehicles.

457. Despite the existence of warranties, Defendants failed to inform Plaintiff and Georgia State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

458. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

459. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

460. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Georgia State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

461. Accordingly, recovery by Plaintiff and Georgia State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

462. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Georgia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

463. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on

1    Plaintiff's and Georgia State Class members' remedies would be insufficient to make them

2    whole.

3        464.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff

4    and Georgia State Class members assert, as additional and/or alternative remedies, the revocation

5    of acceptance of the goods and the return to them of the purchase or lease price of all Class

6    Vehicles currently owned or leased, and for such other incidental and consequential damages as

7    allowed.

8        465.    Defendants were provided reasonable notice of these issues by way of a letter sent

9    by Plaintiffs' counsel as well as the regulators' investigations.

10       466.    As a direct and proximate result of Defendants' breach of express warranties,

11   Plaintiff and Georgia State Class members have been damaged in an amount to be determined at

12   trial.

**GEORGIA COUNT VI:**
13               **Breach of Implied Warranty of Merchantability**
                 **Ga. Code Ann. §§ 11-2-314 and 11-2A-212**
14               **(On Behalf of the Georgia State Class)**

15

16       467.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17   forth herein.

18       468.    Plaintiff H & S Transport Co. (for the purposes of this count, "Plaintiff") brings

19   this claim on behalf of itself and the Georgia State Class against all Defendants.

20       469.    Defendants are and were at all relevant times "merchant[s]" with respect to

21   vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of vehicles under

22   § 11-2-103(1)(d).

23       470.    With respect to leases, Defendants are and were at all relevant times "lessors" of

24   vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

25       471.    The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

27       472.    Warranties that the Class Vehicles were in merchantable condition and fit for the

28   ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

1    fact made on their labels, are implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-

2    212.

3        473.    These Class Vehicles, when sold or leased and at all times thereafter, were

4    materially different from vehicles and component engines Defendants used for emissions testing,

5    included defects that led to inflated and misleading output performance and emissions ratings,

6    and/or did not comply with emissions regulations when being driven, and were therefore not

7    merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

8    the promises or affirmations of fact made on their labels.

9        474.    Defendants were provided reasonable notice of these issues by way of a letter sent

10   by Plaintiffs' counsel as well as the regulators' investigations.

11       475.    As a direct and proximate result of Defendants' breach of the implied warranty of

12   merchantability, Plaintiff and Georgia State Class members have been damaged in an amount to

13   be proven at trial.

14                          **6.    Indiana**

15                          **INDIANA COUNT I:**
                **Violations of the Indiana Deceptive Consumer Sales Act**
16                          **Ind. Code § 24-5-0.5-3**
                     **(On Behalf of the Indiana State Class)**
17

18       476.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

19   forth herein.

20       477.    Plaintiffs Lanham Hardwood Flooring Co., Inc. and United Farm and Home

21   Cooperative (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves

22   and the Indiana State Class against all Defendants.

23       478.    In the course of their business, Defendants concealed and suppressed material facts

24   concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

25   emissions certification and output testing for the Class Engines such that they falsely represented

26   emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

27   emissions tests when they in fact did not.

28

479. Indiana State Class members had no way of discerning that Defendants' representations were false and misleading because Indiana State Class members did not have access to Defendants' emissions certification and output test engines and data. Indiana State Class members did not and could not unravel Defendants' deception on their own.

480. Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

481. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Indiana State Class.

482. Defendants knew or should have known that their conduct violated the Indiana DCSA.

483. Defendants owed the Indiana State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b. intentionally concealed the foregoing from regulators and Indiana State Class members; and/or

c. made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

484. Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Indiana State Class.

485. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Indiana State Class, about the true

environmental cleanliness and performance of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

486.    Defendants' violations present a continuing risk to the Indiana State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

487.    The Indiana State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Indiana DCSA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

488.    As a direct and proximate result of Defendants' violations of the Indiana DCSA, members of the Indiana State Class have suffered injury-in-fact and/or actual damage.

489.    Pursuant to Ind. Code § 24-5-0.5-4, the Indiana State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Indiana State Class member, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

490.    The Indiana State Class also seeks punitive damages based on the outrageousness and recklessness of the Defendants' conduct and Defendants' high net worth.

491.    Pursuant to Ind. Code § 24-5-0.5-5(a), Plaintiffs' counsel sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The Indiana State Class seeks all damages and relief to which it is entitled.

**INDIANA COUNT II:**
**Breach of Express Warranty**
**Ind. Code §§ 26-1-3-313 and 26-1-2.1-210**
**(On Behalf of the Indiana State Class)**

492.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

493.    Plaintiffs Lanham Hardwood Flooring Co., Inc. and United Farm and Home Cooperative (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Indiana State Class against all Defendants.

494.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of vehicles under § 26-1-2-103(1)(d).

495.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ind. Code § 26-1-2.1-103(1)(p).

496.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

497.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

498.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

499.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

500.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than

$400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

501.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

502.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

503.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased the Class Vehicles.

504.    Despite the existence of warranties, Defendants failed to inform Indiana State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

505.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

506.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

507.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Indiana State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

508.    Accordingly, recovery by Indiana State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

509.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Indiana State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

510.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Indiana State Class members' remedies would be insufficient to make them whole.

511.    Finally, because of Defendants' breach of warranty as set forth herein, Indiana State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

512.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

513.    As a direct and proximate result of Defendants' breach of express warranties, Indiana State Class members have been damaged in an amount to be determined at trial.

**INDIANA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ind. Code §§ 26-1-3-314 and 26-1-2.1-212**
**(On Behalf of the Indiana State Class)**

514.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

515.    Plaintiffs Lanham Hardwood Flooring Co., Inc. and United Farm and Home Cooperative (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Indiana State Class against all Defendants.

516. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of vehicles under § 26-1-2-103(1)(d).

517. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ind. Code § 26-1-2.1-103(1)(p).

518. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

519. Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

520. These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

521. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

522. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Indiana State Class members have been damaged in an amount to be proven at trial.

### 7. Kansas

**KANSAS COUNT I:**
**Violations of the Kansas Consumer Protection Act**
**Kan. Stat. Ann. § 50-623 *et seq.***
**(On Behalf of the Kansas State Class)**

523. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

524.    Plaintiff PMC, Inc. d/b/a KC Scaffold (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Kansas State Class against all Defendants.

525.    Each Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

526.    Kansas State Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

527.    The sale of the Class Vehicles to the Kansas State Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

528.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

529.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

530.    Kansas State Class members had no way of discerning that Defendants' representations were false and misleading because Kansas State Class members did not have access to Defendants' emissions certification and output test engines and data.

531.     Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

532.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Kansas State Class.

533.     Defendants knew or should have known that their conduct violated the Kansas CPA.

534.     Defendants owed the Kansas State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.     intentionally concealed the foregoing from regulators and Kansas State Class members; and/or

c.     made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

535.     Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Kansas State Class.

536.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kansas State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

537.     Defendants' violations present a continuing risk to the Kansas State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

538. Members of the Kansas State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

539. As a direct and proximate result of Defendants' violations of the Kansas CPA, the Kansas State Class have suffered injury-in-fact and/or actual damage.

540. Pursuant to Kan. Stat. Ann. § 50-634, the Kansas State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Kansas State Class member.

541. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, *et seq.*

**KANSAS COUNT II:**
**Breach of Express Warranty**
**Kan. Stat. §§ 84-2-313 and 84-2A-210**
**(On Behalf of the Kansas State Class)**

542. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

543. Plaintiff PMC, Inc. d/b/a KC Scaffold (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Kansas State Class against all Defendants.

544. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of vehicles under § 84-2-103(1)(d).

545. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Kan. Stat. § 84-2A-103(1)(p).

546. The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

547.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

548.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

549.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

550.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

551.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

552.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1    553.    Defendants' warranties formed a basis of the bargain that was reached when

2    consumers purchased or leased Class Vehicles.

3    554.    Despite the existence of warranties, Defendants failed to inform Kansas State

4    Class members that the Class Vehicles were defective and intentionally designed and

5    manufactured to emit more pollution and achieve inferior output performance than what was

6    disclosed to regulators and represented to consumers who purchased or leased them, and

7    Defendants failed to fix the defective emission components free of charge.

8    555.    Defendants breached the express warranty promising to repair and correct

9    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

10    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

11    556.    Affording Defendants a reasonable opportunity to cure their breach of written

12    warranties would be unnecessary and futile here.

13    557.    Furthermore, the limited warranty promising to repair and correct Defendants'

14    defect in materials and workmanship fails in its essential purpose because the contractual remedy

15    is insufficient to make Kansas State Class members whole and because Defendants have failed

16    and/or have refused to adequately provide the promised remedies within a reasonable time.

17    558.    Accordingly, recovery by Kansas State Class members is not restricted to the

18    limited warranty promising to repair and correct Defendants' defect in materials and

19    workmanship, and they seek all remedies as allowed by law.

20    559.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

21    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

22    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

23    material facts regarding the Class Vehicles. Kansas State Class members were therefore induced

24    to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

25    560.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

26    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

27    and workmanship as many incidental and consequential damages have already been suffered

28    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

1   continued failure to provide such limited remedy within a reasonable time, and any limitation on

2   Kansas State Class members' remedies would be insufficient to make them whole.

3       561.    Finally, because of Defendants' breach of warranty as set forth herein, Kansas

4   State Class members assert, as additional and/or alternative remedies, the revocation of

5   acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

6   currently owned or leased, and for such other incidental and consequential damages as allowed.

7       562.    Defendants were provided reasonable notice of these issues by way of a letter sent

8   by Plaintiffs' counsel as well as the regulators' investigations.

9       563.    As a direct and proximate result of Defendants' breach of express warranties,

10  Kansas State Class members have been damaged in an amount to be determined at trial.

**KANSAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Kan. Stat. §§ 84-2-314 and 84-2A-212**
**(On Behalf of the Kansas State Class)**

14      564.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

15  forth herein.

16      565.    Plaintiff PMC, Inc. d/b/a KC Scaffold (for the purposes of this count, "Plaintiff")

17  brings this claim on behalf of itself and the Kansas State Class against all Defendants.

18      566.    Defendants are and were at all relevant times "merchant[s]" with respect to

19  vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of vehicles under § 84-

20  2-103(1)(d).

21      567.    With respect to leases, Defendants are and were at all relevant times "lessors" of

22  vehicles under Kan. Stat. § 84-2A-103(1)(p).

23      568.    The Class Vehicles are and were at all relevant times "goods" within the meaning

24  of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

25      569.    Warranties that the Class Vehicles were in merchantable condition and fit for the

26  ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

27  fact made on their labels, are implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

28

570.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

571.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

572.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Kansas State Class members have been damaged in an amount to be proven at trial.

**8.    Kentucky**

**KENTUCKY COUNT I:**
**Violations of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. Ann. § 367.110 *et seq.***
**(On Behalf of the Kentucky State Class)**

573.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

574.    Plaintiff Lanham Hardwood Flooring Co., Inc. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Kentucky State Class against all Defendants.

575.    Defendants, Plaintiff, and the Kentucky State Class are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

576.    Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

577.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. § 367.170(1). Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing

the defects identified herein, marketing their vehicles as reliable, efficient, and of high quality, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and performance, and stood behind their vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

578.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

579.    Kentucky State Class members had no way of discerning that Defendants' representations were false and misleading because the Kentucky State Class did not have access to Defendants' emissions certification and output test engines and data.

580.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

581.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Kentucky State Class.

582.    Defendants knew or should have known that their conduct violated the Kentucky CPA.

583.    Defendants owed the Kentucky State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and Kentucky State Class members; and/or

c. made incomplete representations about the Class Vehicles' output performance and emissions, while purposefully withholding material facts that contradicted these representations.

584. Defendants' fraudulent concealment of the Class Vehicles' true emissions and performance was material to the Kentucky State Class.

585. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kentucky State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

586. Defendants' violations present a continuing risk to the Kentucky State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

587. Members of the Kentucky State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

588. As a direct and proximate result of Defendants' violations of the Kentucky CPA, Kentucky State Class members have suffered injury-in-fact and/or actual damage.

589. Pursuant to Ky. Rev. Stat. Ann. § 367.220, the Kentucky State Class seeks to recover actual damages in an amount to be determined at trial; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**KENTUCKY COUNT II:**
**Breach of Express Warranty**
**Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210**
**(On Behalf of the Kentucky State Class)**

590.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

591.    Plaintiff Lanham Hardwood Flooring Co., Inc. (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Kentucky State Class against all Defendants.

592.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of vehicles under § 355.2-103(1)(d).

593.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

594.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

595.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

596.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

597.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well.

*See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

598.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

599.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

600.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

601.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

602.    Despite the existence of warranties, Defendants failed to inform Kentucky State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

603.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

604.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

605.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy

1    is insufficient to make Kentucky State Class members whole and because Defendants have failed

2    and/or have refused to adequately provide the promised remedies within a reasonable time.

3         606.    Accordingly, recovery by Kentucky State Class members is not restricted to the

4    limited warranty promising to repair and correct Defendants' defect in materials and

5    workmanship, and they seek all remedies as allowed by law.

6         607.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

7    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9    material facts regarding the Class Vehicles. Kentucky State Class members were therefore

10   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11        608.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

12   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13   and workmanship as many incidental and consequential damages have already been suffered

14   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15   continued failure to provide such limited remedy within a reasonable time, and any limitation on

16   Kentucky State Class members' remedies would be insufficient to make them whole.

17        609.    Finally, because of Defendants' breach of warranty as set forth herein, Kentucky

18   State Class members assert, as additional and/or alternative remedies, the revocation of

19   acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

20   currently owned or leased, and for such other incidental and consequential damages as allowed.

21        610.    Defendants were provided reasonable notice of these issues by way of a letter sent

22   by Plaintiffs' counsel as well as the regulators' investigations.

23        611.    As a direct and proximate result of Defendants' breach of express warranties,

24   Kentucky State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

1
2
3

**KENTUCKY COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212**
**(On Behalf of the Kentucky State Class)**

4       612.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5    forth herein.

6       613.    Plaintiff Lanham Hardwood Flooring Co., Inc. (for the purposes of this count,

7    "Plaintiff") brings this claim on behalf of itself and the Kentucky State Class against all

8    Defendants.

9       614.    Defendants are and were at all relevant times "merchant[s]" with respect to

10   vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of vehicles under

11   § 355.2-103(1)(d).

12      615.    With respect to leases, Defendants are and were at all relevant times "lessors" of

13   vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

14      616.    The Class Vehicles are and were at all relevant times "goods" within the meaning

15   of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

16      617.    Warranties that the Class Vehicles were in merchantable condition and fit for the

17   ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

18   fact made on their labels, are implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-

19   212.

20      618.    These Class Vehicles, when sold or leased and at all times thereafter, were

21   materially different from vehicles and component engines Defendants used for emissions testing,

22   included defects that led to inflated and misleading output performance and emissions ratings,

23   and/or did not comply with emissions regulations when being driven, and were therefore not

24   merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

25   the promises or affirmations of fact made on their labels.

26      619.    Defendants were provided reasonable notice of these issues by way of a letter sent

27   by Plaintiffs' counsel as well as the regulators' investigations.

28

- 121 -                              AMENDED CLASS ACTION COMPLAINT
                                                                              CASE NO. 3:24-CV-06640-JSC

1     620.    As a direct and proximate result of Defendants' breach of the implied warranty of

2     merchantability, Kentucky State Class members have been damaged in an amount to be proven at

3     trial.

4            **9.      Massachusetts**

5                        **MASSACHUSETTS COUNT I:**
                **Deceptive Acts or Practices Prohibited by Massachusetts Law**
6                    **Mass. Gen. Laws Ch. 93a, § 1, *et seq.***
                    **(On Behalf of the Massachusetts State Class)**
7

8     621.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

9     forth herein.

10    622.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this

11    claim on behalf of itself and the Massachusetts State Class against all Defendants.

12    623.    Defendants, Plaintiff, and the Massachusetts State Class are "persons" within the

13    meaning of Mass. Gen. Laws ch. 93A, § 1(a).

14    624.    Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen.

15    Laws ch. 93A, § 1(b).

16    625.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or

17    practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendants

18    participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

19    626.    In the course of their business, Defendants concealed and suppressed material facts

20    concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

21    emissions certification and output testing for the Class Engines such that they falsely represented

22    emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

23    emissions tests when they in fact did not.

24    627.    Massachusetts State Class members had no way of discerning that Defendants'

25    representations were false and misleading because Massachusetts State Class members did not

26    have access to Defendants' emissions certification test vehicles and Defendants' emissions

27    certification and output test engines and data.

28

628.    Massachusetts State Class members did not and could not unravel Defendants' deception on their own.

629.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

630.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Massachusetts State Class.

631.    Defendants knew or should have known that their conduct violated the Massachusetts Act.

632.    Defendants owed the Massachusetts State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

        a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

        b.    intentionally concealed the foregoing from regulators and Massachusetts State Class members; and/or

        c.    made incomplete representations about the Class Vehicles' performance and emissions while purposefully withholding material facts that contradicted these representations.

633.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Massachusetts State Class.

634.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Massachusetts State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

635.    Defendants' violations present a continuing risk to the Massachusetts State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

636.    The Massachusetts State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Massachusetts Act. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

637.    As a direct and proximate result of Defendants' violations of the Massachusetts Act, the Massachusetts State Class have suffered injury-in-fact and/or actual damage.

638.    Pursuant to Mass. Gen. Laws ch. 93A, §§ 9, 11, the Massachusetts State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts State Class member. Because Defendants' conduct was committed willfully and knowingly, each Massachusetts State Class member is entitled to recover up to three times actual damages, but no less than two times actual damages.

639.    The Massachusetts State Class also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

640.    Pursuant to Mass. Gen. Laws ch. 93A, § 9(3), Plaintiffs' counsel sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The Massachusetts State Class seeks all damages and relief to which it is entitled.

641.    As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**MASSACHUSETTS COUNT II:**
**Breach of Express Warranty**
**Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts State Class)**

642.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

643.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Massachusetts State Class against all Defendants.

644.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under M.G.L. c. 106 § 2-104(1) and are "seller[s]" of vehicles under § 2-103(1)(d).

645.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under M.G.L. c. 106 § 2A-103(1)(p).

646.    The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

647.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

648.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

649.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

650.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. See 40 C.F.R. § 1048.120.

651.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. See 40 C.F.R. § 1039.120.

652.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

653.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

654.    Despite the existence of warranties, Defendants failed to inform Massachusetts State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

655.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

656.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

657.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

658.    Accordingly, recovery by Massachusetts State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

659.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Massachusetts State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

660.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Massachusetts State Class members' remedies would be insufficient to make them whole.

661.    Finally, because of Defendants' breach of warranty as set forth herein, Massachusetts State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

662.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

663.    As a direct and proximate result of Defendants' breach of express warranties, Massachusetts State Class members have been damaged in an amount to be determined at trial.

**MASSACHUSETTS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212**
**(On Behalf of the Massachusetts State Class)**

664.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

665.    Plaintiff Perry Supply, LLC (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Massachusetts State Class against all Defendants.

666.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under M.G.L. c. 106 § 2-104(1) and are "seller[s]" of vehicles under § 2-103(1)(d).

667.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under M.G.L. c. 106 § 2A-103(1)(p).

668.    The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

669.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

670.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

671.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

672.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Massachusetts State Class members have been damaged in an amount to be proven at trial.

### 10.    Minnesota

**MINNESOTA COUNT I:**
**Violations of the Minnesota Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.68 *et seq.***
**(On Behalf of the Minnesota State Class)**

673.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

674.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Minnesota State Class against all Defendants.

675.    The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

676.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69(1). Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

677.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

678.    Minnesota State Class members had no way of discerning that Defendants' representations were false and misleading because Minnesota State Class members did not have access to Defendants' emissions certification and output test engines and data.

679.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

680.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Minnesota State Class.

681.    Defendants knew or should have known that their conduct violated the Minnesota CFA.

682.    Defendants owed the Minnesota State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and Minnesota State Class members; and/or

c.    made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

683.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Minnesota State Class.

684.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Minnesota State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

685.    Defendants' violations present a continuing risk to the Minnesota State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

686.    Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Minnesota CFA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

687.    As a direct and proximate result of Defendants' violations of the Minnesota CFA, Minnesota State Class members have suffered injury-in-fact and/or actual damage.

688.    Pursuant to Minn. Stat. § 8.31(3a), Minnesota State Class members seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1    689.    Minnesota State Class members also seek punitive damages under Minn. Stat.

2    § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate

3    disregard for the rights of others.

**MINNESOTA COUNT II:**
**Violations of the Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43-48 *et seq.***
**(On Behalf of the Minnesota State Class)**

7    690.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

8    forth herein.

9    691.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff")

10   brings this claim on behalf of itself and the Minnesota State Class against all Defendants.

11   692.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

12   deceptive trade practices, which occur when a person "(5) represents that goods or services have

13   sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

14   have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

15   does not have;" "(7) represents that goods or services are of a particular standard, quality, or

16   grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises

17   goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. In the course

18   of the Defendants' business, it engaged in deceptive practices by representing that Class Vehicles

19   have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do

20   not have; representing that Class Vehicles are of a particular standard, quality, or grade, or that

21   goods are of a particular style or model, if they are of another; and advertising Class Vehicles

22   with intent not to sell them as advertised. Defendants participated in misleading, false, or

23   deceptive acts that violated the Minnesota DTPA.

24   693.    Defendants' actions as set forth above occurred in the conduct of trade or

25   commerce.

26   694.    In the course of their business, Defendants concealed and suppressed material facts

27   concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

28   emissions certification and output testing for the Class Engines such that they falsely represented

1    emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

2    emissions tests when they in fact did not.

3         695.    Minnesota State Class members had no way of discerning that Defendants'

4    representations were false and misleading because Minnesota State Class members did not have

5    access to Defendants' emissions certification and output test engines and data.

6         696.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles

7    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

8    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

9    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

10   a transaction involving Class Vehicles has been supplied in accordance with a previous

11   representation when it has not.

12        697.    Defendants intentionally and knowingly misrepresented material facts regarding

13   the Class Vehicles with intent to mislead the Minnesota State Class.

14        698.    Defendants knew or should have known that their conduct violated the Minnesota

15   DTPA.

16        699.    Defendants owed the Minnesota State Class a duty to disclose the illegality and

17   public health risks, the true nature of the Class Vehicles, because Defendants:

18             a.      possessed exclusive knowledge that they were manufacturing, selling, and

19   distributing vehicles throughout the United States that did not perform as advertised;

20             b.      intentionally concealed the foregoing from regulators and Minnesota State

21   Class members; and/or

22             c.      made incomplete representations about the Class Vehicles' output

23   performance and emissions while purposefully withholding material facts that contradicted these

24   representations.

25        700.    Defendants' concealment of the true characteristics of the Class Vehicles' true

26   performance and emissions was material to the Minnesota State Class.

27        701.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including the Minnesota State Class, about the true

1    environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants'

2    brands, the devaluing of environmental cleanliness and integrity at Defendant companies, and the

3    true value of the Class Vehicles.

4         702.    Defendants' violations present a continuing risk to the Minnesota State Class as

5    well as to the general public. Defendants' unlawful acts and practices complained of herein affect

6    the public interest.

7         703.    Minnesota State Class members suffered ascertainable loss and actual damages as

8    a direct and proximate result of Defendants' misrepresentations and concealment of and failure to

9    disclose material information. Defendants had an ongoing duty to all their customers to refrain

10   from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles

11   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

12   in the course of Defendants' business.

13        704.    As a direct and proximate result of Defendants' violations of the Minnesota

14   DTPA, Minnesota State Class members have suffered injury-in-fact and/or actual damage.

15        705.    Pursuant Minn. Stat. §§ 8.31(3a) and 325D.45, the Minnesota State Class seeks

16   actual damages, attorneys' fees, and any other just and proper relief available under the

17   Minnesota DTPA.

**MINNESOTA COUNT III:**
**Breach of Express Warranty**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On Behalf of the Minnesota State Class)**

21        706.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

22   fully set forth herein.

23        707.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff")

24   brings this claim on behalf of itself and the Minnesota State Class against all Defendants.

25        708.    Defendants are and were at all relevant times "merchant[s]" with respect to

26   vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of vehicles under § 336.2-103(1)(d).

27        709.    With respect to leases, Defendants are and were at all relevant times "lessors" of

28   vehicles under Minn. Stat. § 336.2A-103(1)(p).

710.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

711.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

712.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

713.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

714.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. See 40 C.F.R. § 1048.120.

715.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. See 40 C.F.R. § 1039.120.

1        716.    As manufacturers of large spark and compression ignition powered Vehicles,

2   Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

3        717.    Defendants' warranties formed a basis of the bargain that was reached when

4   consumers purchased or leased Class Vehicles.

5        718.    Despite the existence of warranties, Defendants failed to inform Minnesota State

6   Class members that the Class Vehicles were defective and intentionally designed and

7   manufactured to emit more pollution and achieve inferior output performance than what was

8   disclosed to regulators and represented to consumers who purchased or leased them, and

9   Defendants failed to fix the defective emission components free of charge.

10       719.    Defendants breached the express warranty promising to repair and correct

11  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

12  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

13       720.    Affording Defendants a reasonable opportunity to cure their breach of written

14  warranties would be unnecessary and futile here.

15       721.    Furthermore, the limited warranty promising to repair and correct Defendants'

16  defect in materials and workmanship fails in its essential purpose because the contractual remedy

17  is insufficient to make Minnesota State Class members whole and because Defendants have failed

18  and/or have refused to adequately provide the promised remedies within a reasonable time.

19       722.    Accordingly, recovery by Minnesota State Class members is not restricted to the

20  limited warranty promising to repair and correct Defendants' defect in materials and

21  workmanship, and they seek all remedies as allowed by law.

22       723.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

23  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

24  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

25  material facts regarding the Class Vehicles. Minnesota State Class members were therefore

26  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

27       724.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

28  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

1    and workmanship as many incidental and consequential damages have already been suffered

2    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

3    continued failure to provide such limited remedy within a reasonable time, and any limitation on

4    the Minnesota State Class members' remedies would be insufficient to make them whole.

5    725.    Finally, because of Defendants' breach of warranty as set forth herein, Minnesota

6    State Class members assert, as additional and/or alternative remedies, the revocation of

7    acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

8    currently owned or leased, and for such other incidental and consequential damages as allowed.

9    726.    Defendants were provided reasonable notice of these issues by way of a letter sent

10    by Plaintiffs' counsel as well as the regulators' investigations.

11    727.    As a direct and proximate result of Defendants' breach of express warranties,

12    Minnesota State Class members have been damaged in an amount to be determined at trial.

### MINNESOTA COUNT IV:
### Breach of Implied Warranty of Merchantability
### Minn. Stat. §§ 336.2-314 and 336.2A-212
### (On Behalf of the Minnesota State Class)

16    728.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17    forth herein.

18    729.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff")

19    brings this claim on behalf of itself and the Minnesota State Class against all Defendants.

20    730.    Defendants are and were at all relevant times "merchant[s]" with respect to

21    vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of vehicles under § 336.2-103(1)(d).

22    731.    With respect to leases, Defendants are and were at all relevant times "lessors" of

23    vehicles under Minn. Stat. § 336.2A-103(1)(p).

24    732.    The Class Vehicles are and were at all relevant times "goods" within the meaning

25    of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

26    733.    Warranties that the Class Vehicles were in merchantable condition and fit for the

27    ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

28

1  fact made on their labels, are implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-

2  212.

3      734.    These Class Vehicles, when sold or leased and at all times thereafter, were

4  materially different from vehicles and component engines Defendants used for emissions testing,

5  included defects that led to inflated and misleading output performance and emissions ratings,

6  and/or did not comply with emissions regulations when being driven, and were therefore not

7  merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

8  the promises or affirmations of fact made on their labels.

9      735.    Defendants were provided reasonable notice of these issues by way of a letter sent

10  by Plaintiffs' counsel as well as the regulators' investigations.

11      736.    As a direct and proximate result of Defendants' breach of the implied warranty of

12  merchantability, Minnesota State Class members have been damaged in an amount to be proven

13  at trial.

14          **11.    Missouri**

15      **MISSOURI COUNT I:**
    **Violations of the Missouri Merchandising Practices Act**
16      **Mo. Rev. Stat. § 407.010 *et seq.***
    **(On Behalf of the Missouri State Class)**
17

18      737.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

19  forth herein.

20      738.    Plaintiffs Catalina Beverage Co. and PMC, Inc. d/b/a KC Scaffold (for the

21  purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Missouri

22  State Class against all Defendants.

23      739.    Defendants, Plaintiffs, and the Missouri State Class are "persons" within the

24  meaning of Mo. Rev. Stat. § 407.010(5).

25      740.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the

26  meaning of Mo. Rev. Stat. § 407.010(7).

27      741.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the

28  "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

742.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

743.    Plaintiffs and Missouri State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Missouri State Class members did not have access to Defendants' emissions certification and output test engines and data.

744.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

745.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Missouri State Class.

746.    Defendants knew or should have known that their conduct violated the Missouri MPA.

747.    Defendants owed the Plaintiff and Missouri State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and Missouri State Class members; and/or

1     c.  made incomplete representations about the Class Vehicles' output

2 performance and emissions while purposefully withholding material facts that contradicted these

3 representations.

4     748. Defendants' concealment of the true performance and emissions was material to

5 the Missouri State Class.

6     749. Defendants' unfair or deceptive acts or practices were likely to and did in fact

7 deceive regulators and reasonable consumers, including Missouri State Class, about the true

8 environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants'

9 brands, and the true value of the Class Vehicles.

10    750. Defendants' violations present a continuing risk to Plaintiffs, the Missouri State

11 Class, and the general public. Defendants' unlawful acts and practices complained of herein affect

12 the public interest.

13    751. Plaintiffs and Missouri State Class members suffered ascertainable loss and actual

14 damages as a direct and proximate result of Defendants' misrepresentations and concealment of

15 and failure to disclose material information. Defendants had an ongoing duty to all their

16 customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of

17 Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

18 practices made in the course of Defendants' business.

19    752. As a direct and proximate result of Defendants' violations of the Missouri MPA,

20 Plaintiffs and Missouri State Class members have suffered injury-in-fact and/or actual damage.

21    753. Defendants are liable to Plaintiffs and the Missouri State Class for damages in

22 amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as

23 injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and

24 proper relief under Mo. Rev. Stat. § 407.025.

25

26

27

28

**MISSOURI COUNT II:**
**Breach of Express Warranty**
**Mo. Stat. §§ 400.2-313 and 400.2A-210**
**(On Behalf of the Missouri State Class)**

754.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

755.     Plaintiffs Catalina Beverage Co. and PMC, Inc. d/b/a KC Scaffold (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Missouri State Class against all Defendants.

756.     Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of vehicles under § 400.2-103(1)(d).

757.     With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Mo. Stat. § 400.2A-103(1)(p).

758.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

759.     In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

760.     In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

761.     For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well.

1   *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class

2   Vehicles through a Federal Emissions Warranty.

3        762.    The Warranty required by the EPA for spark-ignition vehicles applies for three

4   years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes

5   first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than

6   $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent

7   of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-

8   related warranty for the engine may not be shorter than the standard warranty terms. *See* 40

9   C.F.R. § 1048.120.

10       763.    The Warranty required by the EPA for compression-ignition vehicles applies for

11  3,000 hours or five years, whichever comes first, and likewise may not be shorter than the

12  standard warranty terms. *See* 40 C.F.R. § 1039.120.

13       764.    As manufacturers of large spark and compression ignition powered Vehicles,

14  Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles

15       765.    Defendants' warranties formed a basis of the bargain that was reached when

16  consumers purchased or leased Class Vehicles.

17       766.    Despite the existence of warranties, Defendants failed to inform Missouri State

18  Class members that the Class Vehicles were defective and intentionally designed and

19  manufactured to emit more pollution and achieve inferior output performance than what was

20  disclosed to regulators and represented to consumers who purchased or leased them, and

21  Defendants failed to fix the defective emission components free of charge.

22       767.    Defendants breached the express warranty promising to repair and correct

23  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25       768.    Affording Defendants a reasonable opportunity to cure their breach of written

26  warranties would be unnecessary and futile here.

27       769.    Furthermore, the limited warranty promising to repair and correct Defendants'

28  defect in materials and workmanship fails in its essential purpose because the contractual remedy

is insufficient to make Plaintiffs and Missouri State Class members whole and because

Defendants have failed and/or have refused to adequately provide the promised remedies within a

reasonable time.

770.    Accordingly, recovery by Plaintiffs and Missouri State Class members is not

restricted to the limited warranty promising to repair and correct Defendants' defect in materials

and workmanship, and they seek all remedies as allowed by law.

771.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

material facts regarding the Class Vehicles. Plaintiffs and Missouri State Class members were

therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

772.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

resolved through the limited remedy of repairing and correcting Defendants' defect in materials

and workmanship as many incidental and consequential damages have already been suffered

because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

continued failure to provide such limited remedy within a reasonable time, and any limitation on

Missouri State Class members' remedies would be insufficient to make them whole.

773.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs

and Missouri State Class members assert, as additional and/or alternative remedies, the revocation

of acceptance of the goods and the return to them of the purchase or lease price of all Class

Vehicles currently owned or leased, and for such other incidental and consequential damages as

allowed.

774.    Defendants were provided reasonable notice of these issues by way of a letter sent

by Plaintiffs' counsel as well as the regulators' investigations.

775.    As a direct and proximate result of Defendants' breach of express warranties,

Missouri State Class members have been damaged in an amount to be determined at trial.

1

2

3

**MISSOURI COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Mo. Stat. §§ 400.2-314 and 400.2A-212**
**(On Behalf of the Missouri State Class)**

4        776.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

5    forth herein.

6        777.    Plaintiffs Catalina Beverage Co. and PMC, Inc. d/b/a KC Scaffold (for the

7    purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Missouri

8    State Class against all Defendants.

9        778.    Defendants are and were at all relevant times "merchant[s]" with respect to

10   vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of vehicles under § 400.2-103(1)(d).

11       779.    With respect to leases, Defendants are and were at all relevant times "lessors" of

12   vehicles under Mo. Stat. § 400.2A-103(1)(p).

13       780.    The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

15       781.    Warranties that the Class Vehicles were in merchantable condition and fit for the

16   ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

17   fact made on their labels, are implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat.

18   § 400.2A-212.

19       782.    These Class Vehicles, when sold or leased and at all times thereafter, were

20   materially different from vehicles and component engines Defendants used for emissions testing,

21   included defects that led to inflated and misleading output performance and emissions ratings,

22   and/or did not comply with emissions regulations when being driven, and were therefore not

23   merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

24   the promises or affirmations of fact made on their labels.

25       783.    Defendants were provided reasonable notice of these issues by way of a letter sent

26   by Plaintiffs' counsel as well as the regulators' investigations.

27

28

784.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Missouri State Class members have been damaged in an amount to be proven at trial.

12.    **Nebraska**

**NEBRASKA COUNT I:**
**Violations of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. § 59-1601 *et seq.***
**(On Behalf of the Nebraska State Class)**

785.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

786.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Nebraska State Class against all Defendants.

787.    Defendants and Nebraska State Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

788.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

789.    The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. The conduct Defendants engaged in as set forth herein constitutes unfair or deceptive acts or practices.

790.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

791.    Nebraska State Class members had no way of discerning that Defendants' representations were false and misleading because the Nebraska State Class did not have access to Defendants' emissions certification and output test engines and data.

792.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class

Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

793.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Nebraska State Class.

794.    Defendants knew or should have known that their conduct violated the Nebraska CPA.

795.    Defendants owed the Nebraska State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and Nebraska State Class members; and/or

c.    made incomplete representations about the Class Vehicles' performance and emissions while purposefully withholding material facts that contradicted these representations.

796.    Defendants' concealment of the Class Vehicles' true performance and emissions was material to the Nebraska State Class.

797.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Nebraska State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

798.    Defendants' violations present a continuing risk to the Nebraska State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

799.    Plaintiff and Nebraska State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of

and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Nebraska CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

800.    As a direct and proximate result of Defendants' violations of the Nebraska CPA, Plaintiff and Nebraska State Class members have suffered injury-in-fact and/or actual damage.

801.    Because Defendants' conduct caused injury to Nebraska State Class members' property through violations of the Nebraska CPA, the Nebraska State Class seeks recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendants' unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

**NEBRASKA COUNT IV:**
**Breach of Express Warranty**
**Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210**
**(On Behalf of the Nebraska State Class)**

802.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

803.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Nebraska State Class against all Defendants.

804.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

805.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

806.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

807.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of

three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

808.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

809.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

810.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

811.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

812.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

813.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

814.    Despite the existence of warranties, Defendants failed to inform Plaintiff and Nebraska State Class members that the Class Vehicles were defective and intentionally designed

and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

815. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

816. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

817. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Nebraska State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

818. Accordingly, recovery by Plaintiff and Nebraska State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

819. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Nebraska State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

820. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Nebraska State Class members' remedies would be insufficient to make them whole.

821.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Nebraska State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

822.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

823.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Nebraska State Class members have been damaged in an amount to be determined at trial.

**NEBRASKA COUNT V:**
**Breach of Implied Warranty of Merchantability**
**Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the Nebraska State Class)**

824.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

825.    Plaintiff Krieser Drywall & Insulation (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Nebraska State Class against all Defendants.

826.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

827.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

828.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

829.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

830.     These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

831.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

832.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Nebraska State Class members have been damaged in an amount to be proven at trial.

### 13.    New Jersey

**NEW JERSEY COUNT I:**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**(On Behalf of the New Jersey State Class)**

833.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

834.     Plaintiffs Air Group, LLC, Empire Lumber & Millwork Co., and Ferraro Fine Foods Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

835.     Plaintiffs and New Jersey State Class members and Defendants are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

836.     Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

837.     The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact

with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. § 56:8-2.

838. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

839. Plaintiffs and New Jersey State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and New Jersey State Class members did not have access to Defendants' emissions certification and output test engines and data.

840. Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

841. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New Jersey State Class.

842. Defendants knew or should have known that their conduct violated the New Jersey CFA.

843. Defendants owed Plaintiffs and the New Jersey State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

1          b.      intentionally concealed the foregoing from regulators, Plaintiffs, and New

2 Jersey State Class members; and/or

3          c.      made incomplete representations about the Class Vehicles' output

4 performance and emissions, while purposefully withholding material facts from Plaintiffs and the

5 New Jersey State Class that contradicted these representations.

6      844.    Defendants' concealment of the Class Vehicles' true emissions and performance

7 was material to Plaintiffs and the New Jersey State Class.

8      845.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

9 deceive regulators and reasonable consumers, including Plaintiffs and the New Jersey State Class,

10 about the true environmental cleanliness and performance of the Class Vehicles, the quality of the

11 Defendants' brands, and the true value of the Class Vehicles.

12     846.    Defendants' violations present a continuing risk to Plaintiffs and the New Jersey

13 State Class as well as to the general public. Defendants' unlawful acts and practices complained

14 of herein affect the public interest.

15     847.    Plaintiffs and New Jersey State Class members suffered ascertainable loss and

16 actual damages as a direct and proximate result of Defendants' misrepresentations and

17 concealment of and failure to disclose material information. Absent those misrepresentations and

18 omissions, Plaintiffs and New Jersey State Class members would not have purchased or leased

19 the Class Vehicles, would not have purchased or leased them at the prices they paid, and/or would

20 have purchased or leased less expensive alternative vehicles that did not have inflated

21 performance values or issues with exhaust emissions. Defendants had an ongoing duty to all their

22 customers to refrain from unfair and deceptive practices under the New Jersey CFA.

23     848.    As a direct and proximate result of Defendants' violations of the New Jersey CFA,

24 Plaintiffs and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an

25 amount to be proven at trial, and seek all just and proper remedies, including, but not limited to,

26 actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and

27 unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just

28 and appropriate relief.

**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
**N.J.S. 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey State Class)**

849.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

850.    Plaintiffs Air Group, LLC, Empire Lumber & Millwork Co., and Ferraro Fine Foods Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

851.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under N.J.S. 12A:2-104(1) and "sellers" of vehicles under 2-103(1)(d).

852.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under N.J.S. 12A:2A-103(1)(p).

853.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

854.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

855.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

856.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well.

1  See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class

2  Vehicles through a Federal Emissions Warranty.

3  857. The Warranty required by the EPA for spark-ignition vehicles applies for three

4  years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes

5  first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than

6  $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent

7  of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-

8  related warranty for the engine may not be shorter than the standard warranty terms. See 40

9  C.F.R. § 1048.120.

10  858. The Warranty required by the EPA for compression-ignition vehicles applies for

11  3,000 hours or five years, whichever comes first, and likewise may not be shorter than the

12  standard warranty terms. See 40 C.F.R. § 1039.120.

13  859. As manufacturers of large spark and compression ignition powered Vehicles,

14  Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

15  860. Defendants' warranties formed a basis of the bargain that was reached when

16  consumers purchased or leased Class Vehicles.

17  861. Despite the existence of warranties, Defendants failed to inform Plaintiffs and

18  New Jersey State Class members that the Class Vehicles were defective and were defectively

19  designed and manufactured to emit more pollution and achieve inferior output performance than

20  what was disclosed to regulators and represented to individuals and entities who purchased or

21  leased them, and Defendants failed to fix the defective emission components free of charge.

22  862. Defendants breached the express warranty promising to repair and correct

23  Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and

24  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25  863. Affording Defendants a reasonable opportunity to cure their breach of written

26  warranties would be unnecessary and futile here.

27  864. Furthermore, the limited warranty promising to repair and correct Defendants'

28  defects in materials and workmanship fails in its essential purpose because the contractual remedy

1    is insufficient to make Plaintiffs and New Jersey State Class members whole and because

2    Defendants have failed and/or have refused to adequately provide the promised remedies within a

3    reasonable time.

4         865.    Despite the existence of warranties, Defendants failed to inform Plaintiffs and

5    New Jersey State Class members that the Class Vehicles were defective and intentionally

6    designed and manufactured to emit more pollution and achieve inferior output performance than

7    what was disclosed to regulators and represented to consumers who purchased or leased them,

8    and Defendants failed to fix the defective emission components free of charge.

9         866.    Defendants breached the express warranty promising to repair and correct

10   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

11   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

12        867.    Accordingly, recovery by Plaintiffs and New Jersey State Class members is not

13   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

14   and workmanship, and they seek all remedies as allowed by law.

15        868.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

16   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

17   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18   material facts regarding the Class Vehicles. Plaintiffs and New Jersey State Class members were

19   therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20        869.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

21   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

22   and workmanship because of Defendants' failure and/or continued failure to provide such limited

23   remedy within a reasonable time, and any limitation on Plaintiffs' and New Jersey State Class

24   members' remedies would be insufficient to make them whole.

25        870.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs

26   and New Jersey State Class members assert, as additional and/or alternative remedies, the

27   revocation of acceptance of the goods and the return to them of the purchase or lease price of all

28

1    Class Vehicles currently owned or leased, and for such other incidental and consequential

2    damages as allowed.

3           871.    Defendants were provided reasonable notice of these issues by way of a letter sent

4    by Plaintiffs' counsel as well as the regulators' investigations.

5           872.    As a direct and proximate result of Defendants' breach of express warranties,

6    Plaintiffs and New Jersey State Class members have been damaged in an amount to be

7    determined at trial.

8                                **NEW JERSEY COUNT III:**
                         **Breach of Implied Warranty of Merchantability**
9                             **N.J.S. 12A:2-314 and 2A-212**
                        **(On Behalf of the New Jersey State Class)**
10

11          873.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

12   forth herein.

13          874.    Plaintiffs Air Group, LLC, Empire Lumber & Millwork Co., and Ferraro Fine

14   Foods Corp. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves

15   and the New Jersey State Class against all Defendants.

16          875.    Defendants are and were at all relevant times "merchant[s]" with respect to

17   vehicles under N.J.S. 12A:2-104(1) and "sellers" of vehicles under 2-103(1)(d).

18          876.    With respect to leases, Defendants are and were at all relevant times "lessors" of

19   vehicles under N.J.S. 12A:2A-103(1)(p).

20          877.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

22          878.    Warranties that the Class Vehicles were in merchantable condition and fit for the

23   ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

24   fact made on their labels, are implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

25          879.    These Class Vehicles, when sold or leased and at all times thereafter, were

26   materially different from vehicles and component engines Defendants used for emissions testing,

27   included defects that led to inflated and misleading output performance and emissions ratings,

28   and/or did not comply with emissions regulations when being driven, and were therefore not

1   merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

2   the promises or affirmations of fact made on their labels.

3         880.    Defendants were provided reasonable notice of these issues by way of a letter sent

4   by Plaintiffs' counsel as well as the regulators' investigations.

5         881.    As a direct and proximate result of Defendants' breach of the implied warranty of

6   merchantability, Plaintiffs and New Jersey State Class members have been damaged in an amount

7   to be proven at trial.

8                **14.**     **<u>New York</u>**

9                        **NEW YORK COUNT I:**

            **Violations of the New York General Business Law § 349**

10               **N.Y. Gen. Bus. Law § 349**

11          **(On Behalf of the New York State Class)**

12         882.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

13   forth herein.

14         883.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on

15   behalf of itself and the New York State Class against all Defendants.

16         884.    Plaintiff and the New York State Class members and Defendants are "persons"

17   under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY

18   DAPA").

19         885.    Defendants' actions as set forth herein occurred in the conduct of trade or

20   commerce under the NY DAPA.

21         886.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of

22   any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth

23   herein, constitutes deceptive acts or practices under this section.

24         887.    In the course of their business, Defendants concealed and suppressed material facts

25   concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

26   emissions certification and output testing for the Class Engines such that they falsely represented

27   emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass

28   emissions tests when they in fact did not.

888.    Plaintiff and New York State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and New York State Class members did not have access to Defendants' emissions certification and output test engines and data.

889.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

890.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New York State Class.

891.    Defendants knew or should have known that their conduct violated the NY DAPA.

892.    Defendants owed Plaintiff and the New York State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    intentionally concealed the foregoing from regulators and New York State Class members; and/or

c.    made incomplete representations about the Class Vehicles' emissions and performance while purposefully withholding material facts that contradicted these representations.

893.    Defendants' concealment of the true characteristics of the Class Vehicles' true emissions and performance was material to Plaintiff and the New York State Class.

894.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles

895.    Defendants' violations present a continuing risk to Plaintiff and the New York State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

896.    Plaintiff and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Absent those misrepresentations and omissions, Plaintiff and New York State Class members would not have purchased or leased the Class Vehicles, would not have purchased or leased them at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have inflated performance values or issues with exhaust emissions. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

897.    As a direct and proximate result of Defendants' violations of the NY DAPA, Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damage.

898.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff and New York State Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT II:**
**Violations of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York State Class)**

899.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

900.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the New York State Class against all Defendants.

901.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

902.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

903.    Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiff and the New York State Class.

904.    Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Class Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Class Vehicles to intentionally and grossly defraud and mislead the New York State Class concerning the true emissions produced by the Class Vehicles and their performance.

905.    The misrepresentations and omissions regarding emissions and performance set forth above were material and likely to deceive a reasonable consumer.

906.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New York State Class.

907.    Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the New York State Class, about the illegality and true characteristics of the Class Vehicles, the quality of Defendants' brand and the true value of the Class Vehicles.

908. Defendants' violations of the NY FAA present a continuing risk to Plaintiff and New York State Class members and to the general public. Defendants' deceptive acts and practices affect the public interest.

909. The Class Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

910. Plaintiff and New York State Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's false advertising in violation of the NY FAA.

911. Plaintiff and the New York State Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class members. Because Defendants' conduct was committed willingly and knowingly, New York State Class members are entitled to recover three times actual damages, up to $10,000.

912. The New York State Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**NEW YORK COUNT III:**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On Behalf of the New York State Class)**

913. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

914. Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the New York State Class against all Defendants.

915. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

916. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under N.Y. UCC Law § 2A-103(1)(p).

917. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

918.    In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

919.    In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

920.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." See 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. See 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

921.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, see 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. See 40 C.F.R. § 1048.120.

922.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. See 40 C.F.R. § 1039.120.

923.    Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

924.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

925.    Despite the existence of warranties, Defendants failed to inform Plaintiff and New York State Class members that the Class Vehicles were defectively designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to the individuals and entities who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

926.    Defendants breached the express warranty promising to repair and correct Defendants' defects in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

927.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

928.    Furthermore, the limited warranty promising to repair and correct Defendants' defects in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and New York State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

929.    Accordingly, recovery by Plaintiff and New York State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defects in materials and workmanship, and they seek all remedies as allowed by law.

930.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and New York State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

931.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defects in materials and workmanship because of Defendants' failure and/or continued failure to provide such limited

1    remedy within a reasonable time, and any limitation on Plaintiff and New York State Class

2    members' remedies would be insufficient to make them whole.

3         932.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff

4    and New York State Class members assert, as additional and/or alternative remedies, the

5    revocation of acceptance of the goods and the return to them the purchase or lease price of all

6    Class Vehicles currently owned or leased, and for such other incidental and consequential

7    damages as allowed.

8         933.    Defendants were provided reasonable notice of these issues by way of a letter sent

9    by Plaintiffs' counsel as well as the regulators' investigations.

10        934.    As a direct and proximate result of Defendants' breach of express warranties,

11   Plaintiff and New York State Class members have been damaged in an amount to be determined

12   at trial.

13                              **NEW YORK COUNT IV:**
                        **Breach of Implied Warranty of Merchantability**
14                        **N.Y. U.C.C. Law §§ 2-314 and 2A-212**
                         **(On Behalf of the New York State Class)**
15

16        935.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17   forth herein.

18        936.    Plaintiff Marders (for the purposes of this count, "Plaintiff") brings this claim on

19   behalf of itself and the New York State Class against all Defendants.

20        937.    Defendants are and were at all relevant times "merchant[s]" with respect to

21   vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of vehicles under § 2-103(1)(d).

22        938.    With respect to leases, Defendants are and were at all relevant times "lessors" of

23   vehicles under N.Y. UCC Law § 2A-103(1)(p).

24        939.    The Class Vehicles are and were at all relevant times "goods" within the meaning

25   of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

26        940.    Warranties that the Class Vehicles were in merchantable condition and fit for the

27   ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

28   fact made on their labels, are implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

1    941.    These Class Vehicles, when sold or leased and at all times thereafter, were

2    materially different from vehicles and component engines Defendants used for emissions testing,

3    included defects that led to inflated and misleading emissions ratings and/or performance

4    representations, and/or did not comply with emissions regulations when being used in the real

5    world, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles

6    are used, and did not conform to the promises or affirmations of fact made on their labels.

7    942.    Defendants were provided reasonable notice of these issues by way of a letter sent

8    by Plaintiffs' counsel as well as the regulators' investigations.

9    943.    As a direct and proximate result of Defendants' breach of the implied warranty of

10    merchantability, Plaintiff and New York State Class members have been damaged in an amount

11    to be proven at trial.

12    **15.    Ohio**

13    **OHIO COUNT I:**
**Violations of the Ohio Consumer Sales Practices Act**
14    **Ohio Rev. Code § 1345.01 *et seq.***
**(On Behalf of the Ohio State Class)**
15

16    944.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

17    forth herein.

18    945.    Plaintiffs Alexander Moving Company and Lanham Hardwood Flooring Co., Inc.

19    (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio

20    State Class against all Defendants.

21    946.    Defendants, Plaintiffs, and Ohio State Class members are "persons" within the

22    meaning of Ohio Rev. Code § 1345.01(B). Defendants are a "supplier" as defined by Ohio Rev.

23    Code § 1345.01(C).

24    947.    Plaintiffs and the Ohio State Class are "consumers" as that term is defined in Ohio

25    Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles with the Defect

26    Devices installed in them are "consumer transactions" within the meaning of Ohio Rev. Code

27    § 1345.01(A).

28

948.    Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio CSPA prohibits a supplier from (i) representing that goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

949.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

950.    Plaintiffs and Ohio State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Ohio State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions certification and output test engines and data.

951.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

952.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

953.    Defendants knew or should have known that their conduct violated the Ohio CSPA.

954.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the types of acts and omissions of Defendants in this Complaint—including, but not limited to, the failure to honor both implied warranties and express

warranties, the making and distribution of false, deceptive, and/or misleading representations, and

the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales

practices in violation of the CSPA. These cases include, but are not limited to, the following:

        a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

        b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co*. (OPIF #10002123);

        c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

        d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

        e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

        f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

        g.    *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

        h.    *Brown v. Spears* (OPIF #10000403);

        i.    *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

        j.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

        k.    *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524).

955.    Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

        a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

        b.    intentionally concealed the foregoing from regulators, Plaintiffs, and Ohio State Class members; and/or

        c.    made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

956.    Defendants' concealment of the true characteristics of the Class Vehicles' performance and emissions was material to Plaintiffs and the Ohio State Class.

957.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Ohio State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

958.    Defendants' violations present a continuing risk to Plaintiffs and the Ohio State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

959.    Plaintiffs and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Ohio CSPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

960.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiffs and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief, to the extend available under the Ohio CSPA.

**OHIO COUNT II:**
**Violations of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code § 4165.01 _et seq._**
**(On Behalf of the Ohio State Class)**

961.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

962.    Plaintiffs Alexander Moving Company and Lanham Hardwood Flooring Co., Inc. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class against all Defendants.

963.    Defendants, Plaintiffs, and the Ohio State Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

964.    Defendants engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

965.    The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . . (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . [or] (11) Advertises goods or services with intent not to sell them as advertised."

966.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

967.    Plaintiffs and Ohio State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Ohio State Class members did not have access to Defendants' emissions certification and output test engines and data.

968.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3        969.    Defendants intentionally and knowingly misrepresented material facts regarding

4    the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

5        970.    Defendants knew or should have known that their conduct violated the Ohio

6    DTPA.

7        971.    Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the

8    illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

9            a.    possessed exclusive knowledge that they were manufacturing, selling, and

10    distributing vehicles throughout the United States that did not perform as advertised;

11            b.    intentionally concealed the foregoing from regulators, Plaintiffs, and Ohio

12    State Class members; and/or

13            c.    made incomplete representations about the Class Vehicles' true

14    performance and emissions while purposefully withholding material facts that contradicted these

15    representations.

16        972.    Defendants' concealment of the true characteristics of the Class Vehicles' output

17    performance and emissions was material to Plaintiffs and the Ohio State Class.

18        973.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

19    deceive regulators and reasonable consumers, including Plaintiffs and the Ohio State Class, about

20    the true environmental cleanliness and performance of the Class Vehicles, the quality of the

21    Defendants' brands, and the true value of the Class Vehicles.

22        974.    Defendants' violations present a continuing risk to Plaintiffs and the Ohio State

23    Class, as well as to the general public. Defendants' unlawful acts and practices complained of

24    herein affect the public interest.

25        975.    Plaintiffs and Ohio State Class members suffered ascertainable loss and actual

26    damages as a direct and proximate result of Defendants' misrepresentations and concealment of

27    and failure to disclose material information. Defendants had an ongoing duty to all their

28    customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of

1    Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and

2    practices made in the course of Defendants' business.

3        976.    Pursuant to Ohio Rev. Code § 4165.03, Plaintiffs and the Ohio State Class seek an

4    order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages,

5    and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

6                              **OHIO COUNT III:**
                          **Breach of Express Warranty**
7              **Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313**
                      **(On Behalf of the Ohio State Class)**
8

9        977.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

10   fully set forth herein.

11       978.    Plaintiffs Alexander Moving Company and Lanham Hardwood Flooring Co., Inc.

12   (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio

13   State Class against all Defendants.

14       979.    Defendants are and were at all relevant times "merchant[s]" with respect to

15   vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of vehicles

16   under § 1302.01(4).

17       980.    With respect to leases, Defendants are and were at all relevant times "lessors" of

18   vehicles under Ohio Rev. Code § 1310.01(A)(20).

19       981.    The Class Vehicles are and were at all relevant times "goods" within the meaning

20   of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

21       982.    In connection with the purchase or lease of new Class Vehicles, Defendants

22   provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all

23   factory installed options (except tires and batteries), and a Powertrain Warranty for a period of

24   three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This

25   warranty exists to repair the vehicle in case of "defects in material and workmanship."

26       983.    In addition, federal regulations also require manufacturers of spark-ignition

27   (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal

28   emissions control warranties applicable to each category.

984.    For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

985.    The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

986.    The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

987.    As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

988.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

989.    Despite the existence of warranties, Defendants failed to inform Plaintiffs and Ohio State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

990.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

991.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

992.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Ohio State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

993.    Accordingly, recovery by Plaintiffs and Ohio State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

994.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and Ohio State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

995.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and Ohio State Class members' remedies would be insufficient to make them whole.

996.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Ohio State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

997.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

998.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Ohio State Class members have been damaged in an amount to be determined at trial.

**OHIO COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Ohio Rev. Code Ann. §§ 1302.27 and 1310.19**
**(On Behalf of the Ohio State Class)**

999.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1000.    Plaintiffs Alexander Moving Company and Lanham Hardwood Flooring Co., Inc. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Ohio State Class against all Defendants.

1001.    Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of vehicles under § 1302.01(4).

1002.    With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ohio Rev. Code § 1310.01(A)(20).

1003.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

1004.    Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

1005.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not

1    merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

2    the promises or affirmations of fact made on their labels.

3        1006.   Defendants were provided reasonable notice of these issues by way of a letter sent

4    by Plaintiffs' counsel as well as the regulators' investigations.

5        1007.   As a direct and proximate result of Defendants' breach of the implied warranty of

6    merchantability, Plaintiffs and Ohio State Class members have been damaged in an amount to be

7    proven at trial.

8                    **16.**    <u>**Tennessee**</u>

9                    **TENNESSEE COUNT I:**
               **Violations of the Tennessee Consumer Protection Act**
10              **Tenn. Code Ann. § 47-18-101** *et seq.*
               **(On Behalf of the Tennessee State Class)**
11

12       1008.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

13   forth herein.

14       1009.   Plaintiff United Farm and Home Cooperative (for the purposes of this count,

15   "Plaintiff") brings this claim on behalf of itself and the Tennessee State Class against all

16   Defendants.

17       1010.   Tennessee State Class members are "natural persons" and "consumers" within the

18   meaning of Tenn. Code § 47-18-103(6). Defendants are "person[s]" within the meaning of Tenn.

19   Code § 47-18-103(9).

20       1011.   Defendants are engaged in "trade" or "commerce" or "consumer transactions"

21   within the meaning Tenn. Code § 47-18-103(18).

22       1012.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or

23   deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-

24   104.

25       1013.   In the course of their business, Defendants concealed and suppressed material facts

26   concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the

27   emissions certification and output testing for the Class Engines such that they falsely represented

28

emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

1014.   Tennessee State Class members had no way of discerning that Defendants' representations were false and misleading because Tennessee State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions certification and output test engines and data.

1015.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1016.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Tennessee State Class.

1017.   Defendants knew or should have known that their conduct violated the Tennessee CPA.

1018.   Defendants owed the Tennessee State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.   intentionally concealed the foregoing from regulators and Tennessee State Class members; and/or

c.   made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

1019.   Defendants' concealment of the true characteristics of the Class Vehicles' performance and emissions was material to the Tennessee State Class.

1020.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Tennessee State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1021.   Defendants' violations present a continuing risk to the Tennessee State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1022.   Tennessee State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Tennessee CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1023.   Pursuant to Tenn. Code § 47-18-109, the Tennessee State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent available under the Tennessee CPA.

**TENNESSEE COUNT II:**
**Breach of Express Warranty**
**Tenn. Code Ann. §§ 47-2-313 and 47-2A-210**
**(On Behalf of the Tennessee State Class)**

1024.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1025.   Plaintiff United Farm and Home Cooperative (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Tennessee State Class against all Defendants.

1026.   Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of vehicles under § 47-2-103(1)(d).

1027.  With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Tenn. Code § 47-2A-103(1)(p).

1028.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1029.  In connection with the purchase or lease of new Class Vehicles, Defendants provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all factory installed options (except tires and batteries), and a Powertrain Warranty for a period of three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This warranty exists to repair the vehicle in case of "defects in material and workmanship."

1030.  In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

1031.  For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

1032.  The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

1033.   The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

1034.   As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1035.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1036.   Despite the existence of warranties, Defendants failed to inform Tennessee State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1037.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1038.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1039.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Tennessee State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1040.   Accordingly, recovery by Tennessee State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1041.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

material facts regarding the Class Vehicles. Tennessee State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1042.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Tennessee State Class members' remedies would be insufficient to make them whole.

1043.   Finally, because of Defendants' breach of warranty as set forth herein, Tennessee State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1044.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

1045.   As a direct and proximate result of Defendants' breach of express warranties, Tennessee State Class members have been damaged in an amount to be determined at trial.

**TENNESSEE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tenn. Code Ann. §§ 47-2-314 and 47-2A-212**
**(On Behalf of the Tennessee State Class)**

1046.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1047.   Plaintiff United Farm and Home Cooperative (for the purposes of this count, "Plaintiff") brings this claim on behalf of itself and the Tennessee State Class against all Defendants.

1048.   Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of vehicles under § 47-2-103(1)(d).

1049.   With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Tenn. Code § 47-2A-103(1)(p).

1050.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1051.   Warranties that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

1052.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles and component engines Defendants used for emissions testing, included defects that led to inflated and misleading output performance and emissions ratings, and/or did not comply with emissions regulations when being driven, and were therefore not merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to the promises or affirmations of fact made on their labels.

1053.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs' counsel as well as the regulators' investigations.

1054.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Tennessee State Class members have been damaged in an amount to be proven at trial.

### 17.   Texas

**TEXAS COUNT I:**
**Violations of the Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code § 17.41 *et seq.***
**(On Behalf of the Texas State Class)**

1055.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1056.   Plaintiffs D.I.J. Construction, Inc., Doan's Nursery Number One, Inc., JOSCO Products, and US Strong Power, Inc. (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all Defendants.

1057.   Plaintiffs and the Texas State Class members are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4). Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

1058.   Defendants engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

1059.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

1060.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by: (a) manipulating the data in the emissions certification and output testing for the Class Engines such that they falsely represented emissions data and performance data, and/or (b) falsely attesting that Class Vehicles could pass emissions tests when they in fact did not.

1061.   Plaintiffs and Texas State Class members had no way of discerning that Defendants' representations were false and misleading because Texas State Class members did not have access to Defendants' emissions certification and output test engines and data.

1062.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1063.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Texas State Class.

1064.   Defendants knew or should have known that their conduct violated the Texas DTPA.

1065.   Defendants owed Plaintiffs and the Texas State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.      intentionally concealed the foregoing from regulators and Texas State Class members; and/or

c.      made incomplete representations about the Class Vehicles' output performance and emissions while purposefully withholding material facts that contradicted these representations.

1066.   Defendants' concealment of the true characteristics of the Class Vehicles' performance and emissions was material to the Texas State Class.

1067.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Texas State Class, about the true environmental cleanliness and performance of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1068.   Defendants' violations present a continuing risk to the Texas State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1069.   Texas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1070.   Pursuant to Tex. Bus. & Com. Code § 17.50, the Texas State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for

1    knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys'

2    fees, costs, and any other just and proper relief available under the Texas DTPA.

3        1071.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiffs' counsel sent notice

4    letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in

5    this count and this Complaint by way of the investigations conducted by governmental regulators.

6    The Texas State Class seeks all damages and relief to which it is entitled.

7                            **TEXAS COUNT II:**
                         **Breach of Express Warranty**
8              **Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
                    **(On Behalf of the Texas State Class)**
9

10        1072.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

11    fully set forth herein.

12        1073.   Plaintiffs D.I.J. Construction, Inc., Doan's Nursery Number One, Inc., JOSCO

13    Products, and US Strong Power, Inc. (for the purposes of this count, "Plaintiffs") bring this claim

14    on behalf of themselves and the Texas State Class against all Defendants.

15        1074.   Defendants are and were at all relevant times "merchant[s]" with respect to

16    vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of vehicles

17    under § 2.103(a)(4)

18        1075.   With respect to leases, Defendants are and were at all relevant times "lessors" of

19    vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

20        1076.   The Class Vehicles are and were at all relevant times "goods" within the meaning

21    of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

22        1077.   In connection with the purchase or lease of new Class Vehicles, Defendants

23    provide a Basic Truck Factory Warranty for a period of one year or 2,000 hours, to cover all

24    factory installed options (except tires and batteries), and a Powertrain Warranty for a period of

25    three years of 6,000 hours, to cover the engines, transmission, differential, or drive axle. This

26    warranty exists to repair the vehicle in case of "defects in material and workmanship."

27

28

1078.   In addition, federal regulations also require manufacturers of spark-ignition (gasoline) non-road engines and compression ignition (diesel) non-road engines to provide federal emissions control warranties applicable to each category.

1079.   For spark-ignition engines, this includes a warranty that the "new nonroad engine, including all parts of its emission-control system" was "designed, built, and equipped so it conforms at the time of sale" with applicable emissions requirements, and is "free from defects in materials and workmanship that may keep it from meeting these requirements." *See* 40 C.F.R. § 1048.120. Analogous warranty requirements govern for compression-ignition vehicles as well. *See* 40 C.F.R. § 1039.120. Thus, Defendants also provide an express warranty for their Class Vehicles through a Federal Emissions Warranty.

1080.   The Warranty required by the EPA for spark-ignition vehicles applies for three years, or at least 50 percent of the engine's useful life in hours of operation, whichever comes first. Further, for "a high-cost warranted part" (i.e., a part with a replacement value greater than $400, *see* 40 C.F.R. § 1048.801) the warranty must be valid for at least five years, or 70 percent of the engine's useful life in hours of operation, whichever comes first. In any case, the emission-related warranty for the engine may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1048.120.

1081.   The Warranty required by the EPA for compression-ignition vehicles applies for 3,000 hours or five years, whichever comes first, and likewise may not be shorter than the standard warranty terms. *See* 40 C.F.R. § 1039.120.

1082.   As manufacturers of large spark and compression ignition powered Vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1083.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1084.   Despite the existence of warranties, Defendants failed to inform Texas State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve inferior output performance than what was disclosed to

1   regulators and represented to consumers who purchased or leased them, and Defendants failed to

2   fix the defective emission components free of charge.

3       1085.   Defendants breached the express warranty promising to repair and correct

4   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6       1086.   Affording Defendants a reasonable opportunity to cure their breach of written

7   warranties would be unnecessary and futile here.

8       1087.   Furthermore, the limited warranty promising to repair and correct Defendants'

9   defect in materials and workmanship fails in its essential purpose because the contractual remedy

10  is insufficient to make Texas State Class members whole and because Defendants have failed

11  and/or have refused to adequately provide the promised remedies within a reasonable time.

12      1088.   Accordingly, recovery by Texas State Class members is not restricted to the

13  limited warranty promising to repair and correct Defendants' defect in materials and

14  workmanship, and they seek all remedies as allowed by law.

15      1089.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

16  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

17  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18  material facts regarding the Class Vehicles. Texas State Class members were therefore induced to

19  purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20      1090.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

21  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

22  and workmanship as many incidental and consequential damages have already been suffered

23  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

24  continued failure to provide such limited remedy within a reasonable time, and any limitation on

25  Texas State Class members' remedies would be insufficient to make them whole.

26      1091.   Finally, because of Defendants' breach of warranty as set forth herein, Texas State

27  Class members assert, as additional and/or alternative remedies, the revocation of acceptance of

28

1  the goods and the return to them of the purchase or lease price of all Class Vehicles currently

2  owned or leased, and for such other incidental and consequential damages as allowed.

3      1092.  Defendants were provided reasonable notice of these issues by way of a letter sent

4  by Plaintiffs' counsel as well as the regulators' investigations.

5      1093.  As a direct and proximate result of Defendants' breach of express warranties,

6  Texas State Class members have been damaged in an amount to be determined at trial.

7                              **TEXAS COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
8                **Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
                         **(On Behalf of the Texas State Class)**
9

10     1094.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

11  forth herein.

12     1095.  Plaintiffs D.I.J. Construction, Inc., Doan's Nursery Number One, Inc., JOSCO

13  Products, and US Strong Power, Inc. (for the purposes of this count, "Plaintiffs") bring this claim

14  on behalf of themselves and the Texas State Class against all Defendants.

15     1096.  Defendants are and were at all relevant times "merchant[s]" with respect to

16  vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of vehicles

17  under § 2.103(a)(4)

18     1097.  With respect to leases, Defendants are and were at all relevant times "lessors" of

19  vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

20     1098.  The Class Vehicles are and were at all relevant times "goods" within the meaning

21  of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

22     1099.  Warranties that the Class Vehicles were in merchantable condition and fit for the

23  ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of

24  fact made on their labels, are implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and

25  2A.212.

26     1100.  These Class Vehicles, when sold or leased and at all times thereafter, were

27  materially different from vehicles and component engines Defendants used for emissions testing,

28  included defects that led to inflated and misleading output performance and emissions ratings,

1    and/or did not comply with emissions regulations when being driven, and were therefore not

2    merchantable, not fit for the ordinary purpose for which vehicles are used, and did not conform to

3    the promises or affirmations of fact made on their labels.

4        1101.   Defendants were provided reasonable notice of these issues by way of a letter sent

5    by Plaintiffs' counsel as well as the regulators' investigations.

6        1102.   As a direct and proximate result of Defendants' breach of the implied warranty of

7    merchantability, Texas State Class members have been damaged in an amount to be proven at

8    trial.

9    **X.    REQUEST FOR RELIEF**

10       WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class

11   and all State Classes, respectfully request that the Court enter judgment in their favor and against

12   Defendants, as follows:

13       A.    An order certifying the Nationwide and State Classes under the applicable

14   provisions of Rule 23; appointing and designating the Plaintiffs to serve as representatives

15   of the Class and applicable State Classes; and appointing the undersigned attorneys to

16   serve as Class Counsel;

17       B.    An order temporarily and permanently enjoining Defendants from

18   continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and

19   practices alleged in this Complaint;

20       C.    Relief in the form of a comprehensive program to fully reimburse and

21   make whole all Class members for all costs and economic losses that resulted from the

22   inaccurate emissions and performance disclosures, as well as any other consequential

23   damages suffered as a result;

24       D.    A declaration that Defendants are financially responsible for all Class

25   notices and the administration of Class relief;

26       E.    Costs, restitution, compensatory damages for economic loss and out-of-

27   pocket costs, multiple damages under applicable states' laws, punitive and exemplary

28   damages under applicable law; and disgorgement, in an amount to be determined at trial;

1            F.      Rescission of all Class Vehicle purchases or leases, including

2  reimbursement and/or compensation of the full purchase price of all Class Vehicles,

3  including taxes, licenses, and other fees;

4            G.     Any and all applicable statutory and civil penalties;

5            H.     An order requiring Defendants to pay both pre- and post-judgment interest

6  on any amounts awarded;

7             I.     An award of costs and attorneys' fees, as allowed by law;

8             J.     Leave to amend this Complaint to conform to the evidence produced at

9  trial; and

10           K.     Such other or further relief as the Court may deem appropriate, just, and

11  equitable.

## XI.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: December 23, 2024       Respectfully submitted,

By: */s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (State Bar No. 083151)
Kevin Budner (State Bar No. 287271)
Phong-Chau G. Nguyen (State Bar No. 286789)
Celena H. Nelson (State Bar No. 356840)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
E-mail: ecabraser@lchb.com
E-mail: kbudner@lchb.com
E-mail: pgnguyen@lchb.com
E-mail: chnelson@lchb.com

1

2          David Stellings (*pro hac vice*)
           Katherine McBride (*pro hac vice*)
3          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
           250 Hudson Street, 8th Floor
           New York, NY 10013
4          Telephone: 212.355.9500
           Facsimile: 212.355.9592
5          E-mail: dstellings@lchb.com
           E-mail: kmcbride@lchb.com
6
           Roland Tellis (State Bar No. 186269)
7          David Fernandes (CA Bar #280944)
           Adam Tamburelli (CA Bar #301902)
8          BARON & BUDD, P.C.
           15910 Ventura Boulevard, Suite 1600
9          Encino, CA 91436
           Telephone: 818.839.2333
10         Facsimile: 818.986.9698
           E-mail: rtellis@baronbudd.com
11         dfernandes@baronbudd.com
           atamburelli@baronbudd.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28