1  Elizabeth J. Cabraser (SBN 083151)
   Kevin Budner (SBN 287271)
2  Phong-Chau G. Nguyen (SBN 286789)
   LIEFF CABRASER HEIMANN
3    & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111
   Telephone: 415.956.1000
5  Facsimile: 415.956.1008
   ecabraser@lchb.com
6  kbudner@lchb.com
   pgnguyen@lchb.com
7
   David Stellings (*pro hac vice*)
8  Katherine I. McBride (*pro hac vice*)
   Miranda Litwak (*pro hac vice*)
9  LIEFF CABRASER HEIMANN
     & BERNSTEIN, LLP
10 250 Hudson Street, 8th Floor
   New York, NY 10013
11 Telephone: 212.355.9500
   Facsimile: 212.355.9592
12 dstellings@lchb.com
   kmcbride@lchb.com
13 mlitwak@lchb.com

14 *Counsel for Plaintiffs*
   [Additional counsel listed on signature page]
15

16                    **UNITED STATES DISTRICT COURT**

17                   **NORTHERN DISTRICT OF CALIFORNIA**

18                       **SAN FRANCISCO DIVISION**

19 BROADMOOR LUMBER & PLYWOOD CO.,        Case No. 3:24-cv-06640-JSC
   AIR GROUP LLC, ALEXANDER MOVING CO.,
20 et al.,                                **UNOPPOSED MOTION FOR PRELIMINARY
                                          APPROVAL OF CLASS SETTLEMENT AND
21            Plaintiff,                   DIRECTION OF NOTICE UNDER FED. R. CIV.
                                          P. 23(e)**
22 v.

23 TOYOTA INDUSTRIES CORPORATION,
   TOYOTA MATERIAL HANDLING N.A.,
24 TOYOTA MATERIAL HANDLING, INC. and
   TOYOTA MOTOR CORPORATION,
25
              Defendant.
26

27

28

3395637.8

# TABLE OF CONTENTS

**Page**

I.    Introduction .......................................................................................................... 1

II.   Background and Procedural History ...................................................................... 2

    A.    Factual background: Plaintiffs allege Defendants manipulated emissions tests for the Settlement Class Forklifts. ............................................................................... 2

    B.    Procedural background: Plaintiffs investigated their claims through a comprehensive discovery process and tested their legal theories through contested motions to dismiss......... 3

    C.    The Settlement process: The Parties engaged in a lengthy negotiation facilitated by a highly regarded mediator. ............................................................................... 5

III.  Summary of Settlement Terms ............................................................................... 5

    A.    The Settlement Class definition ..................................................................... 5

    B.    Settlement benefits to Settlement Class members ........................................ 6

    C.    Notice and Claims Administration................................................................. 7

    D.    Attorneys' Fees, Expenses, and Service Awards .......................................... 7

IV.   Legal Standard for Preliminary Approval and Decision to Give Notice ............... 8

V.    Argument ............................................................................................................... 8

    A.    The Court will be able to certify the proposed Settlement Class for settlement purposes upon final approval. ...................................................................... 8

        1.    The Settlement Class meets the requirements of Rule 23(a). ................ 9

        2.    The Settlement Class meets the requirements of Rule 23(b)(3). ........... 11

    B.    The Settlement is fair, reasonable, and adequate. ........................................ 13

        1.    Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class............................ 13

        2.    Rule 23(e)(2)(B): The Settlement is the product of good-faith, informed, and arm's-length negotiations......................................................................... 15

        3.    Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims. ..................................... 16

        4.    Rule 23(e)(2)(D): The Settlement treats all Class members equitably relative to one another............................................................................................ 20

        5.    The Proposed Settlement merits approval under this District's Procedural Guidance. .............................................................................................. 21

VI.   Conclusion ............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Altamirano v. Shaw Indus., Inc.*,
2015 WL 4512372 (N.D. Cal. July 24, 2015).................................................................21

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018)...................................................................................15

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015)...................................................................................16

*Biederman v. FCA US LLC*,
765 F. Supp. 3d 920 (N.D. Cal. 2025)............................................................................18

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023).......................................................................................20

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) ..........................................................................................8

*Butler v. Sears, Roebuck & Co.*,
702 F.3d 359 (7th Cir. 2012) .........................................................................................11

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 4126533 (N.D. Cal. Aug. 3, 2016)..................................................................26

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2019 WL 2554232 (N.D. Cal. May 3, 2019) .......................................................... *passim*

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs, & Prod. Liab. Litig.*,
2019 WL 536661 (N.D. Cal. Feb. 11, 2019) ...............................................................9, 12

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018)............................................................................18

*Churchill Vill., L.L.C., v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004)..........................................................................................25

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ..........................................................................................8

*Clemens v. Hair Club for Men, LLC*,
2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ................................................................11

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015 (9th Cir. 2012) ........................................................................................10

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024).........................................................................................18

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006)..........................................................................................12

*Free Range Content, Inc. v. Google, LLC*,
2019 WL 1299504 (N.D. Cal. Mar. 21, 2019)................................................................15

**TABLE OF AUTHORITIES**
(continued)

Page

*Friedman v. 24 Hour Fitness USA, Inc.*,
    2009 WL 2711956 (C.D. Cal. Aug. 25, 2009)......................................................................12

*Gatchalian v. Atl. Recovery Sols., LLC*,
    2023 WL 8007107 (N.D. Cal. Nov. 16, 2023) ......................................................................9

*Hanlon* v. *Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................................10, 13

*Hernandez v. County of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015)......................................................................................10

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) ................................................................................8, 9, 12, 25

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ............................................................................................9

*Kim v. Space Pencil, Inc.*,
    2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ...................................................................18

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ............................................................................................22

*Maree v. Deutsche Lufthansa AG*,
    2023 WL 2563914 (C.D. Cal. Feb. 13, 2023) ...................................................................15

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ..............................................................................................15

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................................................................25

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ............................................................................................27

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .....................................................................19

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004)........................................................................................22

*Nobles v. MBNA Corp.*,
    2009 WL 1854965 (N.D. Cal. June 29, 2009) ...................................................................17

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ..............................................................................................10

*In re Ring LLC*,
    2023 WL 9687346 (C.D. Cal. Dec. 20, 2023) ...................................................................15

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ..............................................................................................8

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) ..............................................................................................11

# TABLE OF AUTHORITIES
## (continued)

Page

*Smith v. Cardinal Logistics Mgmt. Corp.*,
  2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ....................................................................13

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) .......................................................................................19

*Stockwell v. City & Cty. of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) .......................................................................................9

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011).........................................................................................21

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ......................................................................................12

*Trosper v. Styker Corp.*,
  2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ..............................................................10

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) .....................................................................................................11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2016 WL 4010049 (N.D. Cal. July 26, 2016)....................................................10, 12, 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2017 WL 672820 (N.D. Cal. Feb. 16, 2017) ..................................................................27

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2019 WL 2077847 (N.D. Cal. May 10, 2019) ................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2022 WL 17730381 (N.D. Cal. Nov. 9, 2022) ........................................................ *passim*

*Wahl v. Yahoo! Inc.*,
  2018 WL 6002323 (N.D. Cal. Nov. 15, 2018) ...............................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).......................................................................................................9

*Wolin v. Jaguar Land Rover N. Am.*,
  617 F.3d 1168 (9th Cir. 2010) ...................................................................................12, 13

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020)................................................................15

*In re Zoom Video Commc'ns, Inc. Privacy Litig.*,
  2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) ...............................................................19

**Statutes**

28 U.S.C. § 1712.........................................................................................................28

28 U.S.C. § 1713.........................................................................................................28

28 U.S.C. § 1714.........................................................................................................28

28 U.S.C. § 1715(b).....................................................................................................28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Court Rules**

Fed. R. Civ. P. 23(c)(2) ....................................................................................8, 25

Fed. R. Civ. P. 23(e) ..........................................................................................2, 8

Fed. R. Civ. P. 23(e)(1) ...........................................................................8, 13, 24

Fed. R. Civ. P. 23(e)(2) ...............................................................8, 13, 19, 28

Fed. R. Civ. P. 23(e)(2)(B) ..................................................................................16

Fed. R. Civ. P. 23(e)(3) ......................................................................................20

Fed. R. Civ. P. 23(e)(5) ........................................................................................8

**Other Authorities**

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.
   Empirical L., Stud. 811 (2010) ....................................................................20

5 *Moore's Federal Practice—Civil* § 23.22 (2016) ............................................9

Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorneys' Fees in Class Actions 2009-
   2013*, 92 N.Y.U. L. Rev. 937 (2017) ...........................................................20

## **NOTICE OF MOTION AND MOTION**

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on February 26, 2026, or at such other date and time as the Court may set, in Courtroom 8 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs' Counsel, on behalf of a proposed Settlement Class of owners and lessees of certain Toyota forklifts with internal combustion engines, will and hereby do move the Court for an order granting preliminary approval of the Class Action Settlement and directing notice to the Class under Fed. R. Civ. P. 23(e)(1); appointing Settlement Class Counsel and Settlement Class Representatives under Fed. R. Civ. P. 23(g)(3); and scheduling a final approval hearing under Fed. R. Civ. P. 23(e)(2).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

After a year of pre-filing investigations followed by more than a year of active litigation and discovery, Plaintiffs have secured, and are pleased to present for approval, an outstanding resolution for the Class. The proposed Settlement resolves claims for purchasers and lessees of the 272,422 Toyota forklifts (the "Settlement Class Forklifts")[1] that Plaintiffs alleged were manipulated during the emissions certification process and emitted more pollutants than reasonably expected. For a release of those claims, the Settlement provides a non-reversionary cash fund of $299.5 million, a Service Plan conservatively valued at an additional $136.5 million, and a New Parts Warranty in the event of a future recall. *See* Declaration of David Stellings ("Class Counsel Decl."), Attachment 1 (Settlement Agreement ("SA")) ¶¶ 2.35, 4.2, 4.3. All together, these benefits are worth more than $436 million.

The compensation is significant, both in the aggregate and on an individual basis. All Settlement Class members are eligible to receive substantial cash payments, likely in the range of $1,400 to $2,800 per Settlement Class Vehicle, depending on the number of claims submitted. *See* Class Counsel Decl. ¶ 20. No matter the claims rate, every Settlement Class member who submits a valid claim stands to receive a sizeable payment that compares favorably to other emission-manipulation cases, particularly given that this settlement was secured without the benefit of a regulatory finding regarding Defendants' alleged misconduct or parallel government litigation.[2]

But that's not all. Under the Settlement's Service Plan program, every Settlement Class member with an operable Settlement Class Forklift can schedule a visit from an authorized Toyota Material Handling dealership that includes the manufacturer-recommended inspection and, where appropriate, basic services for all the major systems of the Settlement Class Forklift, as well as a choice of either a free oil change or a

---

[1] Plaintiffs use the terms "Settlement Class Forklifts" and "Settlement Class Vehicles" (the defined term in the Settlement Agreement) interchangeably. They include Toyota forklifts with internal combustion ("IC") engines built between 2007-2021. All other defined terms have the meaning ascribed to them in the Settlement Agreement unless otherwise indicated.

[2] The settling Defendants are Toyota Industries Corporation, Toyota Material Handling N.A., and Toyota Material Handling, Inc. and are referred to herein as Defendants or TICO. One additional Defendant, Toyota Motor Corporation ("TMC"), was dismissed without prejudice following Plaintiffs' investigation, discovery, and information exchanges with TMC, including an interview with a Toyota employee with knowledge about TMC's involvement in the conduct at issue in this litigation and related ties to California. Class Counsel Decl. ¶ 8.

transmission fluid change. SA, Ex. B. This is the type of regular inspection and maintenance required for the sustained operation of the Settlement Class Forklifts, and it is of real value to the Settlement Class. Per Defendants' own calculations, the Service Plan will cost an average of $800 per forklift to implement, for a total of up to $189,306,400, and no less than $83,725,600, depending on the total number of Settlement Class Forklifts still in operation. Declaration of Susan George ¶¶ 4-6.[3] Using the midpoint of this range for the sake of simplicity yields a Service Plan valuation of $136,516,000, and even that figure—based only on the cost to Defendants—underestimates the retail value of the program for the Settlement Class.

For one additional layer of protection, if a government agency requires or recommends an emissions-related recall for the Class Engines in the next three years, the Settlement requires Defendants to provide a warranty on any new engine parts that are required by the recall. SA ¶ 4.3. And in the unlikely scenario that the regulators require a buyback, the Settlement Release does not prevent Settlement Class members from participating or in any way benefiting from that program. *Id.* ¶ 11.6.

In sum, this proposed resolution—reached after extensive discovery and intensive settlement negotiations overseen by the Honorable Layn R. Phillips (ret.)—provides comprehensive benefits that address the Settlement Class members' interests in numerous, complementary ways. Plaintiffs are confident that the proposed method for notifying the Settlement Class about the Settlement satisfies Due Process and, if the Settlement is approved, will drive a strong claims rate. Plaintiffs therefore respectfully request approval to give notice to the Settlement Class and set the matter for final settlement approval. *See* Fed. R. Civ. P. 23(e).

## II.     Background and Procedural History

### A.     Factual background: Plaintiffs allege Defendants manipulated emissions tests for the Settlement Class Forklifts.

Plaintiffs' investigation into this case began in 2023 after TICO announced that it had suspended "domestic shipment in Japan due to potential violation of regulations related to certification of engines for forklifts." Am. Compl. (Dkt. No. 35) ¶¶ 3-4. According to that announcement, three engine models—two

---

[3] As detailed in the declaration of Toyota Material Handling's Warranty Manager, Susan George, Defendants used two methodologies to estimate the number of Settlement Class Forklifts that are still in operation and that would be eligible for a Service Plan visit. One estimate (104,657) underestimates the total number and the other (236,633) overestimates the total number. George Decl. ¶¶ 7-9.

diesel and one gasoline—could exceed "the domestic (Japanese) emissions regulation values due to aging degradation" and were "potential[ly in] violation of regulations related to Japanese certification for emissions." *Id.* As in prior cheating scandals, Toyota then convened a Special Investigation Committee to conduct an investigation, the results of which ultimately implicated even more engines and potential regulatory violations. *Id.* ¶ 76.

Based on these findings and Plaintiffs' independent investigations, Plaintiffs filed an initial complaint in September 2024 with dozens of pages of robust and thoroughly researched factual allegations. Among other things, the Complaint outlined the alleged misconduct and explained the four main emissions test cheating strategies in detail. Compl. (Dkt. No. 1) ¶¶ 1-15, 44-71; Am. Compl. ¶¶ 1-16, 71-100. The Complaint also exposed the alleged links between the Japanese scandal and the U.S. market to support Plaintiffs' allegations that the misconduct affected forklifts not just Japan, but in the U.S. as well. Am. Compl. ¶¶ 41-44. These allegations were bolstered when, as a result of their connections established in the dealership community through their investigation work, Plaintiffs' counsel learned that Toyota had begun quietly notifying dealers of an ongoing regulatory investigation that could result in EPA "void[ing] the certificate that originally authorized TMH to sell the engines" in certain gasoline-model forklifts. *Id.* ¶ 98.

The Complaint also detailed the ways in which this alleged certification misconduct, and the resulting emissions exceedance, contradicted years of Defendants' consumer-facing representations and subverted the proposed Class members' reasonable expectations. *See, e.g.,* Am. Compl. ¶¶ 102-11. As a result of this deception, Plaintiffs alleged that they and the proposed Class members suffered economic loss, including by overpaying for the forklifts at the point of sale.

**B.    Procedural background: Plaintiffs investigated their claims through a comprehensive discovery process and tested their legal theories through contested motions to dismiss.**

As discussed above, Plaintiffs' work on this case began in 2023, after the initial announcement of potential noncompliance and well before the Special Investigation Committee released its reports in 2024. Without the roadmap of a finding or citation from the U.S. regulators (or even confirmation of an ongoing investigation), Plaintiffs undertook extensive factual investigation and expert workup of their own to assess the nature of TICO's misconduct and the potential links to the U.S. market. These efforts culminated in a detailed complaint filed in September 2024. *See* Compl. Further research and work with the forklift

community resulted in an amended complaint filed in December 2024, which included updated allegations of TICO's conduct and twenty-two plaintiffs across seventeen of the most populous states. *See* Am. Compl.

From there on, the Parties litigated the case intensively. Among other things, TICO and TMC filed separate motions to dismiss, which yielded over a hundred pages of briefing.[4] They raised a number of potentially case-dispositive defenses such as Article III standing, federal preemption, and personal jurisdiction. *See* Dkt. Nos. 41, 45, 48, 77, 79. At the same time, Plaintiffs engaged in extensive discovery. This included Rule 26(f) conferences and the exchange of initial disclosures with both TICO and TMC, three sets of requests for production and interrogatories to the TICO defendants, multiple third-party subpoenas, jurisdictional information exchanges with TMC, and FOIA/public record requests to both the U.S. and California. Class Counsel Decl. ¶¶ 8-9. After extensive negotiations and many meet-and-confers, this discovery yielded rolling productions of nearly 1.5 million pages of documents—mostly comprised of the key documents simultaneously being exchanged with U.S. regulators. *Id.* ¶ 9.

Making use of this discovery took a lot of work from a large team, including many lawyers fluent in Japanese. *Id.* ¶ 10. This team, led by a core of attorneys experienced in vehicle emissions review, undertook an extensive analysis project that was facilitated by regular discussion and synthesized in dozens of review memos. *Id.* Those included, for illustrative purposes, a cast of characters and glossary document; a timeline and summary of events for the many different engines at issue; a master issues outline; regulatory and compliance testing summaries; targeted memoranda on key fact witnesses; and "hot" and "super hot" document analysis memoranda. *Id.* In addition, the Parties negotiated two separate multi-day discovery meetings—including one in Tokyo, Japan and another at TICO's Takahama and Higashi-chita plants near Nagoya, Japan—during which Plaintiffs' counsel conducted multi-hour interviews of TICO witnesses, inspected relevant production and compliance facilities, and learned more about TICO's prospective compliance and quality assurance protocols. *Id.* ¶ 11.

On the defensive side, Plaintiffs' counsel worked with each of the proposed Settlement Class Representatives to search for, review, and produce thousands of pages of documents and ESI responsive to

---

[4] TMC's motion to dismiss followed from Plaintiffs' persistent service efforts, which included securing Court appointment for an international process server under the Hague Convention and translation of the complaint into Japanese to facilitate Hague service. Dkt. Nos. 47, 60.

TICO's 144 document requests. *Id.* ¶ 12. Counsel also worked with Plaintiffs to prepare and serve detailed initial disclosures and then responses to TICO's 168 interrogatories. *Id.*

All told, Plaintiffs fought hard to access and assess the critical information in this case. Through those efforts, Plaintiffs secured a thorough record and a strong, evidence-based understanding of their claims.

**C.     The Settlement process: The Parties engaged in a lengthy negotiation facilitated by a highly regarded mediator.**

With TICO's motion to dismiss pending, and discovery well under way, the Parties agreed to attempt mediation before the Honorable Layn R. Phillips (ret.).[5] The Parties prepared extensively for this formal mediation, including by drafting and sharing multiple rounds of mediation briefing, and communicated regularly with Judge Phillips and his staff to prepare in the weeks and months beforehand. The in-person mediation discussions promoted a candid and fulsome exchange, and at the close of an extended day, the Parties reached a tentative agreement on the basic terms of a settlement. Class Counsel Decl. ¶¶ 14-15. That initial agreement launched several months of further confirmatory discovery and negotiations, and concluded in the proposed comprehensive Settlement, detailed exhibits, and notice program now before the Court. *Id.*

**III.     Summary of Settlement Terms**

The Settlement provides $299.5 million in non-reversionary cash compensation, available to Settlement Class members through a streamlined, state-of-the-art claims process; a Service Plan maintenance program available to all Settlement Class Forklifts in operation and valued at an additional $136.5 million; and a commitment for extensive New Parts Warranty coverage in the event of a future recall. SA ¶¶ 2.35, 4.2, 4.3.

**A.     The Settlement Class definition**

The proposed Settlement Class is: "All persons or entities that purchased a Settlement Class Vehicle, or leased a Settlement Class Vehicle, through the date of filing of the Motion for Preliminary Approval." SA ¶ 2.40.[6] The Settlement Class Vehicles include approximately 272,422 Toyota forklifts with internal

---

[5] *See* Judge Phillips' background, available at: https://phillipsadr.com/our-team/layn-phillips/.

[6] Those excluded from the Settlement Class are: (a) Defendants' officers, directors, and employees; Defendants' affiliates and affiliates' officers, directors, and employees; Defendants' authorized dealers and

1    combustion (non-electric) engines produced from 2007 to 2021, as defined in Exhibit A of the proposed

2    Settlement Agreement. *Id.* ¶ 2.45

3    **B.    Settlement benefits to Settlement Class members**

4    The proposed Settlement delivers substantial cash payments. As noted, it includes a non-

5    reversionary Settlement Cash Value of $299.5 million that (after deducting Court-approved fees, expenses,

6    and administration costs) will be divided on a per-capita basis among all Settlement Class Vehicles for

7    which a valid claim is received. SA ¶¶ 2.34, 2.35, 4.1. Based on reasonable claims-rate projections,

8    individual payments will likely range from $1,400 (assuming a 60% claim rate) to $2,800 (assuming a 30%

9    claims rate) for each eligible forklift.[7] Class Counsel Decl. ¶ 20. If more than one Settlement Class member

10   submits a valid Claim for the same forklift, the original owner (who purchased new) will receive 60% of the

11   funds for that forklift, and the remaining 40% will be distributed evenly among the other valid claimants.

12   SA ¶ 4.1.[8]

13   If there are any funds remaining in the Settlement Fund after all valid, complete, and timely claims

14   are paid, the Parties will attempt additional distributions to Settlement Class members who submitted valid

15   claims until it is economically infeasible to do so. SA ¶ 4.6. Thereafter, if any minimal balance remains, the

16   funds will not revert to TICO, but will instead be directed to *cy pres* recipients subject to the Court's

17   approval. *Id.* This ensures that every dollar secured by the Settlement will inure to the benefit of the

18   Settlement Class and their interests advanced in this litigation.

19   Whether or not they are the subject of a claim for cash payment, all Settlement Class Forklifts in

20   operation will be eligible for a free Service Plan visit, which includes a manufacturer-recommended

21   inspection and, where appropriate, basic services for all major systems of the Settlement Class Forklifts, as

22   well as a free oil change or a transmission fluid change, at the discretion of the Settlement Class member.

23

24   distributors and their officers, directors, and employees; (b) Released Parties; (c) judicial officers and their
     immediate family members and associated court staff assigned to this case; and (d) all those otherwise in the

25   Settlement Class who or which timely and properly exclude themselves from the Settlement Class as provided
     in th[e] Class Action Agreement. SA ¶¶ 2.40(a)-(d).

26   [7] Out of an abundance of caution, the proposed notice documents project a more conservative range of
     possible recoveries that includes a ceiling of an approximately 80% claims rate (which would yield a per-

27   vehicle allocation of approximately $1,000). *See* Section V.B.5.h.

28   [8] The Settlement Administrator retains discretion to adjust the allocation if a Settlement Class member owned
     or leased a Settlement Class Vehicle for less than six months. SA ¶ 4.1.2

3395637.8                                  - 6 -

SA, Ex. B. As discussed above, this Service Plan visit will cost Defendants approximately $800 per Settlement Class Forklift. George Decl. ¶¶ 5-6. In the aggregate, the Service Plan is worth approximately $136.5 million—the midpoint of the range of $83,725,600 to $189,306,400. *Id.* ¶ 4. Even that is a conservative figure keyed to the cost to Defendants, not the higher retail value to Settlement Class members.

Further, if the government requires or recommends an emissions recall for the Settlement Class Vehicles anytime in the next three years, the Settlement requires Defendants to provide impacted Settlement Class members a New Parts Warranty with additional coverage for parts affected by that recall. SA ¶ 4.3.[9]

### C.    Notice and Claims Administration

The fees and costs of the Settlement Administrator to implement the notice program, administer the claims process, mail checks as necessary, and perform the other administrative tasks described in the Settlement, will be paid out of the Settlement Fund. SA ¶ 5.3. The Parties selected Verita—a respected and experienced notice provider and claims administrator—which has designed a robust notice program, detailed below. The total notice and administration costs will depend on the number of claims submitted, but Verita estimates that they will not exceed $895,000. *See* Declaration of Lana Cooper ¶ 44. In counsel's experience, these estimates are reasonable and necessary given the size of the Settlement Class and the scope of the proposed notice and claims administration programs.

### D.    Attorneys' Fees, Expenses, and Service Awards

Any attorneys' fees, expenses, and service awards granted by the Court will be paid from the Settlement fund. SA ¶¶ 9.3, 14.2. Proposed Settlement Class Counsel will apply to the Court for an award of reasonable attorneys' fees and reimbursement of costs at the time of final approval. As will be detailed in that forthcoming motion, counsel anticipate they will request up to $500,000 in costs and $74,875,000 million in fees. The fees reflect approximately 17% of the total value of the Settlement (using the Service Plan's midpoint value) and 25% of the Settlement Cash Value by itself. Settlement Class Counsel will also apply for service awards of up to $2,500 for each of the proposed Settlement Class Representatives (for a

---

[9] Importantly, excluded from the Released Claims are Settlement Class members' rights or ability to participate in any future buyback or repurchase program that any federal or state government entity recommends or orders post-Settlement. The timing and likelihood of such a program remain unknown, but the settlement does not impact Settlement Class members' right to participate in a future program of this kind and receive additional compensation, should it materialize. *Id.* ¶ 11.6.

total of $50,000) to compensate them for their efforts and commitment in prosecuting this case on behalf of the Settlement Class.

## IV.     Legal Standard for Preliminary Approval and Decision to Give Notice

Federal Rule of Civil Procedure 23(e) governs a district court's analysis of a proposed class action settlement and creates a three-step process for approval. First, the court must determine that it "will likely be able to" (i) approve the proposed settlement as fair, reasonable, and adequate, after considering the factors outlined in Rule 23(e)(2), and (ii) certify the settlement class after the final approval hearing. *See* Fed. R. Civ. P. 23(e)(1)(B). Second, upon a favorable preliminary assessment, the court must direct notice to the proposed settlement class to give them an opportunity to object or to opt out. *See* Fed. R. Civ. P. 23(c)(2)(B); Fed. R. Civ. P. 23(e)(1), (5). Third, after a hearing, the court may grant final approval on a finding that the settlement is fair, reasonable, and adequate, and certify the settlement class. Fed. R. Civ. P. 23(e)(2). In this District, a movant's submission should also include the information identified in the District's Procedural Guidance for Class Action Settlements ("Procedural Guidance").

Where, as here, "the parties negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may be normally required under Rule 23(e)." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *see also Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (in the pre-certification context, the court must look for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations"). Throughout this work, courts are guided by a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

## V.     Argument

### A.     The Court will be able to certify the proposed Settlement Class for settlement purposes upon final approval.

The Court should certify the proposed Settlement Class pursuant to Rule 23(e) because it meets the applicable prerequisites of Rules 23(a) and (b). *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc) (upholding district court's preliminary approval and certification of nationwide settlement class in motor vehicle settlement).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.    **The Settlement Class meets the requirements of Rule 23(a).**

a.    **Rule 23(a)(1): The Class is sufficiently numerous.**

The proposed Settlement Class, which consists of owners and lessees of 272,422 Settlement Class Forklifts—owned or leased by, at a minimum, tens of thousands of Settlement Class members—unquestionably meets the numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1); *see also Gatchalian v. Atl. Recovery Sols., LLC*, 2023 WL 8007107, at *4 (N.D. Cal. Nov. 16, 2023) ("Generally, the numerosity requirement is satisfied where a class includes at least 40 members."); 5 *Moore's Federal Practice—Civil* § 23.22 (2016) (similar).

b.    **Rule 23(a)(2): Commonality is satisfied.**

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). "'Even a single question of law or fact common to the members of the class will satisfy the commonality requirement.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).[10]

Courts routinely find commonality where, as here, the class claims arise from alleged emissions misconduct relating to motor vehicles. *See, e.g.*, *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2019 WL 536661, at *6 (N.D. Cal. Feb. 11, 2019) (commonality satisfied in light of the defendants' "common course of conduct" in perpetrating alleged emissions cheating scheme); *In re Volkswagen "Clean Diesel" Mktg.*, *Sales Pracs., & Prods. Liab. Litig.*, 2022 WL 17730381, at *3 (N.D. Cal. Nov. 9, 2022) ("common questions of fact and law regarding emissions and . . . [defendant's] representations"); *see also In re Hyundai*, 926 F.3d at 557 (common questions about misrepresented fuel economy ratings satisfied commonality requirement).

Here, questions of law and fact centered on Defendants' alleged manipulation of emissions tests for the Settlement Class Forklifts, and related misrepresentations to regulators and consumers, are common to all Settlement Class members. As in the *Volkswagen* diesel litigation, "[w]ithout class certification,

---

[10] Here, and throughout, internal citations are omitted unless otherwise indicated.

individual Class members would be forced to separately litigate the same issues of law and fact which arise from Volkswagen's use of the [emissions cheating strategies] and Volkswagen's alleged common course of conduct." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2016 WL 4010049, at *10 (N.D. Cal. July 26, 2016).

### c.      Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class members' claims.

"The test of typicality is whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs and whether other class members have been injured by the same course of conduct." *Hernandez v. County of Monterey*, 305 F.R.D. 132, 159 (N.D. Cal. 2015); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (named plaintiffs' claims must be "reasonably coextensive with those of absent class members; they need not be substantially identical."). Here, the Settlement Class Representatives and other members of the Settlement Class were subjected to the same alleged misconduct by Defendants, claim to have suffered the same injuries in paying more for their Settlement Class Forklifts than they otherwise would have, and will benefit equally from the relief provided by the Settlement. The typicality requirements are satisfied.

### d.      Rule 23(a)(4): The Class Representatives and Class Counsel have protected and will continue to protect the interests of the Class.

Rule 23(a)(4)'s adequacy inquiry looks to whether plaintiffs and their counsel (1) "have any conflicts of interest with other class members" and (2) will "prosecute the action vigorously on behalf of the class[.]'" *Evon v. Law Offices of Sidney Mickell* , 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Both prongs are readily satisfied here.

The Settlement Class Representatives have no interests antagonistic to absent Class members and remain "entirely aligned [with the Settlement Class] in their . . . common goal of obtaining redress for their injuries." *Volkswagen*, 2016 WL 4010049, at *11. The Representatives understand their duties, have agreed to consider the interests of absent Settlement Class members, and have reviewed and endorsed the Settlement terms. *See, e.g., Trosper v. Styker Corp.*, 2014 WL 4145448, at *12 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a 'rudimentary understanding of the present action and … a demonstrated willingness to assist counsel in the prosecution of the litigation.'"). The Representatives are committed to

1   protecting the Settlement Class' interests through the Settlement administration and any potential appeals.

2   *See* Class Counsel Decl. ¶¶ 26-28. They are more than adequate.

3   "Adequacy of representation also depends on the qualifications of counsel." *Sali v. Corona Reg'l*

4   *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018). Plaintiffs are represented by competent counsel with

5   extensive experience prosecuting complex class actions relating to emissions misconduct. *See* Class Counsel

6   Decl. ¶ 29. As demonstrated throughout this case (and in the many months spent in a pre-filing

7   investigation), Settlement Class counsel have undertaken an enormous amount of work, effort, and expense

8   in litigating Plaintiffs' claims, and ultimately obtained an excellent result for Plaintiffs and the Settlement

9   Class. They, too, satisfy Rule 23(a)(4).

10   These same considerations also support the appointment of Settlement Class Counsel to represent

11   the Settlement Class under Rule 23(g). *See Clemens v. Hair Club for Men, LLC*, 2016 WL 1461944, at *3

12   (N.D. Cal. Apr. 14, 2016) (adequacy established and Rule 23(g) appointment warranted based on counsel's

13   "extensive" litigation experience and "significant work" in investigating relevant facts and claims).

14   Plaintiffs therefore submit that David Stellings and Kevin Budner of Lieff Cabraser and Roland Tellis of

15   Baron & Budd should be appointed as Settlement Class Counsel under Rule 23(g)(3) to conduct the

16   necessary steps in the Settlement approval process. Class Counsel Decl. ¶ 29.[11]

17   ### 2.   The Settlement Class meets the requirements of Rule 23(b)(3).

18   Rule 23(b)(3)'s requirements are satisfied as well because (i) "questions of law or fact common to

19   class members predominate over any questions affecting only individual members"; and (ii) a class action is

20   "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

21   23(b)(3).

22   ### a.   Common issues of law and fact predominate.

23   "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are

24   more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods,*

25   *Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). At its core, "[p]redominance is a question of efficiency."

26   *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012). Thus, "more important questions apt to

27

28   [11] Proposed Settlement Class Counsel's additional experiences and firm biographies are described and linked in the Class Counsel Declaration.

1  drive the resolution of the litigation are given more weight . . . over individualized questions which are of

2  considerably less significance to the claims." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir.

3  2016); *see also In re Hyundai*, 926 F.3d at 557-58 (class treatment may be appropriate "even if just one

4  common question predominates").

5      The Ninth Circuit favors class treatment of fraud claims stemming from a defendant's "'common

6  course of conduct.'" *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Wolin v. Jaguar

7  Land Rover N. Am.*, 617 F.3d 1168, 1173, 1176 (9th Cir. 2010) (fraudulent omissions were certifiable and

8  "susceptible to proof by generalized evidence," even if individualized issues remain); *Friedman v. 24 Hour

9  Fitness USA, Inc.*, 2009 WL 2711956, at *8 (C.D. Cal. Aug. 25, 2009) (common issues predominate where

10  alleged injury is a result "of a single fraudulent scheme"). This is so because "[i]n many consumer fraud

11  cases, the crux of each consumer's claim is that a company's mass marketing efforts" misled consumers

12  about a product's features or performance. *In re Hyundai*, 926 F.3d at 559.

13      The same holds true here because TICO's common course of conduct—alleged fraud in engine tests

14  and resulting misrepresentations to consumers—is central to Plaintiffs' claims. Unifying questions for all

15  Settlement Class members include, for example: what misconduct TICO engaged in, if any, during engine

16  testing; what TICO executives knew about the alleged misconduct in its emissions tests and when; whether

17  representations about the Class Forklifts' emissions performance were misleading to reasonable customers;

18  and whether TICO's actions were fraudulent. At bottom, "Plaintiffs allege a common course of conduct—

19  manipulation of emissions and [] test results—that applies to all Class Members and is central to their

20  claims." *In re Volkswagen*, 2022 WL 17730381, at *4; *see also In re EcoDiesel*, 2019 WL 536661, at *7

21  (common facts and injuries arose "from [defendants'] use of the [emissions cheat]"). Defendants allegedly

22  "perpetrated the same fraud in the same manner against all Class Members," *Volkswagen*, 2016 WL

23  4010049, at *12, and questions of law and fact common to the Settlement Class members' claims

24  predominate over any individual questions.

25          **b.    Class treatment is superior to other available methods for the resolution
                    of this case.**

26

27      Class treatment of the claims here is far superior to the litigation of tens (or hundreds) of thousands

28  of individual cases. "From either a judicial or litigant viewpoint, there is no advantage in individual

members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing individual vehicle owners to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication."). The maximum damages sought by each Settlement Class member (in the thousands of dollars), while significant to individual Settlement Class Members, are relatively small in comparison to the substantial cost of prosecuting each one's individual claims, especially given the complex nature of the technology and claims at issue. *See Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008) (small interest in individual litigation where damages averaged $25,000-$30,000 per year of work).

Class resolution is also superior from an efficiency and resource perspective. Indeed, "[i]f Class Members were to bring individual lawsuits against [Defendants], each Member would be required to prove the same wrongful conduct to establish liability and thus would offer the same evidence." *Volkswagen*, 2016 WL 4010049, at *12. With a Settlement Class in the tens of thousands, "there is the potential for just as many lawsuits with the possibility of inconsistent rulings and results." *Id.* "Thus, classwide resolution of their claims is clearly favored over other means of adjudication, and the proposed Settlement resolves Class Members' claims at once." *Id.* Superiority is met, and Rule 23(e)(1)(B)(ii) is satisfied.

* * *

For all the reasons set forth above, Plaintiffs respectfully submit that after notice is issued and Settlement Class member input is received the Court will "likely be able to . . . certify the class for purposes of judgment on the proposal." *See* Fed. R. Civ. P. 23(e)(1)(B).

**B.    The Settlement is fair, reasonable, and adequate.**

Rule 23(e)(2) establishes the criteria for the Court to use to decide whether to direct notice to the proposed class. Courts in this District also look to the Procedural Guidance, which supplement the Federal Rule. The proposed Settlement here readily satisfies both.

**1.    Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class.**

Class Counsel and the Settlement Class Representatives fought hard to protect the interests of the Settlement Class, as evidenced by the significant relief available through the proposed Settlement. Class

Counsel investigated and prosecuted this action with vigor and dedication for more than two years. *See* Fed. R. Civ. P. 23(e)(2)(A).

In litigating and in the settlement negotiations, Settlement Class Counsel had the benefit of years of experience in class action litigation and a strong track record in other automotive class actions involving product liability and emissions cheating claims. This includes their roles as court-appointed counsel in the *Volkswagen "Clean Diesel"* MDL, the *FCA EcoDiesel* MDL, the *Takata Airbag* MDL, and the *Hino Emissions* litigation as just a few examples of many. Class Counsel Decl. ¶ 29.

With that experience, as detailed above, Class Counsel devoted whatever resources were necessary to reach a successful outcome in this case from the very start. *See* Sections II.B; V.B.1. Counsel doggedly pursued discovery through carefully crafted requests and extensive meet and confers to ensure Defendants appropriately searched for and produced relevant materials and data. Counsel deployed a qualified and experienced team to digest the productions received in discovery which, in addition to being voluminous, included highly technical engineering and emissions documents, many of which were in Japanese. In sum, given the nature of the materials, this was uniquely challenging review project that demanded extensive collaboration, oversight, and organization.

Counsel also engaged in robust Rule 12 motion practice in response to two separate pleading challenges (one from the TICO entities together, and one from TMC). Dkt. Nos. 41, 45, 48, 77, 79. This developed record, and the assistance of Plaintiffs' engine and emissions experts, enabled Class Counsel to develop a sophisticated understanding of the central questions in the case and prepared them for well-informed, evidence-based settlement negotiations.

The proposed Settlement Class Representatives are likewise actively engaged. Each preserved and collected documents related to their claims and worked with counsel to produce those documents and to prepare responses to 168 detailed Interrogatories. Throughout, the Representatives actively monitored progress in the litigation and then worked with counsel to evaluate the terms of the proposed Settlement Agreement. Class Counsel Decl. ¶¶ 26-28. Each Representative also expressed their continued willingness to protect the Settlement Class until the Settlement is approved and its administration completed. *Id*. Their interests are aligned and coextensive with those of absent Settlement Class members, as is the relief they stand to receive.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.    Rule 23(e)(2)(B): The Settlement is the product of good-faith, informed, and arm's-length negotiations.

The Settlement resulted from intensive negotiations between experienced attorneys familiar with complex class action litigation and the issues in this case. These serious, arm's-length discussions, overseen by an experienced mediator, unquestionably support approval. *See* Rule 23(e)(2)(B); *see also In re Ring LLC*, 2023 WL 9687346, at *4 (C.D. Cal. Dec. 20, 2023) (A "presumption of correctness" attaches where, as here, a "class settlement [was] reached in arm's-length negotiations between experienced capable counsel after meaningful discovery."); *Free Range Content, Inc. v. Google, LLC*, 2019 WL 1299504, at *6 (N.D. Cal. Mar. 21, 2019) (same).

Where, as here, extensive information has been exchanged, "[a] court may assume that the parties have a good understanding of the strengths and weaknesses of their respective cases and hence that the settlement's value is based upon such adequate information." William B. Rubenstein, et al., 4 Newberg on Class Actions § 13:49 (5th ed. 2012); *cf. In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) (concluding that the "extent of discovery" and factual investigation undertaken by the parties gave them "a good sense of the strength and weaknesses of their respective cases in order to 'make an informed decision about settlement") (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)).[12] A meaningful exchange of discovery also suggests that the litigation was adversarial and therefore serves as "an indirect indicator that a settlement is not collusive but arms-length." 4 Newberg § 13:49; *see also In re Anthem*, 327 F.R.D. at 320 ("Extensive discovery is also indicative of a lack of collusion. . . ."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) ("Lead Counsel vigorously litigated this action during motion practice and discovery, and the record supports the continuation of that effort during settlement negotiations.").

This is precisely the case here. As described above, TICO produced nearly 1.5 million pages of documents—many of which were highly technical—in addition to documents produced by government

---

[12] *See also*, e.g., *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *13 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir. June 27, 2022) (finding that significant "discovery is indicative of lack of collusion" and supported settlement approval); *Maree v. Deutsche Lufthansa AG*, 2023 WL 2563914, at *9 (C.D. Cal. Feb. 13, 2023) (granting preliminary approval in part because the parties exchanged informal discovery and litigated a motion to dismiss); *Wahl v. Yahoo! Inc.*, 2018 WL 6002323, at *4 (N.D. Cal. Nov. 15, 2018) (granting final approval of class settlement although "little formal discovery" was conducted, noting relevant inquiry was whether parties had "sufficient information to evaluate the case's strengths and weaknesses").

agencies and other third parties. Plaintiffs also conducted interviews of key TICO personnel and inspections of relevant facilities in Japan. All of this helped Plaintiffs develop a refined understanding of the facts underpinning the case and, therefore, of the strengths and weaknesses of their claims. Class Counsel Decl. ¶¶ 8-13. It also demonstrates that the litigation and settlement process were adversarial and non-collusive.

So does the involvement of an experienced mediator like Judge Phillips, who oversaw the mediation process and made the final proposal leading to the proposed Settlement at the end of a full-day session. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 257 (N.D. Cal. 2015) (Corley, J.) (Where "the parties have engaged in discovery, participated in mediation, and relied a mediator's proposal in reaching a settlement, courts have found settlement appropriate."); Fed. R. Civ. P. 23(e)(2)(B), Committee Notes on Rules, 2018 Amendment ("[T]he involvement of a neutral or court-affiliated mediator . . . may bear on whether [negotiations] were conducted in a manner that would protect and further the class interests").

Finally, and perhaps most importantly of all, the outstanding result of the negotiations speaks for itself. Where, as here, the Settlement provides thousands of dollars per forklift—a figure that, by most metrics, significantly exceeds settlement payments in comparable emissions cases—in addition to a valuable Service Plan and New Parts Warranty protection, there is little room for argument that Class Counsel failed to protect the interests of the Settlement Class or otherwise engaged in collusive behavior.

### 3. Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims.

This Settlement is an excellent outcome for the Settlement Class, especially taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan; and (iii) the fair terms of the requested award of attorney's fees. *See* Fed. R. Civ. P. 23(e)(2)(C).

The Settlement secures a $299.5 million cash fund and a Service Plan worth an additional $136.5 million to compensate Settlement Class members for alleged overpayment of the Settlement Class Forklifts affected by the Defendants' alleged emissions and testing misconduct. At a combined value of more than $436 million, this is not your everyday settlement.

An examination of the recoveries available to each Settlement Class member makes this point even clearer. Because the Settlement is non-reversionary, the amount paid per forklift will depend on the number of Settlement Class Forklifts for which valid claims are submitted, but in Class Counsel's experience,

reasonable claims-rate projections would yield individual payments ranging from approximately $1,400 (60% claim rate) to $2,800 (30% claim rate) for each eligible forklift. That represents between 5.5% and 11% of the Class Forklifts' average sales price. Class Counsel Decl. ¶ 20. These are big numbers for a class settlement, and they may even be underestimating the final payments. Indeed, using the median class action claims rate of approximately 10%,[13] each Settlement Class Vehicle with a valid claim would be allocated up to $8,200 (32% of average sales price).

At any point in this range, the recovery is comparable to or more than other emissions cheating settlements, some of which resolved claims later in their respective case lifecycles and with the benefit of simultaneous government litigation. The settlement in *FCA EcoDiesel*, for example—which settled after plaintiffs survived a motion to dismiss and with the assistance of a regulatory citation and active government litigation—provided a maximum of $3,075 per vehicle, reflecting an emissions violation premium of about 5% of the average vehicle purchase price. *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2019 WL 2554232, at *1 (N.D. Cal. May 3, 2019) ("*FCA EcoDiesel*") (final settlement approval); *FCA EcoDiesel*, Dkt. Nos. 327-4 at 15, 491-3 at 41. The recent Hino settlement for commercial trucks (which followed a similar, per capita distribution model to that here) ultimately yielded payments of $2,100 per vehicle—roughly 3% of the vehicles' average purchase price. *Express Freight Int'l v. Hino Motors Ltd.*, No. 22-cv-22483-DPG (S.D. Fl.); Class Counsel Decl. ¶ 21.

As these comparators go to show, the result here is an exceptional outcome for the compromise of contested claims brought without parallel government litigation and settled before surviving a motion to dismiss.

        a.      **The Settlement mitigates the risks, expenses, and delays the Settlement Class would bear with continued litigation.**

The Settlement resolves hotly contested claims. Given the inherent uncertainties of continued litigation and the inevitable delay that would accompany it, compromise in exchange for certain and timely provision of the benefits under the Settlement is an unquestionably reasonable outcome. *See Nobles v.*

---

[13] Federal Trade Commission Staff Report, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns (Sep. 2019), available at https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf. (FTC's comprehensive study of class actions, identifying the mean and median claims rates of 5% and 10%, respectively).

*MBNA Corp.*, 2009 WL 1854965 at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair."); *Kim v. Space Pencil, Inc.*, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant.").

This case, like those cited above, is not without risk. As noted, the pending motions to dismiss are not yet decided. While Plaintiffs are confident in the strength of their case and submit that the Complaint states valid, cognizable claims, they are also pragmatic and aware of the various, potentially-case dispositive defenses available to TICO. For example, one of the central arguments of Defendants' motions to dismiss is that the Clean Air Act preempts Plaintiffs' claims. Some courts, including this one, have credited these arguments in a number of contexts. *See Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 593 (6th Cir. 2024) (CAA impliedly preempts some bases for fraud-on-consumer emissions cheating claims); *Biederman v. FCA US LLC*, 765 F. Supp. 3d 920, 938-40 (N.D. Cal. 2025) (similar, as to narrow set of misrepresentations about emissions compliance); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1025 (N.D. Cal. 2018) (preemption applied to breach of warranty claims based on federal emissions control warranties). This argument was particularly strong here, Defendants argued, given the relative dearth of consumer-facing representations that would serve as a non-preempted source of Plaintiffs' claims. *See, e.g.*, Dkt. Nos. 41 at 6-9, 48 at 3-6. Defendants likewise claimed that Plaintiffs suffered no injury and lacked Article III standing—a contention arguably bolstered by the fact that, according to the Japanese Special Investigation Committee report, the most common forklift engine did not actually exceed regulatory emissions limits (at least in Japan). Dkt. No. 48 at 6-7.

Plaintiffs submit that Defendants' arguments were unlikely to prevail here for the many reasons articulated in Plaintiffs' opposition (*see* Dkt. No. 45), but the point is that Defendants' case-dispositive arguments posed real risk. On the other side of the motions to dismiss, moreover, Plaintiffs faced the challenge of obtaining litigation certification of a proposed class comprising more than a decades' worth of vehicles equipped with several different engine models, along with all of the other inherent summary judgment, *Daubert*, trial and appellate risks posed in complex litigation. And, of course, even if Plaintiffs

1   were able to clear every one of these hurdles, doing so would take years, during which Plaintiffs would

2   receive nothing at all.

3        Avoiding years of additional, costly, and uncertain litigation outcomes in exchange for the

4   immediate and significant Settlement cash and a robust Service Plan is a principled compromise that works

5   to the clear benefit of the Settlement Class.

6            **b.**    **Settlement Class members will obtain relief through a straightforward**

7                   **claims process.**

8        The Parties have made every effort to ensure that the claims process will be straightforward and

9   efficient. Settlement Class members need only submit a short claim form online or by mail, with a bulk

10  submission process available to ensure a streamlined submission of claims for Settlement Class members with

11  a high volume of Class Forklifts. Where further information is necessary, Settlement Class members may be

12  asked to submit basic documentation sufficient to show their ownership or lease of a Class Vehicle (*e.g.*,

13  purchase agreement or sale documentation). No further action is required. The steps required and safeguards

14  incorporated in this process are proportional to the compensation available, and necessary and appropriate to

15  preserve the integrity of the Claims Program.

16           **c.**    **Class Counsel will seek reasonable attorneys' fees and costs.**

17       Settlement Class Counsel will move for an award of reasonable attorneys' fees and reimbursement

18  of their litigation expenses from the Settlement fund for work performed and expenses incurred in

19  furtherance of this litigation. Fed. R. Civ. P. 23(e)(2)(C)(iii). Class Counsel anticipate seeking

20  reimbursement for up to $500,000 in litigation expenses, and $74,875,000 in fees, roughly 17% of the

21  Settlement's $436 million overall value (or, at worst, 19.5% using the most conservative Service Plan

22  value).[14] This is well below the presumptively reasonable "benchmark" of 25% and in-line with the median

23  percentages awarded in other "megafund" settlements. *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n*

24  *Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *2, 6-7 (N.D. Cal. Dec. 6, 2017) (citing

---

[14] For the purpose evaluating a fee percentage, both the monetary and reasonably quantifiable non-monetary value should be included. *See In re Zoom Video Commc'ns, Inc. Privacy Litig.*, 2022 WL 1593389, at *10 (N.D. Cal. Apr. 21, 2022) (Both "monetary and non-monetary benefits" contribute to settlement value for purpose of calculating fee percentage.); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) (When "accurately ascertained," the value of "injunctive relief" is included "as part of the value of a common fund for purpose of applying the percentage method of determining fees.").

Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorneys' Fees in Class Actions 2009-2013*, 92 N.Y.U. L. Rev. 937, 947 (2017) ("Eisenberg-Miller 2017") (Empirical analysis shows that "21% was the midpoint for fees where the recovery exceeded $100 million."); Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L., Stud. 811, 839 (2010) (empirical study revealing median fee percentage of 19.5% in settlements valued between $250 and $500 million). Class Counsel will continue the process of auditing time records before filing their fee request but anticipate a final lodestar of approximately $26 million, which will yield a multiplier under three.[15] The final fee application—which will include detailed declarations about the timekeepers, hours, and work performed on various kinds of litigation tasks—will be filed at least 35 days in advance of the Objection Deadline and posted on the Settlement Website, as required by the District's Procedural Guidance.

### 4.    Rule 23(e)(2)(D): The Settlement treats all Class members equitably relative to one another.

The proposed Settlement fairly and reasonably allocates cash benefits among Settlement Class members based on the nature and status of their relationship with a Settlement Class Forklift.

After deducting fees and costs, the Settlement Cash Value will be divided evenly among all Settlement Class Forklifts for which a valid claim is submitted. If more than one valid claim is submitted for the same Settlement Class Forklift, the original owner who purchased new will receive 60% of the allocated funds, and the remaining 40% will be distributed evenly to or among the other valid claimant(s). This weighting fairly reflects that the forklifts' value is highest when new, such that the economic damages incurred as a relative percentage of vehicle value are also highest for new purchasers. The 60/40 split also reflects the fact that new purchasers face relatively fewer legal hurdles and arguably have stronger claims for relief. *See, e.g.*, *In re Volkswagen*, 2022 WL 17730381, at *8 (concluding allocation formula was equitable where differing payment amounts "roughly correspond[ed] to the strength of [class members'] claims and the likelihood of damages at trial"); *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1093-94 (11th Cir. 2023) (affirming approval of allocation formula that considered the "comparative strengths of each class's . . . claims"). As such, the equitable allocation "compensates class members in a

---

[15] Finally, there are no agreements between the parties other than the Settlement. *See* Fed. R. Civ. P. 23(e)(3) ("The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.").

1   manner generally proportionate to the harm they suffered on account of [the] alleged misconduct."

2   *Altamirano v. Shaw Indus., Inc*., 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015).[16]

3       Apart from the cash payments, the benefits from the Service Plan, and the potential New Parts

4   Warranty, will flow to Settlement Class members who still possess their Class Forklifts, which is both fair

5   and necessary to distribute the vehicle-related relief. In sum, the Settlement allocates benefits using

6   transparent and objective criteria to apportion payments equitably and ensures that claims administration is

7   feasible, cost effective, and streamlined for Settlement Class members. *See* Fed. R. Civ. P. 23(e)(2)(D).

8           **5.      The Proposed Settlement merits approval under this District's Procedural
9                     Guidance.**

10      The relevant provisions of the Northern District's Procedural Guidance for Class Action

11  Settlements—all of which favor approval of the proposed Settlement—are addressed below in the order

12  presented on the website.

13              **a.      Preliminary Approval Guidance (1.1) and (1.2): There are no meaningful
14                         differences between the litigation and Settlement Classes, and the
                           released claims are consistent with those asserted in the Complaint.**

15      Where a litigation class has not been certified, the Guidance instructs the parties to explain

16  differences between the proposed class and claims in the operative complaint on one hand and the

17  settlement class and claims to be released on the other. *See* Procedural Guidance, Preliminary Approval (1)

18  and (2). Here, there are no major differences for either.

19      The proposed Settlement Class is essentially identical to the class in the Amended Complaint. Am.

20  Compl. ¶ 120. The only difference is that the Settlement Class closes the class period, with a backstop as of

21  the date of filing for Preliminary Approval. This minor refinement is appropriate to facilitate a principled

22  and equitable Settlement and reflects the fact that those who purchase or lease a Settlement Class Forklift

23  after the filing of this motion will do so with notice of the allegations resolved herein.

24      The claims at issue in the operative Amended Complaint and those released in the Settlement are

25  also substantially the same, if not identical. Finally, the claims released in the Settlement are limited to those

26

27  _____
    [16] *See also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 328 (3d Cir. 2011) (holding that "[c]ourts generally
28  consider plans of allocation that reimburse class members based on the type and extent of their injuries to be
    reasonable"); Joseph M. McLaughlin, McLaughlin on Class Actions § 6:23 (20th ed.) (same).

that relate to emissions, certification, the Clean Air Act, marketing representations identified in the Amended Complaint, and other enumerated categories related to the allegations in the Amended Complaint. SA ¶ 2.27. There is only one minor exception. In the Amended Complaint, Plaintiffs listed the 2007 1DZ engine in their definition of Class Engines and Class Vehicles based on their early investigation. Am. Compl. ¶ 119. After further investigation and discovery, Plaintiffs now understand the 2007 1DZ engine to be an older, mechanical diesel engine that did not contain the technology at issue in this case and was not part of the emissions testing regime applicable to the remainder of the engines at issue. The 2007 1DZ engine is therefore not included in the proposed Settlement Class or the Class Release.

> **b.      Preliminary Approval Guidance (1.3): The Settlement recovery compares favorably to Plaintiffs' potential trial damages.**

The Procedural Guidance instructs the parties to address the "class recovery under the settlement (including details about and the value of injunctive relief), the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount applied to the claims." *See* Procedural Guidance, Preliminary Approval (3).

To recap, the Settlement Class stands to receive $436 million in value, including the quantified value of the Service Plan, estimated to be $136.5 million. This recovery stacks up well to settlements of other similar emissions cases. Section V.B.3. It also compares favorably to Settlement Class members' potential damages estimates at trial. Although the parties had not progressed to the expert report stage in this case, in *FCA EcoDiesel*, the plaintiffs presented expert testimony on an overpayment "premium" theory that measured the benefit-of-the-bargain losses incurred when plaintiffs paid for over-polluting vehicles. *See FCA EcoDiesel*, Dkt. No. 327-4 (Decl. of Colin Weir) ¶¶ 47-51. The value was about $4,500 per vehicle, or about 9% of the vehicles' average sales price. *Id.*[17] Of course, "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)). But

---

[17] Experts in *FCA EcoDiesel* also proposed a separate survey-based conjoint study for damages calculations, and performed an illustrative survey to demonstrate that methodology at the class certification stage. Plaintiffs' experts' damages analysis here would also likely have involved a conjoint survey at a later stage, which would be tailored to the forklift sector, and the distinct facts of this case.

here, a projected recovery range of 5.5% to 11% of the average Settlement Class Forklift value comes close to and, by some measures, could even exceed damages available at trial. This is an exceptional result—particularly for a case resolving with a pending pleading challenge and without the benefit of complementary government litigation—and strongly supports approval.

### c.    Preliminary Approval Guidance (1.4): There are no other cases affected by the Settlement.

Consistent with Procedural Guidance (1.4), Class Counsel represent that there are no other cases that will be affected by the proposed Settlement. *See* Class Counsel Decl. ¶ 23.

### d.    Preliminary Approval Guidance (1.5): The Settlement contemplates a fair and straightforward allocation plan.

The Settlement allocation plan—including a pro-rata cash allocation for Settlement Class Forklifts with valid claims, and a split of 60% of the funds to the original purchaser and 40% to remaining claimants, if any—is detailed above in section V.B.4. The plan is fair and appropriate.

### e.    Preliminary Approval Guidance (1.6): A substantial number of Settlement Class members are expected to participate through a streamlined claims program.

The Settlement, the Notice Plan, and the Claims process are all designed to maximize Settlement Class member participation and to ensure maximal recovery in the hands of individual Settlement Class members. Settlement cash payments will be available through a simple claim form supported, only as needed, by commonplace documents to establish eligibility. The amount of compensation available to Settlement Class members, on the other hand, is considerable. Furthermore, Defendants are not incentivized to minimize participation because the non-reversionary $299.5 million Settlement Cash Value is fixed at the outset, irrespective of the claims rate.

Given all of the above, the Parties anticipate a high participation rate. As potential guideposts, Counsel point to: the "*Audi CO2*" settlement in the *Volkswagen "Clean Diesel"* MDL, the "*Porsche Gasoline*" settlement in the same MDL, and the *FCA EcoDiesel* settlement. The claims rates for each were approximately 20%, 38%, and 58.5%, respectively.[18] These are useful examples as emissions settlements

---

[18]Additional details on these cases are included in the chart prepared for Procedural Guidance (11), below. Counsel Decl., Attachment 2. In *FCA EcoDiesel*, the high claims rate was influenced by obligations and penalties—including an 85% participation target in a regulatory emissions recall—in a parallel regulatory settlement that complemented the consumer settlement terms and participation in the claims program.

previously negotiated by Class Counsel in this District. The Settlement now before the Court will employ a similar notice and outreach program, provides substantial compensation, and utilizes a simplified administration. Class Counsel can therefore confidently project that Settlement Class members will again show up in substantial numbers for this Settlement.

### f. Preliminary Approval Guidance (1.7): The Settlement is entirely non-reversionary.

As detailed above, if there are any funds remaining in the Settlement Cash Value after all timely and valid claims are paid, the funds will first be redistributed to Settlement Class member claimants (unless and until it is economically infeasible to do so). SA ¶ 4.6. Only then will remaining funds, if any, be directed toward *cy pres* efforts to be approved by the Court at a later date. *Id.*

### g. Preliminary Approval Guidance (2.1) and (2.2): The parties selected Verita from a competitive process and sought information on its data privacy practices.

The proposed Settlement Administrator, Verita, was selected through a competitive bidding process that involved four respected vendors. All of the proposals included a combination of direct notice, supplemented with online advertisement and publication notices. Verita is a well-known firm that has successfully administered numerous class settlements and judgments. *See* Cooper Decl. ¶¶ 2-3. Over the last two years, Plaintiffs' counsel have engaged Verita in two cases. Class Counsel Decl. ¶ 25.

Verita's procedures for securely handling class member data, and acceptance of responsibility (and insurance coverage) in case of errors, are detailed further in the declaration of Verita Vice President, Lana Cooper. In sum, Verita has developed a comprehensive cybersecurity framework aligned with benchmarks from the National Institute of Standards and Technology (NIST) that is reviewed annually and communicated to employees through a comprehensive training program. Cooper Decl. ¶¶ 5-14.

### h. Preliminary Approval Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Procedural Guidance.

Rule 23(e)(1) requires that before a proposed settlement may be approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert

those with adverse viewpoints to investigate and come forward and be heard.'" *Churchill Vill., L.L.C., v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). For a Rule 23(b)(3) settlement class, the Court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

As detailed further in the accompanying Cooper Declaration, the proposed Notice Plan meets these standards, comports with best-practices, and includes all relevant information as outlined in the Procedural Guidance. *See* Preliminary Approval Guidance (3). The Parties created the Notice program—including both the content and the distribution plan—with Verita, an experienced firm specializing in notice in complex class action litigation. The program includes a Long and Short Form Notice, various forms of publication and digital notice, and a comprehensive Settlement Website that are clear and complete. Throughout, the format and content of the Notice Plan reflects the advice and examples from the Impact Fund's Notice Project Initiative and the Procedural Guidance. *See* Cooper Decl. ¶¶ 21-23.[19]

The Long Form Notice is designed to explain Settlement Class members' rights and obligations under the Settlement "neutrally, simply, and understandably." *In re Hyundai*, 926 F.3d at 567. *See* Cooper Decl. ¶ 22 (describing Long Form Notice). It includes an overview of the litigation; an explanation of the Settlement benefits; contact information for Class Counsel; the address for a comprehensive Settlement Website that will house links to the notice, motions for approval, attorneys' fees, and other important documents; instructions on how to access the case docket and PACER; reminders to check the Settlement Website for updates on hearing dates and times; and detailed instructions on how to participate in, object to, or opt out of the Settlement. Cooper Decl. ¶ 22; *see also* Procedural Guidance (3)-(5).

The principal method of reaching Settlement Class members will be through direct, individual notice, consisting of postcard notices by U.S. first class mail for all Settlement Class members for whom a postal address is available and email notices where only email contact is available. Cooper Decl. ¶¶ 28, 31.

---

[19] The Notice Project is an Impact Fund initiative to improve access to justice in class action lawsuits by helping class action litigators create class action notices that are easier for class members to understand. *See* https://www.impactfund.org/notice-project.

The email notice conveys the structure of the Settlement and is designed to capture Settlement Class members' attention with concise, plain language. The email notice program was designed specifically to avoid "red flags" that can trigger spam filters, for example using body text and hyperlinks to avoid sending attachments. *Id.* ¶¶ 32-34. The mailed notice is similarly structured and provides basic information about the Settlement and Settlement Class members' rights thereunder. Both forms of Short Form Notice (email and mail) direct readers to the Settlement Website, where the Long Form Notice is available (along with FAQs), for more information.

Finally, the notice program will include a robust paid-media campaign including digital banner advertisements, advertisements in relevant industry publications, a toll-free telephone number, and a Settlement Website. *Id.* ¶¶ 36-41. Based on their considerable experience, Verita anticipates that the direct notice effort alone "will reach the vast majority of Settlement Class members," and the Notice Plan in its entirety is expected to reach "significantly higher" than 70% of the Class. *Id.* ¶ 43.

This Notice Plan satisfies Due Process and Rule 23, and comports with all accepted standards and this District's Procedural Guidance.

### i.    Preliminary Approval Guidance (6): Plaintiffs will seek reasonable attorneys' fees and expenses consistent with precedent.

Consistent with Procedural Guidance (6), Class Counsel have included information about their anticipated request for fees and costs, their lodestar calculation and plan to submit further detailed information to support it, and the value of the Settlement's non-monetary terms. *See* §§ III.D; V.B.3.c.

### j.    Preliminary Approval Guidance (7): Plaintiffs will seek modest incentive awards for the Settlement Class Representatives.

The Settlement Class Representatives will be entitled to the same compensation, calculated under the same formula, as all other Settlement Class members. In addition, Class Counsel intend to seek Court approval for modest service awards of up to $2,500 each ($50,000 total) to compensate the Settlement Class Representatives for their time and efforts in prosecuting claims on behalf of the Class. *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *11 (N.D. Cal. Aug. 3, 2016) (recognizing that service awards up to $5,000 are "presumptively reasonable" in this Circuit). This includes their work in the case investigation, reviewing and approving the pleadings, evaluating and approving the settlement terms,

and, in defensive discovery, collecting and producing thousands of pages of documents and 168 responses to Interrogatories. Requested funds not allocated to incentive awards will be distributed to the Class.

              **k.**     **Preliminary Approval Guidance (8): Plaintiffs will propose *cy pres* awardees for the Court's consideration if a *cy pres* distribution becomes necessary.**

As detailed above, after all timely and valid claims are paid, the Settlement anticipates a redistribution of any funds remaining to Settlement Class members unless and until it is economically infeasible to do so. In the event that a small balance remains thereafter, Plaintiffs will propose potential *cy pres* recipients that are consistent with "(1) the objectives of the underlying statute(s) and (2) the interests of the silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011). The *cy pres* recipients (if any) will then be announced on the Settlement Website—as explained in the Long Form Notice. This ensures that all parties are properly motivated to compensate as many Class members as possible and that all the Settlement funds will benefit the Class. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 672820, at *3 (N.D. Cal. Feb. 16, 2017) (granting preliminary approval of Bosch "Clean Diesel" settlement, including provision that remaining funds not distributed to the class would be "distributed through *cy pres* payments according to a distribution plan and schedule filed by Class Counsel and approved by the Court").

              **l.**     **Preliminary Approval Guidance (9): The Parties have proposed a reasonable schedule for the Settlement Approval Process that provides Settlement Class members sufficient time to exercise their rights.**

The last step in the settlement approval process is the fairness hearing, at which the Court may hear any evidence and argument necessary to evaluate the Settlement and the application for attorneys' fees and costs. The Parties propose a detailed schedule for final approval and implementation in the attached Proposed Order and incorporate it by reference herein. This includes a minimum period of 35 days to opt out or object to the settlement and the motion for attorney's fees and costs.

              **m.**     **Preliminary Approval Guidance (10): The Settlement complies with the Class Action Fairness Act ("CAFA").**

Pursuant to the Settlement Agreement, Defendants will serve notices in accordance with the requirements of 28 U.S.C. § 1715(b) within ten days of the filing of this motion. SA § 9.2. The Settlement

fully complies with all of CAFA's substantive requirements because it does not provide for a recovery of coupons (28 U.S.C. § 1712), does not result in a net loss to any Settlement Class member (28 U.S.C. § 1713), and does not provide for payment of greater sums to some Settlement Class members solely on the basis of geographic proximity to the Court (28 U.S.C. § 1714).

### n. Preliminary Approval Guidance (11): Information about past distributions in comparable class settlements.

Pursuant to the Guidance, Plaintiffs provide an "easy-to-read" chart detailing certain information about comparable settlements in the attached declaration from Class Counsel. Class Counsel Decl., Attachment 2. Included in the chart are three emissions settlements that were previously negotiated by Class Counsel in this District—the *Audi CO2* and *Porsche Gasoline* settlements in the *Volkswagen "Clean Diesel"* MDL, and the settlement in *FCA EcoDiesel*. As the chart shows, those settlements have delivered hundreds of millions of dollars in value to the classes, Class Counsel Decl., Attachment 2, and Class Counsel expect this Settlement to achieve a similarly successful outcome.

## VI.   Conclusion

Plaintiffs respectfully request that the Court: (1) determine under Rule 23(e)(1) that it is likely to approve the Settlement and certify the Settlement Class; (2) direct notice to the Settlement Class through the proposed notice program; (3) appoint Plaintiffs' counsel as Settlement Class Counsel under Rule 23(g) to conduct the necessary steps in the Settlement approval process; and (4) schedule the final approval hearing under Rule 23(e)(2).

Date: January 20, 2026

Respectfully submitted,

By:  */s/  Kevin Budner*
Elizabeth J. Cabraser (SBN 083151)
Kevin Budner (SBN 287271)
Phong-Chau G. Nguyen (SBN 286789)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
kbudner@lchb.com
pgnguyen@lchb.com

David Stellings (*pro hac vice*)
Katherine McBride (*pro hac vice*)
Miranda Litwak (*pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
dstellings@lchb.com
kmcbride@lchb.com
mlitwak@lchb.com

Roland Tellis (SBN 186269)
David Fernandes (SBN 280944)
Adam Tamburelli (SBN 301902)
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
rtellis@baronbudd.com
dfernandes@baronbudd.com
atamburelli@baronbudd.com

*Counsel for Plaintiffs*