UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROADMOOR LUMBER & PLYWOOD CO., et al., <br><br> Plaintiffs, <br><br> v. <br><br> TOYOTA INDUSTRIES CORPORATION, et al., <br><br> Defendants. | Case No.  3:24-cv-06640-JSC <br><br> **ORDER RE: MOTION FOR FINAL APPROVAL AND FOR AWARD OF ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS** <br><br> Re: Dkt. No. 97 |

Plaintiffs filed this putative class action alleging Defendants Toyota Industries Corporation, Toyota Material Handling, Inc., and Toyota Material Handling, N.A. engaged in a pattern of misconduct in the design, development, and testing of gasoline and diesel-powered forklifts and their engines. The Court previously granted preliminary approval of the parties' class action settlement.  (Dkt. No. 92.[1])  Plaintiffs' motion for final approval and motion for attorneys' fees, costs, and service awards for the class representative is now pending before the Court. (Dkt. No. 97.) Having reviewed the briefing and having had the benefit of oral argument on July 10, 2026, the Court GRANTS final approval of the settlement, and GRANTS the motion for attorneys' fees, costs, and service awards.

**BACKGROUND**

The Court assumes the parties' familiarity with the procedural history of this action and incorporates Plaintiffs' discussion of it by reference. (Dkt. No. 84 at 9-12.)

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

**THE SETTLEMENT AGREEMENT**

### A.    The Settlement Class

The Agreement defines the Settlement Class as: "All persons or entities that purchased a Settlement Class Vehicle, or leased a Settlement Class Vehicle, through the date of filing of the Motion for Preliminary Approval." (Dkt. No. 84-1, Settlement Agreement at ¶ 2.40.)

### B.    Payment Terms

Under the Settlement Agreement, Defendant will pay $299.5 million ("Settlement Cash Value"). (*Id*. at ¶ 2.35.)  From this amount, Plaintiffs will seek the following distributions:

1) Attorneys' fees of up to 25 percent ($74,875,000) of the Settlement Cash Value (Dkt. No. 84-1 at ¶ 31);

2) Litigation Expenses of up to $500,000 (*Id*.);

3) Service awards of $2,500 for each of the proposed Settlement Class Representatives (for a total of $50,000) (*Id.*); and

4) Settlement administration costs of no more than $895,000 (Dkt. No. 84-3 at ¶ 44).

The remaining Net Settlement Amount will be divided between Settlement Class Members on a per-capita basis. (Dkt. No. 84-1 at ¶¶ 2.34, 2.35, 4.1.)  If more than one Settlement Class Member submits a valid claim for the same forklift, the original owner will receive 60 percent of the funds for that forklift, and the remaining 40 percent will be distributed evenly among the other valid claimants. (*Id*. at ¶ 4.1.)

### C.    Injunctive Relief

In addition to the monetary settlement, the Settlement Agreement includes injunctive relief. In particular, all Settlement Class Forklifts in operation will be eligible for a free Service Plan visit, which includes a manufacturer-recommended inspection and, where appropriate, basic services for all major systems of the Settlement Class Forklifts, as well as a free oil change or a transmission fluid change, at the discretion of the Settlement Class member. (Dkt. No. 84-1 at 50, Settlement Agreement, Ex. B.) The estimated value of the Service Plan is between $83,725,600 to $189,306,400. (Dkt. No. 84-2 at ¶ 4.) Further, if the government requires or recommends an emissions recall for the Settlement Class Vehicles anytime in the next three years, the Settlement

2

United States District Court
Northern District of California

requires Defendants to provide impacted Settlement Class Members a New Parts Warranty with additional coverage for parts affected by that recall. (Dkt. No. 84-1 at ¶ 4.3.)

### D.    Scope of Release

Settlement Class Members who do not opt-out will release Defendants from any and all claims that:

1) arise out of or in any way relate to the purchase, lease, use, service, repair, or maintenance of any of the Settlement Class Vehicles, and also

2) relate in any way to
   a. certification testing, emissions, or related impacts on output, horsepower, and performance;
   b. any of the alleged violations of the Clean Air Act, federal regulations, or state laws or regulations cited in the Complaint in this Action;
   c. any of the marketing representations identified in the Complaint filed in this Action, including but not limited to the failure to disclose any information about certification testing, emissions, or related impacts on output, horsepower, and performance;
   d. any acts or omissions that were raised or could have been raised within the scope of the facts asserted in the Complaint filed in the Action;
   e. or any event, matter, dispute, or thing that in whole or in part, directly or indirectly, relates to or arises out of said events specified in (a), (b), (c), or (d) of this paragraph.

(*Id*. at ¶ 2.27.) The Settlement Class Representatives also expressly release all claims on behalf of themselves and the Settlement Class under California Civil Code Section 1542. (*Id.* at ¶ 11.5.)

### E.    Notice

Plaintiffs selected Verita as the Settlement Administrator. Following preliminary approval, Verita identified 92,187 unique Settlement Class members and provided notice to the "vast majority" though direct mail and/or email. (Dkt. No. 97-2 at ¶¶ 8-16.)  Verita also provided targeted digital and print publication notice in trade publications and on social media platforms, and on the settlement website, www.ForkliftSettlement.com. (*Id*. at ¶¶ 18-22.)

### F.    Opt-Outs and Objections

The deadline to object or opt-out of the settlement was June 1, 2026. The only class member who initially indicated they intended to opt-out of the settlement has since decided to participate and submitted a claim. (Dkt. No 99-1 at ¶ 16.) No objections were received. (*Id.* at ¶

3

17.)

**DISCUSSION**

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

**I.    CLASS CERTIFICATION**

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on February 26, 2026, this Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the Order granting preliminary approval. (Dkt. No. 92 at 4-7.)

**II.    ADEQUACY OF NOTICE**

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice includes "[n]otice of the motion [for attorneys' fees which] must be served on all parties

4

United States District Court
Northern District of California

and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds the notice plan previously approved by the Court, as implemented by the Settlement Administrator Verita, complied with Rule 23(c)(2)(B). First, Verita provided notice in several different ways: 1) direct notice via mail and/or email, to the extent practicable; (2) supplemental digital notice through the industry-related news platform ForkliftAction.com and social media platforms; (3) publication notice in leading trade publications; (4) a targeted internet campaign to those who expressed interest in forklifts, warehouse logistics, and heavy machinery; (5) a press release; (6) a Settlement Website, www.ForkliftSettlement.com; and (7) a settlement toll-free phone number, post office box, and email address. (Dkt. No. 97-2 at ¶¶ 10-23; Dkt. No. 99-1 at ¶¶ 4-13.)  Verita's supplemental declaration indicates it identified an additional 509 Settlement Class Members after it initially provided notice and all of these additional Settlement Class Members (Toyota -authorized dealerships) were provided mail notice on May 7, 2026. (Dkt. No. 99-1 at ¶ 4.)  Of the 195,889 notices sent (via mail and email), 22,163 were returned as undeliverable covering approximately 8,775 unique Settlement Class Members. (*Id*. at ¶ 8.)  Vertia attests this notice rate is "consistent with direct notice delivery rates for large nationwide settlements." (*Id*.)

Second, the notice clearly and concisely provided an overview of the lawsuit, Settlement Class Member options under the settlement, the process for requesting exclusion or objecting to all or part of the settlement, provided contact information for Class Counsel and Verita, and directed class members to a website, email, and toll-free number for additional information. (Dkt. No. 95-1; Exs. A, B, C.) The settlement website provided a long-form notice and allowed Settlement Class Members who verified their identity to view their estimated damages estimates. (*Id*. at Ex. D.)

Finally, between March 19, 2026, the mail notice date, and June 1, 2026, the Settlement Administrator received only one requests for exclusion, and no objection. (Dkt. No. 99-1 at ¶¶ 16-17.)  Further, the one request for an exclusion subsequently decided to withdraw their objection and submit a claim.  (*Id.* at ¶ 16.)

Given the above, the Court concludes the parties have sufficiently provided the best practicable notice to class members.

## III.    FINAL APPROVAL

To grant final approval, the Court must find the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674 (9th Cir. 2025). In making this determination, courts generally must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products*

6

United States District Court
Northern District of California

*Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification.)

### A.    The Fairness Factors

#### 1.    The Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). The Court need not reach an ultimate conclusion about the merits of the dispute to resolve this factor "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id*.

Plaintiffs' investigation of their claims began in 2023 and this action was filed a year later. (Dkt. No. 97-1, Stellings Decl. at ¶¶ 4-6.)  Unlike other actions alleging emissions misconduct, this action did not follow a regulatory investigation by California or U.S. regulators, so the "Plaintiffs devoted themselves to an extensive pre-filing investigation and expert workup to assess the nature of TICO's misconduct and the potential links to the U.S. market." (*Id*. at ¶ 5.)  After the action was filed, the parties engaged in motion practice with Defendants filing motions to dismiss raises Article III standing, Clean Air Act preemption, and personal jurisdiction issues. (*Id*. at ¶ 8.) The parties' also exchanged extensive discovery and Defendants produced nearly 1.5 million pages of relevant documents. (*Id*. at ¶¶ 9-13.)

Although Plaintiffs believe they have a strong case, they recognize the expense, risk, and

length of continued proceedings necessary to prosecute the action through trial and potential appeal. Given these risks, the certainty of class member recovery under the settlement weighs in favor of granting final approval.

### 2.    Settlement Amount

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The Court previously concluded the amount of the settlement, at least $436 million, was within the range of approval. (Dkt. No. 92 at 9-10.)  This amount is composed of a $299.5 million cash fund to compensate Settlement Class members for alleged overpayment of the Settlement Class Forklifts affected by the Defendants' alleged emissions and testing misconduct, plus a Service Plan valued at between $83,725,600 and $189,306,400 with a mid-point valuation of $136.5 million. (*Id.*; Dkt. No. 84-2 at ¶ 4.)

Based on current claims rate predictions, Settlement Class Members will receive between 5.5% and 11% of the Class Forklifts' average sales price in damages.  (Dkt. No. 97-1, Stellings Decl. at ¶ 20.)  Class Counsel attests this "recovery is comparable to or exceeds other emissions cheating settlements, some of which resolved claims later in their respective case lifecycles and with the benefit of simultaneous government litigation." (*Id.* at ¶ 21 (collecting cases).)  The Settlement Agreement also includes significant injunctive relief through a comprehensive service plan, as discussed above.  Further, if the government requires or recommends an emissions recall for the Settlement Class Vehicles anytime in the next three years, the Settlement requires Defendants to provide impacted Settlement Class Members a New Parts Warranty with additional coverage for parts affected by that recall. (Dkt. No. 84-1 at ¶ 4.3.)

In sum, the settlement relief—damages and injunctive relief—weigh strongly in favor of final approval.

### 3.    Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). In the two and a half years Settlement Class Counsel have been working on the case they

> conducted a thorough pre-filing investigation, worked up experts, obtained and analyzed nearly 1.5 million pages of critical documents (the majority of which were in Japanese), interviewed Defendants' witnesses, inspected their relevant facilities in Japan, briefed two serious motions to dismiss, and engaged in a robust and ultimately successful mediation.

(Dkt. No. 97 at 12 (discussing Dkt. No. 97-1, Stellings Decl. at ¶¶ 3-17).

The Court thus concludes this factor likewise weighs in favor of final approval.

### 4.    Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Class Counsel has extensive experience in vehicle emissions litigation and strongly support approval of the settlement given the risks and challenges involved. (Dkt. No. 97-1, Stellings Decl. at ¶¶ 11, 23.)

### 5.    Presence of a Government Participant

No government entity is a party to this action. This factor is therefore neutral.

### 6.    Reaction of Class Members

As previously discussed, the Settlement Administrator provided notice through a press release, digital marketing campaign, and direct email/mail. The Settlement Administrator estimates the notice reached "the vast majority of class members" and the reaction has been overwhelmingly positive. (Dkt. No. 99-1 at ¶ 11.) As of July 7, 2026, the Settlement Administrator has received 32,915 individual claim forms and 476 bulk-submission claim forms which represents a claims rate of approximately 24 percent. (Dkt. No. 104-1, Silva Decl. at ¶ 4.)

No objections have been received, and while one class member initially indicated they wanted to opt-out, they have since submitted a claim form. "[T]he absence of a large number of

9

objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Churchill Vill.*, 361 F.3d at 577 (holding approval of a settlement that received 45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 class members was proper).

\*\*\*

In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval of the class action settlement.

### B.    The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig*., 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the class payout to class counsel's fees claim. *See In re California Pizza Kitchen Data Breach Litig*., 129 F.4th 667, 675 (9th Cir. 2025) ("class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion.") Counsel seeks $74,875,000 in attorneys' fees. (Dkt. No. 97-1 at ¶ 24.)  According to Class Counsel, this amount is between 15.32 percent to

10

19.54 percent of the "full settlement value." (*Id.* at ¶ 25.)  The full settlement value refers to the $299.5 million cash value plus the additional relief Settlement Class Members will receive through the service plan.  Class Counsel proposes using a "mid-point" valuation of the service plan as "the most accurate reflection of the real value secured for the Settlement Class" and thus characterizes the $74,875,000 in fees  as 17.17 percent of the total Settlement Value ($299.5 million plus $136,516,000 valuation for the service plan).  This amount is not disproportionate to the class member recovery. Further, even if the service plan was not included in the settlement valuation, the fee request would be 25 percent of the settlement value which is within the range of reasonableness.  *See Bluetooth*, 654 F.3d at 942 ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award.").

The second warning sign—a "clear sailing" provision—is not present. *See Bluetooth*, 654 F.3d at 940, n.6 ("a 'clear sailing agreement,' wherein the defendant agrees not to oppose a petition for a fee award up to a specified maximum value.").  Defendants did not agree they would not oppose the fees request, although they have not done so.  (Dkt. No. 84-1, Settlement Agreement at § 14.2 ("Defendants reserve the right to oppose Settlement Class Counsel's motion.").)

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is also not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the class members. (*Id*. at § 4.6.)

The Court thus concludes the Settlement Agreement did not result from, nor was it influenced by, collusion.  Instead, the Settlement Agreement adequately satisfies the Settlement Class Members' claims.

* * *

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. For each of these reasons, the Settlement Agreement passes

11

United States District Court
Northern District of California

muster under Rule 23(e) and final approval is appropriate.

## IV.   MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARD

### A.   Attorneys' Fees

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)). The Ninth Circuit has approved two methods of determining attorney's fees in cases where the amount of the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id.*  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

### 1.   Percentage-of-Recovery Method

The Ninth Circuit uses a 25 percent of the fund "benchmark" for awarding fees.  *Bluetooth*, 654 F.3d at 942. "An adjustment, either up or down, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." *Reyes v. Experian Information Services, Inc.*, 856 Fed. App'x. 108, 110 (9th Cir. 2021) (cleaned up).  Class Counsel seek a total fee award of $74,875,000, which they contend is 17.17 percent of the total settlement value—defined as the $299,000,000 cash damages plus $136,516,000 (the mid-point valuation of the service plan).  But, even if the Court were to exclude the value Plaintiffs ascribe to the service plan, the $74,875,000 million in fees sought is 25 percent of the actual case value of settlement and thus within the range of reasonableness.  (Dkt. No. 97 at 27, n.8.)   This amount is also supported by the lodestar cross-check as discussed below.

12

United States District Court
Northern District of California

## 2.    Lodestar Method

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987).

Class counsel calculates their lodestar as $25,447,833.50 based on 42,269.80 hours of work.  (Dkt. No. 97-1 at ¶ 28.).

### a.    Reasonable Hourly Rate

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

In support of the motion for attorneys' fees, Class Counsel submitted a declaration from co-lead counsel David Stellings which provides a detailed explanation of the fees incurred and the hourly rate calculations.  (Dkt. No. 97-1.)   Class Counsel's declaration attests their hourly rates are in keeping with attorneys of similar skill and experience in the Bay Area, have previously been approved by other district courts, and provides a list of examples.  (*Id*. at ¶¶ 74-75, 78.) Among the participating law firms, the blended average hourly rate for partners and associates is $602. (*Id*. at

13

¶¶ 32-33.)  This is within the range of reasonableness for blended hourly rates approved in this district.  *See, e.g, In re Telescopes Antitrust Litig.*, No. 5:20-CV-03639-EJD, 2025 WL 1093248, at *11 (N.D. Cal. Apr. 11, 2025) (approving hourly blended rate of $709); *Perez v. Rash Curtis & Assocs.*, No. 4:16-CV-03396-YGR, 2020 WL 1904533, at *20 (N.D. Cal. Apr. 17, 2020) ("Courts in this district would generally find that the blended rate of $634.48 is within the reasonable range of rate" and collecting cases).

### b.      Reasonable Hours Expended

Class Counsel's declaration also provides a detailed description of the hours spent on this litigation, which are broken down into six categories: (1) case leadership and strategy; (2) discovery, depositions, and experts; (3) document review and analysis; (4) client and class communications; (5) research, briefing, and court; and (6) settlement.  (Dkt. No. 97-1 at ¶¶ 32-67.)  The vast majority—30,742—of these hours fall in the third category for document review and analysis which "reflects the substantial effort devoted to the analysis, coding, and synthesis of documents and materials produced in discovery." (*Id.* at ¶ 48.)  The Japanese-English translation issues made this particularly time intensive.  (*Id.* at ¶¶ 49-51.)  Class Counsel attached detailed charts to his declaration further describing the amount of time spent by each biller on the different categories of work.  (Dkt. No. 97-1 at 37-47; 55-64.)  Upon review, the 42,269.80 reported hours spent litigating this case, while high, are not plainly unreasonable.

### c.      Multiplier

Based on the current lodestar calculations, Class Counsel seeks a lodestar multiplier of 2.94.  (Dkt. No. 97-1 at ¶ 28.)  However, Class Counsel estimate they will incur approximately 1,200 additional hours to "finalize, protect, and implement the Settlement," which would bring "the total lodestar to $26,605,389.50 [with] a multiplier of 2.81." (*Id.* at ¶ 29.)

In the Ninth Circuit, a multiplier of 1.0-4.0 is within the range of multipliers applied in common fund cases. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (approving a 3.65 multiplier).  In evaluating whether a lodestar multiplier is appropriate, district courts in the Ninth Circuit analyze a number of factors, including, but not limited to: (i) the quality of the representation; (ii) the benefit obtained for the class; (iii) the complexity and novelty of the

14

issues presented; and (iv) the risk of nonpayment. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *see also Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). "Foremost among these considerations, however, is the benefit obtained for the class." *Perez v. Rash Curtis & Assocs.*, No. 4:16-CV-03396-YGR, 2020 WL 1904533, at \*21 (N.D. Cal. Apr. 17, 2020). Taking into account each of the factors, and in particular, the benefit to the class of the $299.5 million cash settlement, the Court concludes multiplier of 2.94 is reasonable.

\* \* \*

In sum, both the percentage-of-recovery and the lodestar analyses, as well as the excellent settlement result, support the requested fee award of $74,875,000.

### B.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (cleaned up). Plaintiffs request "$280,456.71 in litigation expenses, including $20,000 that Class Counsel are reasonably reserving to cover anticipated future costs with Settlement administration and defense efforts." (Dkt. No. 97-1 at ¶ 83.) While significant, this request is supported by a detailed explanation in Class Counsel's declaration which explains the costs are "necessary and appropriate given the international (and national) scale of this case, and of the litigation team that advanced it." (*Id.* at ¶¶ 83-98.) Class Counsel's declaration demonstrates both the reasonableness of the claimed costs and that these types of costs are generally recoverable in similar cases. Accordingly, the Court awards $280,456.71 in litigation costs.

### C.    Service Awards

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class

United States District Court
Northern District of California

representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc*., 715 F.3d 1157, 1164 (9th Cir. 2013).

> In determining whether an incentive award is reasonable, courts generally consider:
>
> (1) the risk to the class representative in commencing a suit, both financial and otherwise;
>
> (2) the notoriety and personal difficulties encountered by the class representative;
>
> (3) the amount of time and effort spent by the class representative;
>
> (4) the duration of the litigation; and
>
> (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Further, district courts must evaluate each incentive award individually. *See Staton*, 327 F.3d at 977.

Class Counsel request service awards of $2,500 per Class Representative (a total of $50,000) in recognition of the time, burdens, and risks undertaken in filing this lawsuit in their names. (Dkt. No. 97-1 at ¶ 102.) Class Counsel attests the class members were active participates and worked closely with counsel on "defensive discovery to search for and produce thousands of

16

pages of documents and ESI responsive to TICO's 144 document requests, and to gather information and prepare detailed initial disclosures and then responses to TICO's 168 interrogatories." (*Id*. at ¶ 100.)  Further, they worked closely with counsel to monitor the litigation and used their expertise as forklift owners and operators to inform the settlement negotiations.  (*Id*. at ¶ 101.)  Under these circumstances, the Court concludes a service award of $2,500 for each Class Representative is reasonable and does not "undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc*., 715 F.3d 1157, 1163 (9th Cir. 2013).

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of the parties' class action settlement. In addition, the Court GRANTS Plaintiffs' motion for attorneys' fees and costs; specifically, the Court awards the following: $74,875,000 in attorney's fees; $280,456.71 in litigation costs; and $50,000 ($2,500 each) in incentive awards for the Class Representatives.

The parties shall provide updates regarding the claims administration every 30 days up through the September 22, 2026 claims deadline.  In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id*. To the extent the parties agree to a different

United States District Court
Northern District of California

schedule including a staged process for a motion to approve distribution as discussed at the final approval hearing, they shall file a stipulation with these dates.

The parties shall file a proposed judgment on or before July 24, 2026.

This Order disposes of Docket No. 97.

**IT IS SO ORDERED.**

Dated: July 10, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

18